**BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
JOHN P. COFFEY (JC-3832)
220 St. Paul Street
Westfield, NJ  07909
Tel:    (908) 928-1700
Fax:    (908) 301-9008
sean@blbglaw.com
        -and-
**BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
BLAIR A. NICHOLAS
MATTHEW P. SIBEN
DAVID A. THORPE
JON F. WORM
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
blairn@blbglaw.com
matthews@blbglaw.com
davidt@blbglaw.com
jonw@blbglaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TEACHER RETIREMENT SYSTEM OF TEXAS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> TYCO INTERNATIONAL LTD.; TYCO ELECTRONICS LTD.; COVIDIAN LTD.; COVIDIAN (U.S.); L. DENNIS KOZLOWSKI; MARK H. SWARTZ; AND FRANK E. WALSH, JR., <br><br> Defendants. | Civil Action No. <br><br><br> **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND NEW JERSEY'S RICO STATUTE** <br><br><br> **JURY DEMANDED** |

## TABLE OF CONTENTS

Page

I.    ALLEGATIONS PURSUANT TO LOCAL CIVIL RULE 10.1 ......................................1

II.   INTRODUCTION .............................................................................................2

III.  JURISDICTION AND VENUE ...........................................................................5

IV.   THE PARTIES.................................................................................................6

      A.    Plaintiffs ...........................................................................................6

      B.    Defendants ......................................................................................10

V.    OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEME....................................12

      A.    The Acquisitions Scheme ................................................................13

            1.    Defendants Manipulated Tyco's Reported Financial Results
                  Upward By Causing Acquired Companies To Falsify Their Results
                  Downward ...............................................................................13

            2.    Defendants Manipulated Tyco's Financial  Statements By
                  Improperly Recording Massive Goodwill And Creating Secret
                  Reserves To Boost Earnings ......................................................18

            3.    Tyco Manipulated Its Financial Statements By Refusing To
                  Writedown Overvalued Goodwill................................................21

            4.    Defendants Concealed The Full Extent Of Tyco's Acquisitions..............22

            5.    Defendants Concealed The  Acquisitions Scheme From An SEC
                  Inquiry....................................................................................22

      B.    The ADT Scheme ............................................................................23

      C.    Cash Flow Manipulation..................................................................24

      D.    The TyCom Fraud...........................................................................25

      E.    Defendants' Looting Of The Company And Related Accounting
            Manipulations Concealing Their Conduct...........................................26

            1.    The Secret Walsh "Finder's Fee" ...............................................27

            2.    The Relocation Programs...........................................................29

3.      Tyco's Key Employee Loans Program ..................................................30

4.      Secret, Unapproved Bonuses .............................................................32

5.      Miscellaneous Improper Theft Of Corporate Assets .............................36

6.      Illicit Insider Sales .........................................................................37

F.      Defendants' Scheme To Conceal Tyco's True Creditworthiness And
        Impending Liquidity Crisis ..........................................................................38

VI.     ADDITIONAL PARTICULARIZED DETAILS OF THE FRAUD ..............................41

A.      Tyco Brings Suit Against Certain Individual Defendants .....................................41

        1.      Tyco's Lawsuit Against Kozlowski ..................................................41

        2.      Tyco's Lawsuit Against Swartz .......................................................43

        3.      Tyco's Lawsuit Against Walsh .........................................................45

B.      The 6/12/02 And 12/31/02 Restatements .......................................................45

C.      The Flawed Boies Firm Report ...................................................................48

D.      The 7/29/03 Restatement ........................................................................57

E.      The Criminal Proceedings ........................................................................61

        1.      The Criminal Case Against Kozlowski And Swartz ...............................61

        2.      The Criminal Case Against Walsh ....................................................64

F.      The SEC's Findings ...............................................................................66

        1.      The September 11, 2002 Complaint ..................................................66

        2.      The December 17, 2002 Complaint ...................................................67

        3.      The April 17, 2006 Complaint .........................................................69

        4.      The December 20, 2006 Complaint ...................................................70

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...................................71

A.      1999 Materially False And Misleading Statements And Omissions ......................71

        1.      The 1999 10-K Filed On 12/13/99 ....................................................72

                a.      Tyco's "Strategy" ...............................................................72

    b.  Tyco's Purchase Accounting Reserves ..........................................73

    c.  Tyco's Operating Results ...............................................................74

    d.  Management Remuneration ............................................................76

  2.  The 1999 10-K/A Filed On 1/28/00 ........................................................76

B.  2000 Materially False And Misleading Statements And Omissions ....................77

  1.  1/17/00 1Q 2000 Earnings Announcement ..............................................77

  2.  1/18/00 Conference Call ..........................................................................78

  3.  2/11/00 10-Q For Quarter Ended 12/31/99 ..............................................79

    a.  Tyco's Operating Results ...............................................................79

    b.  Tyco's Charges and Reserves ........................................................80

  4.  2/15/00 Article In *The Wall Street Journal* ............................................81

  5.  3/1/00 Proxy Statement For 2000 Annual Meeting .................................82

    a.  Management Remuneration ............................................................82

    b.  Key Employee Loan Program ........................................................84

    c.  The SEC Investigation ..................................................................85

  6.  1999 Annual Report To Shareholders .......................................................86

  7.  4/18/00 Earnings Announcement ..............................................................89

  8.  4/18/00 Conference Call ..........................................................................90

  9.  5/7/00 Announcement Of Thomas & Betts Acquisition ...........................91

  10.  5/15/00 10-Q For Quarter Ended 3/31/00 ................................................92

    a.  Tyco's Operating Results ...............................................................92

    b.  Tyco's Charges And Reserves .......................................................93

  11.  6/26/00 10-Q/A Filed For Quarter Ended 12/31/99 .................................93

    a.  Tyco's Operating Results ...............................................................95

    b.  Tyco's Charges And Reserves .......................................................96

12.     The 1999 10-K/A Filed On 6/26/00 ................................................97

13.     6/26/00 10-Q/A Filed For Quarter Ended 3/31/00 ...........................98

        a.      Tyco's Operating Results ..............................................99

14.     The Mallinckrodt Acquisition ...................................................100

15.     6/28/00 Conference Call ..........................................................101

16.     7/12/00 S-4 (And Related Offering Documents  For The Exchange
        Of Tyco Shares For Mallinckrodt Shares) ...............................102

17.     7/13/00 Press Release ..............................................................104

18.     7/19/00 Earnings Announcement ..............................................105

19.     7/19/00 Conference Call ..........................................................106

20.     7/26/00 TyCom Offering Documents ........................................106

21.     8/14/00 10-Q For Quarter Ended 6/30/00 .................................107

        a.      Tyco's Operating Results ............................................107

        b.      Tyco's Charges and Reserves ......................................108

22.     The Mallinckrodt Acquisition Closing ......................................109

23.     10/24/00 Earnings Announcement ............................................110

24.     10/24/00 Conference Call .........................................................111

25.     11/13/00 Lucent Acquisition .....................................................113

26.     11/14/00 Conference Call .........................................................114

27.     12/4/00 Simplex Acquisition ....................................................115

28.     The 2000 10-K Filed On 12/21/00 .............................................115

        a.      Tyco's "Strategy" .......................................................116

        b.      Tyco's Manipulation Of Purchase Accounting Reserves ...........116

        c.      Tyco's Operating Results ............................................117

        d.      Management Remuneration And Related Transactions .............118

29.     12/29/00 Lucent Acquisition Closes ..........................................118

C.    2001 Materially False And Misleading Statements And Omissions ..................119

    1.    1/17/01 Press Release ........................................................119

    2.    1/17/01 Conference Call ....................................................120

    3.    2001 Proxy Statement Filed 1/29/01 ..................................121

        a.    Management Remuneration ......................................121

        b.    Key Employee Loan Program ...................................123

    4.    1/30/01 2000 Annual Report To Shareholders .......................124

    5.    2/13/01 Form 10-Q For Quarter Ended 12/31/00 ..................128

        a.    Tyco's Operating Results..........................................128

        b.    Tyco's Reserves .....................................................129

    6.    2/20/01 Prospectus Supplement (And Related Offering Documents
        For The Offering Of Tyco Debt Securities Cusip #902118AY4
        And #902118AX6)...........................................................129

    7.    2/23/01 Form S-4 (And Related Offering Documents For The
        Exchange Of Tyco Shares For Scott Technologies Shares) ..................131

    8.    3/13/01 Conference Call ....................................................133

    9.    3/28/01 Press Release ........................................................134

    10.    3/29/01 S-4 (And Related Offering Documents  For The Exchange
        Of Tyco Shares For CIT Shares) .........................................134

    11.    4/18/01 Press Release ........................................................140

    12.    4/18/01 Conference Call ....................................................141

    13.    5/3/01 Press Release ..........................................................141

    14.    5/11/01 Form 10-Q For Quarter Ended 3/31/01 ....................142

        a.    Tyco's Operating Results..........................................142

        b.    Tyco's Reserves .....................................................143

    15.    5/17/01 Press Release ........................................................144

    16.    5/30/01 Conference Call ....................................................144

17.  5/30/01 Press Release .................................................................146

18.  7/5/01 Press Release .................................................................146

19.  7/18/01 Earnings Announcement.................................................147

20.  7/18/01 Conference Call ............................................................149

21.  8/3/01 Announcement ................................................................149

22.  8/3/01 Conference Call ..............................................................150

23.  8/13/01 Form 10-Q For Quarter Ended 6/30/01 ......................151

     a.    Tyco's Operating Results.................................................151

     b.    Tyco's Reserves ..............................................................152

24.  8/24/01 S-4 (And Related Offering Documents For The Exchange
     Of Tyco Shares For Sensormatic Shares)....................................153

25.  8/28/01 S-3 (And Related Offering Documents For The Offering
     Of Tyco Debt Cusip #902118BC1) ............................................155

26.  9/11/01 Conference Call ............................................................157

27.  10/18/01 Press Release ..............................................................158

28.  10/18/01 Conference Call ..........................................................159

29.  10/23/01 S-4 (And Related Offering Documents For The Exchange
     Of Tyco Shares For TyCom Shares)............................................160

30.  11/15/01 Conference Call ..........................................................162

31.  12/3/01 Announcement ..............................................................163

32.  12/20/01 Announcement ............................................................164

33.  12/28/01 Form 10-K For Fiscal Year Ended 9/30/01 ...............164

     a.    Tyco's "Strategy".............................................................165

     b.    Tyco's Operating Results.................................................165

     c.    Management Remuneration .............................................167

D.   2002 Materially False And Misleading Statements And Omissions ..................168

1.    1/11/02 2001 Annual Report To Shareholders ........................................168

2.    1/15/02 Press Release ........................................................................171

3.    1/15/02 Conference Call .....................................................................172

4.    1/22/02 Conference Call .....................................................................173

5.    1/28/02 Proxy Statement ....................................................................176

        a.    Management Remuneration ......................................................176

        b.    Key Employee Loan Program...................................................178

6.    2/4/02 Press Release .........................................................................180

7.    2/6/02 Conference Call ......................................................................181

8.    2/13/02 Conference Call .....................................................................183

9.    2/14/02 Form 10-Q ...........................................................................184

        a.    Tyco's Operating Results..........................................................184

        b.    Tyco's Reserves......................................................................185

10.    2/22/02 *Boston Globe* Article ...............................................................186

11.    2/26/02 Conference Call .....................................................................186

12.    3/5/02 Conference Call ......................................................................187

13.    3/10/02 *Sun-Sentinel* Article................................................................188

14.    3/12/02 Conference Call .....................................................................189

15.    3/19/02 Conference Call And *The Wall Street Journal* Article..............189

16.    4/2/02 Conference Call ......................................................................191

17.    4/25/02 Press Releases.......................................................................191

18.    4/25/02 Conference Call .....................................................................192

19.    4/30/02 Conference Call .....................................................................193

20.    5/15/02 10-Q For The Quarter Ended 3/31/02.......................................194

        a.    Tyco's Operating Results..........................................................195

           b.      Tyco's Reserves ........................................................................196

        21.     5/16/02 Conference Call .......................................................198

VIII.   PLAINTIFFS RELIED UPON DEFENDANTS' FALSE AND MISLEADING STATEMENTS..........................................................................................205

IX.    DEFENDANTS' CONDUCT CAUSED PLAINTIFFS' LOSS ....................................206

X.     INAPPLICABILITY OF THE PSLRA SAFE HARBOR............................................218

XI.    ADDITIONAL ALLEGATIONS CONCERNING DEFENDANTS' SCIENTER ........219

XII.   APPROPRIATENESS OF GROUP PLEADING AS TO THE INDIVIDUAL DEFENDANTS ........................................................................................................224

XIII.  THE INDIVIDUAL DEFENDANTS' CONTROL OVER TYCO...............................225

XIV.  THE INDIVIDUAL DEFENDANTS' USE OF ANALYSTS AS A CONDUIT TO DISSEMINATE FALSE AND MISLEADING INFORMATION ABOUT TYCO........................................................................................................................226

XV.   PLAINTIFFS' NEW JERSEY RICO ALLEGATIONS ...........................................228

     A.    Defendants' Pattern Of Racketeering Conduct....................................228

         1.      Theft And Violations Of Chapter 20 Of Title 2C Of The New Jersey Statutes..........................................................................229

         2.      Fraudulent Practices And Violations Of Chapter 21 Of Title 2C Of The New Jersey Statutes ...........................................................230

         3.      Use Of Tyco To Further And Promote Criminal Objects.......................231

         4.      Securities Violations ...............................................................232

         5.      Mail And Wire Fraud..............................................................232

     B.    Defendants' Violations Of The New Jersey RICO Act...............................233

     C.    Plaintiffs' Injuries Arising From Defendants' Violations Of The New Jersey RICO Act .......................................................................................235

XVI.  PLAINTIFFS' CAUSES OF ACTION ....................................................................236

XVII. PRAYER FOR RELIEF ...........................................................................................259

XVIII. JURY DEMAND .......................................................................................................260

I.    ALLEGATIONS PURSUANT TO LOCAL CIVIL RULE 10.1

1.    The name and address of the parties are as follows: (i) Plaintiff Teacher Retirement System of Texas, 1000 Red River Street, Austin, Texas 78701-2698; (ii) plaintiff Fred Alger Management, Inc., 30 Montgomery Street, 11th Floor, Jersey City, New Jersey 07302; (iii) Plaintiffs CastleRock Fund, Ltd., CastleRock Partners L.P., CastleRock Partners II L.P. and CastleRock Asset Management Personal Accounts, 101 Park Avenue, 23rd Floor, New York, New York 10178; (iv) Plaintiffs Atticus Global Advisors, Ltd., Atticus International Fund, Ltd., Half Moon Capital Partners, L.P., NR Securities Limited (f/k/a Dred, Ltd.) and National Bank of Canada, 767 Fifth Avenue, 12th Floor, New York, New York 10153; (v) Plaintiffs Omega Capital Partners, L.P., Omega Overseas Partners, Ltd., Omega Capital Investors, L.P., Omega Equity Investors, L.P., Omega Equity Overseas, Ltd., Omega Institutional Partners, L.P., Omega Institutional Partners II, L.P., Beta Equities, Inc., Goldman Sachs Profit Sharing Master Trust, The Ministers and Missionaries Benefit Board of American Baptist Churches and Permal LGC Ltd., 88 Pine Street, 31st Floor, New York, New York 10005; (vi) Plaintiff Watchung Road Associates, L.P., 45 Watchung Road, Short Hills, New Jersey 07078; (vii) Plaintiff Mr. Leon G. Cooperman, 45 Watchung Road, Short Hills, New Jersey 07078; (viii) Plaintiff Mrs. Toby Cooperman, 45 Watchung Road, Short Hills, New Jersey 07078; (ix) Plaintiff Michael Scott Cooperman, 1430 SE Crystal Lake Drive, Corvallis, Oregon 97333; (x) Plaintiff Commonfund Asset Management Company, Inc., 15 Old Danbury Road, P.O. Box 812, Wilton, Connecticut 06897-0812; (xi) Plaintiff Munder Large-Cap Value Fund, 480 Pierce Street, Suite 300, Birmingham, Michigan 48009; (xii) Defendant Tyco International Ltd., 90 Pitts Bay Road, Second Floor, Pembroke, HM 08, Bermuda; (xiii) Defendant Tyco Electronics Ltd., Chesney House, Second Floor, 96 Pitts Bay Road, Pembroke HM 08, Bermuda; (xiv) Defendant Covidian

-1-

Ltd., 90 Pitts Bay Road, Second Floor, Pembroke, HM 08, Bermuda; (xv) Defendant Covidian

(U.S.), 15 Hampshire Street, Mansfield, MA 02048; (xvi) Defendant L. Dennis Kozlowski, Mid-

State Correctional Facility, P.O. Box 216, Marcy, New York 13403-0216, Inmate No. 05A4820;

(xvii) Defendant Mark H. Swartz, Oneida Correctional Facility, 6100 School Road, Rome, New

York 13440, Inmate No. 05A4823; and (xviii) Defendant Frank E. Walsh, Jr., 2 Morgan Court,

Morristown, New Jersey 07960.

II.     INTRODUCTION

2.      This action concerns one of the largest and most egregious fraudulent schemes in

corporate history.   As described below, Defendant Tyco International Ltd. ("Tyco" or the

"Company"), together with its former Chairman and Chief Executive Officer, L. Dennis

Kozlowski ("Kozlowski"), former Chief Financial Officer Mark H. Swartz ("Swartz"), and

former director Frank E. Walsh, Jr. ("Walsh") (collectively, the "Individual Defendants")

conceived, controlled and concealed a massive, criminal enterprise that will forever link Tyco

with the most infamous of corporate scandals ever to rock the global securities markets.   As

*Fortune* aptly put it, Defendants' fraudulent conduct turned Tyco into "a notorious corporate

rogue that, in the public's mind . . . rank[s] with Enron and WorldCom for murky accounting,

corrupt leadership, and guile at conning investors."   The Tyco fraud, masterminded by the

Individual Defendants but permeating the entire Company, fused bald theft of corporate assets

with fraudulent accounting entries designed to conceal and perpetuate the Individual Defendants'

unparalleled looting of shareholders' money.   By way of false and misleading accounting

measures and other deceit, Defendants hid Tyco's true financial condition from investors and

artificially inflated the price of Tyco securities, enabling them to expand their criminal

enterprise − and further enrich themselves − as the Company acquired hundreds of companies

-2-

and issued billions of Tyco securities shortly before and during the period from December 13, 1999 to June 7, 2002 (the "Relevant Period").

3.      Defendants had dual purposes for Tyco's acquisition binge and issuance of billions of dollars of securities.  First, by rapidly expanding Tyco, they were able to employ numerous accounting mechanisms associated with acquisitions to falsely manipulate Tyco's publicly reported financial results.  Second, growing Tyco into an enormous $35+ billion revenue per year corporate conglomerate increased the pool of corporate assets that the Individual Defendants could illegally siphon away for their own personal benefit.

4.      As detailed herein – and as well documented in, among other sources, Tyco's own admissions and findings made by the United States Securities and Exchange Commission ("SEC") – Defendants knowingly caused Tyco to systematically violate Generally Accepted Accounting Principles ("GAAP") and otherwise manipulate Tyco's reported financial results by making fraudulent accounting entries.  Among other things, Defendants created large, improper "reserves" in connection with hundreds of acquisitions, which they then improperly tapped to falsely inflate earnings to meet analyst expectations.  Defendants also caused companies Tyco was about to acquire to artificially suppress and forego earnings before they were consolidated on Tyco's balance sheet, so that the newly acquired companies could then report stellar financial results after they became part of Tyco.  As one analyst quoted by *BusinessWeek* noted about this prong of the fraud:  "This is one of the most startling examples of financial engineering you can hope to find."

5.      Defendants also manipulated Tyco's reported earnings and cash flows by causing Tyco's subsidiary Security Services, Inc. ("ADT") to enter into sham transactions with dealers from whom Tyco purchased security monitoring contracts.  Mischaracterizing these transactions

through accounting gimmickry, Tyco falsely inflated its publicly reported operating income by $567 million and its cash flow from operations by $719 million from its fiscal year 1998 through its fiscal quarter ended December 31, 2002.

6. Defendants also falsely manipulated Tyco's reported cash flows in other ways, all with the purpose of creating the appearance that Tyco's earnings were substantially higher than they were and thereby enabling Tyco to continue to refinance its ever-growing debt burdens.  In this regard, Defendants repeatedly misrepresented and concealed Tyco's true creditworthiness and falsely reassured investors that Tyco would not face liquidity problems as its debts came due.

7. At the same time Defendants were falsifying Tyco's financial statements and misleading investors as to Tyco's business operations, creditworthiness and the value of its assets, the Individual Defendants were looting Tyco and cashing out their artificially-inflated shares.  The Individual Defendants' thievery is well documented.  For instance, Defendant Kozlowski, Tyco's Chairman and Chief Executive Officer during virtually the entire Relevant Period, was convicted of twenty-two counts of first-degree grand larceny, falsification of business records, conspiracy and securities fraud for his looting of Tyco assets at shareholder expense.  Defendant Swartz, Tyco's Executive Vice-President and Chief Financial Officer during the Relevant Period, was similarly convicted for his participation in Defendants' fraudulent scheme.  And Defendant Walsh, a Tyco director during the Relevant Period, pleaded guilty to one count of securities fraud.  Tyco itself has acknowledged the Individual Defendants' fraudulent looting of the Company, suing each of the Individual Defendants for granting themselves unauthorized and undisclosed compensation and bonuses totaling hundreds of millions of dollars.  Fully aware that Tyco's share price was significantly overpriced by virtue of

their fraudulent schemes, the Individual Defendants sold over $691 million of Tyco stock during the Relevant Period.

8.     While Defendants Kozlowski, Swartz and Walsh were profiting from their scheme to falsely inflate Tyco's publicly traded securities, Plaintiffs purchased Tyco common stock and other Tyco securities during the Relevant Period at artificially inflated prices and suffered tremendous losses upon disclosures revealing, in part, Tyco's true financial condition and Defendants' fraudulent conduct.  As a result of these disclosures, Tyco's stock dropped from its close of $58.9 on the last trading day of 2001 to as low as $8.25 on June 12, 2002, wiping out over $90 billion in market capitalization.  Tyco's other securities similarly suffered significant price declines as a result of disclosures of the truth.  As a result of these disclosures concerning Defendants' fraudulent conduct, Plaintiffs were damaged.

III.    JURISDICTION AND VENUE

9.     Plaintiffs' claims arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o; Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78r and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"); and New Jersey's RICO Statute, N.J.S.A. 2C:41-1, *et seq*.

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Plaintiffs assert claims arising under Sections 10(b), 18 and 20(a) of the Exchange Act.  In addition, the Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, because Plaintiffs assert claims for violation of Sections 11, 12 and 15 of the Securities Act.  The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this District under Section 27 of the Exchange Act because Tyco maintain offices in the District of New Jersey.  Furthermore, many of the alleged acts and transactions, and much of the conduct constituting violations of law, including the issuance and dissemination to the investing public of materially false and misleading information, occurred, at least in part, in the District of New Jersey.

12.     In connection with Plaintiffs' claims under New Jersey's RICO Statute, N.J.S.A. 2C:41-1, *et seq.*, the racketeering enterprises engaged in trade or commerce in New Jersey or affected trade or commerce in New Jersey.

13.     In connection with the acts alleged in the Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

IV.     THE PARTIES

A.     Plaintiffs

14.     Plaintiff Teacher Retirement System of Texas ("TRS") is the nation's sixth largest public pension fund and largest public pension fund in Texas with over $100 billion in assets under management providing retirement and related benefits for more than 1.1 million public education and higher education employees and retirees.   During the Relevant Period, TRS purchased Tyco common stock and Tyco International Group S.A. notes (CUSIP #902118AC2 and CUSIP #902118BC1).   In addition, TRS acquired shares of Tyco in exchange for its holdings in Mallinckrodt Inc. ("Mallinckrodt"), Scott Technologies Inc. ("Scott Technologies"), CIT Group Inc. ("CIT"), and Sensormatic Electronics Corporation ("Sensormatic").  As a result of these purchases and acquisitions and the violations of the securities laws alleged herein, TRS suffered substantial damages.

15.     Plaintiff Commonfund Asset Management Company, Inc. ("Commonfund Asset Management"), together with its parent The Common Fund for Nonprofit Organizations and its various affiliates (collectively, "Commonfund Group"), serves over 1,800 nonprofit institutional clients and manages funds for 72 of the nation's top 100 educational endowments, as well as many of the country's top foundations and healthcare organizations.  Commonfund Group's mission is to enhance the financial resources of nonprofit institutions and to help them improve investment management practices.  Commonfund Group is the largest nonprofit investment manager in the United States with over $42 billion in assets under management.  During the Relevant Period, investment funds advised by Commonfund Asset Management purchased Tyco common stock.  As a result of these purchases of common stock and the violations of the securities laws alleged herein, these funds suffered substantial damages.

16.     Plaintiff Fred Alger Management, Inc. ("Fred Alger") focuses on growth-stock investing and oversees investment portfolios for, among others, individuals, governments, corporate pensions, and foundations.  Fred Alger has over $9 billion in assets under management.  During the Relevant Period, Fred Alger purchased Tyco common stock and Tyco International Group S.A. notes (CUSIP #902118AY4 and CUSIP #902118AX6).  As a result of these purchases and the violations of the securities laws alleged herein, Fred Alger, for itself and its clients, suffered substantial damages.

17.     Plaintiffs CastleRock Fund, Ltd., CastleRock Partners L.P., and CastleRock Partners II L.P. are separate legal entities under CastleRock Asset Management, Inc., an institutional investor with approximately $700 million in assets under management.  Along with CastleRock Asset Management Personal Accounts, these Plaintiffs are collectively referred to herein as "CastleRock" or the "CastleRock Plaintiffs".  During the Relevant Period, the

CastleRock Plaintiffs purchased Tyco common stock and traded in Tyco options. As a result of the CastleRock Plaintiffs' purchases of Tyco common stock and trading in Tyco options and the violations of the securities laws alleged herein, CastleRock suffered substantial damages.

18.    Plaintiffs Atticus Global Advisors, Ltd., Atticus International Fund, Ltd., Half Moon Capital Partners, L.P., NR Securities Limited (f/k/a Dred, Ltd.), and National Bank of Canada (collectively "Atticus Capital" or the "Atticus Capital Plaintiffs") were separate legal entities that during the Relevant Period had invested assets managed by Atticus Capital L.P., an international investment management firm with offices in New York and London, which manages over $18 billion in assets. During the Relevant Period, the Atticus Capital Plaintiffs purchased Tyco common stock and traded in Tyco options. In addition, Atticus Capital acquired shares of Tyco in exchange for its holdings in Mallinckrodt, CIT, Sensormatic and TyCom. As a result of these purchases and acquisitions and the violations of the securities laws alleged herein, the Atticus Capital Plaintiffs suffered substantial damages.

19.    Plaintiffs Omega Capital Partners, L.P., Omega Overseas Partners, Ltd., Omega Capital Investors, L.P., Omega Equity Investors, L.P., Omega Equity Overseas, Ltd., Omega Institutional Partners, L.P., Omega Institutional Partners II, L.P., Beta Equities, Inc., Goldman Sachs Profit Sharing Master Trust, The Ministers and Missionaries Benefit Board of American Baptist Churches and Permal LGC Ltd. (collectively "Omega" or the "Omega Plaintiffs") are separate legal entities with assets managed by Omega Advisors Inc., an investment advisor based in New York City with over $5 billion in assets under management. Omega Advisors Inc.'s founder, Leon Cooperman, spent twenty-five years at Goldman, Sachs & Co., where he was a General Partner, and Chairman & Chief Executive Officer of Goldman's Asset Management division. During the Relevant Period, the Omega Plaintiffs purchased Tyco common stock. As a

result of these purchases and the violations of the securities laws alleged herein, the Omega Plaintiffs suffered substantial damages.

20.     Plaintiff Watchung Road Associates, L.P. ("Watchung") is an investment vehicle. During the Relevant Period, Watchung purchased Tyco common stock and traded in Tyco options.  As a result of these purchases and the violations of the securities laws alleged herein, Watchung suffered substantial damages.

21.     Plaintiff Leon G. Cooperman is an individual residing in Short Hills, New Jersey. During the Relevant Period, Mr. Cooperman purchased Tyco common stock and traded in Tyco options.  As a result of these purchases of common stock and trades in options and the violations of the securities laws alleged herein, Mr. Cooperman suffered substantial damages.

22.     Plaintiff Toby Cooperman is an individual residing in Short Hills, New Jersey. During the Relevant Period, Mrs. Cooperman purchased Tyco common stock and traded in Tyco options.  As a result of these purchases of common stock and trades in options and the violations of the securities laws alleged herein, Mrs. Cooperman suffered substantial damages.

23.     Plaintiff Michael Scott Cooperman is an individual residing in Oregon.  During the Relevant Period, Mr. Cooperman purchased Tyco common stock and traded in Tyco options. As a result of these purchases of common stock and trades in options and the violations of the securities laws alleged herein, Mr. Cooperman suffered substantial damages.

24.     Plaintiff Munder Large-Cap Value Fund, a series of Munder Series Trust, ("Munder") is a registered investment company managed by Munder Capital Management. Munder Capital Management manages investments on behalf of corporations, public and private pension fund sponsors, trustees of charitable foundations and universities, insurance companies, and individual investors invested in separate accounts, retirement plans and mutual funds.

Munder Capital Management has over $29 billion in assets under management. During the Relevant Period, Munder purchased Tyco common stock. As a result of these purchases of common stock and the violations of the securities laws alleged herein, Munder suffered substantial damages.

     B.   <u>Defendants</u>

25.   Defendant Tyco is a Bermuda corporation. During the Relevant Period, Tyco's principal United States subsidiary had its office at 273 Corporate Drive, Suite 100, Portsmouth, New Hampshire. The current headquarters of Tyco's principal United States subsidiary is in Princeton, New Jersey. Tyco is a diversified manufacturing and services company. During the Relevant Period, Tyco designed, manufactured and distributed electronic and electrical components, undersea cable communications systems, disposable medical supplies, fire detection and suppression systems, electronic security systems and other products. Tyco's common stock has at all relevant times traded on the New York Stock Exchange ("NYSE") under the ticker symbol TYC.

26.   On June 29, 2007, Tyco split itself into three entities: Tyco, Covidian Ltd. and Tyco Electronics Ltd. According to Tyco's SEC filings, each of the three separate entities assumes responsibility for any alleged violations of the securities laws pre-existing the split:

> Tyco will assume 27%, Covidian will assume 42% and Tyco Electronics will assume 31% of certain Tyco pre-separation contingent and other corporate liabilities, which include securities class action litigation, ERISA class action litigation, certain legacy tax contingencies and any actions with respect to the spin-offs or the distributions made or brought by any third party. Any amounts relating to these contingent and other corporate liabilities paid by Tyco after the spin-offs that are subject to the allocation provisions of the Separation and Distribution Agreement will be shared among Tyco, Covidian and Tyco Electronics pursuant to the same allocation ratio. As described in the Separation and Distribution Agreement, Tyco, Tyco Electronics and Covidian are jointly and severally liable for all amounts relating to the previously disclosed securities class action settlement. All costs and expenses that Tyco incurs in connection with the defense of such litigation, other than the amount of any judgment or settlement,

which will be allocated in the manner described above, will be borne equally by Covidian, Tyco Electronics and Tyco.

27.     Covidian Ltd. ("Covidian") is a successor corporation of Tyco.  Covidian split from Tyco on June 29, 2007 and began trading as a public company on July 2, 2007.  Covidian is liable jointly and severally with Tyco.

28.     Tyco Electronics Ltd. ("Tyco Electronics") is a successor corporation of Tyco. Tyco Electronics split from Tyco on June 29, 2007 and began trading as a public company on July 2, 2007.  Tyco Electronics is liable jointly and severally with Tyco.

29.     Defendant L. Dennis Kozlowski was Tyco's Chairman of the Board, President, and Chief Executive Officer from 1997 and an Executive Officer of Tyco from 1992 until his resignation in June of 2002.  Kozlowski resigned shortly before the Manhattan District Attorney obtained a criminal indictment against him from a grand jury sitting in New York County. Kozlowski's first criminal trial resulted in a mistrial declared on April 2, 2004.  The retrial of Kozlowski began on January 18, 2005 and concluded on June 17, 2005, when the jury returned verdicts.  Of the twenty-three counts submitted to it, the jury found Kozlowski guilty on all charges of grand larceny, conspiracy and securities fraud, and all but one count of falsification of business records.  On September 19, 2005, Kozlowski was sentenced to a term of imprisonment of eight and one-third years to twenty-five years, and ordered to pay an individual fine of $70 million and restitution, jointly and severally with Defendant Swartz, to Tyco of $134,351,397 within one year.  Kozlowski's conviction and sentence were upheld by the Appellate Division of the New York Supreme Court on November 13, 2007.

30.     Defendant Mark H. Swartz was Tyco's Chief Financial Officer and an Executive Vice President from 1995 until September of 2002.  Swartz was also a Tyco director from 1995 until his resignation in August 2002.  Indicted along with Kozlowski, Swartz was tried on

criminal charges in New York County.  The first criminal trial resulted in a mistrial declared on April 2, 2004.  The retrial of Swartz began on January 18, 2005 and concluded on June 17, 2005, when the jury returned verdicts.  Of the twenty-three counts submitted to it, the jury found Swartz guilty on all charges of grand larceny, conspiracy and securities fraud, and all but one count of falsification of business records.  On September 19, 2005, Swartz was sentenced to a term of imprisonment of eight and one-third years to twenty-five years, and ordered to pay an individual fine of $35 million and restitution, jointly and severally with Kozlowski, to Tyco of $134,351,397 within one year and Swartz was ordered to pay restitution to Tyco of an additional $1,200,000.  Swartz's conviction and sentence was affirmed by the Appellate Division of the New York Supreme Court on November 13, 2007.

31.    Defendant Frank E. Walsh, Jr., was a Tyco director from 1992 until he was not renominated for election to the Tyco Board of Directors ("Board") in February of 2002.  Walsh was forced to resign from Tyco's Board of Directors and has pleaded guilty to a violation of New York State's Martin Act for committing securities fraud, admitting to the fact that Tyco paid him an undisclosed $20 million fee in connection with Tyco's acquisition of CIT and that he and Kozlowski concealed that payment from Tyco's Board of Directors.

V.    OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEME

32.    This section of the Complaint is intended to provide a succinct overview of the fraudulent scheme employed by Defendants and is complemented by the more extensive, detailed allegations set forth in Section VI below.

33.    The Tyco fraud had two related facets.  *First*, Tyco's senior officers and directors, including the Individual Defendants, unlawfully looted the Company for hundreds of millions of dollars rightfully belonging to shareholders such as Plaintiffs.  *Second*, Defendants manipulated Tyco's financial statements to artificially boost results so as to maintain Tyco's high stock price

-12-

and perpetuate their own criminal enterprise of enriching themselves.   Accordingly, the two facets of the Tyco fraud should be viewed as interconnected – Defendants' accounting manipulations concealed and enabled Defendants' criminal looting and self-dealing.  The various prongs of the fraud are summarized in ¶¶34-127 below.

      A.     <u>The Acquisitions Scheme</u>

34.     Throughout the Relevant Period, Defendants caused Tyco to acquire hundreds of companies.  Defendants told investors and the public at large that Tyco was successfully growing as a result of "synergies" and efficiencies achieved when Tyco acquired other companies and as a result of "organic" growth, *i.e.,* growth generated from preexisting Tyco entities.  In fact, Tyco's financial reporting was falsified in myriad ways to create the appearance of financial success through an intentional and undisclosed scheme to inflate financial results, much of which was connected to Tyco's accounting for newly acquired companies.

      1.     Defendants Manipulated Tyco's Reported Financial Results Upward
           <u>By Causing Acquired Companies To Falsify Their Results Downward</u>

35.     Defendants caused companies Tyco was acquiring to falsify their financial results downward immediately prior to being acquired so that the acquisitions could report falsely positive (and accretive) financial results once they became a part of Tyco.

36.     Defendants accomplished this by requiring acquired companies to forego revenue generation activities in the months prior to the closing of the acquisition so that the revenue could be recognized post-acquisition.   Defendants also caused companies that Tyco was acquiring to accelerate payments of expenses (including those not yet due) before the acquisition was completed so as to reduce expenses payable after Tyco consolidated the acquired company on Tyco's balance sheet.  By doing so, Defendants made Tyco's financial results (and Tyco's senior management) look better than they really were.  Prior to consolidation on Tyco's financial

statements, the acquired company would appear to have weak cash flows from operations and weak earnings, but would have much stronger cash flows and earnings once part of the Tyco family. Tyco would get an apparent boost in free cash flow and earnings to report to the public, and Defendants would take credit for turning around the previously underperforming acquisition.

37.     From 1996 through the middle of 2002, Defendants caused Tyco to acquire over 700 companies. One of those companies was CIT Group Inc. ("CIT"). As Tyco did with most of its acquisitions, the Company falsely accounted for the CIT acquisition. But unlike Tyco's other acquisitions, CIT continued to publish financial statements to the public. It was from these public disclosures that, in 2002, the market began to piece together how Defendants used the acquisition scheme to manipulate Tyco's financial results.

38.     On January 7, 2002, *The Wall Street Journal* published an article titled "Tyco Tumble Reflects Wariness About Bookkeeping," which described market reaction to early, partial disclosures concerning Defendants' acquisition scheme and their efforts to conceal their manipulation of Tyco's reported financial results. The article noted:

> The bears concede they can't point to any smoking guns, but say a number of smaller items raise concerns. For starters, some cite a series of charges by finance company CIT Group just before the June 1, 2000, closing of Tyco's $10 billion deal to acquire it. The charges depressed CIT's earnings but didn't show up on Tyco's books. CIT's results surged in the first month after Tyco took control.
>
> Tyco has been accused previously by critics of using such preclosure write-offs to boost future results, ***assertions it has strenuously denied***.[1]

39.     On January 30, 2002, *The New York Times* reported on investors' concerns that Tyco might be falsely manipulating its financial statements in connection with the acquisitions. Notably, *The New York Times* commented that Defendants were not disclosing to the public the financial results of Tyco's acquisitions in the period before Tyco finalized the acquisition:

---

[1]  Unless otherwise indicated, all emphasis is added herein.

-14-

Mr. Kozlowski defended Tyco's accounting practices and said the company was "prepared to openly discuss whatever legitimate questions or concerns our shareholders, the analyst community, or the media might have."

But Tyco, which has made $30 billion in acquisitions during the last three fiscal years, **has refused to show investors the financial statements of the companies it acquires after Tyco has agreed to buy them but before they are actually folded into Tyco**.

Short sellers, who profit when a company's stock falls, have said Tyco should disclose those statements so that investors can see whether the companies that Tyco buys are taking one-time charges and manipulating their cash flow downward before they are merged.

**By cutting their earnings and cash flow before the acquisition is completed, the acquired companies enable Tyco to report higher earnings and cash flow after the deals close**, according to James Chanos, president of Kynikos Associates, and other short sellers.

Despite questions from Mr. Chanos and some Wall Street analysts, **Tyco has also refused to disclose the balance sheets of acquired companies at the time it takes them over**. The company should explain why it has recorded more than $30 billion in good will related to acquisitions over the last three years, the short sellers say.

Good will is the excess of the price that Tyco pays for the companies over their real, or tangible, assets. By marking up good will and marking down real assets when the deals are completed, Tyco can inflate its profits, the short sellers contend.

40.     Investors reacted negatively to the allegations that Tyco might be falsifying its financial statements.   However, many in the public markets continued to be misled by Defendants' fraud.  Indeed, on January 31, 2002, the day after *The New York Times* article discussed above, J.P. Morgan issued an analyst report disputing the reports of accounting impropriety:

The notion that Tyco "spring loads" its results in the quarters following an acquisition *is not supported by an analysis of the segment results*.  In spite of the continual grind of bad press, rumors and a falling stock price, we believe there remains no smoking gun on Tyco accounting or business practices, and we see no liquidity risks.

-15-

41.     On February 25, 2002, *BusinessWeek* shed additional light on Defendants' acquisition scheme in an article titled:  "Behind Tyco's Accounting Alchemy:  The CIT acquisition offers new insight into how the company produced huge pops in profits."

> Even as Kozlowski moves to shed CIT, its financials are providing new insight into how Tyco itself operates. Critics say the CIT deal presents a rare glimpse into how Tyco has managed to ''spring-load'' its results -- producing a huge pop in profits right after an acquisition closes. Alone among Tyco's major acquisitions, CIT continues to file financial reports with the U.S. Securities & Exchange Commission because of its reliance on the public debt markets.  Those reports disclose that in its first four months under the Tyco umbrella -- from June 2 to Sept. 30, 2001 -- CIT generated $ 252.5 million in net income.  That's more than three times the $ 81.3 million CIT earned in its last five months as an independent public company, from Jan. 1 to June 1.  ***This is one of the most startling examples of financial engineering you can hope to find***," says Albert J. Meyer, an analyst at David W. Tice & Associates and longtime critic of Tyco's accounting.

> Tyco vehemently rejects this accusation, and in an interview with *BusinessWeek*, the company countered every charge leveled by Meyer and other critics.

42.     As detailed more fully herein at, among other places, ¶151, Tyco has now admitted it engaged in such wrongful conduct during the Relevant Period.  Tyco's SEC filings after the Relevant Period admit numerous examples of such conduct.  For example, Tyco has admitted that:

> [T]here were instances in which the pre-acquisition earnings of an acquired entity for the period immediately preceding the consummation of its acquisition by Tyco were significantly lower than the entity's earnings in prior periods.  The decrease in reported earnings in the period immediately preceding the consummation of an acquisition, which decreases were for the most part due to non-recurring charges, raise the issue as to whether the acquired entity's pre-merger financials had been improperly manipulated in order to increase reported earnings subsequent to the consummation of the acquisition.

43.     And, Tyco also has admitted:  "[T]here were instances where prior management appeared to influence the management of an acquisition target into adopting accounting

treatments that 'over-accrued' expenses prior to an acquisition's consummation or otherwise exceeded what was permitted by GAAP."

44.     Numerous internal Tyco documents confirm such practices were commonplace. Tyco described these documents in a Form 8-K filing with the SEC dated December 30, 2002 (detailed further herein at ¶¶149-151):

> [I]n 1999 a controller for one of the [ADT] Fire & Security business units prepared and gave a presentation to the subsidiary's operating managers relating to what was entitled "Acquisition Balance Sheet Opportunities." It urged its audience to "be aggressive in determining exposures; determine reserves with worst case scenario; have a strong story to tell regarding each reserve; book the reserves on the acquired company's financial system; use the owner for ideas; improve on your estimates." The presentation also told its audience to "be aggressive in determining the reductions of the asset," and "create stories to back the reductions." With respect to "transitioning the acquired company" by creating reserves to cover one-time costs, the document provided "being aggressive in our estimates will allow us to be aggressive in the cost we apply." It also provided, "keep the reserve descriptions within the accounting rules but stretch the expenditures that go in."

> A similar document summarizes a September 18, 1998 Tyco presentation on the US Surgical ("Surgical") merger which closed October 1, 1998. The presentation in its "Synergies Summary," indicated that Tyco could recognize $72 million from "Financial Engineering" in 1999 and $52 million in the each of the following two years.

> An August 17, 1998 memorandum similarly identified means to achieve EBIT goals for Surgical in the first year after the merger. The memo lists numerous cost-savings measures, and reaches a "total savings before financial engineering" of $145.4 million. The memo also suggests $64.6 million in "financial engineering" categories, including plans to "over-accrue expenses in Q3 before closing" and "accrue in advance rebates."

> Another document dated September 10, 1996 discusses "Carlisle Plastics – Financial Engineering and Purchase Accounting." The memo and attachments define "financial engineering" as "pre-merger entries" and "purchase accounting" items as "post-merger entries." A "Discussion Items" attachment states "we'll book additional 'Financial Engineering' reserves in July with the objective of having a break even month. This way we won't raise any flags with the Lender reporting. The balance of the reserves will be booked in August." The equity balance sheet attachment for the Carlisle acquisition contemplates $26,440,000 in financial engineering . . . .

45.     After the Relevant Period, the SEC found that Tyco employed the acquisition scheme described above to wrongfully manipulate Tyco's financial statements.  *See* ¶¶184-91 below.

> 2.     Defendants Manipulated Tyco's Financial Statements By Improperly Recording Massive Goodwill And Creating Secret Reserves To Boost Earnings

46.     As another part of the acquisition scheme, Defendants also caused Tyco to falsely record the value of tangible assets and liabilities held by acquired companies.

47.     Tyco falsely recorded tangible assets of acquired companies at depressed values and, concomitantly, attributed a disproportionate share of the value of the acquired company to an intangible asset − goodwill.  By falsely depressing the valuation of tangible assets and recording excess goodwill, Defendants were able to manipulate Tyco's financial statements in future periods in two ways.  ***First***, the Company was able to reduce depreciation and amortization and thereby falsely inflate income in future periods.  (Unlike hard assets, goodwill does not depreciate or amortize; depreciation and amortization reduce a company's reported earnings.)  ***Second***, by falsely depressing asset values, the Company was able to create a kind of hidden "reserve" that could be utilized to artificially inflate earnings in future reporting periods.  In effect, in quarters when Tyco could not make its financial projections, Tyco could sell an asset falsely carried on its books at a depressed valuation at its true (inevitably higher) value and thereby record a "gain" on the difference between the carrying price and the sale price.

48.     Tyco also recorded liabilities of acquired companies at falsely inflated values, with similar purpose and results.  By increasing the purported amount of a liability, Tyco was able to increase the portion of the purchase price of an acquisition attributed to goodwill.  Further, by falsely increasing the amount of liability, the Company could take an improperly

large reserve in connection with the liability.  Tyco was then able to reverse its artificially inflated reserves in future reporting periods to manipulate its reported earnings.

49.     An April 29, 2002 article in *Barron's* reported on an interview with noted accounting Professor Abe Briloff on this aspect of the Company's acquisition scheme.  Briloff, the Emanuel Saxe Distinguished Professor Emeritus of Accounting at New York's Baruch College, studied Tyco's books for months and concluded that it appeared Tyco was inflating its earnings by improperly booking inflated goodwill and tapping "secret reserves" created in connection with its acquisitions:

> Abe Briloff, valued contributor to Barron's for three decades and a fiery scourge of accounting gimmickry for even longer than that, whose last piece for the magazine was a timely dissection of Cisco's bookkeeping back in October 2000, has been studying Tyco's accounting for some months and, fair to say, has not been very favorably impressed by it.  Abe faxed us some observations on Friday that we're eager to share with you.

> He starts out by asserting that Tyco's woes largely spring from its pell-mell acquisition sprees, which both diverted vast amounts of resources and inspired "astute accounting practices" that enabled it to inflate, possibly quite substantially, reported earnings.

> By way of illustration, he zeros in on the company's acquisitions in the fiscal year ended September 2001.  All were booked under purchase rather than pooling-of-interest accounting.  That means that all assets acquired and liabilities assumed had to be valued at the time of acquisition; the excess of assets over liabilities represents tangible net worth and anything more than tangible net worth that the acquirer pays in stock and/or cash is tossed into goodwill.  (Thank Abe, not us, for the primer.)

> Aside from its takeover of CIT, which, Abe notes, has its "own accounting rhythm," Tyco made a vast slew of acquisitions in fiscal '01, shelling out $11.4 billion ($7.6 billion in cash and the rest in stock) in the process.  In return, as he puts it, Tyco got nothing it "could count, weigh, measure or smell" in the way of net tangible assets.  Meanwhile, identifiable liabilities of the outfits it scooped up exceeded their identifiable assets by $1.9 billion.  That $1.9 billion, plus the $11.4 billion cost of the acquisitions, ended up as a $13.3 billion addition to goodwill.

> Which prompts Abe to wonder how Tyco's management can justify "paying $11.4 billion for a pot full of companies which somehow managed to lose everything that their shareholders had put into the companies and, in fact, were

-19-

left owing almost $2 billion" when Tyco came along to bail them out? One good question, in Abe's view, prompts another: "Does such a nexus of enterprises warrant the booking of $13.3 billion in goodwill?"

The point of the exercise, so far as Tyco is concerned, is crystal-clear to Abe: "***Such suppression of the cost of assets acquired and/or exaggeration of liabilities assumed provides a 'secret reserve' capable of being insinuated into income in post-acquisition periods." In other words, the point of the exercise was to goose earnings.*** Can you believe?

50.     On June 12, 2002, shortly after the Relevant Period, New York's *Daily News* reported that Tyco was in fact utilizing its acquisitions to undervalue assets so Tyco could create secret reserves:

One theory was that Tyco was aggressively undervaluing the assets of acquisition targets before the new companies joined Tyco's balance sheet.

The practice, detractors said, allowed Tyco to build a pool of assets from which it could then unlock value at a later point.

[A]t least one New York businessman with close ties to Simplex Time Recorder, a December 2000 Tyco acquisition, told the *Daily News* he witnessed such dealings first-hand.

"I think it's fair and accurate to say they made [Simplex] writedowns on the value of their receivables to a level that, if it didn't break the law, certainly bordered on breaking the law," the businessman said.

51.     As the SEC found after the Relevant Period, and as detailed further at ¶¶184-91 below, "managers were told [by Tyco] to encourage improper adjustments to a target's books and records, thereby reducing the value of the assets and overstating the liabilities prior to their acquisition by Tyco." The SEC further noted "Understating acquired assets benefited Tyco's earnings by decreasing depreciation expense in future periods for long-lived assets and, for current assets, by allowing Tyco to record larger profits as the assets were utilized. Overstating acquired liabilities allowed Tyco to maintain on its books and records inflated reserves, which Tyco used in future periods to improve its earnings."

52.    The SEC specifically found that Tyco utilized these reserves in violation of GAAP to meet analysts' earnings estimates when the Company would have otherwise fallen short of its expected financial results:

> At times, Tyco enhanced its earnings by improperly reversing excess purchase accounting reserves to its income statement.  During the period 1997 through 2001, Tyco reversed at least $47.1 million from those reserves to its income statement.  On a number of occasions, the reversals of purchase accounting reserves to Tyco's income statement were timed for the purpose of meeting earnings targets.

> In some instances, Tyco's corporate headquarters resorted to the practice of using reserves to bolster financial performance.  In spite of the fact that such reserves are not permitted under GAAP, Tyco corporate kept a general unallocated reserve on its own books and used the reserve when unanticipated charges threatened to cause Tyco's earnings to fall short of what analysts expected.

53.    Further details concerning this element of Defendants' fraudulent scheme can be found below in ¶¶151-52, and 189-94.

### 3.    Tyco Manipulated Its Financial Statements By Refusing To Writedown Overvalued Goodwill

54.    In addition to fraudulently inflating the amount of goodwill the Company recorded as a result of acquisitions, Defendants also caused Tyco, in violation of GAAP, to maintain that goodwill at falsely high levels.

55.    For example, Tyco admits in its restatement that it knew prior to March 31, 2002 that the Company was carrying the CIT subsidiary on its books at $4.5 billion over its market value.  Yet, Defendants caused Tyco *not* to write down the value of CIT in the Company's reported financial results for the quarter ending March 31, 2002, as required by GAAP.  Tyco did not write down the value of CIT despite admitting on April 25, 2002 that Tyco would likely have to sell CIT for nearly $3 billion less than the Company had paid for it the year prior.

56.    Further details concerning this element of Defendants' fraudulent scheme can be found below in ¶¶138-42, and 127.

4.      Defendants Concealed The Full Extent Of Tyco's Acquisitions

57.      Defendants concealed the true extent of the acquisition scheme by hiding the number of deals Tyco was doing.  In late January 2002, however, *The Wall Street Journal* approached Tyco about the matter and uncovered some of the truth.

58.      On February 4, 2002, Swartz told *The Wall Street Journal* that, in fiscal years 1999, 2000 and 2001, Tyco paid almost $8 billion in cash for over 700 **undisclosed** acquisitions, the existence or terms of which were never revealed to the investing public or disclosed in the Company's public filings.

> Tyco International Ltd. said it spent about $8 billion in its past three fiscal years on more than 700 acquisitions that **were never announced to the public**.
>
> *       *       *
>
> Although Tyco says its disclosures have been adequate, **the company late last week sent a special alert to its investors giving new details about its unannounced acquisitions** after questioned about them for this article. The alert, which gave fresh information about last year but not the full three-year period, revealed that Tyco paid $4.19 billion in cash for unannounced deals in the fiscal year ended Sept. 30, 2001, or about 37% of the $11.3 billion in cash it spent on all deals. The company said separately that it made 350 unannounced acquisitions in that fiscal year.

59.      Upon this disclosure, shares in the Company tumbled $5.73, or 19%, to close at $29.90 on February 4, 2002 after closing at $35.63 on the prior trading day.

5.      Defendants Concealed The
Acquisitions Scheme From An SEC Inquiry

60.      In 1999 and early 2000, the SEC conducted an "informal inquiry" into Tyco's accounting for acquisitions.  The existence of this informal inquiry was closed in July 2000.

61.      During the SEC's informal inquiry, Defendants repeatedly and falsely stated that the Company's accounting was conservative.  When the SEC closed the informal inquiry without

proceeding to a formal investigation, Defendants claimed this was a confirmation that Tyco's accounting was proper and conservative.

62.     In fact, the SEC's informal inquiry was not validation of Tyco's accounting for acquisitions because – as Defendants well knew – they had concealed documents from the SEC during that probe of the Company.  Tyco later admitted in SEC filings after the Relevant Period: "A large quantity of documents collected by Tyco and its counsel in connection with the SEC's document request had not been produced to the SEC at the time the SEC closed its inquiry in July 2000."

63.     Further details concerning this element of Defendants' fraudulent scheme can be found below in ¶¶523-25.

B.     The ADT Scheme

64.     Defendants also designed a scheme of sham transactions to overstate operating income and cash flow in connection with Tyco's ADT subsidiary's purchases of security alarm monitoring contracts.

65.     Tyco's ADT subsidiary is a security alarm provider.  ADT routinely purchases security monitoring contracts from external independent dealers who operate under the umbrella of ADT's authorized dealer network.  ADT incurs costs for performing due diligence associated with the purchase of such contracts and for maintaining and operating the authorized dealer network.

66.     During the Relevant Period, ADT overstated operating income and cash flow by charging sham connection fees to dealers from whom it purchased security monitoring contracts. The connection fee was fully offset by a simultaneous increase in the purchase price ADT allocated to the dealers' security monitoring contracts.  ADT would then immediately recognize the connection fee into income, but amortize the purchase price over an extended period of time,

thereby artificially inflating Tyco's reported earnings and cash flows in violation of GAAP.  The connection fee and simultaneous purchase price increase completely offset each other and served no legitimate business purpose.  Indeed, the SEC (which later brought civil actions against Tyco and a number of its employees in connection with, among other things, the ADT scheme) found "the connection fee transaction lacked economic substance and should not have been recorded in Tyco's income statement."  *See* ¶185 below.

67.     As a result of the ADT Scheme, Defendants inflated Tyco's operating income by $567 million and its cash flow from operations by $719 million during fiscal year 1998 through the fiscal quarter ended December 31, 2002.  In 2003, Tyco restated its operating income and cash flow relating to the connection fees, thereby admitting its financial results for these periods were false.

68.     Further details concerning this element of Defendants' fraudulent scheme can be found below at, among other places, ¶¶105-07, 133, 143, 151, 154, 156, 158, 161-64, 185-87 and 191.

C.     Cash Flow Manipulation

69.     Defendants manipulated Tyco's publicly reported free cash flows via the ADT scheme and the acquisition scheme, among others.  By reporting falsely and artificially inflated free cash flows, Defendants concealed the Company's true financial condition.  Many investors judge the quality of reported earnings by comparing earnings to cash flows.

70.     On November 15, 2004, *Fortune* commented on Defendants' manipulation of Tyco's cash flows:

> [T]he money that investors thought was pouring into the company's coffers –
> Tyco's executives had boasted about some $4 billion a year in free cash flow –
> **simply wasn't there**.

Yes, Tyco was generating scads of cash from its many hundreds of businesses. The problem was, the old Tyco under Kozlowski wasn't counting two huge financial drains. First, the company was spending more than $1 billion a year building, and subsidizing losses on, a huge undersea cable network called TyCom. ([New Tyco CEO]Breen quickly halted spending and put TyCom up for sale.) Second, Tyco was squandering cash on its home-security business. For the most part, instead of selling alarm systems directly to customers, it was buying accounts from third-party dealers. ***Tyco's financial officers treated it as part of the acquisitions budget, rather than an operating cash flow item.*** When the company offered Wall Street its projections of free cash flow, somehow these payments—$1.3 billion a year—weren't factored in.

D.    The TyCom Fraud

71.    During the Relevant Period, Tyco's TyCom subsidiary built undersea fiber-optic networks for third parties. Initially, TyCom was a wholly-owned subsidiary of Tyco. On July 26, 2000, Tyco sold 14% of TyCom in a public offering of 70.3 million shares at $32 per share for gross proceeds of $2.24 billion. Tyco recorded earnings of $64.1 million in connection with the offering, but $39.6 million of it was recorded in violation of GAAP. *See* ¶151 below. TyCom common stock dropped substantially after its offering, to as low as $7.41 on September 27, 2001. On October 19, 2001, Tyco announced it would re-acquire all outstanding shares of TyCom for 0.3133 shares of Tyco, valuing each TyCom share at approximately $15.42 based on Tyco's trading price at the time. Throughout the Relevant Period, as a result of its ownership of the overwhelming majority of TyCom common stock, Tyco controlled TyCom.

72.    A civil action on behalf of purchasers of TyCom common stock was filed in the District of New Hampshire alleging that Kozlowski, Swartz and Tyco, among others, committed fraud in connection with certain statements made concerning TyCom (the "TyCom Class Action"). The TyCom Class Action complaint has been sustained and the case is currently in discovery. *See In re TyCom Ltd. Sec. Litig.*, 2005 D.N.H. 125 (D.N.H. 2005).

73.    As described further below at § V.E.4. and § VI, the TyCom offering was part of Defendants' criminal enterprise. Kozlowski and Swartz (among others) were paid huge,

undisclosed bonuses skimmed off the proceeds of the offering.  *See, e.g.* ¶¶100-04, 131, 133 and 148.  As alleged in the TyCom Class Action, Tyco, Swartz and Kozlowski made numerous misrepresentations concerning, among other things, the market demand for TyCom's undersea bandwidth.  TyCom artificially inflated reported revenues (and thereby falsely represented demand for bandwidth) by swapping bandwidth capacity with other telecommunication companies and recording the swaps as actual sales.  These swaps were not sales but merely sham "wash" transactions.  Indeed, demand for TyCom's undersea fiber was so weak that TyCom was unable to sell any bandwidth from the beginning of 2000 until the middle of 2001.

74.   Further, as alleged in the TyCom Class Action, the TyCom offering documents falsely represented that industry analyst The Yankee Group determined demand for bandwidth was growing dramatically.  In truth, The Yankee Group found the price of bandwidth was dropping tremendously.

75.   As a result of Defendants' false statements, TyCom's stock price was artificially inflated and Tyco carried TyCom shares on its books at inflated values.  Ultimately, TyCom proved to be a failure.  There was little market demand for TyCom's services despite Defendants' statements to the contrary.  On April 25, 2002, the Company was forced to take a $2.34 billion write-down on the value of the TyCom Global Network.  Tyco's stock price reacted negatively to this, among other disclosures on April 25, 2002, thereby damaging Plaintiffs.

E.   Defendants' Looting Of The Company And Related
     Accounting Manipulations Concealing Their Conduct

76.   The Individual Defendants stole tens of millions of dollars from Tyco, and Defendants concealed their thievery by falsifying Tyco's financial statements and lying in Tyco's SEC filings.  Tyco was converted into a criminal enterprise for the benefit of its senior

management, with a Board of Directors that turned a blind eye to the fraud so long as the Company's stock price remained at artificially inflated levels.

77.     Tyco admitted after the Relevant Period in a Form 8-K filed with the SEC on September 17, 2002 (the "September 2002 8-K"):  "During at least the five years prior to June 3, 2002, Tyco's three top corporate officers - its CEO, its CFO, and its Chief Corporate Counsel – engaged in a pattern of improper and illegal conduct by which they enriched themselves at the expense of the Company with no colorable benefit to the Company and concealed their conduct from the Board and its relevant committees."   Some of the more egregious aspects of that misconduct is described below.

1.     The Secret Walsh "Finder's Fee"

78.     In connection with Tyco's acquisition of CIT in June 2001, Kozlowski and Walsh conspired to cause Tyco to secretly transfer to Walsh $20 million as a "finder's fee" for his purported work in furtherance of the acquisition ($10 million directly to Walsh and $10 million to a charity he headed).  Walsh was supposed to be an independent director of the Company monitoring the conduct of the Company's senior executives, including Kozlowski and Swartz.  The large payment to Walsh posed a material conflict of interest and was required to be disclosed pursuant to SEC requirements.  Tyco has acknowledged, and Walsh has testified, that Swartz knew about the illicit payment.

79.     Walsh, Kozlowski and Swartz purposefully concealed the payment to Walsh from Tyco's other directors.  Walsh testified at Kozlowski's criminal trial that Kozlowski instructed Walsh to conceal the payment from the other directors.

80.     Tyco was required to, but did not, disclose the $20 million payment to Walsh to investors.  In fact, Tyco deliberately concealed the payment in three SEC filings: the Form S-4 filed with the SEC on March 29, 2001, relating to a proposed merger between CIT and a Tyco

subsidiary (the "March 2001 CIT S-4"); an amendment to that document on Form S-4/A filed on April 13, 2001 (the "April 2001 CIT S-4/A"); and a Prospectus related to that transaction filed on April 24, 2001 (the "April 2001 CIT Prospectus").  Indeed, Defendants affirmatively denied the existence of such a payment when they made the following false statement in each of these filings:

> Except for Lehman Brothers and Goldman, Sachs & Co., the fees and expenses of which will be paid by Acquiror, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Acquiror or Guarantor who might be entitled to any fee or commission from Acquiror, Guarantor or any of their respective affiliates in connection with the transactions contemplated by this Agreement.

81.     Defendants also caused Tyco to misrepresent in its Form 10-K for the year 2001 the amount Tyco paid in connection with the CIT acquisition.  The Form 10-K excluded the illicit $20 million payment to Walsh.

82.     The payment to Walsh was not disclosed until Tyco filed its proxy statement with the SEC on January 28, 2002.  On January 29, 2002, *The Wall Street Journal* highlighted the illicit Walsh payment.

83.     Tyco's stock dropped by over 23% – from a close on January 28, 2002 of $42.00 to as low $32.00 on January 29, 2002 on trading of over 170 million shares – four times the previous day's trading.

84.     Tyco shares would have dropped even more on January 29, 2002 had Tyco and Kozlowski not lied to the marketplace concerning Board of Director approval of the payment.  On January 29, 2002, *The Wall Street Journal* quoted Tyco's false assertions that the payment was legitimate:

> ***Tyco spokeswoman Maryanne Kane said Tyco's board decided, without any outside help, that the $20 million payment was "appropriate based on the amount of work" Mr. Walsh did, which she said included providing guidance, advice and facilitating meetings.***

-28-

A Tyco press release on January 20, 2002 quoted Kozlowski: "*The Board felt that fee was appropriate in light of Mr. Walsh's efforts*."  Neither Tyco, nor any member of the Board, corrected these false and misleading statements.

85.     Walsh pleaded guilty to committing securities fraud in connection with the illicit $20 million payment, and the false and misleading statements Defendants caused Tyco to make as a result of the payment.

86.     Further details concerning this element of Defendants' fraudulent scheme can be found below in ¶¶131, 134-37, 148, 173-74, 180-83.

2.     The Relocation Programs

87.     During the Relevant Period, Tyco maintained "relocation" programs to aid its employees to cover costs associated with Tyco's transitioning of offices from New Hampshire to New York City and Boca Raton, Florida.  The relocation loan programs included specific guidelines, approved by the Company's Board of Directors, as to appropriate expenditures.

88.     In violation of the terms of the Company's relocation programs, Kozlowski and Swartz – among other Tyco officers – secretly enriched themselves at the expense of Tyco shareholders by taking large, no-interest "relocation" loans from Tyco and causing Tyco to buy real estate and other expensive items for their personal use.  As Tyco admitted after the Relevant Period in its September 2002 8-K: "certain executive officers used the relocation program to receive non-qualifying loans and unauthorized benefits that were not generally available to all salaried employees affected by relocations, or were not related to any Tyco relocation, enriching themselves with no colorable benefit to Tyco."  *See* ¶148.

89.     As a result of these secret, unauthorized loans and perquisites to Kozlowski and Swartz, among others, Tyco issued false and misleading statements to investors.  For example, Tyco's proxy statements during the Relevant Period falsely stated Kozlowski's and Swartz's

-29-

compensation, failing to include the illicit loans as required by SEC regulations.  Specific details concerning Defendants' abuses of the relocation programs are provided *infra* at § V.E.2, § VI.A., and § VI.E (including ¶¶131, 133, and 148).

### 3.     Tyco's Key Employee Loans Program

90.     During the Relevant Period, Kozlowski and Swartz, as well as other executive officers, misused Tyco's Key Employee Loan Program (the "KEL Program") for their own enrichment, rather than the stated purpose of encouraging ownership of Tyco common shares by executive officers and other key employees.

91.     As set forth in the September 2002 8-K, "the Key Employee Loan Program was intended to encourage ownership of Tyco common shares by executive officers and other key employees.  The KEL Program was intended to provide loans ("KEL" loans) on favorable terms to these officers to enable them to pay taxes due upon the vesting of shares granted under Tyco's restricted share ownership plan without having to sell the shares at the time of vesting to pay the resultant tax liability."

92.     Furthermore, according to the September 2002 8-K, during the fiscal years 1997 through 2002, Defendants "used KEL loans for purposes other than the payment of taxes due upon the vesting of restricted shares, borrowed more than the limits allowed under the program terms, or both."

93.     According to the September 2002 8-K, Kozlowski "borrowed funds for purposes other than those stated in the KEL program and used the KEL program like an unlimited line of credit.  In addition to taking non-program loans, Kozlowski borrowed in excess of the KEL program's limits."  "Mr. Kozlowski's non-program KEL borrowing principally occurred in 1999 and afterwards.  As of August 1998, Mr. Kozlowski's total KEL account balance was $132,310. By August 1999, Mr. Kozlowski's outstanding balance had increased to over $55.9 million.  By

the end of 2001, Mr. Kozlowski had taken over 200 KEL loans - some for millions of dollars, and some as small as $100."

94.     According to the September 2002 8-K, Kozlowski used the "non-program loans . . . to fund his personal lifestyle, including speculating in real estate, acquisition of antiques and furnishings for his properties (including properties purchased with unauthorized 'relocation loans'), and the purchase and maintenance of his yacht."   The September 2002 8-K further acknowledges that Kozlowski "generally abandoned his investment in the Company by selling substantially all of his restricted shares when they vested (or shortly thereafter – thus violating both the spirit and the letter of the KEL program)."

95.     As the Company's Chief Financial Officer, Defendant Swartz knew the authorized purpose for the KEL Program and was responsible for approving and monitoring the KEL loans of senior management, including Kozlowski's KEL loans.   As a Tyco director, Swartz was also "responsible for reporting any issues relating to those loans to the Compensation Committee."   According to the September 2002 8-K, Swartz was aware of the nature and extent of Kozlowski's loans.

96.     Tyco acknowledged in the September 2002 8-K that Defendant Swartz, like Defendant Kozlowski, "borrowed million in non-program loans . . . [and] used those unauthorized loans to purchase, develop and speculate in real estate; to fund investments in various business ventures and partnerships (including private ventures in which both he and Mr. Kozlowski used Tyco KEL loans to invest); and for miscellaneous personal uses having nothing to do with the ownership of Tyco stock."

97.    The Company has also admitted Swartz "generally abandoned his investment in the Company by selling substantially all of his restricted shares when they vested or shortly thereafter - thus violating both the spirit and the letter of the KEL program."

98.    Further details concerning this element of Defendants' fraudulent scheme can be found below in ¶¶131, 133, and 175-79.

### 4.    Secret, Unapproved Bonuses

99.    As part of the fraudulent scheme and criminal enterprise, Kozlowski and Walsh conspired to pay themselves and other members of Tyco's senior management secret, unapproved bonuses.   Kozlowski and Walsh, among other co-conspirators including PricewaterhouseCoopers LLP ("PwC"), manipulated the Company's accounting for several large transactions to conceal the bonus payments from investors.

100.    In September 2000, in connection with Tyco's public offering of TyCom stock (a spin-off of a Company subsidiary detailed herein at ¶¶71 and 269), Kozlowski and Swartz perpetrated a scheme to pay themselves and approximately fifty other senior Tyco employees huge, undisclosed bonuses costing the Company approximately $95,962,000.   Kozlowski received $32,976,000 and Swartz received $16,611,000.

101.    As the Company stated in its September 2002 8-K, *see* ¶148 for further detail, Kozlowski "conceived and implemented" the illicit payments, and Swartz authorized the deceptive accounting treatment that concealed the payments from investors, which was explained to Swartz in a memorandum prepared by Tyco's Vice President of Finance, Mark Foley.

102.    On September 30, 2002, *The Wall Street Journal* reported on the TyCom bonuses "accounting experts . . . say **the accounting for the bonuses appears so egregiously wrong."** *The Wall Street Journal* stated further:

In Tyco's recent report on its internal investigation, the company provided fresh details about the accounting treatment used by executives to bury the unauthorized bonuses -- details that may shed light on its accountant's role.

In September 2000, for example, the company said Mr. Kozlowski "caused Tyco to pay a special, unapproved bonus" to 51 employees totaling about $96 million.  Tyco said the bonus was purportedly a reward to employees for helping Tyco reap a $1.76 billion gain from an initial public offering of stock in its optical-fiber unit, TyCom.

Under the plan, which was the largest of the supposedly unauthorized compensation schemes, Tyco forgave previous relocation loans it had extended to the employees and included an extra sum to cover the income taxes on the forgiven loans.  Mr. Kozlowski alone received $33 million, while Mr. Swartz received $16.6 million.  TyCom later turned into a financial debacle as fiber-optic outfits faltered amid a capacity glut.  Tyco has since repurchased the stock it sold to the public and written off most of the unit's value.

Typically, accounting experts say, employee bonuses are accounted for as part of general and administrative expenses.  But Tyco's filing says the TyCom bonus was booked in three different accounts totaling $97.4 million -- a slightly larger figure than the bonus payments, which Tyco didn't explain.  About $44.6 million of the total was booked as part of the TyCom offering expense, which some accounting experts said was incorrect but at least resulted in a similar bottom-line effect as the proper accounting treatment.

The other $52.8 million, however, doesn't appear to have been counted as an expense at all, according to three accounting experts who reviewed Tyco's filing.  Instead, ***Tyco seems to have hidden the sum in two different reserve accounts that had been previously established on the balance sheet for unrelated purposes***.  The majority of the money, $41 million, was booked against "Accrued Federal Income Tax," the filing says, in effect reducing sums that Tyco had put aside to pay its federal corporate taxes.

"***This looks like blatant misstatement of both the income statement and the balance sheet***," said Charles Mulford, an accounting professor at Georgia Institute of Technology in Atlanta, who reviewed the Tyco report but isn't involved in the case.  Based on the filing, Mr. Mulford said the maneuver appears to have improperly inflated Tyco's pretax income by $52.8 million in the period, the fourth quarter of fiscal 2000.  For that quarter, Tyco reported net income of $1.1 billion before the TyCom gain.

***Mr. Mulford called dipping into the income-tax kitty particularly "egregious," and said "it would be very surprising if it wasn't picked up by the auditors."***

-33-

Lynn Turner, a former chief accountant at the Securities and Exchange Commission who also reviewed the filing, went even further, saying "*this is called fraud*."

103.    As a result of Kozlowski's and Swartz's fraudulent scheme to pay themselves and other Tyco employees large bonuses in connection with the TyCom offering, Defendants caused Tyco to issue false and misleading statements to investors concerning Tyco's financial results and balance sheet and with regard to Defendants Kozlowski's and Swartz's compensation.

104.    Further details concerning the illicit TyCom bonus payment can be found below in ¶¶133 and 148.

105.    A second illicit bonus payment scheme was perpetrated by Kozlowski and Swartz in November 2000 in connection with the Company's divestiture of its ADT Automotive business. Secret, unapproved bonus payments were made to sixteen Tyco employees totaling $55.95 million, with $12.84 million going to Swartz and $25.56 million going to Kozlowski.

106.    According to the September 2002 8-K, Swartz approved the Company's accounting for these bonuses, which was used to conceal the payments from the public.

107.    Further details concerning the illicit ADT Automotive bonus payment can be found below in ¶¶133 and 148.

108.    Swartz and Kozlowki also manipulated Tyco's financial statements to pay themselves huge bonuses in connection with Tyco's acquisition of stock in Flag Telecom.

109.    In the Flag Telecom deal, Tyco purchased shares of Flag Telecom with cash and TyCom stock.  Tyco recorded the Flag Telecom shares on its books at an earlier price far in excess of the then-current trading price of Flag Telecom.  Defendants did this so Tyco could purportedly justify recording a profit from the transaction.  By recording a falsely inflated valuation of the Flag Telecom stock, Tyco erroneously recorded a gain on the TyCom stock it used as consideration in the transaction.

-34-

110.    On September 25, 2002, *The New York Times* reported on Tyco's false accounting in the Flag Telecom deal and how it was used to hide the Company's illicit, undisclosed payments to Defendants Kozlowski and Swartz:

Tyco International claimed a profit on an investment even as the company lost money on it, a review of the transaction shows.  Tyco then used that profit as an excuse to pay almost $24 million in bonuses to top managers.

Most of that went to L. Dennis Kozlowski, the former chief executive, and Mark H. Swartz, the former chief financial officer.

Details of the transaction, which occurred 15 months ago, have emerged only in recent days and are raising questions about the accuracy of the company's profit reports, in the opinion of some accountants.

The transaction appears to have provided a clear economic loss for Tyco, which was forced to pay an above-market price for an 11 percent stake in a small company called Flag Telecom that has since gone bankrupt.

But Tyco disclosed last week that the company had managed to claim a profit of $79.4 million on the transaction, and that this profit was used to justify the bonuses.

\*      \*      \*

***The Flag transaction, however, may indicate that the company reported profits improperly, or at least in a way that bore no resemblance to economic reality, and that the executives collected bonuses based on those so-called profits.***

\*      \*      \*

In Tyco's financial statements for the quarter ended last June, the company disclosed a profit of $64.1 million on the sale of stock in an unnamed subsidiary, which Tyco officials confirmed yesterday was TyCom.  The Boies report said the company actually computed a profit of $79.4 million.  ***It appears the difference related to hiding the value of $15.4 million in compensation expenses reflected in the bonuses the executives were paid.***  By reducing the stated profit, the company could also avoid reporting the compensation costs without affecting the reported income numbers.

\*      \*      \*

In the end, Flag went bankrupt and Tyco wrote off its entire investment, which it valued at $114 million.

*The deal was a fiasco for Tyco*.

111.   Further details concerning the illicit Flag Telecom bonus payment can be found below in ¶133.

112.   With the agreement and participation of PwC, Kozlowski and Swartz succeeded in concealing from investors and potential investors that Kozlowski and Swartz had succeeded in advancing their personal interests at the expense of Tyco in this manner.

5.   Miscellaneous Improper Theft Of Corporate Assets

113.   In addition to the improper conduct described above, during the Relevant Period Defendants also personally enriched themselves by stealing corporate assets through undisclosed compensation practices, self-dealing transactions, and other misuses of corporate trust.  Further details concerning Defendants' theft of corporate assets can be found below in ¶¶131, 133, 147-49, 151, 165-72 and 175-79.

114.   For example, according to the September 2002 8-K, Kozlowski abused his position within Tyco by causing the Company to purchase his Rye, New Hampshire home for approximately $4.5 million on July 6, 2000.  The house was appraised for only $1.5 million in March 2002.

115.   Defendants Kozlowski and Swartz also personally benefited from undisclosed "auto and aircraft perquisites from Tyco that, in the aggregate, exceeded $50,000 per year" according to Tyco's Form 8-K.  In addition, Tyco admitted in the September 2002 8-K that "Mr. Kozlowski caused Tyco to make available to him various properties that the Company owned for his purported business use" and the Company did not report these personal uses.  Kozlowski also "used millions of dollars of Company funds to pay for his other personal interests and activities" including investments in a film, more than $1 million for an extravagant birthday party for his

wife in Sardinia, jewelry, flowers, wine, and charges to the Company for the use of his personal yacht.

116.    In addition, Kozlowski also caused Tyco to use corporate funds to make charitable contributions for his personal benefit.  According to the September 2002 8-K, the Company conceded that "Kozlowski caused Tyco to make donations or pledges to charitable organizations totaling over $106 million. Of this total, at least $43 million in donations were represented in transmittal letters or otherwise as Mr. Kozlowski's personal donations, or were made using the Company's funds for Mr. Kozlowski's personal benefit."

117.    These are but a few of the examples of Defendants' theft of corporate assets, which are detailed in the various SEC, Company and criminal investigations of Defendants' conduct.

6.    Illicit Insider Sales

118.    Part of the Individual Defendants' scheme included enriching themselves by selling large amounts of their personal Tyco stock at artificially inflated values.  The Individual Defendants' sales during the Relevant Period were massive, as set forth below (and detailed more extensively in § XI):

| Defendant | Stock Sales During Relevant Period |
|---|---|
| Kozlowski | $457.7 million |
| Swartz | $231.3 million |
| Walsh | $2.7 million |

119.    Notably, Swartz and Kozlowski concealed their insider sales from investors, as was reported by *The New York Times* on January 30, 2002:

Two senior executives of Tyco International Ltd. quietly disposed of more than $100 million in Tyco stock during the company's last fiscal year, despite public comments that they rarely if ever sold Tyco shares.

L. Dennis Kozlowski, Tyco's chairman, and Mark Swartz, its chief financial officer, returned the stock to the company in late 2000 and 2001, according to forms filed with the Securities and Exchange Commission in November.

*        *        *

Mr. Kozlowski has repeatedly told analysts and the media that his large holdings in Tyco stock demonstrate his commitment to the company.

"I'm paid in Tyco stock," Mr. Kozlowski said in an interview last month. "We, the board, everybody, feel the best way to keep management's interest aligned with shareholders is to keep 100 percent of our net worth in Tyco's stock."

Mr. Kozlowski returned about 1.25 million shares of stock to the company last year, according to the filings. Mr. Kozlowski owns about three million shares of Tyco stock, according to a report Tyco filed Monday with the S.E.C., and has an additional 11 million Tyco options.

F.      Defendants' Scheme To Conceal Tyco's True
        Creditworthiness And Impending Liquidity Crisis

120.    Throughout the Relevant Period, Defendants repeatedly made false and misleading statements concealing the Company's true creditworthiness and its ability to pay future debt obligations by misrepresenting the value of the Company's assets and actual earnings, the quality of its earnings, and its cash flows.  In the latter part of the Relevant Period, Defendants were faced with an impending liquidity crisis at Tyco and made false statements concealing this liquidity crisis.

121.    To carry out the acquisition scheme discussed above – which included having Tyco overpay for many of the companies it purchased – Tyco had borrowed heavily.  As a result, in 2002 Tyco had approximately $26 billion of debt on its balance sheet that the Company would have to begin repaying in 2003.

122.    In 2002, as investors learned more about the Company's accounting improprieties and self-dealing transactions, investors began to become increasingly concerned about how Tyco would repay its massive debt load and whether Defendants' were honestly reassuring investors the Company could do so.

123.    Despite Defendants' assurances of sound creditworthiness, on February 4, 2002, the Company's credit rating was downgraded by Standard & Poor's and Fitch Ratings. Nonetheless, Defendants continued to reassure investors of Tyco's creditworthiness, but such reassurances proved to be false and misleading.

124.    For example, the May 20, 2002 edition of *BusinessWeek* included a mocking parody of a letter from Kozlowski to Tyco's Board of Directors, which poked fun at Kozlowski's diminished credibility concerning Tyco's creditworthiness and pending liquidity crisis:

To: Board of Directors, Tyco International

From: Dennis Kozlowski, chairman and CEO

Re: Cash Money

Unbelievable!  A year ago, *BusinessWeek* had me as its cover boy – "The Most Aggressive CEO."  This year, Tyco stock is off 70%.  **No matter how often I repeat, "There is no liquidity crisis. There is no liquidity crisis. There is no liquidity crisis," Wall Street keeps wondering how we'll get the cash to pay our debts.**  Skeptics doubt we can raise billions by selling CIT Group.  **My credibility, they say, is shot.**  I say: The Street wants to see the money?  We'll show them money.  Herewith, 10 fresh cash-raising initiatives:

1. Think how much cash changes hands each year in this country's fragmented fund-raising industry.  Bake sales.  Student car washes.  Talent auctions.  Bingo.  We can get our cut.  With Tyco stock, we will buy a bunch of these operations, roll them up, and "Tycoize" them into a cash machine.  This makes my mouth water:  We pay stock and we get back cash – plus first dibs on all unsold banana bread.

*      *      *

4. We're already at work on this:  We lug our stacks of 2002 financial projections to the recycling center.  We make sure all paper is weighed precisely, so recyclers pay us full pulping value.

*     *     *

10. Stop financial engineering – the mergers, spin-offs, and initial public offerings.  Run our businesses just for the cash they can generate.  On second thought, scratch that – no one will ever believe me.

125.    Here, *BusinessWeek's* fake letter from Kozlowski to the Board of Directors calls attention to market rumors then-existing concerning the acquisitions scheme, Tyco's fake financial forecasting and financial engineering – even despite the fact that much of the details concerning these fraudulent practices had not yet entered the marketplace.

126.    Up until their resignations from Tyco, Kozlowski and Swartz would continue to falsely assert that Tyco had strong cash flows and earnings, ample assets that could be sold to pay down debt and no liquidity issues.  In truth, many of Tyco's assets were carried at inflated valuations and the Company's earnings and cash flows were being manipulated.

127.    In the October 7, 2002 edition of *BusinessWeek*, issued only a few months after Defendants' false and misleading statements concerning Tyco's ability to pay its debts, the magazine reported on Tyco's looming liquidity crisis in an article entitled "TYCO: THE VISE GROWS EVER-TIGHTER, Half its debt is coming due – but where's the cash to pay it?"

> Now comes the much tougher challenge of cleaning up the financial mess.  The $36 billion empire Kozlowski left behind is under siege on every front. Sales and margins are plunging, ***even as Tyco staggers under $26 billion of debt***.  And with its market value already down this year by some $90 billion, "it's getting awfully hot in the kitchen," says Nicholas P. Heymann, an analyst at Prudential Securities Inc.
>
> Just how hot became more clear on Sept. 25, when Breen, in his first conference call with investors since taking charge, sharply cut earnings estimates issued in July by Tyco's former team.  At the same time, Breen warned that Tyco would have to take yet another big write-off: this time, up to $2.5 billion for its disastrous foray into the underseas cable-telecom market. That's on top of a $6.7

-40-

billion write-down it took earlier this year on the sale of Tyco's CIT Group Inc. for $4.6 billion.

> ***These latest disclosures only increase the urgency of Breen's immediate task: averting a liquidity crisis***.  While the sale of CIT helped boost Tyco's cash level to about $7 billion, ***nearly half of its debt comes due by the end of next year***.  And as previous estimates of cash flow continue to be ratcheted down, ***it now looks like Tyco could come up $3 billion short of what it needs***.  "There are still an awful lot of uncertainties," says Eric Ause, an analyst at Fitch Ratings, ***which is maintaining its junk-bond rating on Tyco's debt***.

## VI.   ADDITIONAL PARTICULARIZED DETAILS OF THE FRAUD

128.    In this section Plaintiffs plead in further detail the facts concerning Defendants' fraudulent scheme as revealed in:  (i) Tyco's own court filings in legal proceedings Tyco commenced against Kozlowski, Swartz and Walsh; (ii) the Company's three restatements the financial statements it issued during the Relevant Period; (iii) the reports produced by Tyco's outside legal counsel Boies, Schiller & Flexner LLP ("the Boies Firm"); (iv) the criminal proceedings brought against Kozlowski, Swartz and Walsh; and (v) the findings of the SEC in its civil proceedings against Tyco, the Individual Defendants, Tyco's former general counsel Mark Benick, and certain other Tyco employees.

### A.    Tyco Brings Suit Against Certain Individual Defendants

129.    Between June 2002 and April 2003, Tyco filed civil complaints against Kozlowski, Swartz and Walsh for breach of their fiduciary duties and other wrongful conduct. As described below, the various complaints filed by Tyco against Kozlowski, Swartz and Walsh contain admissions by Tyco detailing aspects of Defendants' fraud.

#### 1.    Tyco's Lawsuit Against Kozlowski

130.    On September 12, 2002, Tyco filed a civil complaint against Kozlowski in the United States District Court for the Southern District of New York, captioned *Tyco International Ltd. v. L. Dennis Kozlowski*, No. 02-7317 (S.D.N.Y.), for breach of fiduciary duty and other

wrongful conduct.  The Company amended its complaint on April 1, 2003.  The Company's

complaint against Kozlowski alleges numerous unauthorized and criminal acts committed by

Kozlowski from at least 1995 until his resignation on June 3, 2002.

131.    Specifically, Tyco's amended complaint against Kozlowski contains the

following details:

- "[B]eginning at least as early as 1995, [Kozlowski] contrived a scheme to abuse the trust that had been placed in him by Tyco's Board of Directors by misappropriating money and assets from the Company, and engaging in a concerted pattern of conduct to conceal his larcenous acts from the Board." (¶1);

- "In addition to his own wrongful conduct, Kozlowski also induced and conspired with certain other senior officers and agents of Tyco to breach their own fiduciary duties to the Company.  Kozlowski did this by allowing these persons to share in his misappropriations of money and assets, also without notice to or approval by the Company's Compensation Committee of the Board of Directors, and by entering into various undisclosed agreements with these persons, including agreements that gave them excessive and undisclosed compensation, and tied their compensation to Kozlowski's, in ways that were affirmatively concealed from the Company's Board." (¶2);

- "Kozlowski concealed (and induced or conspired with others to conceal) from the Board and its relevant committees the following:

  a. Kozlowski transformed an approved Tyco 1995 relocation program that complied with IRS regulations and was available to all employees into a special program for senior executives that permitted them to use millions of dollars of Company funds to purchase and speculate in New York real estate;

  b. Kozlowski abused the Company's Key Employee Loan ("KEL") program, which had been established for the purpose of facilitating the continued ownership of Tyco stock, from at least 1997 onward, by using it as his personal line of credit to fund myriad personal expenditures;

  c. Kozlowski misused subsequent Tyco loan programs, using millions of dollars of Company funds to purchase and speculate in real estate and personal investments;

    d.   Kozlowski directed Tyco's CFO, Mark Swartz, in 1999 to enter unapproved credits against $25 million of Kozlowski's own KEL loans, $12.5 million of Swartz's KEL loans and $1 million of an event planner's KEL loans;

    e.   Kozlowski awarded unauthorized "special bonuses" to himself and over 40 other Tyco employees in September of 2000 that forgave the employees' relocation loans and paid their additional tax liabilities owed on the forgiveness;

    f.   Kozlowski fabricated another bonus program in favor of himself and two dozen select executives in November of 2000;

    g.   Kozlowski made fraudulent affirmative misrepresentations to the Compensation Committee of the Board in order to secure benefits for himself and make unauthorized awards of compensation to certain senior executives and key managers;

    h.   Kozlowski paid an unauthorized $20 million fee to Frank Walsh, a friend and then-Tyco director, in July 2001 in connection with the acquisition of The CIT Group and specifically asked Walsh to conceal it from the Board;

    i.   Kozlowski engaged in self-dealing transactions involving Company assets, including various real estate purchases and sales in which appraisals were not obtained, and allowed members of his extended family to use Company property; and

    j.   Kozlowski concealed from the Board a criminal investigation into his own conduct and the service of subpoenas upon the Company."

(¶3) (Internal references to exhibits omitted);

- "[T]hrough a pattern of conduct abundant with conflicts of interest, self-dealing, and other serious legal and ethical problems, Kozlowski secretly devised means to enrich himself with corporate assets outside the attention of the Company's Board, its Compensation Committee and the public's eye." (¶16);

- "Kozlowski violated the trust reposed in him as the Chief Executive of the Company and breached his fiduciary duties to the Company by engaging in criminal conduct." (¶95).

    2.    Tyco's Lawsuit Against Swartz

132.    On April 1, 2003, Tyco filed a civil complaint against Swartz in the United States District Court for the Southern District of New York, captioned *Tyco International Ltd. v. Mark H. Swartz*, No. 03-2247 (S.D.N.Y.), for breach of fiduciary duty and other wrongful conduct.

133.   Specifically, Tyco's complaint against Swartz contains the following details:

- "Swartz violated both the purpose and the specific restrictions of the KEL program. From 1997 to his departure, Swartz borrowed $99,093,460 in KEL loans. Of his total KEL loans, more than $86,208,567 was used by Swartz for private investments unconnected with the stated purpose of the program including at least $20,125,000 to his private investment accounts and $42,000,000 for unspecified loans." (¶28);

- "Swartz directed one of his subordinates (whom he rewarded with a special $125,000 bonus) in August 1999 to cause Kozlowski's KEL account to be credited in the amount of $25 million, Swartz's own KEL account to be credited in the amount of $12.5 million, and the KEL account of a corporate event planner to be credited another $1 million. . . . As Swartz was aware, these 'credits' were not disclosed to, nor approved by, the Compensation Committee or the Board, as the Company's proxy statements, prepared under Swartz's supervision, provided they must be…." (¶29);

- Swartz used a Florida relocation program to obtain $20,992,000 in interest-free loans to build a home in Boca Raton, Florida. (¶¶30-33);

- Swartz received unauthorized loan forgiveness of $16,610,687 in connection with purported bonuses awarded in connection with the Company's initial public offering of TyCom. "The aggregate cost to the Company of the unauthorized loan forgiveness program was almost $100 million." (¶¶34-41);

- Swartz also received approximately $12,844,632 in benefits in connection with the divestiture of Tyco's ADT Automotive business. (¶¶42-48) "The aggregate cost to the Company of the unauthorized ADT Automotive Bonus program was over $55 million." (¶47);

- In November 2000, over $55 million in compensation to senior Tyco executives was recorded as direct selling costs of Tyco's ADT Automotive business, and netted against the gain associated with the divestiture of ADT Automotive business. (¶¶43-47);

- Swartz also received benefits which exceeded $6,971,695 by causing shares of TyCom stock previously issued to himself and other executives to vest as part of a purported gain on the exchange of TyCom shares for an equity interest in Flag Telecom Holdings Ltd. "The total cost to the Company for this accelerated vesting exceeded $15,378,700." (¶¶56-60);

- "The personal benefit to Swartz of these unauthorized 'special bonus' programs that were never disclosed – the TyCom Bonus ($16,610,687), the ADT Automotive Bonus ($12,844,632), and the Flag Bonus

-44-

($6,971,675) – cost the Company over $36,426,994 in less than twelve months.  The combined cost to the Company of all of these unauthorized bonuses for all the recipients was $167,295,808." (¶61); and

- "Swartz's W-2 income in calendar year 2000 alone was $60,735,241.81." (¶48).

### 3.   Tyco's Lawsuit Against Walsh

134.   On June 17, 2002, Tyco filed a civil complaint against Walsh in the United States District Court for the Southern District of New York, captioned *Tyco International Ltd. v. Frank E. Walsh, Jr.*, No. 02-4633 (S.D.N.Y.), for breach of fiduciary duty and other wrongful conduct.

135.   The complaint filed by Tyco against Walsh admits that Walsh received a $20 million unauthorized "fee" in connection with his role in Tyco's acquisition of CIT which was never ratified by the Board and that this payment was not disclosed by Tyco until Tyco filed its proxy statement on January 28, 2002.  (¶¶19, 26).

136.   Tyco's complaint against Walsh acknowledges that: "Following this disclosure, which was immediately picked up and publicized in the national financial press, the share price of Tyco's stock fell from $42 to $33.65, reducing the Company's market capitalization by $16.7 billion in one day."  (¶26).

137.   Additionally, Tyco's complaint against Walsh admits that, "Walsh's position at the time as Tyco's lead director and member of the Corporate Governance and Nominating Committee made it overwhelmingly likely that the disclosure of his payments would cause substantial harm to the Company's reputation and credibility in the marketplace, which it did." (¶35).

### B.   The 6/12/02 And 12/31/02 Restatements

138.   Tyco has restated certain financial statements issued during the Relevant Period, and thereby admits these financial statements were materially false and misleading.

139.   On June 12, 2002, Tyco admitted that its financial statements for the quarter ended March 31, 2002 were false and misleading.   Tyco's March 31, 2002 Form 10-Q had falsely stated Tyco had no need to take an impairment charge on goodwill:

> The Company periodically reviews and evaluates its goodwill and other intangible assets for potential impairment. Effective October 1, 2001, the beginning of Tyco's fiscal year 2002, the Company adopted SFAS No. 142, "Goodwill and Other Intangible Assets," under which goodwill is no longer amortized but instead is assessed for impairment at least annually. Under the transition provisions of SFAS No. 142, there was no goodwill impairment at October 1, 2001. ***Updated valuations were completed as of March 31, 2002 for our Tyco Telecommunications (formerly TyCom) reporting unit and Tyco Capital, which resulted in no impairment of goodwill at that date***.

140.   On June 12, 2002, Tyco filed with the SEC an amended Form 10-Q for the quarter ended March 31, 2002, which stated:

> This Amendment on Form 10-Q/A is being filed solely to restate the Company's Consolidated Financial Statements for the quarter ended March 31, 2002 and to revise the related disclosures. This filing does not reflect any other changes.   The restatement to the financial statements herein reflects an impairment of goodwill in the Tyco Capital segment in accordance with SFAS No. 142, "Goodwill and Other Intangible Assets," ***resulting in a $4.5 billion estimated impairment charge***.

141.   Tyco admitted that the $4.5 billion charge emanated from its CIT business, which was part of the Tyco Capital unit.   In violation of GAAP, Defendants purposefully ignored market indices of the true value of these assets, instead choosing to continue to carry the assets at inflated values.   Tyco's amended Form 10-Q admits that "***market-based information used in connection with the Company's preliminary consideration of the potential initial public offering for 100% of CIT indicated that CIT's book value exceeded its estimated fair value as of March 31, 2002.***"

142.   The $4.5 billion restatement was massive.   As a result of this restatement, Tyco's net earnings ***loss*** for the quarter ended March 31, 2002 increased from $1,905.4 million to

$6,418.1 million.   The $4.5 billion restatement eliminated nearly 40% of the total net income (minus dividends) that the Company had earned over its entire existence.

143.     On December 31, 2002, Tyco filed three amended Form 10-Qs with the SEC restating its financial results for the quarters ended December 31, 2001, March 31, 2002, and June 30, 2002.   These restatements increased Tyco's net loss by $581 million resulting from charges to correct prior accounting errors, goodwill and impairment charges and the elimination of inter-company sales.   During the quarter ended December 31, 2001, Tyco's pre-tax income was overstated by more than 21%.   During the quarter ended March 31, 2002, Tyco understated its reported loss by more 71%, and for the quarter ended June 30, 2002, Tyco's reported pre-tax income of $150.6 million was restated to a loss of $236.1 million.   Tyco's Form 10-Q/A for the quarter ended June 30, 2002, explained the basis for the restatement as follows:

> As described in Note 1 to the Company's Consolidated Financial Statements in its Form 10-K/A for the year ended September 30, 2001, the Company is reimbursed by dealers for certain costs incurred by the Company under ADT's authorized dealer program.  The Company has restated its Consolidated Financial Statements and the related disclosures for the quarter and nine months ended June 30, 2002 to record as a deferred credit the amount by which dealer reimbursements exceed the actual costs incurred by the Company during these periods (resulting in decreases to net income of $25.5 million and $80.7 million, respectively). The deferred credit is being amortized on a straight-line basis over ten years. Financial statements for periods prior to fiscal 2002 have not been restated. However, we have recorded the effect of the charge related to prior years as well as certain other charges, as discussed below in "Charges Relating to Prior Years Recorded in Fiscal 2002" (resulting in a decrease to net income of $199.7 million for the nine months ended June 30, 2002).  In addition, the Company has restated its Consolidated Financial Statements and the related disclosures to reflect the elimination of certain inter-company sales and the associated margin between the Company's Engineered Products and Services and Electronics' segments (resulting in decreases to revenues of $20.0 million and $121.0 million and a decrease to net income of $2.7 million and an increase of $1.1 million for the quarter and nine months ended June 30, 2002, respectively), and to adjust the amount of capitalized interest (resulting in a decrease to net income of $10.4 million for the quarter and nine months ended June 30, 2002). The Company has also restated its financial statement disclosures to reflect a reduction of operating income of $42.0 million in the Electronics segment, offset by a reduction of

corporate operating expenses for the same amount (resulting in no change to net income) for the nine months ended June 30, 2002. In addition, due to changes in the assumed tax rates, the Company increased the goodwill impairment charge by $218.6 million in the Telecommunications reporting unit and $112.8 million in the Tyco Infrastructure reporting unit during the quarter and nine months ended June 30, 2002. The Company also reduced its loss on the write-off of investments due to the reduction in book value of an investment by $39.6 million in the nine months ended June 30, 2002.  The restatement results in an aggregate decrease in sales of $20.0 million and $121.0 million and an increase in net loss of $370.0 million and $581.5 million for the quarter and nine months ended June 30, 2002, respectively.

144.    The Form 10-Q/A for the quarter ended June 30, 2002 also stated:

During the fourth quarter of fiscal 2002, the Company identified various adjustments relating to prior year financial statements.  Management concluded the effects of these adjustments, as well as any unrecorded proposed audit adjustments, were not material individually or in the aggregate to the current year or any prior year.  Accordingly, prior year financial statements have not been restated.  Instead, these adjustments that aggregate $261.6 million on a pre-tax income basis or $199.7 million on an after-tax income basis have been recorded effective October 1, 2001.

145.    Tyco's Form 10-Q/A for the quarters ended December 31, 2001 and March 31, 2002 contained disclosures similar to the preceding two (2) paragraphs.

C.    The Flawed Boies Firm Report

146.    According to Tyco's Form 8-K filed with the SEC on September 17, 2002, on April 30, 2002, Tyco retained the Boies Firm "to represent Tyco in connection with the [Corporate Governance] Committee's review and analysis of transactions between and among Tyco and its subsidiaries and certain of Tyco's directors and officers, and any litigation arising from or relating to that review."  Beginning in June 2002, the scope of the Boies Firm retention was expanded "to include 'the use of company funds' and 'the Company's accounting and disclosures.'"

147.    According to a Tyco Form 8-K filing on December 30, 2002, the work of the Boies Firm was then further expanded in July 2002, "to include a review and analysis of, and

-48-

litigation concerning, selected accounting and corporate governance issues and transactions in addition to the conduct and compensation of senior corporate executives and directors."  The expanded Boies Firm report was also to advise the Company on "the integrity of the company's financials and the possible existence of systemic or significant fraud, or other improper accounting that would materially adversely affect the Company's reported earnings or cash flow from operations in 2003 or thereafter."

148.    On September 17, 2002, Tyco filed the September 2002 8-K setting forth the Boies Firm's purported findings with respect to its investigation into the misuse and misappropriation of Tyco funds by the Company's management (which included Mark Belnick, the Company's general counsel during the Relevant Period).  The September 2002 8-K, which was signed by Tyco's new President and CEO Edward Breen (who came to Tyco after the Relevant Period), states:

- "During at least the five years prior to June 3, 2002, Tyco's three top corporate officers - its CEO, its CFO, and its Chief Corporate Counsel – engaged in a pattern of improper and illegal conduct by which they enriched themselves at the expense of the Company with no colorable benefit to the Company. . . ."

                    *    *    *

- Kozlowski "improperly borrowed approximately $29,756,000 in non-qualifying relocation loans to purchase land and construct a home in Boca Raton, Florida during the years 1997 to 2000, and improperly borrowed approximately $7,012,000 in non-qualifying relocation loans to purchase a cooperative apartment in New York City in 2000."

- Kozlowski, Swartz, Belnick and other executive officers also misused various relocation programs "to receive non-qualifying loans and unauthorized benefits that were not generally available to all salaried employees affected by relocations, or were not related to any Tyco relocation, enriching themselves with no colorable benefit to Tyco."  In particular:

    o Kozlowski received $7,011,669 in interest free loans "for purported New York relocations that did not qualify under the

New York Relocation Program," $29,756,110 in interest free loans "for the acquisition of property under an unauthorized Florida relocation program," and "$24,922,849 in interest free loans . . . for the acquisitions of other properties that were not authorized by any relocation program."

o Kozlowski used the unapproved New York relocation plan to "[p]urchase[], using interest-free relocation loans, a $7 million Tyco-owned apartment at 610 Park Avenue, New York City in 2000, at depreciated book value and without appraisals, which Mr. Kozlowski deeded to his ex-wife a few months later."

o Kozlowski also used the New York plan to sell "his house at 10 Runnymede, North Hampton, New Hampshire to the Company in 2000 without appraisals for an amount approximately three times its market value" which the Company wrote down by approximately $3 million less than 24 months later.

o Purportedly pursuant to the New York plan, Kozlowski caused "Tyco to purchase a second apartment for his use (with Mr. Kozlowski as nominee owner) at 950 Fifth Avenue, New York in 2001 for $16.8 million, and then caused Tyco to spend $3 million in improvements and $11 million in furnishings for that apartment." "[F]or the apartment . . . he caused Tyco to purchase fine art worth millions of dollars and failed to pay sales taxes." At the expense of the Company, Kozlowski "purchased and decorated the apartment with appointments and furnishings lacking any legitimate business justification, including: a shower curtain for $6,000; a dog umbrella stand for $15,000; a sewing basket for $6,300; a traveling toilette box for $17,100; a gilt metal wastebasket for $2,200; coat hangers for $2,900; two sets of sheets for $5,960; a notebook for $1,650; and a pincushion for $445."

o Kozlowski used the unapproved Florida relocation plan to "purchase[] lots and buil[d] a home at 4101 Ibis Point Circle, Boca Raton, Florida, located in a development called 'The Sanctuary.'"

o At least $19,439,392 of Kozlowski's "relocation" loans were "repaid" through "unauthorized forgiveness" that Kozlowski bestowed upon himself.

o Swartz received "$7,668,750 in interest free loans . . . for property acquisitions in New York and New Hampshire under the unauthorized New York Relocation Program," "$20,992,000 in interest free loans . . . under an unauthorized Florida relocation

program," and "$4,437,175 [in] interest-free [loans], for the acquisition of other properties . . ." At least $9,792,000 of Swartz's "relocation" loans were "repaid through forgiveness" by Kozlowski.

o Belnick "used the unauthorized version of the New York relocation program to borrow approximately $4,217,000 from September 1998 through May 2001 for the purchase and improvement of a cooperative apartment in New York City at 300 Central Park West." Further, even though Tyco had no corporate offices in Utah, "[f]rom 2001 through March 2002, Mr. Belnick borrowed an additional $10,418,599 to purchase land and build a home at 3468 West Crest Court, Park City, Utah. Mr. Belnick then charged Tyco $1600 per month for his home office located in that house."

- "In September 2000, Mr. Kozlowski caused Tyco to pay a special, unapproved bonus to 51 employees who had relocation loans with the Company . . . calculated to forgive the relocation loans of all 51 employees, at a total cost of $56,415,037, and to pay compensation sufficient to discharge all of the tax liability due as a result of the forgiveness of those loans. This action was purportedly related to the successful completion of the TyCom Initial Public Offering. The total gross wages paid by the Company in this loan forgiveness program were $95,962,000, of which amount Mr. Kozlowski received $32,976,000 and Mr. Swartz $16,611,000." "All of the forgiveness benefits were individually reported on separate W-2s, yet none of the income associated with the forgiveness benefits was reported in the Company's proxies for the Named Officers, i.e. Kozlowski and Swartz in the year 2000." The cost of this approximately $100 million "bonus" was recorded by Tyco as an expense in connection with the TyCom IPO.

- "On November 13, 2000, Mr. Kozlowski sent a letter to 16 of the Company's executive officers and key managers thanking them for their many contributions towards the successful divestiture of Tyco's ADT Automotive business and enclosing bonuses and 'relocation' payments." "[T]he total benefits awarded at the time of the ADT Automotive divestiture were, and total cost the Company was, approximately $55,954,455." "[T]he award of the ADT Automotive bonus was also an unauthorized and unilateral award by Mr. Kozlowski." "None of these benefits was approved by, or disclosed to, the Compensation Committee or the Board of Directors."

- "During the fiscal years from 1997 to [2002] . . . certain executive officers used KEL loans for purposes other than the payment of taxes due upon the vesting of restricted shares, borrowed more than the limits allowed under the program's terms, or both."

-51-

- "According to Tyco records . . . approximately 90% of Mr. Kozlowski's KEL loans were non-program loans, which he used to fund his personal lifestyle, including speculating in real estate, acquisition of antiques and furnishings for his properties (including properties purchased with unauthorized 'relocation loans'), and the purchase and maintenance of his yacht."

- "Mr. Swartz, like Mr. Kozlowski, borrowed millions in non-program loans. Like Mr. Kozlowski, Mr. Swartz used those unauthorized loans to purchase, develop and speculate in real estate; to fund investments in various business ventures and partnerships (including private ventures in which both he and Mr. Kozlowski used Tyco KEL loans to invest); and for miscellaneous personal uses having nothing to do with the ownership of Tyco stock."

- "In August 1999, at Mr. Kozlowski's and Mr. Swartz's direction, entries were made in Tyco's KEL records that purported to reduce $25,000,000 of Mr. Kozlowski's outstanding KEL indebtedness, $12,500,000 of Mr. Swartz's KEL indebtedness, and $1,000,000 of the KEL indebtedness of another employee.  This was done without the knowledge or approval of the Compensation Committee."

- There was a secret agreement among Tyco's Chief Corporate Counsel Belnick and Kozlowski which promised additional millions of dollars of compensation and which gave Mr. Belnick "an undisclosed incentive to aid and facilitate Mr. Kozlowski's improper diversion of Company funds to Mr. Kozlowski's personal benefit." Belnick received cash and stock in 2000 which made him "one of Tyco's four highest paid executive officers other than the chief executive officer" but "Tyco's proxy statement for fiscal 2000 did not disclose Mr. Belnick's compensation."

- "During [the fiscal years from 1997 to 2002], both Mr. Kozlowski and Mr. Swartz each received auto and aircraft perquisites from Tyco that, in the aggregate, exceeded $50,000 per year." "These perquisites were . . . required to be reported in a proxy to the extent they exceeded $50,000" but "were not reported in the proxy because Mr. Kozlowski and Mr. Swartz represented that they would reimburse the Company for amounts in excess of $50,000. However, in most cases Messrs. Kozlowski and Swartz failed to reimburse the Company for all perquisites in excess of $50,000. In addition, Mr. Kozlowski caused Tyco to make available to him various properties that the Company owned for his purported business use."

- "At least for the last five years, Mr. Kozlowski has systematically abused his position and caused Tyco to expend funds for his personal benefit, which did not advance the Company's interest in any colorable way."

- "Kozlowski also used millions of dollars of Company funds to pay for his other personal interests and activities during [the fiscal years from 1997 to 2002], including a $700,000 investment in the film 'Endurance'; more than $1 million for an extravagant birthday party celebration for his wife in Sardinia; over $1 million in undocumented business expenses, including a private venture (West Indies Management - $134,113); jewelry ($72,042); clothing ($155,067); flowers ($96,943); club membership dues ($60,427); wine ($52,334); and an undocumented $110,000 charge for the purported corporate use of Mr. Kozlowski's personal yacht, 'Endeavour.'"

- Kozlowski also engaged in various self-dealing transactions injurious to the Company, "used millions of dollars of Company funds to pay for his other personal interests and activities during [the fiscal years from 1997 to 2002]" and caused Tyco to make at least $43 million in donations or pledges to charitable organizations which "were represented in transmittal letters or otherwise as Mr. Kozlowski's personal donations, or were made using the Company's funds for Mr. Kozlowski's personal benefit."

- In early 2001, Kozlowski "caused Tyco to pay to and for the benefit of Mr. Walsh a $20 million fee for his role in the transaction [to acquire CIT]." "The Board never ratified the Walsh payment, then or later."

- "The improper and unlawful conduct of Tyco's former CEO, CFO and Chief Corporate Counsel in enriching themselves at the expense of the Company with no colorable benefit to the Company has damaged Tyco."

- "The amount of money improperly diverted by Tyco's former executives from the Company to themselves is . . . large by any other relevant comparison; and the extent of the former executives' misconduct has harmed Tyco's reputation and credibility with investors, lenders, and others."

149.    On December 30, 2002, Tyco filed a Form 8-K (the "December 2002 8-K") setting forth additional findings in connection with the Boies Firm's expanded investigation and "review [of] Tyco's 1999-2002 reported revenues, profits, cash flow, internal auditing and control procedures, accounting for major acquisitions and reserves, the use of nonrecurring charges, the personal use of corporate assets, the use of corporate funds to pay personal expenses, employee loan and loan forgiveness programs, and corporate governance issues."  The December 2002 8-K was signed on behalf of Tyco by Executive Vice President and General Counsel William B. Lytton, who came to Tyco after the Relevant Period.

-53-

150.   The December 2002 8-K reiterated the September 2002 8-K's detailed findings in summary fashion, stating: "As discussed in the September 2002 Report, prior senior management's stewardship of Tyco was characterized by serious abuses of trust and self-dealing by the highest officers of Tyco. As also discussed in the September 2002 Report, during at least 1999 to 2002, Tyco's prior senior management from time to time failed to properly report and account for their compensation and conduct."   However, the principal focus of the December 2002 8-K was the Company's financial accounting.

151.   The December 2002 8-K contains the following admissions by Tyco:

- "[C]urrent management has concluded that, in the past, the Company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; inadequate approval procedures and documentation; a lack of oversight by senior management at the corporate level; a pattern of using aggressive accounting that, even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used; pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ; and a lack of a stated and demonstrable commitment by former senior corporate management to set appropriate standards of ethics, integrity, accounting, and corporate governance."

- "During at least the five years preceding Kozlowski's resignation, Tyco pursued a pattern of aggressive accounting that was intended, within the range of accounting permitted by GAAP, to increase current earnings above what they would have been if a more conservative accounting approach had been followed. There were also instances where senior management exerted pressure and provided incentives which had the purpose and effect of encouraging unit and segment officers to achieve higher earnings, including in some cases by their choice of accounting treatments."

- "[T]here were instances where prior management appeared to influence the management of an acquisition target into adopting accounting treatments that 'over-accrued' expenses prior to an acquisition's consummation or otherwise exceeded what was permitted by GAAP."

-54-

- "Tyco's aggressive accounting in the past was not neutral as to the timing of the recognition of revenues and expenses.  The Company, for example, devoted considerably less attention to identifying appropriate accounting adjustments that would reduce reported earnings in the period immediately after an acquisition than it devoted to identifying appropriate accounting adjustments that would increase reported earnings after an acquisition."

- "[I]n a number of instances the accounting treatment applied to certain transactions in the Company's reported financials was erroneous."

- "With respect to the purchase accounting and pooling transactions examined, there were instances in which the pre-acquisition earnings of an acquired entity for the period immediately preceding the consummation of its acquisition by Tyco were significantly lower than the entity's earnings in prior periods."

- Internal Tyco documents describe actions taken by Raychem prior to its August 12, 1999 acquisition by Tyco which "included directions from Raychem management to hold back shipments and pay all bills received whether due or not, prior to the consummation of the acquisition. These documents fit the pattern discussed above of the Company's aggressive use of numerous accounting opportunities where available to enhance earnings in the first few quarters after companies were acquired, compared to the period just before acquisition."

- Tyco and US Surgical agreed that US Surgical would take steps to reduce revenues in the period immediately preceding its merger with Tyco and taking other steps which "had the effect of accelerating expenses just prior to the merger and accordingly, reducing expenses (and thereby increasing earnings) subsequent to the merger."

- "[T]here was both a notable lack of documentation supporting the establishment and utilization of reserves and a pattern of aggressive purchase accounting in the application of APB 16."

- Tyco entered numerous erroneous accounting entries with respect to reserves in connection with the AMP, Mallinckrodt, Raychem, Sensormatic, Sherwood, Simplex, US Surgical, and Wells Fargo transactions.

- "The Company determined the amounts reimbursed from dealers under ADT's authorized dealer program exceeded the costs actually incurred. The cumulative effect of reimbursements recorded in years prior to fiscal 2002 in excess of costs incurred, net of the deferred credit, which would have been amortized, is $185.9 million."

-55-

- "The Company determined that the gain of $64.1 million on the issuance of TyCom shares previously reported for fiscal 2001 should have been lower by $39.6 million"; and

- "The Company in general took aggressive approaches in its accounting, including its acquisition accounting, the classification of charges and expenses as non-recurring, amortization and depreciation decisions, recognition of revenue, and capitalization of expenses."

152.    While the Boies Firm's report disclosed a great amount of detail concerning Defendants' fraudulent activities, it was neither the whole truth nor a fair and accurate representation of Defendants' fraud.  As Abraham Briloff, the Emanuel Saxe Distinguished Professor Emeritus of Accounting at New York's Baruch College, wrote in *Accounting Today* on April 21, 2003, the Boies Firm report was a "whitewash" that wrongfully reached the conclusion to "let by-gones be bygones" so Tyco could move on past its Kozlovski-era fraudulent conduct:

"They still don't get it" was my strident response to the report orchestrated by David Boies Esq. in the wake of his law firm's probe of Tyco International. . . .

*          *          *

Boies' report uncovered "serious abuses of trust and self-dealing by the highest officers of Tyco," as well as a pattern of highly aggressive accounting.

Having uncovered that "Stygian swamp" at Tyco, Boies concluded that "there was [no] significant or systemic fraud affecting the company's prior financial statements."

Alas!  David Boies has lost his olfactory sensitivity . . . .

*          *          *

My "white paper, whitewash" jibes not withstanding, there is no doubt in my mind but that the Boies dream team fully accomplished the objectives contemplated by the "terms of arrangement" with Tyco's squeaky-clean new management and an SEC that was firmly under the control of then-chair Harvey Pitt and his chief accountant Robert Herdman.

Thus, it was important that they should endeavor to put Tyco's past behind it, to let by-gones be bygones, and to calm the jitters on Wall Street regarding Tyco's financial accountings and, conceivably, to install confidence in the marketplace generally.

-56-

D.     The 7/29/03 Restatement

153.     On March 12, 2003, Tyco announced, without elaboration, that it anticipated taking certain charges in connection with its ongoing audit of the Company's financial statements:

> Tyco International Ltd. (NYSE: TYC, BSX: TYC, LSE: TYI) today announced that in the quarter ending March 31, 2003, it expects to take non-cash, ***pre-tax charges that are estimated to be between \$265 million and \$325 million for issues identified primarily in its Fire & Security Services business***. These charges are expected to lower earnings by \$0.09 to \$0.11 per share.

154.     Then, on April 30, 2003, Tyco announced that this charge to earnings would actually total approximately \$1 billion.  The Company stated in a press release:

> The charges arising out of the Company's ongoing program of intensified internal audits and detailed controls and operating reviews were \$997.4 million pre-tax.   This includes the \$265 million to \$325 million range of anticipated charges announced on March 13th.  Approximately 52% of the charges are the result of applying management's judgment to estimates of reserves, accruals and valuations of investments.   The remaining 48% is attributable to account reconciliation discrepancies, inappropriate capitalization of expenses and other accounting adjustments, of which 44% relate to prior periods from 1997 through the first quarter of fiscal 2003.  Approximately 60% of the total charges related to the Fire and Security segment and 20% to Engineered Products and Services.

> The Company also recorded a charge of \$364.5 million pre-tax to reflect a change in the method of amortization used for ADT dealer program account assets.  The Company has adopted an accelerated approach, based on a 200% declining balance, as opposed to the 10 year straight line method previously in place.

> The Company has also adopted the newly issued EITF 02-16, which requires that the connect fee associated with ADT's dealer program be recognized as a reduction of the dealer asset account as opposed to a reduction in costs associated with the program. The impact associated with this change in accounting is recorded as a cumulative charge of \$206.7 million after-tax as of October 1, 2002, \$12 million pre-tax for the first quarter of fiscal 2003 and \$7 million pre-tax in the second quarter of fiscal 2003.

> The Company's continuing reexamination of the dealer program assets and connect fee was part of management's evaluation of this business as well as the ongoing process of responding to the SEC's Division of Corporation Finance inquiries regarding the dealer program.   The Company has not completed its

discussions with the SEC on these matters or the other accounting items announced today. The Company, with the concurrence of its external auditors, believes that all of the charges announced today, coupled with those set forth in the Company's Annual Report on Form 10-K for fiscal 2002, are not material individually or in the aggregate to any prior year, and therefore, do not require a restatement of previously disclosed operating results. The Company cannot predict the outcome of its discussions with the SEC or that such outcome will not necessitate further amendments or restatements of the Company's results of operations. The Company hopes to resolve all issues raised by the ongoing SEC Division of Corporation Finance review during its fiscal third quarter.

155. After Tyco announced it would again be taking a charge to its earnings, *The Wall Street Journal* wrote on May 1, 2003:

Tyco International is becoming the Freddy Krueger of business scandals. It keeps coming back to terrorize the shareholders, not to mention undercut any incipient public confidence that America's corporate woes are being cleaned up.

The conglomerate disclosed yesterday that it plans to take another $1 billion charge against earnings, after having found still more accounting problems.

156. Then, on July 29, 2003, the Company issued a press release announcing it would restate and filed restated financial results with the SEC in a Form 10-K/A for the period ended September 30, 2002 and on Forms 10-Q/A for the periods ended December 31, 2002 and March 31, 2003 (collectively, the "July 29, 2003 Restatement Filings"). The press release stated:

The restatement includes two previously recorded charges related to the ADT business, which were recorded in the quarter ended March 31, 2003, reflecting a change in the amortization method for customer contracts acquired through the ADT dealer program ($364.5 million pre-tax) and a change in accounting for the ADT dealer program connect fee ($265.5 million pre-tax).

As previously announced, the Company is restating pre-tax charges of $434.5 million recorded in the quarter ended March 31, 2003 for items related to prior periods and pre-tax charges of $261.6 million recorded in the quarter ended December 31, 2001.

In addition to these charges, the Company is also restating prior periods for $71.5 million in pre-tax charges primarily related to workers' compensation and general liability accruals recorded in the quarter ended March 31, 2003. The restatement of prior period results also includes $46.6 million of cumulative pre-tax charges related to split dollar life insurance arrangements for former senior

-58-

executives.   The previously announced charges have also been adjusted for an incremental cumulative tax benefit of $116 million as of March 31, 2003.

157.    In this restatement, Tyco cut fiscal 2000 net income to $4.32 billion, or $2.52 per share, from $4.52 billion, or $2.64 per share.  For 2001, the Company's net income was reduced to $3.46 billion, or $1.89 per share, from $3.97 billion, or $2.17 per share. Tyco's restated loss for 2002 was revised to $9.18 billion, or $4.62 per share, from $9.41 billion, or $4.73 per share. In addition, for the first six months of fiscal 2003, Tyco reported restated net income of $710.2 million, or 35 cents per share, compared with a loss of $49.1 million, or two cents per share, as previously reported.

158.    Reporting on the July 29, 2003 restatement, *The Wall Street Journal* penned an article on July 30, 2003 stating:

> The restatement, which came as a result of discussions with the Securities and Exchange Commission, represents an embarrassment for Tyco's new management and for outside auditor PricewaterhouseCoopers LLP, both of which in April had said no restatement was needed despite numerous accounting problems. The restatement, which stems largely from practices at Tyco's ADT security-alarm unit, slashed a total of $1.15 billion from previously reported pretax profits for fiscal years 1998 through 2001.

159.    *The Wall Street Journal* also reported:  "Tyco had resisted the restatement, saying none was needed, but was instructed by the SEC's corporation-finance arm that a restatement was indeed necessary."

160.    Tyco's Form 10-K/A filed with the SEC on July 29, 2003 stated:

> This Amendment No. 2 on Form 10-K/A is being filed to restate certain amounts (see "Restatement" within Note 1 for discussion of significant changes) and to revise disclosure and presentation of the Company's Consolidated Financial Statements for the fiscal years ended September 30, 2002, 2001, 2000, 1999 and 1998, in connection with a review of our financial statements and related disclosures by the Staff of the Division of Corporation Finance of the U.S. Securities and Exchange Commission (the "SEC").

161.    The Form 10-K/A further explained:

As previously disclosed, we have been engaged in a dialogue with the staff of the Division of Corporation Finance of the U.S. Securities and Exchange Commission (the "Staff") as part of a review of our periodic filings.  We believed that we had resolved the material accounting issues at the time of the original filing of our Form 10-K for the year ended September 30, 2002.  Subsequent correspondence and discussions with the Staff, principally regarding the method of amortizing contracts acquired through our ADT dealer program as well as the accounting for amounts reimbursed to us from ADT dealers, coupled with issues related to prior periods identified during our intensified internal audits and detailed operating reviews in the quarter ended March 31, 2003 have led us to restate our consolidated financial statements for the quarters ended March 31, 2003 and December 31, 2002, and for the fiscal years ended September 30, 2002, 2001, 2000, 1999 and 1998.

The restatement principally relates to (i) recording charges in the prior years and quarters to which they relate, rather than in the period such charges were initially identified, (ii) a revision in the method of amortization used to allocate the costs of contracts acquired through our ADT dealer program so that the amortization of such costs better matches the pattern of revenue related to such contracts, (iii) a revision in the method of accounting for amounts reimbursed to us from ADT dealers as part of the ADT dealer program to effectively treat such amounts as an integral part of the purchase of the underlying contracts, and (iv) certain other adjustments regarding charges or credits so as to record them in earlier accounting periods to which they relate.

162.   Tyco explained that it was restating to reverse charges of $261.6 million it had previously recorded effective October 1, 2001, which were related to "reimbursements from ADT dealers in years prior to fiscal 2002 in excess of the costs incurred, a lower net gain on the issuance of TyCom shares previously reported for fiscal 2001 and adjustments identified both as a result of the Phase 2 review [performed by the Boies Firm] and the recording of previously unrecorded audit adjustments."  Rather than recording all of those charges in the first quarter of Tyco's fiscal 2001, the restatement provided for them to be properly recorded in the historical periods to which the charges related.

163.   The July 29, 2003 Restatement Filings also provided for Tyco to reverse the $434.5 million in charges taken by Tyco in the quarter ended March 31, 2003 and to reflect those charges in the quarters to which the charges related.

164. Additionally, Tyco provided substantially more detail concerning its accounting for the fraudulent ADT connection fee, as well as additional detail concerning the components of the July 29, 2003 Restatement Filings and its impacts to Tyco's previously reported financial results.

E.     The Criminal Proceedings

1.     The Criminal Case Against Kozlowski And Swartz

165. On September 12, 2002, Kozlowski and Swartz were indicted by the Manhattan District Attorney for the State of New York on criminal charges including conspiracy to commit fraud, grand larceny and enterprise corruption (the "RICO Indictment").

166. The RICO Indictment specifically states that, from January 1, 1995 through September 9, 2002, Kozlowski and Swartz created and operated a criminal enterprise for the purpose of stealing money from Tyco and defrauding investors. In addition, the RICO Indictment alleged that Kozlowski and Swartz accomplished those goals by, among other things, falsifying records, concealing material information and providing false information to Tyco shareholders.

167. Defendants' scheme included making false pretenses and misrepresentations, numerous acts of "looting," including the granting of bonuses, forgiveness of loans, and vestings of restricted stock, and filing false SEC filings and business records. The RICO Indictment states:

> Defendant Kozlowski was the boss of the criminal enterprise, and set its policies. He decided what bonuses would be paid, to whom, and when, without regard for the restrictions that the Board had put on executive officers' compensation. He entered into private deals with executive officers and directors of Tyco, which he sought to keep secret even when they were required to be disclosed. He caused Internal Audit to report to the Board through himself, and ensured that they would not audit [Tyco subsidiary TME Management Corp.]. Working with personnel from Investor Relations, defendant Kozlowski met with and defrauded investors, analysts, and journalists to manipulate Tyco's stock price. He used the personnel

in Executive Treasury to pay his bills from the Tyco "concentration account." He established a system of internal controls in which his assistant's authorization was sufficient to warrant expenditures of many millions of dollars.

Defendant Swartz was chief of operations of [the criminal enterprise]; he was the second-in-command to defendant Kozlowski. Defendant Swartz exercised control over the transfer of funds, the booking of accounting entries, and the operations of those portions of Tyco's Human Resources department dealing with certain compensation, bonuses, and loans. Defendant Swartz established a system by which the Finance Department, and not the Tyco Legal Department, controlled the data going into Tyco's filings with the [SEC] and caused Tyco's filings to be false and deceptive. Defendant Swartz deceived investors and the Board by misallocating substantial personnel costs resulting in falsely enhanced operating performance.

168.   According to the RICO Indictment, Kozlowski and Swartz exercised control over Tyco's flow of information and funds by: (1) granting themselves excess compensation in the form of improper bonuses; (2) forgiving the payment of personal expenses and unapproved loans; and (3) concealing these payments from the Company's shareholders.   The RICO Indictment further alleges: "As part of a scheme constituting a systematic on-going course of conduct Defendants and others . . . falsely represented and materially omitted to represent accurately and in a timely fashion:

(1)   The compensation paid to executive officers

(2)   The loans extended to executive officers

(3)   The extent of stock sales by corporate insiders

(4)   The earnings per share of Tyco stock before non-recurring charges

(5)   The level of spending by the executive officers in managing the money and property of Tyco's owners and investors

(6)   Related party transactions."

169.   The RICO Indictment charges that Kozlowski and Swartz concealed from Tyco's shareholders that: (1) tens of millions of dollars worth of payments and forgiven loans were made to Tyco executives; (2) tens of millions of dollars worth of credit lines and loans were

given to Tyco executives; (3) Kozlowski and Swartz sold substantial amounts of Tyco stock to

Tyco; (4) Tyco's reported earnings were artificially inflated; (5) Tyco executives used corporate

resources to fund personal ventures and property acquisitions; (6) Tyco purchased properties

from members of Tyco's Board; and (7) Tyco gifted residences, money and other property to

employees.

170.    Also according to the RICO Indictment, while Kozlowski was giving speeches to

Tyco's investors about his confidence in the Company, he misrepresented the number of Tyco

stock sales he made, which had exceeded 5.5 million shares.  During the time period covered by

the indictment, Kozlowski received proceeds of more than $280 million in insider sales and

Swartz received proceeds of more than $125 million in insider sales.

171.    On June 17, 2005, a jury convicted Kozlowski and Swartz of twenty-two counts

of first-degree grand larceny, falsification of business records, conspiracy, and violation of New

York Gen. Bus. Law § 352-c(5) (the "Martin Act").[2]  With respect to the Martin Act claim, the

Hon. Justice Michael J. Obus instructed the jury:

> What is required is a plan to deprive persons of property by false or fraudulent
> pretenses, representations or promises.  A representation is fraudulent when it
> relates to a material fact and is falsely made with intent to deceive . . . .  As I
> stated, the false statement or representation or mission must be material . . . .  A
> material fact is one that would be of concern to a reasonable and prudent person
> in making a decision with respect to an investment.  A falsely stated represented
> or omitted fact is material if there is a substantial likelihood a reasonable person
> would consider it important in deciding whether or not to buy or sell a security . . .
> .  [U]nder all the circumstances the falsely stated represented or omitted fact

---

[2] Section 352-c(5) provides:

> Any person, partnership, corporation, company, trust or association, or any agent or employee thereof
> who intentionally engages in any scheme constituting a systematic ongoing course of conduct **with
> intent to defraud** ten or more persons or to obtain property from ten or more persons by false or
> fraudulent pretenses, representations or promises, and so obtains property from one or more of such
> persons **while engaged in inducing or promoting the issuance, distribution, exchange, sale,
> negotiation or purchase of any securities** or commodities, as defined in this article, shall be guilty of a
> class E felony.

New York Gen. Bus. Law § 352-c(5).

would have assumed actual significance in the decision whether or not to purchase or sell such securities.

172.    Following their convictions, Kozlowski and Swartz were sentenced to serve a term of up to twenty-five years in state prison and ordered to pay several hundred million dollars in restitution and fines.

### 2.    The Criminal Case Against Walsh

173.    On December 17, 2002, Tyco's former lead director Walsh was arrested for and pled guilty to a felony violation of New York law in the Supreme Court of the State of New York for "a ***securities fraud*** in which he took an undisclosed $20 million payment from [Tyco]" in connection with Tyco's acquisition of CIT.  In its press release announcing the arrest and the charges, the District Attorney specifically noted that: "After the Board approved the CIT purchase, Tyco submitted to the United States Securities and Exchange Commission an S-4 securities filing which failed to disclose that WALSH was to receive a [$20 million] fee."  On that same date, Walsh entered a plea of guilty to a violation of the Martin Act, New York Gen. Bus. Law § 352-c(6), in the Supreme Court of New York, County of New York, Criminal Term Part 51, before the Hon. Justice Michael J. Obus.[3]  In connection with his guilty plea, on December 17, 2002, Walsh made the following allocution, admitting the details of his Martin Act violation:

> The Defendant: During the period from 1992 to January 2002, I served as a director of Tyco International Limited, a public corporation whose stock[] is traded in New York county and elsewhere.

---

[3] The provision of the Martin Act under which Walsh was charged and pled guilty provides:
> Any person, partnership, corporation, company, trust or association, or any agent or employee thereof who intentionally engages in fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale, or who makes any material false representation or statement with intent to deceive or defraud, while engaged in inducing or promoting the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of any securities or commodities, as defined in this article, and thereby wrongfully obtains property of a value in excess of two hundred fifty dollars, shall be guilty of a class E felony.

New York Gen. Bus. Law § 352-c(6).

In late 2000 I became aware that Tyco was interested in pursuing a possible acquisition of a financial services company as a way of exp[a]nding and diversifying its business operations. I recommended that Tyco consider acquiring a company I was familiar with, the C.I.T. Group, Inc. L. Dennis Kozlowski, Tyco's C.E.O. indicated that Tyco was interested in pursuing my proposal, and as a result, in early 2001 I arranged for a meeting between him and Al Gamper Junior, the C.E.O. of C.I.T. and followed up with additional actions to further the acquisition.

After the initial meeting, Kozlowski proposed that if the acquisition was successfully completed I should receive an investment banking or finder's fee for my services. We agreed not to discuss it further at that time. After the extended negotiations, the proposed transaction was submitted to the Tyco Board for its approval. I participated in the discussions and along with all the other members of the Board, voted in favor of the transaction which I believed at the time to be a very favorable transaction for Tyco. However, I intentionally did not disclose to any of the members of the Board, other than Kozlowski and Swartz, that I stood to receive a substantial fee if the transaction was approved.

***Following the Board's approval, a securities filing was done by Tyco in which the company omitted to disclose that I was to get a fee. That made the filing false.*** Thereafter, I reached an agreement with L. Dennis Kozlowski that I would receive a ten million dollar fee for my services, and Tyco would further contribute ten million dollars to a charity recommended by me.

In July 2001, I sent in written requests for the money and Mark Swartz sent it. These monies were paid. In December of 2001, in completing the 2001 Directors and Officers Questionnaire, I fully disclosed my receipt of the fee and the payment of the money to charity. This, however, was after the Board and shareholders had approved the transaction and the closing of the acquisition.

I've attempted throughout my career to hold myself to the highest standards of personal and professional behavior, and I deeply regret my conduct in this instance.

174.    Under Walsh's plea agreement, which the Court accepted, the Court found Walsh guilty of violating the Martin Act, § 352-c(6) when he failed to disclose his fee in connection with the CIT payment and ordered Walsh to pay $20 million to Tyco, $1,125,000 to the State of New York, $1,125,000 to the City of New York, and $250,000 to the District Attorney of New York County.  Thus, pursuant to his guilty plea to the felony criminal charge, Walsh agreed to

make restitution to Tyco in the amount of $20,000,000 and to pay a fine in the amount of $2,500,000.

F.      The SEC's Findings

1.      The September 11, 2002 Complaint

175.    On September 11, 2002, the SEC filed a complaint against Defendants Kozlowski and Swartz, as well as Tyco's former general counsel Mark Belnick, alleging that these individuals had violated, among others, the antifraud provisions of the federal securities laws (the "September 11, 2002 Complaint").  The SEC alleged that the three respondents had stolen from the Company at shareholder expense and hid the truth from shareholders such as Plaintiffs:

*This is a looting case.  It involves egregious, self-serving and clandestine misconduct by the three most senior executives at Tyco International Ltd.* ("Tyco").  From at least 1996 until June of 2002, L. Dennis Kozlowski ("Kozlowski") (then Tyco's Chief Executive Officer) and Mark H. Swartz ("Swartz") (then Tyco's Chief Financial Officer) took hundreds of millions of dollars in secret, unauthorized and improper low interest or interest-free loans and compensation from Tyco.  Kozlowski and Swartz concealed these transactions from Tyco's shareholders. Kozlowski and Swartz later pocketed tens of millions of dollars by causing Tyco to forgive repayment of many of their improper loans. They also concealed these transactions from Tyco's shareholders.  Moreover, Kozlowski and Swartz engaged in numerous highly profitable related party transactions with Tyco and awarded themselves lavish perquisites — without disclosing either the transactions or perquisites to Tyco shareholders.  At the same time that Kozlowski and Swartz engaged in their massive covert defalcation of corporate funds, Kozlowski regularly assured investors that at Tyco "nothing was hidden behind the scenes," that Tyco's disclosures were "exceptional" and that Tyco's management "prided itself on having sharp focus with creating shareholder value." Similarly, Swartz regularly assured investors that "Tyco's disclosure practice remains second to none."  The federal securities laws required disclosure of their loans, compensation and related party transactions.  *By failing to disclose these matters, Kozlowski and Swartz violated the antifraud provisions of the federal securities laws.*

176.    The SEC's September 11, 2002 Complaint alleged that Kozlowski and Swartz violated a number of provisions of the federal securities laws by "(i) causing Tyco to file materially false annual reports and proxy statements with the Commission that allowed them to

be elected and re-elected to Tyco's Board of Directors, (ii) lying to Tyco's auditors, and (iii) causing false entries to be made on the books and records of Tyco, in order to conceal and fund their secret compensation arrangements."

177.     According to the SEC's September 11, 2002 Complaint:  "Kozlowski and Swartz also engaged in fraudulent stock sales by selling hundreds of millions of dollars worth of Tyco stock while concealing from investors material information concerning their undisclosed self-dealing transactions, in breach of the duty they owed to Tyco and its shareholders."

178.     The SEC also found that Tyco's former general counsel, Mark Belnick, violated the antifraud provisions of the federal securities laws:

> During his tenure as Chief Corporate Counsel at Tyco, Mark A. Belnick ("Belnick") also defrauded Tyco shareholders of millions of dollars through egregious self-dealing transactions.  From 1998 into early 2002, Belnick received approximately $14,000,000 in interest-free loans from Tyco to buy and renovate a $4,000,000 apartment on Central Park West and to buy and renovate a $10,000,000 ski chalet in Park City, Utah. By failing to disclose his self-dealing to investors, ***Belnick violated the antifraud provisions of the federal securities laws.***  Belnick also engaged in fraudulent stock sales by selling millions of dollars of Tyco stock while concealing from investors material information concerning his undisclosed self-dealing transactions, in breach of the duty he owed to Tyco and its shareholders.  Moreover, Belnick's failure to disclose his loans caused Tyco to file materially false annual reports and proxy statements with the Commission, in violation of the proxy rules and reporting requirements of the federal securities laws.

179.     The September 11, 2002 Complaint includes numerous specific and detailed allegations supporting and augmenting the SEC's allegations quoted herein.   Plaintiffs incorporate by reference herein ¶¶13-61 of the September 11, 2002 Complaint, which is attached as Exhibit A hereto.

### 2.     The December 17, 2002 Complaint

180.     On December 17, 2002, the SEC filed a settled civil action against Walsh.  In a press release, the SEC stated:

TYCO FORMER LEAD DIRECTOR AND CHAIRMAN OF COMPENSATION
COMMITTEE FRANK E. WALSH, JR. CHARGED WITH MATERIALLY
MISLEADING CIT'S AND TYCO'S SHAREHOLDERS BY COLLECTING
SECRET $20 MILLION "FINDER'S FEE" IN CONNECTION WITH TYCO'S
2001 ACQUISITION OF THE CIT GROUP, INC.

181.    In connection with the settlement, the SEC filed a complaint against Tyco (the

"December 17, 2002 Complaint") in which the SEC alleged:

> This action involves violations of the federal securities laws by Frank E.
> Walsh, Jr. ("Walsh"), a former director of Tyco International Ltd. ("Tyco"), in
> connection with Tyco's June 2001 $9.2 billion acquisition of The CIT Group, Inc.
> ("CIT"). ***Walsh signed a registration statement filed by Tyco in connection with
> the CIT acquisition, which Walsh knew contained materially misleading
> statements concerning fees or commissions payable in connection with the
> transaction.***

182.    The December 17, 2002 Complaint further alleged:

> When the transaction was submitted to the Board, Walsh participated in
> and voted in favor of the transaction but Walsh intentionally did not disclose to
> the Board that he would receive a substantial fee in connection with the
> transaction.

> The terms and conditions of the Tyco/CIT merger were set forth in the
> Agreement and Plan of Merger dated March 12, 2001 (the "Agreement and Plan
> of Merger"). In the section of the Agreement and Plan of Merger that contains the
> representations and warranties of Tyco, Tyco represented that, other than Lehman
> Brothers and Goldman, Sachs & Co. (the investment bankers that represented
> Tyco in the Tyco/CIT merger), "there is no investment banker, broker, finder or
> other intermediary that has been retained by or is authorized to act on behalf of
> [Tyco] who might be entitled to any fee or commission from [Tyco] . . . in
> connection with the transactions contemplated by this Agreement."

> On April 13, 2001, Tyco filed with the Commission a registration
> statement on Form S-4 (the "Registration Statement") for the securities related to
> the contemplated merger between Tyco and CIT. The Agreement and Plan of
> Merger was incorporated by reference in, and attached to, the Registration
> Statement.

> In his capacity as a director of Tyco, Walsh signed the Registration
> Statement. At the time that he signed, Walsh knew that the Registration Statement
> contained a material misrepresentation regarding the payment of a "finder's fee"
> because he knew that he stood to obtain a substantial fee if the transaction was
> consummated.

-68-

183.   The December 17, 2002 Complaint includes numerous specific and detailed allegations supporting and augmenting the SEC's allegations quoted herein.   Plaintiffs incorporate by reference herein paragraphs 8-16 of the December 17, 2002 Complaint, which is attached as Exhibit B hereto.

### 3.   The April 17, 2006 Complaint

184.   On April 17, 2006, after a nearly four-year investigation, the SEC settled its civil action against Tyco for $50 million.  In a press release issued by the SEC, it stated "from 1996 through 2002, Tyco violated the federal securities laws by, among other things, utilizing various improper accounting practices and a scheme involving transactions with no economic substance to overstate its reported financial results by at least one billion dollars."

185.   Describing the ADT fraud, the SEC's press release stated:  "Tyco inflated its operating income by $567 million from its fiscal year 1998 through its fiscal quarter ended December 31, 2002, by means of connection fees that Tyco's ADT Security Services, Inc. subsidiary charged to dealers from whom it purchased security monitoring contracts.  ***Because the connection fee was fully offset by a simultaneous increase in the purchase price ADT allocated to the dealers' security monitoring contracts, the connection fee transaction lacked economic substance and should not have been recorded in Tyco's income statement***.  In 2003, Tyco restated its operating income and cash flow relating to the connection fees."

186.   In connection with the settlement, the SEC filed a complaint against Tyco (the "April 17, 2006 Complaint") in which the SEC alleged:

> From 1996 through 2002, Tyco International Ltd. ("Tyco") violated the federal securities laws by overstating its reported financial results, smoothing those reported earnings, and hiding vast amounts of senior executive compensation and a large number of related party transactions from investors.  To achieve those goals, the company utilized a number of improper practices conceived, guided, or encouraged by the individuals who managed the company

at the time.  *As a result, the company overstated its operating income by an aggregate amount of at least one billion dollars.*

During that time, Tyco acquired hundreds of companies.  *At least $500 million of Tyco's inflated operating income resulted from improper accounting practices related to some of its acquisitions.*  In addition, apart from its acquisition activities, Tyco used a variety of reserve accounts to enhance and smooth its reported financial results and to meet earnings projections from its fiscal year ended June 30, 1997, through its quarter ended June 30, 2002.

Another area of Tyco's misconduct involved a scheme designed to overstate operating income in connection with transactions between Tyco's ADT Security Services, Inc. ("ADT") subsidiary and the security alarm dealers from whom it purchased residential and commercial security alarm monitoring contracts.  As a result, from its fiscal year ended September 30, 1998, through its fiscal quarter ended December 31, 2002, Tyco inflated its operating income by approximately $567 million and inflated its cash flow from operations by approximately $719 million.

Additionally, from September 1996 through early 2002, Tyco failed to disclose millions of dollars of executive compensation, executive indebtedness, and related party transactions of its former Chief Executive Officer L. Dennis Kozlowski ("Kozlowski"), former Chief Financial Officer Mark H. Swartz ("Swartz"), and former Chief Corporate Counsel Mark A. Belnick ("Belnick"). Tyco also incorrectly accounted for certain executive bonuses it paid in its fiscal years 2000 and 2001 by excluding the costs associated with these bonuses from operating expenses.

187.   The April 17, 2006 Complaint includes numerous specific and detailed allegations supporting and augmenting the SEC's allegations quoted herein.  Plaintiffs incorporate by reference herein ¶¶13-56 of the April 17, 2006 Complaint, which is attached as Exhibit C hereto.

4.   The December 20, 2006 Complaint

188.   On December 20, 2006, the SEC filed a complaint against former Tyco employees Richard D. Power ("Power"), Edward Federman ("Federman") and Richard J. "Skip" Heger ("Heger") (the "December 20, 2006 Complaint") alleging, among other things:  "For more than five years, Defendants engaged in multiple improper accounting practices – including structuring sham transactions, employing improper acquisition accounting, and manipulating

reserves to boost and smooth earnings – all designed to fraudulently inflate Tyco's reported financial results and conceal its true performance from investors and analysts."

189.   The SEC found that Federman improperly managed reserves to enhance earnings and meet earnings targets, which he communicated to Defendant Swartz.  For instance, when Federman was Chief Financial Officer of Tyco's Electronics division, he sent an e-mail to Swartz stating the division had "used $11.4 million in reserves to make [its] January 2000 forecast."

190.   Both Power and Federman worked closely with Defendant Kozlowski, who "regularly" had the two "supervise the accounting for Tyco's most important acquisitions." According to the SEC, Power and Federman "repeatedly proposed improper accounting entries designed to further falsely inflate Tyco's operating income."

191.   The December 20, 2006 Complaint includes numerous specific and detailed allegations supporting and augmenting the SEC's allegations quoted herein.   Plaintiffs incorporate by reference herein ¶¶1-56 of the December 20, 2006 Complaint, which is attached as Exhibit D hereto.

VII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

A.   1999 Materially False And Misleading Statements And Omissions

192.   By early December 1999, the SEC had begun a nonpublic, informal inquiry relating to charges and reserves taken in connection with the Company's acquisitions.  In a press release dated December 9, 1999, only four days before the start of the Relevant Period, Defendants denied any impropriety.  Kozlowski stated: "we welcome the opportunity to respond to [the SEC's] request.  ***We remain confident of our accounting methodology, our public***

*disclosures and the continuing strength of our business.*"[4]

193.    Kozlowski's December 9, 1999 statement was materially false and misleading for the reasons specified above in § V and § VI, specifically § V.A.5. which describes Defendants' acquisitions scheme.   Defendants never corrected this false statement and reaffirmed it by making similar statements throughout the Relevant Period.

194.    The price of Tyco stock closed at $28.25 on December 9, 1999.

       1.    The 1999 10-K Filed On 12/13/99

195.    On December 13, 1999, the first day of the Relevant Period, Defendants filed Tyco's 10-K for the fiscal year ended September 30, 1999 (the "1999 10-K"), signed by Defendants Swartz, Kozlowski and Walsh, among others.   In it, Defendants set out numerous statements that were materially false and misleading and which omitted material information. These false and misleading statements addressed a variety of topics, including the following:

       a.    Tyco's "Strategy"

196.    The 1999 10-K purports to set forth Tyco's "strategy," which Defendants later repeated verbatim in filings with the SEC during the Relevant Period.   According to the 1999 10-K:

> Tyco's strategy is to be the low-cost, high quality producer and provider in each of its markets.   It promotes its leadership position by investing in existing businesses, developing new markets and acquiring complementary businesses and products. Combining the strengths of its existing operations and its business acquisitions, Tyco seeks to enhance shareholder value through increased earnings per share and strong cash flows.

As Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

---

[4]  The press release was filed with the SEC on December 9, 1999 in a Form 8-K, signed by Defendant Swartz.

b.      Tyco's Purchase Accounting Reserves

197.    The 1999 10-K sets forth statements that were materially false and misleading

concerning Tyco's use of purchase accounting reserves:

> In Fiscal 1999, the Company made acquisitions that were accounted for under the purchase accounting method at an aggregate cost of $6,923.3 million. Of this amount, $4,546.8 million was paid in cash (net of cash acquired), $1,449.6 million was paid in the form of Tyco common shares, and the Company assumed $926.9 million in debt.   In connection with these acquisitions, the Company established purchase accounting reserves of $525.4 million for transaction and integration costs.   ***At the beginning of Fiscal 1999, purchase accounting reserves were $505.6 million as a result of purchase accounting transactions made in prior years. During Fiscal 1999, the Company paid out $354.4 million in cash and incurred $16.3 million in non-cash charges against the reserves established during and prior to Fiscal 1999. Also in Fiscal 1999, the Company determined that $90.0 million of purchase accounting reserves related to acquisitions prior to Fiscal 1999 were not needed and reversed that amount against goodwill. At September 30, 1999, there remained $570.3 million in purchase accounting reserves on the Company's Consolidated Balance sheet, of which $408.0 is included in current liabilities and $162.3 million is included in long-term liabilities. The Company expects to pay out approximately $350.0 million in cash in Fiscal 2000 that will be charged against these purchase accounting reserves.***

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI, specifically § V.A. which details Defendants' acquisitions scheme.

198.    The 1999 10-K also made misleading statements about specific acquisitions.  The

1999 10-K details Tyco's merger with AMP Inc. ("AMP") and US Surgical without disclosing

Defendants' practice of improperly accounting for acquisitions and otherwise manipulating

Tyco's financial statements through acquisitions, as detailed herein.  According to the 1999

10-K:

> In Fiscal 1999, the Company consummated two mergers that were accounted for under the pooling of interests method of accounting. The merger with United States Surgical Corporation closed on October 1, 1998, and the merger with AMP Incorporated closed on April 2, 1999.  As required by generally accepted

accounting principles, the Company restated its financial statements as if USSC and AMP had always been a part of the Company.  The Company recorded as expenses during Fiscal 1999 costs directly associated with the USSC and AMP mergers and the costs of terminating employees and closing or consolidating facilities as a result of the mergers.  The Company also expensed in Fiscal 1999 the costs of staff reductions and facility closings that AMP undertook as part of a plan to improve its profitability unrelated to the Company's merger with AMP.  In Fiscal 1998, the Company expensed charges for staff reductions and facility closings under the AMP profit improvement plan and charges that USSC incurred to exit certain of its businesses.  These are discussed in more detail under "Liquidity and Capital Resources" below.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.A. which details Defendants' acquisitions scheme and abusive accounting  manipulations for acquired companies.

c.      Tyco's Operating Results

199.    The 1999 10-K also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, the 1999 Form 10-K states:

|  | FISCAL 1999 | FISCAL 1998 | (UNAUDITED) TWELVE MONTHS ENDED SEPTEMBER 30, 1997 |
|---|---|---|---|
|  |  | (IN MILLIONS) |  |
| Pre-tax income before extraordinary items and cumulative effect of accounting changes. . . . . . . . | 1,651.2 | 1,702.8 | 79.0 |
| Income taxes. . . . . . . . . . . | (620.2) | (534.2) | (379.5) |
| Income (loss) before extraordinary items and cumulative effect of accounting changes. . . . . . . . . . . . . . . . . | 1,031.0 | 1,168.6 | (300.5) |
| Extraordinary items, net of taxes. . . . | (45.7) | (2.4) | (60.9) |
| Cumulative effect of accounting changes, net of taxes. . . . . . . . . . . . . | -- | -- | (15.5) |
| Net income (loss). . . . . . . . . . | $ 985.3 | $ 1,166.2 | $ (345.9) |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above

-74-

in § V and § VI.

200.    In addition, the Company's financial statements were materially false and misleading because they attribute Tyco's favorable results to "organic growth" and "synergies" resulting from Tyco's acquisitions.  According to the 1999 10-K:

> Operating profits improved in all segments in each of Fiscal 1999 and Fiscal 1998, with the exception of the Healthcare and Specialty Products segment in Fiscal 1998 for reasons that are discussed below.  The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues result from organic growth and from acquisitions that are accounted for under the purchase method of accounting.

Similarly, regarding the AMP and US Surgical mergers, the 1999 10-K states: "[b]y integrating merged companies with the Company's existing businesses, the Company expects to realize operating synergies and long-term cost savings."   And concerning profits in Tyco's electrical business, Defendants stated:

> The 40.5% increase in operating profits in Fiscal 1999 compared with Fiscal 1998 was due to improved margins at AMP, the acquisition of Raychem, and higher sales volume at TSSL and the Tyco Printed Circuit Group. The improved operating margins in Fiscal 1999 compared with Fiscal 1998 were primarily due to the implementation of AMP's profit improvement plan, which was initiated in the fourth quarter of Fiscal 1998, cost reduction programs associated with the AMP merger, a pension curtailment/settlement gain and the acquisition of Raychem.   For information on the implementation of the AMP profit improvement plan and the cost reduction programs related to the AMP merger, see Note 16 (1999 Charges and 1998 Charges) to the Consolidated Financial Statements.   These improvements were partially offset by $253.4 million of certain costs in Fiscal 1999 at AMP prior to the merger with Tyco, including costs to defend the AlliedSignal Inc. tender offer, the write-off of inventory and other balance sheet write-offs and adjustments.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.A. which details Defendants' acquisitions scheme and abusive accounting  manipulations for acquired companies.

d.      Management Remuneration

201.   The 1999 10-K incorporates by reference certain documents concerning management remuneration, thereby making the 1999 10-K false and misleading: "Information concerning management remuneration is hereby incorporated by reference to the Registrant's definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year."   Because the 1999 10-K incorporates by reference Tyco's Proxy Statement, filed on March 1, 2000, the 1999 10-K contains the same materially false and misleading statements set forth therein, as described below.

202.   The 1999 10-K also falsely represented: "During Fiscal 1999, the maximum amount outstanding under the [KEL Program] was $91.6 million."   As Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in  § V and § VI, specifically § V.E.3. which details Defendants' abuse of the KEL Program.

2.      The 1999 10-K/A Filed On 1/28/00

203.   On January 28, 2000, Tyco filed its 10-K/A for the fiscal year ended September 30, 1999 (the "1/28/00 10-K/A"), signed by defendant Swartz.  The 1/28/00 10-K/A misleadingly stated:

| NAME & PRINCIPAL POSITION | YEAR | ANNUAL COMPENSATION (2) | | | LONG-TERM COMPENSATION | | | |
| | | SALARY | CASH BONUS(3) | STOCK BONUS (4) | RESTRICTED STOCK AWARD(S)(5) | SHARES UNDERLYING STOCK OPTIONS | LONG-TERM INCENTIVE PAYOUTS | ALL OTHER COMPENSATION (6) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| L. DENNIS KOZLOWSKI....... CHAIRMAN & CHIEF EXECUTIVE OFFICER, TYCO INTERNATIONAL LTD. | 1999 1998 1997 | $1,350,000 1,250,000 1,250,000 | $3,200,000 2,500,000 2,544,260 | | $25,707,178 20,140,000 | 6,621,834 3,832,800 6,600,000 | $6,508,125 | $387,001 901,002 108,125 |
| JERRY R. BOGGESS.......... PRESIDENT, TYCO FIRE & SECURITY SERVICES | 1999 1998 1997 | 500,000 450,000 375,000 | 3,381,782 2,610,000 542,093 | $2,086,401 1,332,520 | | 198,236 100,000 300,000 | | 282,713 143,621 |
| NEIL R. GARVEY........... PRESIDENT, TYCO TELECOMMUNICATIONS | 1999 1998 1997 | 425,000 400,000 256,000 | 1,940,000 1,675,000 501,500 | 570,996 787,313 | | 178,500 300,000 | | 195,076 84,761 2,850 |
| RICHARD J. MEELIA........ PRESIDENT, TYCO HEALTHCARE GROUP | 1999 1998 1997 | 567,980 500,000 500,000 | 2,619,900 1,064,013 395,153 | 3,246,355 1,163,068 | | 790,564 100,000 300,000 | | 137,829 149,477 |
| MARK H. SWARTZ........... EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER, TYCO INTERNATIONAL LTD. | 1999 1998 1997 | 750,000 559,500 559,500 | 1,600,000 1,250,000 1,272,130 | | 12,029,641 10,070,000 | 2,976,480 2,764,666 2,200,000 | 2,169,375 | 150,014 256,878 31,994 |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI specifically § V.E detailing Defendants undisclosed remuneration.[5]

204.    In form and substance, Tyco's 1/28/00 10-K/A also contained the same false and misleading statements and/or omissions as did its Form 10-K filed on December 13, 1999.

B.    2000 Materially False And Misleading Statements And Omissions

1.    1/17/00 1Q 2000 Earnings Announcement

205.    On January 17, 2000, Tyco announced diluted earnings per share for the first quarter of fiscal 2000 (ending December 31, 1999), before non-recurring charges and credits and extraordinary items, of 46 cents per share.  This was a 48% increase over the previous year's 31 cents per share.  In the Company's press release, Kozlowski stated:  "Organic growth across each of our four business segments and all geographies drove Tyco's performance in the first quarter." "Free cash flow was improved as well.  The strength of our core businesses combined with strong cash flows are indicative of another strong year for Tyco."  As Defendants either knew or

---

[5]  On February 1, 2000, Defendants filed a 10-K/A for the fiscal year ended September 30, 1999, (the "2/1/00 10-K/A"), signed by Defendant Swartz.  The 2/1/00 10-K/A simply corrects a formatting error in the chart above. The corrected information from the 2/1/00 10-K/A, rather than the version in the 1999 10-K, is used in the chart as quoted.

were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

206.    Tyco's false and misleading press release was filed with the SEC attached to a Form 8-K on January 20, 2000 signed by Swartz.

      2.    <u>1/18/00 Conference Call</u>

207.    On January 18, 2000, Tyco held a conference call to discuss, among other things, its earnings during the first quarter of fiscal 2000.  Defendants also addressed the informal inquiry into potential accounting improprieties at Tyco begun by the SEC the month before.  During the call both Kozlowski and Swartz falsely reassured investors and analysts that there had been no improprieties at Tyco:

| | |
|---|---|
| SWARTZ: | Since we disclosed last month, when the SEC informed us about the informal inquiry being performed, we ended up making the submissions as expected, beginning in January and will continue to provide the information that's being requested by the SEC.  ***What's extremely important to realize though is that we have gone through this information, reviewed the materials going back three years; we at the company remain very comfortable and confident that our accounting was appropriate for reserves as our auditors also remain confident with the accounting that we performed for those acquisitions***.  We will continue to make the submissions as requested by the SEC and move as quickly as possible in providing it to them so that we can get this behind us; however, ***we continue, as I said, to remain very comfortable with our accounting.*** |
| KOZLOWSKI: | So with that, these are the reasons why I say prospects have never been better here, the core businesses are great, the undersea fiber optic cable network appears to be great for us, our cash flow is terrific, ***we believe we have no issues with the SEC from everything we've seen*** but, you know, we're still going through this informal inquiry and we will fully cooperate with the SEC and we're looking forward to having a very, very good and exciting year here, and there |

> are some acquisitions on the horizon for us.
>
> *       *       *
>
> . . . we're looking at a company that, you know, ***will have strong organic growth for us, and we're looking at a company that should be enjoying organic growth in double figures going forward.***
>
> *       *       *
>
> Just to quickly reiterate, we're very pleased with where we are at Tyco, we had strong revenue growth of some 27% of which about 16% of it was organic growth . . . . ***you can see our results have never been better and our prospects have never seemed stronger to us.***

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.A. which details Defendants' acquisitions scheme and abusive accounting manipulations for acquired companies.

        3.     <u>2/11/00 10-Q For Quarter Ended 12/31/99</u>

    208.   On February 11, 2000, Defendants filed Tyco's Form 10-Q for the quarter ended December 31, 1999 (the "2/11/00 10-Q"), signed by Defendant Swartz. In it, Defendants set out numerous materially false and misleading statements.   These false and misleading statements addressed a variety of topics, including the following:

        a.     <u>Tyco's Operating Results</u>

    209.   The 2/11/00 10-Q falsely describes Tyco's operating results providing the following summary information:

-79-

|                                                       | (UNAUDITED) FOR THE QUARTERS ENDED DECEMBER 31, | |
|                                                       | 1999     | 1998     |
|                                                       | (IN MILLIONS) | |
| Pre-tax income (loss) before extraordinary items..... | 1,069.9  | (74.4)   |
| Income taxes......................................... | (278.5)  | (33.3)   |
| Income (loss) before extraordinary items............. | 791.4    | (107.7)  |
| Extraordinary items, net of taxes.................... | (0.2)    | (2.4)    |
| Net income (loss).................................... | $ 791.2  | $ (110.1) |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

210.   In addition, Defendants falsely attributed Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

Operating income improved in all segments in the quarter ended December 31, 1999 as compared to the quarter ended December 31, 1998.  The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues resulted from organic growth and from acquisitions.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.  The purported synergies, as described in § V.A. were the result of Defendants' acquisitions scheme and abusive accounting manipulations for acquired companies.

b.   Tyco's Charges and Reserves

211.   The 2/11/00 10-Q also made materially false and misleading statements regarding Tyco's reserves:

In the quarter ended December 31, 1999, the Company established restructuring and other non-recurring reserves of $14.4 million primarily related to the exiting of USSC's interventional cardiology business and the restructuring of AMP's Brazilian operations.  At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $453.3 million.  During the quarter ended

-80-

December 31, 1999, the Company paid out $58.3 million in cash and incurred $19.9 million in non-cash charges that were charged against these reserves. Also in the quarter ended December 31, 1999, the Company determined that $137.6 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit to the merger, restructuring and other non-recurring charges line item in the Consolidated Statement of Operations. The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP's products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC. Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, whose costs were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company's 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At December 31, 1999, there remained $251.9 million of merger, restructuring and other non-recurring reserves on the Company's Consolidated Balance Sheet, of which $207.7 million is included in current liabilities and $44.2 million is included in long-term liabilities.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.A. which details Defendants' acquisitions scheme and abusive accounting  manipulations for acquired companies.

4.     2/15/00 Article In *The Wall Street Journal*

212.     According to a February 15, 2000 article in *The Wall Street Journal* entitled "Lion's Share: For Plastic Hangers, You Almost Need to Go to Tyco International," executives of Tyco "have said the acquisitions frequently allow them to bring leadership to fragmented, inefficient industries. Purchased firms are melded with Tyco units and the overlap eliminated. Profit margins of acquisitions often double in just a year, the company says." As Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.A. which details Defendants' acquisitions scheme and abusive accounting

manipulations for acquired companies.

5.     <u>3/1/00 Proxy Statement For 2000 Annual Meeting</u>

213.     On March 1, 2000, Defendants filed with the SEC Tyco's Proxy Statement for the 2000 annual meeting (the "2000 Proxy Statement"). The 2000 Proxy Statement contains materially false and misleading statements on a variety of topics, including management remuneration, the Key Employee Loan Program, and allegations of accounting impropriety by the Company.

a.     <u>Management Remuneration</u>

214.     Concerning Tyco's executive compensation program generally, the 2000 Proxy Statement states:

> Tyco's executive compensation program [offers] significant financial rewards when the Company and the individual achieve superior results (as exemplified in the above chart), but significantly lower compensation is paid if performance goals are not met. Specifically, if the compensation targets are not achieved, the Company's executives are ineligible for either cash bonuses or equity-based compensation. In order for Mr. Kozlowski and Mr. Swartz to earn a cash bonus in fiscal 1999, cash income and operating cash flow growth of a minimum of 15% over fiscal 1998 performance was required, and before they could earn shares in fiscal 1999, an increase in earnings per share of at least 17.5% growth over fiscal 1998 was required.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.E. which details Defendants' looting of the Company.

215.     The 2000 Proxy Statement also contains materially false and misleading information regarding the administration of compensation to executive officers and key managers.

> The Compensation Committee of the Board of Directors approves all of the policies under which compensation is paid or awarded to the Company's executive officers and key managers and oversees the administration of executive compensation programs. The Compensation Committee is composed solely of

-82-

independent directors, none of whom has any interlocking relationships with the Company that are subject to disclosure under rules of the SEC relating to proxy statements.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.E. which details Defendants' looting of the Company.

216.   The 2000 Proxy Statement contains the following specific information concerning the compensation of Defendants Kozlowski and Swartz:

| | | ANNUAL COMPENSATION (2) | | | LONG-TERM COMPENSATION | | | |
| | | | | | | SHARES | | | |
| NAME & PRINCIPAL POSITION | YEAR | SALARY | CASH BONUS(3) | STOCK BONUS (4) | RESTRICTED STOCK AWARDS(5) | UNDERLYING STOCK OPTIONS | LONG-TERM INCENTIVE PAYOUTS | ALL OTHER COMPENSATION (6) |
|---|---|---|---|---|---|---|---|---|
| L. DENNIS KOZLOWSKI....... CHAIRMAN & CHIEF EXECUTIVE OFFICER, TYCO INTERNATIONAL LTD. | 1999 1998 1997 | $1,350,000 1,250,000 1,250,000 | $3,200,000 2,500,000 2,544,260 | | $25,707,178 20,140,000 | 6,621,834 3,832,800 6,600,000 | $6,508,125 | $387,001 901,002 108,125 |
| | | | | * * * | | | | |
| MARK H. SWARTZ........... EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER, TYCO INTERNATIONAL LTD. | 1999 1998 1997 | 750,000 559,500 559,500 | 1,600,000 1,250,000 1,272,130 | | 12,029,641 10,070,000 | 2,976,480 2,764,666 2,200,000 | 2,169,375 | 150,014 256,878 31,994 |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.E. which details Defendants' looting of the Company.

217.   The 2000 Proxy Statement also misrepresented Kozlowski's compensation:

For fiscal 1999, Mr. Kozlowski received a base salary of $1.35 million and a cash bonus in the amount of $3.2 million, as shown in the SUMMARY COMPENSATION TABLE on page 12.   Mr. Kozlowski was also granted 624,000 shares of restricted stock on October 18, 1999.   Mr. Kozlowski's eligibility for the cash bonus was conditioned on the Company's experiencing minimum growth in pre-tax income and operating cash flow of 15% over fiscal 1998 and his eligibility for the stock award was conditioned upon an increase in earnings per share of at least 17.5% over fiscal 1998.   The Company's performance substantially exceeded these benchmarks. These shares were granted based on achievement of fiscal 1999 performance criteria and vested on January 5, 2000.   While Mr. Kozlowski did not receive any new stock option awards during fiscal 1999, he did receive restoration options.   The restoration provision

> enables executive officers to use their earned equity award to repay indebtedness owed to the Company or to use option proceeds for tax planning purposes while maintaining their equity position in the Company.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.E. which details Defendants' looting of the Company.

218.   To justify Kozlowski's compensation, the 2000 Proxy Statement describes fiscal 1999 as Tyco's "most successful year ever,"

> with increases over fiscal 1998 in earnings per share before non-recurring items of 51%, net income before non-recurring items of 117%, and net sales of 83%, prior to the restatement of 1998 results for the pooling of interests with United States Surgical Corporation and AMP Incorporated. Executive compensation was directly tied to, and is reflective of, this performance.

It attributes that success to Kozlowski:

> Mr. Kozlowski also led the Company in making strategic acquisitions that, along with the organic growth of the Company, laid the groundwork for continued growth and performance.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

b.     Key Employee Loan Program

219.   The 2000 Proxy Statement makes materially false and misleading statements concerning Tyco's KEL Program.

> The Compensation Committee administers the loan program. ***The Compensation Committee authorizes loans, which may not exceed the amount allowable under any regulation of the United States Treasury or other applicable statute or regulation.*** Loans may be required to be secured by Tyco common shares owned by the employee or may be unsecured. ***Loans generally bear interest at Tyco's incremental short-term borrowing rate (5.5% for 1999). Loans are generally repayable in ten years or when the participant reaches age 69, whichever occurs first,*** except that earlier payments must be made in the event that the participant's

-84-

employment with the Company or its subsidiaries terminates.  The participant is also required to make loan payments upon the sale or other disposition of Tyco common shares (other than gifts to certain family members) with respect to which loans have been granted.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.E.3. which details Defendants' violations of the KEL Program.

220.    The 2000 Proxy Statement also falsely and misleadingly states:

At September 30, 1999, the amount of loans outstanding under the [Key Employee Corporate Loan Program] totaled $18,569,137, of which $0 was loaned to Mr. Kozlowski . . . and $0 to Mr. Swartz. The largest amount of indebtedness since October 1,1998 incurred by each of the Named Officers was: $52,688,249 for Mr. Kozlowski.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.E.3. which details Defendants' violations of the KEL Program.

c.    The SEC Investigation

221.    The 2000 Proxy Statement falsely addresses the informal SEC investigation, and characterizes allegations that Defendants engaged in improper acquisition accounting as mere "rumors":

As shareholders are aware, certain recent rumors and allegations, which we believe to be unfounded, have adversely affected Tyco's stock price. Shareholders are also aware that the SEC is conducting an inquiry and that shareholder lawsuits have been filed against the Company in various courts across the country . . . .  We continue to have complete confidence in the senior management team and feel the fundamentals driving the company have not changed. As indicated earlier, our philosophy is to reward stellar performances, which is what we did for fiscal 1999.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.A. which details Defendants' acquisitions scheme and abusive

-85-

accounting manipulations for acquired companies (including Defendants' efforts to conceal the abuses from the SEC as detailed in § V.A.5.).

222.    Tyco's stock price closed at $48.50 on March 10, 2000.

      6.    <u>1999 Annual Report To Shareholders</u>

223.    On or about March 14, 2000, Tyco released its 1999 Annual Report to Shareholders (the "1999 Annual Report"). The 1999 Annual Report falsely and misleadingly states on its first page that "we have grown our earnings at a 35% compounded rate for the past five years." As Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

224.    The 1999 Annual Report also included a letter to Tyco shareholders from Defendant Kozlowski, which states:

> Fiscal 1999 was an excellent year for Tyco International. We exceeded our corporate goals and continued to build on our recurring revenue base and forge strong partnerships with our customers. ***We also acquired many fine companies that will provide an immediate boost to our already strong profit and cash flow*** and become an additional source of sustainable growth well into the future.

> For the sixth consecutive year, we increased revenues and earnings substantially. Revenues rose 18 percent to $22.5 billion and earnings grew $1.15 billion to $2.56 billion, an 82 percent increase over the prior year.

> Fiscal 2000, which began for Tyco on October 1, 1999, is off to a good start. We expect sales to exceed $26 billion and free cash flow—an important measure of our underlying business performance—to nearly double, from $1.7 billion to over $3.0 billion. This free cash flow figure is after the reinvestment of $1.6 billion in capital expenditures to strengthen our position in each of our four business areas.

> Today, Tyco is healthier than ever.

> *        *        *

-86-

We aim for sustained earnings growth in excess of 20 percent, powered by increased revenues and margin expansion. We achieve this by: the elimination of overhead and burdensome bureaucracy; economies of scale; a relentless focus on costs, productivity improvements and quality; and an increase in growth in the higher-margin service components of our business. Where growth, margin improvement and cost reduction are concerned, Tyco has no finish line. This model has produced consistently strong results for well over a decade.

\*    \*    \*

Although we have successfully integrated our major acquisitions, we never assume such success will automatically be ours. Indeed, we know the corporate landscape is littered with failed marriages, that the hope of wondrous synergies is often a mirage.  Therefore, we spend hundreds of hours assessing the benefits and risks of each transaction we consider. We always ask: What's the worst-case scenario?

We perform thorough due diligence every time, and we walk away from nine out of every ten transactions we evaluate. Even when we decide that the rewards significantly outweigh the risks, we spend a great deal of time planning the integration process to minimize the difficulties inherent in each acquisition.

My Perspective: Confidence in the Future

We believe that shareholder value is created through higher earnings per share and strong cash flow. And this has been reflected in the performance of our share price: In the past five years, Tyco shares have appreciated four times faster than the S&P 500. We're proud of that record, although, as we enter a new millennium, we tend to regard it as ancient history.

The questions we ask are: What have we done for you lately? What are we going to do for you in the next five years? What we have done is to establish an outstanding group of global businesses, which can do well in any economic environment. And we have given our employees incentives to achieve the first-class business and financial performance you have come to expect from Tyco.

[W]e will keep executing the same strategy that has brought us this far. We will continue to use our strong balance sheet and powerful cash flow to invest in our operations and to make strategic acquisitions to improve our product line as well as our bottom line. I promise that we will stay focused on the business goals that matter most: seizing opportunities, generating new revenue sources, growing earnings and cash flow, and increasing shareholder value.

The future looks bright. We think we can double our earnings over the next three years.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

225.    The 1999 Annual Report also provided investors with a false overview of the Company's operations:

Overview

Sales increased 18.0% during Fiscal 1999 to $22,496.5 million from $19,061.7 million in Fiscal 1998. Sales in Fiscal 1998 increased 14.4% compared to the twelve months ended September 30, 1997.  Income (loss) before extraordinary items and cumulative effect of accounting changes was $1,031.0 million in Fiscal 1999, as compared to $1,168.6 million in Fiscal 1998 and ($300.5) million in the twelve months ended September 30,1997. Income before extraordinary items for Fiscal 1999 included an after-tax charge of $1,341.5 million ($1,596.7 million pre-tax) related to the mergers with USSC and AMP and costs associated with AMP's profit improvement plan. Income before extraordinary items for Fiscal 1998 included an after-tax charge of $192.0 million ($256.9 million pre-tax) primarily related to AMP's profit improvement plan and costs incurred by USSC to exit certain businesses.  Loss before extraordinary items and cumulative effect of accounting changes for the twelve months ended September 30, 1997 included an after-tax charge of $1,485.5 million ($1,670.4 million pretax) for merger and transaction costs, write-offs and integration costs primarily associated with the mergers of ADT, Former Tyco, Keystone and Inbrand.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.A. which details Defendants' acquisitions scheme and abusive accounting manipulations for acquired companies.

226.    The 1999 Annual Report also misleadingly stated:

Loans are made to employees of the Company under the Former Tyco 1983 Key Employee Loan Program for the payment of taxes upon the vesting of shares granted under Former Tyco's Restricted Stock Ownership Plans.  The loans are unsecured and bear interest, payable annually, at a rate which approximates the Company's incremental short-term borrowing rate.  Loans are generally repayable in ten years, except that earlier payments are required under certain circumstances.  During Fiscal 1999, the maximum amount outstanding under this program was $91.6 million.  Loans receivable under this program were $18.6

-88-

million and $22.2 million at September 30, 1999 and 1998, respectively.

As Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.E.3. which details Defendants' abuse of the KEL Program.

       7.     <u>4/18/00 Earnings Announcement</u>

227.   On April 18, 2000, Tyco released its financial results for the quarter ending March 31, 2000:

> Tyco International Ltd. (NYSE-TYC, LSE-TYI, BSX-TYC), a diversified manufacturing and service company, reported today that diluted earnings per share before non-recurring charges and credits and extraordinary item, for its second quarter ended March 31, 2000 were 50 cents per share, a 47 percent increase over 34 cents per share for the same quarter last year.  Net income rose to $853.6 million, an increase of 50 percent compared to $567.8 million last year.  Sales for the quarter rose 35 percent to $7.07 billion compared with last year's $5.24 billion.  The results for last year have been restated to reflect the merger with AMP, which occurred on April 2, 1999 and was accounted for as a pooling of interests, and are before acquisition-related and non-recurring charges and extraordinary item.  After giving effect to acquisition related and other non-recurring charges and credits, and extraordinary item, diluted earnings per share were 50 cents, or $855.9 million, in fiscal 2000 compared to 7 cents, or $119.5 million, in fiscal 1999.

> Income before non-recurring charges and credits and extraordinary items for the first half of fiscal 2000 rose to $1.64 billion, or 96 cents per diluted share, a 48 percent increase over last year's diluted per share earnings of 65 cents.  After giving effect to acquisition related and other non-recurring charges and credits, and extraordinary item, diluted earnings per share were 96 cents, or $1.65 billion for the first half of fiscal 2000 compared to 1 cent, or $9.4 million, in fiscal 1999.  Revenues for the first half increased to $13.7 billion, 31 percent higher than last year's $10.5 billion.

> "Each of our four businesses had strong organic growth and generated positive free cash flow in the second quarter," said L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer.  "Our core businesses are well positioned to continue that trend for the remainder of the year," he added.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI.

        8.    <u>4/18/00 Conference Call</u>

228.    On April 18, 2000, Tyco held a conference call to discuss, among other things, its earnings during the second quarter of fiscal 2000.  Defendants Kozlowski and Swartz also addressed the SEC's informal investigation of Tyco's acquisition accounting.  During the call, Defendant Swartz falsely stated:

SWARTZ:    . . . we continue to be confident with the financial results we've reported previously and the personnel working on that, we continue to provide the information to the SEC that was requested and we're really not in a position to give any update in far as timing in that we don't control that. What we do control though is getting the information to them and seeing what's going in and ***we continue to remain very confident with the financial results we've reported.***

        \*      \*      \*

Q:    But when . . . when you're saying you're happy with the way things are going, what . . . what is it that you're looking at that makes you happy?

SWARTZ:    That we're . . . that we're in a situation that we're able to produce the information to them quickly on what had been requested and based on the additional review that we've gone through as well as outside advisors that we've brought in, to be . . . ***continue to be very comfortable with the financials results.***

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. and § V.A.5. which details Defendants' efforts to conceal the acquisitions scheme and abusive accounting manipulations from the SEC.

229.    During the call, Defendant Kozlowski also emphasized the financial health of the Company:

KOZLOWSKI:                    . . . we're very pleased with our quarter, with the strong outlook we have going forward but the fact that our organic growth for the company has been some 19% that our earnings are up some 47% and then the prospects and outlook for a very strong cash flow.

As *The Wall Street Journal* quoted Kozlowski the following day in an article entitled "Tyco's Profit Surged in Fiscal 2nd Quarter, Helped by Sales Gain" (4/19/00): "Each of our four businesses had strong organic growth and generated positive free cash flow in the second quarter . . . .  Our core businesses are well-positioned to continue that trend for the remainder of the year."  As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

9.    5/7/00 Announcement Of Thomas & Betts Acquisition

230.    On May 7, 2000, Tyco announced its acquisition of the Thomas & Betts Electronic OEM Business.   The press release headline stated that the acquisition would be immediately accretive to earnings.  According to the press release:

"This acquisition offers significant cost saving opportunities through manufacturing synergies, rationalization of R&D and efficiencies through combined product marketing, distribution and purchasing,"  Mr. Kozlowski stated.  ***Mr. Kozlowski also noted that the addition of this business would provide an immediate positive contribution to Tyco's earnings.***

"***Our previous acquisitions in Tyco Electronics have achieved strong top line growth and exceeded cost reduction targets***.  We expect that the acquisition of the Electronic OEM Business of Thomas & Betts will also provide positive benefits to Tyco shareholders," Mr. Kozlowski concluded.

Defendants' May 7, 2000 statements were false and misleading because they failed to disclose the existence of the acquisitions scheme described herein at § V.A., including but not limited to the fact that the acquisition would be accretive because of Defendants' erroneous and misleading accounting and manipulation of the acquired company's financial statements.   Moreover,

previous acquisitions had only demonstrated "strong top line growth" because of Defendants' manipulations.

> 10.    5/15/00 10-Q For Quarter Ended 3/31/00

231.    On May 15, 2000, the Company filed Tyco's Form 10-Q for the quarter ended March 31, 1999 (the "5/15/00 10-Q"), signed by Defendant Swartz.  In it, Defendants set out numerous false and misleading statements addressing a variety of topics, including the following:

> a.    Tyco's Operating Results

232.    The 5/15/00 10-Q falsely states Tyco's operating results:

| | (UNAUDITED) | | | |
| | FOR THE QUARTERS ENDED MARCH 31, | | FOR THE SIX MONTHS ENDED MARCH 31, | |
| | 2000 | 1999 | 2000 | 1999 |
| | (IN MILLIONS) | | | |
| Pre-tax income before extraordinary items......... | 1,140.4 | 308.2 | 2,210.4 | 233.8 |
| Income taxes...................................... | (284.5) | (146.2) | (563.1) | (179.5) |
| Income before extraordinary items................. | 855.9 | 162.0 | 1,647.3 | 54.3 |
| Extraordinary items, net of taxes................. | -- | (42.5) | (0.2) | (44.9) |
| Net income........................................ | $ 855.9 | $ 119.5 | $ 1,647.1 | $ 9.4 |

233.    Defendants attributed Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income improved in all segments in the six months ended March 31, 2000 as compared to the six months ended March 31, 1999.  The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues resulted from organic growth and from acquisitions.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

b.      Tyco's Charges And Reserves

234.    The 5/15/00 10-Q also gives materially false and misleading information regarding Tyco's reserves.  For example:

> In the six months ended March 31, 2000, the Company established restructuring and other non-recurring reserves of $24.8 million, of which $7.3 million is included in cost of sales, primarily related to the exiting of USSC's interventional cardiology business and the restructuring activities in AMP's Brazilian operations and wireless communications business.  At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $453.3 million.  During the six months ended March 31, 2000, the Company paid out $92.4 million in cash and incurred $45.5 million in non-cash charges that were charged against these reserves. Also in the six months ended March 31, 2000, the Company determined that $150.3 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit of $144.0 million to the merger, restructuring and other non-recurring charges line item and a credit of $6.3 million to the cost of sales line item in the Consolidated Statement of Operations.  The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP's products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC.  Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, the costs of which were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated.   The changes in estimates of the Company's 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded.  At March 31, 2000, there remained $189.9 million of merger, restructuring and other non-recurring reserves on the Company's Consolidated Balance Sheet, of which $147.6 million is included in current liabilities and $42.3 million is included in long-term liabilities.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in  § V and § VI, specifically § V.A. which details Defendants' acquisitions scheme and abusive accounting manipulations in connection with acquisitions.

235.    Tyco's share price closed at $50.75 on May 15, 2000.

11.     6/26/00 10-Q/A Filed For Quarter Ended 12/31/99

236.    On June 26, 2000, the Company filed another 10-Q/A for the quarter ended December 31, 1999 (the "6/26/00 10-Q/A(1)"), signed by Swartz. According to the 6/26/00 10-

Q/A(1), the restatement was in response to a "limited review" by the SEC.

237.   In the 6/26/00 10-Q/A(1), Defendants gave the following explanation for the need to restate Tyco's operating results:

> The amendment to the financial statements herein is being filed to reclassify certain charges and to adjust merger, restructuring and other non-recurring charges between periods due to the timing of the underlying events as follows:
>
> > - To reclassify $65.6 million of charges, incurred by AMP during the quarter ended December 31, 1998 prior to its merger with Tyco, related to the write-off of goodwill and fixed assets of exited businesses in the Consolidated Statements of Operations out of the "merger, restructuring and other non-recurring (credits) charges, net" line and into the "charge for the impairment of long-lived assets" line;
> >
> > - To eliminate $26.0 million of merger, restructuring and other non-recurring credits recorded to merger, restructuring and other non-recurring (credits) charges in the first quarter of fiscal 2000 related to charges which were originally recorded in fiscal 1999 related primarily to severance and facility closings;
> >
> > - To reverse a $16.9 million credit previously recorded in the quarter ended December 31, 1999, related to merger, restructuring and other non-recurring charges which were originally recorded in fiscal 1997 related primarily to facility closings and lease termination costs, and to record $3.0 million of that credit in the quarter ended December 31, 1998;
> >
> > - To reclassify $15.0 million of inventory related restructuring costs, incurred during the quarter ended December 31,1998, in the Consolidated Statements of Operations out of the "merger, restructuring and other non-recurring (credits) charges, net" line and into the "cost of sales" line;
> >
> > - To report certain non-recurring costs related to the integration of the USSC suture business originally recorded in the first quarter of fiscal 1999 as costs in later periods when such activity was completed (reversing a $22.3 million charge in the quarter ended December 31, 1998 and recording $7.7 million of that charge in the quarter ended December 31, 1999); and
> >
> > - To update various disclosures primarily related to the above adjustments.

238.   Although Tyco's filing of an amended 10-Q was in effect an admission that it had materially misstated its operating results during the Relevant Period, Defendants successfully

minimized that admission by restating Tyco's results only minimally, by denying that there were any materially false statements in Tyco's previously filed 10-Q, and by denying any involvement in a scheme to manipulate Tyco's acquisition accounting.

239.    The 6/26/00 10-Q/A(1) itself contains numerous materially false and misleading statements on a variety of topics, including the following:

   a.    Tyco's Operating Results

240.    The 6/26/00 10-Q/A(1) falsely stated Tyco's operating results in summary form:

| | (UNAUDITED) FOR THE QUARTERS ENDED DECEMBER 31, | |
| --- | --- | --- |
| | 1999 | 1998 |
| | (IN MILLIONS) | |
| Pre-tax income (loss) before extraordinary items | 1,019.3 | (49.1) |
| Income taxes | (262.1) | (40.5) |
| Income (loss) before extraordinary items | 757.2 | (89.6) |
| Extraordinary items, net of taxes | (0.2) | (2.4) |
| Net income (loss) | $ 757.0 | $ (92.0) |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in  § V and § VI.

241.    In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco, *see, e.g.*, ¶151), but instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income improved in all segments in the quarter ended December 31, 1999 as compared to the quarter ended December 31, 1998. The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues resulted from organic growth and from acquisitions.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

b.      Tyco's Charges And Reserves

242.    The 6/26/00 10-Q/A(1) also gives materially false and misleading information regarding Tyco's reserves:

> In the quarter ended December 31, 1999, the Company established restructuring and other non-recurring reserves of $22.1 million primarily related to the exiting of USSC's interventional cardiology business, charges associated with USSC's suture business and the restructuring of AMP's Brazilian operations. At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $399.3 million. During the quarter ended December 31, 1999, the Company paid out $58.3 million in cash and incurred $19.9 million in non-cash charges that were charged against these reserves. Also in the quarter ended December 31, 1999, the Company determined that $94.7 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit to the merger, restructuring and other non-recurring charges line item in the Consolidated Statement of Operations. The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP's products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC. Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, whose costs were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company's 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At December 31, 1999, there remained $248.5 million of merger, restructuring and other non-recurring reserves on the Company's Consolidated Balance Sheet, of which $204.3 million is included in current liabilities and $44.2 million is included in long-term liabilities.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, specifically § V.A. which details Defendants' acquisitions scheme and abusive accounting manipulations in connection with acquisitions.

12.   The 1999 10-K/A Filed On 6/26/00

243.   On June 26, 2000, the Company filed another 10-K/A for the fiscal year ended September 30, 1999 (the "6/26/00 10-K/A"), signed by Swartz.  At the same time, Tyco restated its operating results for the first two quarters of fiscal 2000 (as discussed below).  Defendants announced the restatement in a release issued over the *PR Newswire* on June 26, 2000, which said that the restatement was in response to a "limited review" of a single Tyco registration statement for a debt exchange offer filed in December 1999, and that the review included "those portions of Tyco's financial statements principally relating to charges and reserves reported in connection with Tyco's acquisition activity."

244.   In the 6/26/00 10-K/A, Defendants gave the following explanation for the need to restate Tyco's operating results:

The amendment to the financial statements is being filed to reclassify certain charges and to adjust merger, restructuring and other non-recurring charges between periods due to the timing of the underlying events as follows:

- To reclassify $172.5 million of charges, incurred by AMP prior to its merger with Tyco, related to the write-off of goodwill and fixed assets of exited businesses in the Consolidated Statement of Operations out of the "merger, restructuring and other non-recurring charges" line and into the "charge for the impairment of long-lived assets" line;

- To reclassify $27.5 million of inventory related restructuring costs in the Consolidated Statement of Operations out of the "merger, restructuring and other non-recurring charges" line and into the "cost of sales" line;

- To eliminate $26.0 million of merger, restructuring and other non-recurring charges which were originally recorded in fiscal 1999 related primarily to severance and facility closings and the subsequent reversal of such charge recorded as a credit to merger, restructuring and other non-recurring (credits) charges taken in the first quarter of fiscal 2000;

- To record a credit in fiscal 1999 for the reversal of $16.9 million of merger, restructuring and other non-recurring charges which were originally recorded in fiscal 1997 related primarily to facility closings and lease termination costs (this credit was previously recorded in the first

-97-

quarter of fiscal 2000);

- To report certain non-recurring costs related to the integration of the USSC suture business originally recorded in the first quarter of fiscal 1999 as costs in later periods when such activity was completed (deferring $11.1 million of merger, restructuring and other non-recurring charges originally recorded in fiscal 1999 until fiscal 2000); and

- To update various disclosures primarily related to purchase accounting liabilities and merger, restructuring and other non-recurring charges.

245. Although Tyco's filing of an amended 10-K was in effect an admission that it had materially misstated its operating results during the Relevant Period, Defendants successfully minimized that admission by restating Tyco's results only minimally, by denying that there were any materially false statements in Tyco's previously filed 10-K, and by denying any involvement in a scheme to manipulate Tyco's acquisition accounting.

246. The 6/26/00 10-K/A itself contains numerous materially false and misleading statements on a variety of topics, including false descriptions of the Company's operating results.

13.    6/26/00 10-Q/A Filed For Quarter Ended 3/31/00

247. On June 26, 2000, Tyco filed another 10-Q/A for the quarter ended March 31, 2000 (the "6/26/00 10-Q/A(2)"), signed by Defendant Swartz.  According to the 6/26/00 10-Q/A(2), the restatement was in response to a "limited review" by the SEC.

248.    In the 6/26/00 10-Q/A(2), Defendants explained that Tyco was restating its results for reasons similar to those described in the 6/26/00 10-K/A.

249. Although Tyco's filing of an amended 10-Q was in effect an admission that it had materially misstated its operating results during the Relevant Period, Defendants attempted to downplay that admission by restating its results only minimally.

250. The 6/26/00 10-Q/A(2) itself contains numerous materially false and misleading statements on a variety of topics, including the following:

a.    Tyco's Operating Results

251.    The 6/26/00 10-Q/A(2) falsely stated Tyco's operating results:

| | FOR THE QUARTERS ENDED MARCH 31, | | FOR THE SIX MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|
| | 2000 | 1999 | 2000 | 1999 |
| | (IN MILLIONS) | | | |
| Pre-tax income before extraordinary items | 1,139.9 | 311.5 | 2,159.3 | 262.4 |
| Income taxes | (284.4) | (147.2) | (546.6) | (187.7) |
| Income before extraordinary items | 855.5 | 164.3 | 1,612.7 | 74.7 |
| Extraordinary items, net of taxes | -- | (42.5) | (0.2) | (44.9) |
| Net income | $ 855.5 | $ 121.8 | $ 1,612.5 | $ 29.8 |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A.5. describing Defendants' concealment of the acquisitions scheme from the SEC.

252.    The market was misled by Defendants' statements, as illustrated by this June 26, 2000, UBS Warburg analyst report containing materially false and misleading information received from Defendants.  The analyst report, entitled "TYC: SEC Review = Positive Outcome . . . Overhang Lifted," stated:

**Magnitude of SEC Accounting Requests Is Insignificant, in our view.**

*        *        *

Management also expressed comfort with consensus estimates for the second quarter, $0.57, and 2000, $2.16 . . . .  We remain extremely bullish on TYC . . .

*        *        *

[W]e are looking for $3.3 billion in free cash flow generation this fiscal year, which along with the company's unlevered balance sheet, afford ample powder for acquisitions - implying our earnings estimates are conservative.

253.    Tyco's share price closed at $48.69 on June 26, 2000.

254.    On June 27, 2000, the day after Defendants filed the 6/26/00 10-K/A, the 6/26/00 10-Q/A (1), and the 6/26/00 10-Q/A (2), *The Wall Street Journal* reported that, with the filing of the restatements, the SEC's informal inquiry was effectively put to rest ("Tyco's Shares Rise 13% After Concern Restates Results Following SEC Review").  Analyst response was favorable. According to the article: "Michael Holton, analyst at T. Rowe Price Associates in Baltimore, . . . said **the results of the inquiry 'put to rest any lurking fears about the company's accounting and the credibility of its management.' He called the announcement 'positive across the board**.'"

255.    That same day, Defendant Kozlowski was cited by the *Financial Times* as saying that "the changes [reflected in the restatements] only affected the timing of non-recurring charges at Tyco."   According to the June 27 article ("Tyco Lifted by Conclusion of SEC Review"), Kozlowski said that "[t]he company has 'the financial resources and flexibility to continue to pursue acquisitions that will have an immediate positive impact on our earnings per share."   As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A.5. describing Defendants' concealment of the acquisitions scheme from the SEC.  Most notably, Defendants knew the SEC's investigation had not uncovered the truth known to Defendants and that Defendants had concealed numerous, important documents from the SEC that were responsive to the SEC's document requests to Tyco.

14.    The Mallinckrodt Acquisition

256.    On June 28, 2000, Tyco announced the acquisition of Mallinckrodt.   The Company's press release stated:

*Acquisition Will Have Immediate Positive Impact on Earnings*; Strengthens Tyco Healthcare's Leading Positions in Medical Devices

\*       \*       \*

*"The Mallinckrodt acquisition will be immediately accretive to Tyco's earnings," Mr. Kozlowski stated.* "It offers consolidation opportunities as well as significant manufacturing, purchasing and distribution synergies. *Our past acquisitions in Tyco Healthcare have achieved strong top line growth and operating efficiencies*. We expect that the acquisition of Mallinckrodt also will provide ongoing positive benefits to Tyco shareholders.

Defendants' June 28, 2000 statements were false and misleading because they failed to disclose the existence of the acquisitions scheme described herein at § V.A., including but not limited to the fact that the acquisition would be accretive because of Defendants' erroneous and misleading accounting and manipulation of the acquired company's financial statements and recording of excess goodwill. Moreover, previous acquisitions had only demonstrated "strong top line growth" because of Defendants' manipulations.

15.     6/28/00 Conference Call

257.     On June 28, 2000, Tyco held a conference call to discuss, among other things, its acquisition of Mallinckrodt and its projections for the quarter. During the call, Defendant Kozlowski continued to falsely predict a favorable quarter:

KOZLOWSKI:          To begin with, first of all we are confident of our quarter and our year at Tyco. Business continues to be good. Our organic growth continues to go well. We expect we will have a strong quarter . . . . We are still projecting our $3.3 billion of free cash this year.

258.     About the Mallinckrodt acquisition and other acquisitions, he stated:

KOZLOWSKI:          Mallinckrodt fits all the criteria that we often talk about for a Tyco acquisition. *It will be immediately accretive to the company.* It has strong growth. As a matter of fact, the growth of the Mallinckrodt businesses markets are even better than the strong growth that we're experiencing in current Tyco Healthcare markets.

\*        \*        \*

> But as we said back in May, you're seeing good strong organic growth from us.  We do anticipate real good organic growth out for the next 12-24 months in all of our businesses, from everything we see and we're well positioned.  And we will be adding to that with these selective acquisitions that make a whole lot of sense. ***That are immediately accretive, give us good strong cash flows and fit right within to what we're doing.***

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

      16.    7/12/00 S-4 (And Related Offering Documents
           For The Exchange Of Tyco Shares For Mallinckrodt Shares)

    259.    On July 12, 2000, Tyco filed with the SEC a Form S-4 relating to a proposed merger between Mallinckrodt and a subsidiary of Tyco (the "7/12/00 S-4").  The 7/12/00 S-4 was signed by Defendants Swartz, Kozlowski and Walsh, and by other of Tyco's directors (Michael A. Ashcroft, Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 7/12/00 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999 and January 20, 2000.

    260.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 7/12/00 S-4 recites Tyco's purported strategy, quoted and discussed above in ¶196.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of

Mallinckrodt:

> At a meeting held on June 22, 2000, Tyco's Board of Directors determined that
> the acquisition of Mallinckrodt was in keeping with its corporate strategy of
> complementing its internal growth with acquisitions that are likely to benefit from
> cost reductions and synergies when combined with Tyco's existing operations and
> that are expected to be accretive to earnings per share.

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

261.    On August 9, 2000, Defendants filed with the SEC a Form S-4/A (the "8/9/00 S-

4/A"), amending the 7/12/00 S-4.  The 8/9/00 S-4/A was signed by Swartz for himself and for

Kozlowski and Walsh, and for other of Tyco's directors (Michael A. Ashcroft, Joshua M.

Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E.

Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 8/9/00 S-4/A incorporates the

following documents by reference, it contains the same materially false and misleading

statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Forms

10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco's Quarterly Reports on

Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii)

Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14,

2000.

262.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the

Relevant Period, the 8/9/00 S-4/A recites Tyco's purported strategy, quoted and discussed above

in ¶196.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of

Mallinckrodt, using precisely the same language quoted from the 7/12/00 S-4, above.  As

Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

263.    On August 11, 2000, Defendants filed with the SEC a Prospectus relating to the proposed merger between Mallinckrodt and a subsidiary of Tyco (the "8/11/00 Prospectus"). Because the 8/11/00 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

264.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 8/11/00 Prospectus recites Tyco's purported strategy, quoted and discussed above in ¶196.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of Mallinckrodt, using precisely the same language quoted from the 7/12/00 S-4, above.  As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

17.    7/13/00 Press Release

265.    On July 13, 2000, Tyco issued a press release announcing that the SEC had terminated its informal inquiry into Tyco's accounting practices without recommending an enforcement action. According to the press release:  "As Tyco has previously stated, the Company has at all times been confident with respect to the propriety of its accounting and its previously issued financial statements."  As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A.5. describing

Defendants' concealment of the acquisitions scheme from the SEC.

    18.  <u>7/19/00 Earnings Announcement</u>

  266.  On July 19, 2000, Tyco issued a press release announcing the Company's financial results for the quarter ended June 30, 2000:

> Tyco International Ltd. (NYSE: TYC) (LSE: TYI; BSX: TYC), a diversified manufacturing and service company, reported today that diluted earnings per share before non-recurring charges and credits and extraordinary item, for its third quarter ended June 30, 2000 were 58 cents per share, a 38 percent increase over 42 cents per share for the same quarter last year.  Net income rose to $992.1 million, an increase of 42 percent compared to $699.4 million last year. Sales for the quarter rose 27 percent to $7.42 billion compared with last year's $5.82 billion.  The results for last year are before restructuring and non-recurring charges and extraordinary item.  After giving effect to restructuring and other non-recurring charges and credits, diluted earnings per share before extraordinary item were 58 cents, or $997.3 million, in fiscal 2000 compared to 13 cents, or $212.2 million, in fiscal 1999.

> Income before non-recurring charges and credits and extraordinary items for the nine months of fiscal 2000 rose to $2.63 billion, or $1.54 per diluted share, a 44 percent increase over last year's diluted per share earnings of $1.07.  After giving effect to acquisition related and other non-recurring charges and credits, diluted earnings per share before extraordinary item were $1.52, or $2.61 billion for the first nine months of fiscal 2000 compared to 17 cents, or $286.9 million, in fiscal 1999.  Revenues for the nine months increased to $21.13 billion, 30 percent higher than last year's $16.27 billion.

> "The results we reported for our third quarter reflected solid organic revenue growth and strong operating margins in each of our business segments. This has created free cash flow of over $900 million in the quarter.  Free cash flow in the first nine months of fiscal 2000 was $1.9 billion, which exceeds the free cash flow generated for all of fiscal year 1999," said L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer.

> "The integration of the acquisitions we completed this year have served to enhance our performance, and will provide for continued improvements as we complete this fiscal year and move into fiscal year 2001.  The completion of the acquisition of the Electronics OEM business of Thomas & Betts in July and the announced acquisition of Mallinckrodt will create additional positive impact going forward.  In addition, our balance sheet will be enhanced by the closing of the ADT Automotive divestiture, expected to be completed in mid-August, and the completion of the Mallinckrodt acquisition, expected in October," he added.

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

19.      7/19/00 Conference Call

267.    On July 19, 2000, Tyco held a conference call to discuss, among other things, its earnings during the third quarter of fiscal 2000.  Defendant Kozlowski falsely stated:

KOZLOWSKI:              Revenue was up 27% versus last year to 7.4 billion with strong organic growth. We had organic growth of over 17% this quarter . . . .  We here at Tyco continue to see strong performance across all business segments, we anticipate a good fourth quarter and our fiscal year 2001 which begins on October 1st looks very good to us at this time . . . .  We are very comfortable with the estimates for next quarter.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

268.    Kozlowski also addressed the termination of the SEC's inquiry into Tyco's accounting practices.   Reiterating the message of Tyco's recent press release, Defendant Kozlowski stated: "the company has at all times been confident with respect to the propriety of its accounting and its previously issued financial statements.  I hope with that we will not deal with accounting questions or accounting inquiries here at Tyco."  When asked whether he was "aware of any new negative news articles or anything that happens to be coming out," Kozlowski responded:  "Not at all."  As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A.5. describing Defendants' concealment of the acquisitions scheme from the SEC.

20.      7/26/00 TyCom Offering Documents

269.    On July 26, 2000, TyCom filed an amended Registration Statement and final

-106-

Prospectus with the SEC for the initial offering of 61,130,435 shares of TyCom common stock at

$32 per share.  The Registration Statement falsely stated:

> Recent research conducted for us by The Yankee Group projects that transatlantic fiber optic traffic volume will increase at a compound annual growth rate of approximately 123% from 2000 through 2005.  As a result of the rapid development of terrestrial networks in the United States and Europe over the last few years, demand for undersea bandwidth capacity to link to those and other networks is increasing.  This need for interconnectivity requires the deployment of large bandwidth transoceanic systems. According to The Yankee Group, transpacific traffic volume will increase at a compound annual growth rate of approximately 129% from 2000 through 2005.  Demand for large bandwidth transoceanic systems is developing, in part as a result of the use of wireless Internet and the ongoing deployment of terrestrial networks in the region. This projected demand for increased undersea bandwidth capacity will provide a significant opportunity to system and bandwidth capacity providers, especially those that have the technology, capital and infrastructure required for fast deployment and reliable maintenance of undersea fiber optic cable systems.

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V.D., § V.E.4. and § VI.  The offering documents expressly misrepresented the demand for

bandwidth that was the purported basis for the valuation of TyCom.   Notably, the offering

documents also did not disclose that Tyco was motivated to offer the TyCom shares so that

Defendants Kozlowski, Swartz and others at Tyco could give themselves bonuses as described at

¶¶100-104.

21.     8/14/00 10-Q For Quarter Ended 6/30/00

270.    On August 14, 2000, Defendants filed Tyco's Form 10-Q for the quarter ended

June 30, 2000 (the "8/14/00 10-Q"), signed by Defendant Swartz.   In it, Defendants set out

numerous materially false and misleading statements addressing a variety of topics, including the

following:

a.      Tyco's Operating Results

271.    The 8/14/00 10-Q falsely stated Tyco's operating results in summary format:

| | FOR THE QUARTERS ENDED JUNE 30, | | FOR THE NINE MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
| | 2000 | 1999 | 2000 | 1999 |
| | (UNAUDITED) (IN MILLIONS) | | | |
| Pre-tax income before extraordinary items........... | 1,329.7 | 399.2 | 3,488.9 | 661.5 |
| Income taxes....................................... | (332.4) | (187.0) | (878.9) | (374.6) |
| Income before extraordinary items.................. | 997.3 | 212.2 | 2,610.0 | 286.9 |
| Extraordinary items, net of taxes.................. | -- | (0.5) | (0.2) | (45.4) |
| Net income......................................... | $ 997.3 | $ 211.7 | $ 2,609.8 | $ 241.5 |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

272.    In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above.   Instead Defendants attributed Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income, before certain credits (charges), improved in all segments in the quarter and nine months ended June 30, 2000 as compared to the quarter and nine months ended June 30, 1999.  The operating improvements are the result of increased revenues and enhanced margins in certain segments.   Increased revenues resulted from organic growth and from acquisitions.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. detailing the acquisitions scheme.

b.    Tyco's Charges and Reserves

273.    The 8/14/00 10-Q gives materially false and misleading information regarding Tyco's reserves.  For example:

> In the nine months ended June 30, 2000, the Company established restructuring and other non-recurring reserves of $35.9 million, of which $7.3 million is included in cost of sales, primarily related to the restructuring activities in AMP's

-108-

Brazilian operations and wireless communications business, charges associated with USSC's suture business and the exiting of USSC's interventional cardiology business.  At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $399.3 million.  During the nine months ended June 30, 2000, the Company paid out $116.4 million in cash and incurred $50.5 million in non-cash charges that were charged against these reserves.  Also in the nine months ended June 30, 2000, the Company determined that $117.2 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit of $110.9 million to the merger, restructuring and other non-recurring charges line item and a credit of $6.3 million to the cost of sales line item in the Consolidated Statement of Operations. The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP's products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC.  Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, the costs of which were provided for in previous AMP restructuring plans.  In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated.  The changes in estimates of the Company's 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At June 30, 2000, there remained $151.1 million of merger, restructuring and other non-recurring reserves on the Company's Consolidated Balance Sheet, of which $117.6 million is included in accrued expenses and other current liabilities and $33.5 million is included in other long-term liabilities.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. detailing the acquisitions scheme.

22.    The Mallinckrodt Acquisition Closing

274.    In a press release dated October 17, 2000, Tyco announced that it had completed the acquisition of Mallinckrodt.  The press release stated:

> "*The Mallinckrodt acquisition will be immediately accretive to Tyco's earnings,*" *according to L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer.*"  It offers consolidation opportunities as well as significant manufacturing, purchasing and distribution synergies.  *Our past acquisitions in Tyco Healthcare have achieved strong top line growth and operating efficiencies*.  The acquisition of Mallinckrodt also will provide ongoing positive benefits to Tyco shareholders.

Defendants' October 17, 2000 statements were false and misleading because they failed to

disclose the existence of the acquisitions scheme described herein at § V.A., including but not limited to the fact that the acquisition would be accretive because of Defendants' erroneous and misleading accounting and manipulation of the acquired company's financial statements and recording of excess goodwill.  Moreover, previous acquisitions had only demonstrated "strong top line growth" because of Defendants' manipulations.

23.     10/24/00 Earnings Announcement

275.    On October 24, 2000, Tyco issued a press release announcing its financial results for the quarter ended September 31, 2000:

> Tyco International Ltd. (NYSE: TYC; BSX-TYC, LSE-TYI), a diversified manufacturing and service company, reported today that diluted earnings per share for its fourth quarter ended September 30, 2000 were 64 cents, a 39 percent increase over earnings of 46 cents per share in its fourth quarter of 1999.  Net income before extraordinary item rose to $1.10 billion, an increase of 40 percent compared to $782.7 million last year.  Sales for the quarter rose 25 percent to $7.81 billion compared with last year's $6.22 billion.  These results are before restructuring and other non-recurring credits, charges, gain and extraordinary item.  After giving effect to restructuring and other non-recurring credits, charges and gain, diluted earnings per share before extraordinary item for the fourth quarter of fiscal 2000 were $1.12, or $1.91 billion, compared to 46 cents, or $780.8 million, in the fourth quarter of fiscal 1999.

> For fiscal 2000, income before restructuring and other non-recurring credits, charges, gain and extraordinary item rose to $3.73 billion, or $2.18 per diluted share, a 42 percent increase over last year's diluted per share earnings of $1.53.  After giving effect to restructuring and other non-recurring credits, charges and gain, diluted earnings per share before extraordinary item were $2.64, or $4.52 billion for fiscal 2000 compared to 64 cents, or $1.07 billion, in fiscal 1999.  Revenues for the twelve months increased to $28.93 billion, 29 percent higher than last year's $22.50 billion.

> "Tyco continues to show no signs of slowing down," said L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer.  "Organic growth remained strong across the board.  We continued to expand our operating margins to record levels.  Backlog is up in virtually every business, which in addition to reflecting the current strength of these businesses gives us good visibility on the coming year.  We generated free cash flow of over $1.4 billion in the quarter and in excess of our target of $3.3 billion for the full year, even after spending nearly $200 million related to the TyCom Global Network.

"During the quarter, we generated additional net cash proceeds of over $2.1 billion from the issuance of shares by TyCom Ltd. in an initial public offering. Substantially all of these proceeds will be used to build and deploy the TyCom Global Network. This transaction resulted in a gain, before tax, of $1.8 billion reported in our fourth quarter. Subsequent to the end of the fiscal year, we completed the sale of ADT Automotive for $1 billion in cash. These cash proceeds, together with the free cash flow generated by our businesses, provide a strong balance sheet and significant resources for future growth and acquisition opportunities.

"As all these factors indicate, Tyco is anticipating another solid year in 2001. The rapid integration of the Thomas & Betts Electronics acquisition is producing strong growth opportunities for that business. We closed our acquisition of Mallinckrodt last week and are already capitalizing on the exciting new growth potential Mallinckrodt gives us in our worldwide healthcare business. Fire and Security's recurring revenue base continues to increase, providing us with a more predictable and profitable revenue and earnings stream. And, worldwide demand for Tyco Flow Control's broad offering of industrial valve and control products continues to strengthen and we see further demand in the areas of power generation, water and wastewater markets," he added.

As Defendants either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V.D., § V.E.4. and § VI.

24.    10/24/00 Conference Call

276.    On October 24, 2000, Tyco held a conference call to discuss, among other things, its earnings during the fourth quarter of fiscal 2000. Defendant Kozlowski touted Tyco's performance for the quarter: "The organic growth for the entire fiscal year was in excess of 16% . . . . [W]e detect no signs of weakness in any areas of any of our businesses." He also said: "I hope you got the sense from our conference call here today that business is very good at Tyco, the outlook is quite strong. You will be seeing robust organic growth from us." As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

277.    In addition, Defendant Kozlowski described Tyco's strategy for acquiring other companies, emphasizing that each and every acquisition has to be "strongly accretive" to Tyco:

KOZLOWSKI:    *. . .[I]rregardless of the size [all our acquisitions] have to meet the same criteria of being strongly accretive to us, and we get that accretion through cost reductions*, we do not count revenue enhancements into any of that but we've push hard for revenue enhancement and we wouldn't buy a company whose revenues we didn't think we could enhance, we simply wouldn't pay for it at the time it comes to a part of the company, it has to fit within the segments that we are in, it has to have management sponsorship here, and it has to be something that just makes a whole lot of sense.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in  § V and § VI, including § V.A. detailing the acquisitions scheme.

278.    The following day, in an article entitled "Tyco's Net Income More Than Doubles; Profit Before One-Time Items Rises 40%," *The Wall Street Journal* quoted an "upbeat" Kozlowski as saying: "we detect no signs of weakness in any of our businesses," and called the company's outlook "quite strong."  As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in  § V and § VI.

279.    On October 25, 2000, J.P. Morgan, reporting materially false and misleading information received from Defendants, issued another bullish report on Tyco entitled, "Strong 4Q Results Deliver Revenue."  The report stated:

Tyco delivered another upside quarter in a tough environment, reinforcing our view the stock should enjoy a flight to quality given a slew of earnings disappointments this quarter.

*        *        *

Tyco exceeded its already aggressive target of $3.3 billion related in free cash for the year posting free cash for the quarter of over $1.4 billion and a full year total of over $3.3 billion.

*     *     *

Management reinforced its view on acquisitions and once again outlined its disciplined approach of comprehensive due diligence, strategic business fit, and long term growth sustainability, going a long way to quell investor concerns over the potential for a large, unfavorable deal.  The company does not intend to be the buyer of last resort for every large industrial company that is for sale and its track record supports this view.  The stock has been hurt by this perception recently and we think the absence of Tyco activity on some high profile acquisitions should reinforce this point and lower the perceived risk.

*     *     *

Investors are looking at technology names with exposure to many end markets that Tyco Electronics serves and concluding that Tyco will hit a bump in the road. We do not dispute that growth in handsets, computers or other tech markets has slowed, but it has certainly not stopped altogether.  Tyco has good visibility into the next several quarters and expects growth to hold near current levels over that period of time.

*     *     *

Management reaffirmed its comfort level with our $2.70 earnings estimate for FY2001, and looks for recent strong trends to persist across its businesses through the year.

280.    The price of Tyco stock closed at $54.75 on October 25, 2000.

25.    11/13/00 Lucent Acquisition

281.    On November 13, 2000, Tyco announced that it had agreed to acquire Lucent's

Power Systems Business. As set forth in the Company's press release:

Acquisition Provides Excellent Strategic Fit for Tyco Electronics and TyCom**, Will be Immediately Accretive to Earnings** . . . .  Tyco International Ltd. (NYSE: TYC; LSE: TYI; BSX: TYC) a diversified manufacturing and service company, today announced that it has agreed to acquire Lucent Technologies' Power Systems business unit ("LPS") from Lucent Technologies Inc. (NYSE: LU) for $2.5 billion in cash.  The acquisition is subject to customary regulatory approvals.

According to L. Dennis Kozlowski, Chairman and Chief Executive Officer of Tyco International Ltd., **"We expect that the acquisition of LPS, like previous**

-113-

> *acquisitions, will be immediately accretive to Tyco's earnings.   Previous*
> *acquisitions in Tyco Electronics continue to achieve strong top line growth and*
> *exceed cost reduction targets.***"**

Defendants' November 13, 2000 statements were false and misleading because they failed to

disclose the existence of the acquisitions scheme described herein at § V and § VI, including

§ V.A. detailing the acquisitions scheme.   Defendants did not disclose the fact that the

acquisition would be accretive because of Defendants' erroneous and misleading accounting and

manipulation of the acquired company's financial statements and recording of excess goodwill.

Moreover, previous acquisitions had only demonstrated "strong top line growth" because of

Defendants' manipulations.

26.   <u>11/14/00 Conference Call</u>

282.   On November 14, 2000, Tyco held a conference call to announce a deal to

purchase a unit of Lucent.  According to Defendant Kozlowski:

KOZLOWSKI:              The deal is ***very attractive financially in terms of earnings***
***per share accretion and return.***  This is possible through
some $385 million in synergies . . . .   About 60% of the
synergies will be realized in the first full year we have the
company and about 99% of the synergies will be realized in
year 2.  So therefore, as we pointed out, year one accretion
will be about 6¢, year two and year three will be about 12
and 15¢ respectively . . . .  We believe we will have no
problems meeting the goals, the financial goals that we
have set out before you within this business.  And overall
we are pleased to also report that Tyco continues to
function well. All of our businesses are operating at a high
level.  ***We're very comfortable with the earnings estimates***
***that we have out for the quarter and for the year and this***
***deal will be accretive as we pointed out to those earnings***
***estimates for the year.***

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in  § V and § VI, including § V.A. detailing the acquisitions scheme.

-114-

27.   12/4/00 Simplex Acquisition

283.   On December 4, 2000, Tyco announced that it would acquire Simplex Time Recorder Co.  The Company's press release stated:

> According to L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer, "***This transaction meets all of Tyco's acquisition criteria.  The transaction will be immediately accretive to Tyco's earnings per share and generate positive operating cash flows***."

Defendants' December 4, 2000 statements were false and misleading because they failed to disclose the existence of the acquisitions scheme described herein at § V.A., including but not limited to the fact that the acquisition would be accretive because of Defendants' erroneous and misleading accounting and manipulation of the acquired company's financial statements and recording of excess goodwill.

284.   According to a December 5, 2000 article in *The Wall Street Journal* ("Tyco Agrees to Buy Simplex Time Recorder"), Defendant Kozlowski said of the deal:  "The combination of Simplex with Tyco Fire and Security Services will provide excellent manufacturing and service synergies, allowing for immediate benefits for Tyco shareholders."  As Defendant Kozlowski either knew or was reckless in not knowing, this statement when made were materially false and misleading and omitted material information for the reasons set forth above in § V.A.

28.   The 2000 10-K Filed On 12/21/00

285.   On December 21, 2000, Tyco filed its 10-K for the fiscal year ended September 30, 2000 (the "2000 10-K"), signed by Defendants Swartz, Kozlowski and Walsh, and by other of Tyco's directors (Lord Ashcroft, Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser). In it, Defendants set out numerous materially false and misleading statements on a

variety of topics, including the following:

a.   Tyco's "Strategy"

286.   Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the

Relevant Period, the 2000 10-K recites Tyco's purported strategy:

> Tyco's strategy is to be the low-cost, high quality producer and provider in each
> of our markets. We promote our leadership position by investing in existing
> businesses, developing new markets and acquiring complementary businesses and
> products. Combining the strengths of our existing operations and our business
> acquisitions, we seek to enhance shareholder value through increased earnings per
> share and strong cash flows.

As Defendants either knew or were reckless in not knowing, this statement of strategy when

made was materially false and misleading and omitted material information for the reasons set

forth above in § V and § VI.

b.   Tyco's Manipulation Of Purchase Accounting Reserves

287.   The 2000 10-K sets forth statements that were materially false and misleading

concerning Tyco's manipulation of purchase accounting reserves:

> In Fiscal 2000, we made acquisitions that were accounted for under the purchase
> accounting method at an aggregate cost of $5,162.0 million. Of this amount,
> $4,246.5 million was paid in cash (net of cash acquired), $671.4 million was paid
> in the form of Tyco common shares, and we assumed $244.1 million in debt. In
> connection with these acquisitions, we established purchase accounting reserves
> of $426.2 million for transaction and integration costs. ***At the beginning of***
> ***Fiscal 2000, purchase accounting reserves were $570.3 million as a result of***
> ***purchase accounting transactions made in prior years. During Fiscal 2000, we***
> ***paid out $544.2 million in cash and incurred $52.1 million in non-cash charges***
> ***against the reserves established during and prior to Fiscal 2000. Also in Fiscal***
> ***2000, we determined that $117.8 million of purchase accounting reserves***
> ***related to acquisitions made prior to Fiscal 2000 were not needed and reversed***
> ***that amount against goodwill. At September 30, 2000, there remained $372.6***
> ***million in purchase accounting reserves on our Consolidated Balance Sheet, of***
> ***which $349.2 million is included in current liabilities and $23.4 million is***
> ***included in long-term liabilities***.

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI, including § V.A. detailing the acquisitions scheme..

c.    Tyco's Operating Results

288.    The 2000 10-K also gives favorable, purportedly accurate information concerning

Tyco's operating results. For example, Defendants provide the following summary information:

|  | YEAR ENDED SEPTEMBER 30, | | |
|  | 2000 | 1999 | 1998 |
| Income before income taxes, minority interest and extraordinary items | 6,464.8 | 1,705.2 | 1,702.8 |
| Income taxes | (1,926.0) | (637.5) | (534.2) |
| Minority interest | (18.7) | -- | -- |
| Income before extraordinary items | 4,520.1 | 1,067.7 | 1,168.6 |
| Extraordinary items, net of taxes | (0.2) | (45.7) | (2.4) |
| NET INCOME | $ 4,519.9 | $ 1,022.0 | $ 1,166.2 |

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI.

289.    In addition, these statements are materially false and misleading because they fail

to disclose the schemes to defraud described above.   Instead, Defendants attributed Tyco's

favorable results to "organic growth" and "synergies" resulting from Tyco's acquisitions.

According to the 2000 10-K:

Operating income improved in all segments in each of Fiscal 2000 and Fiscal
1999.  The operating improvements are the result of both increased revenues in all
segments and enhanced margins in all but one segment in Fiscal 2000. Increased
revenues result from organic growth and from acquisitions that are accounted for
under the purchase method of accounting.

Defendants also state: "By integrating merged companies with our existing businesses, we

expect to realize operating synergies and long-term cost savings."  And concerning profits

in Tyco's electrical business, Defendants state:

The 49.6% increase in operating income, before certain credits (charges), in Fiscal
1999 compared with Fiscal 1998 was due to improved margins at AMP, the

-117-

acquisition of Raychem, and higher sales volume at the Tyco Printed Circuit Group.  The improved operating margins, before certain credits (charges), in Fiscal 1999 compared with Fiscal 1998 were primarily due to the implementation of AMP's profit improvement plan, which was initiated in the fourth quarter of Fiscal 1998, cost reduction programs associated with the AMP merger, a pension curtailment/settlement gain and the acquisition of Raychem.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. detailing the acquisitions scheme.

> d.      Management Remuneration And Related Transactions

290.    The 2000 10-K addresses management remuneration only by reference, stating: "Information concerning management remuneration is hereby incorporated by reference to the Registrant's definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year."  Because the 2000 10-K incorporates Tyco's Proxy Statement, filed on January 29, 2001, by reference, the 2000 10-K contains the same materially false and misleading statements set forth therein, as described below at ¶¶297-303.

291.    Similarly, the 2000 10-K addresses related party transactions by reference, stating:   "Information concerning certain relationships and related transactions is hereby incorporated by reference to the Registrant's definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year."  Because the 2000 10-K incorporates Tyco's Proxy Statement, filed on January 29, 2001, by reference, the 2000 10-K contains the same materially false and misleading statements set forth therein, as described below at ¶¶297-303.

> 29.     12/29/00 Lucent Acquisition Closes

292.    On December 29, 2000, Tyco announced that it had completed its acquisition of Lucent's Power Systems Business. According to the press release:

According to L. Dennis Kozlowski, Chairman and Chief Executive Officer of Tyco International Ltd., "This business is an excellent fit for Tyco Electronics. We expect that the acquisition of LPS *will be immediately accretive to Tyco's earnings*. Previous acquisitions in Tyco Electronics *continue to achieve strong top line growth and exceed expected earnings targets*."

293.    On January 2, 2001, *The Wall Street Journal* reported that Tyco completed its purchase of a Lucent unit for $2.5 billion. The article included a comment from Tyco concerning the benefits of the acquisition:

Tyco said the acquisition, which gives it a strong foothold in the fast-growing business of providing power supplies to telecommunications concerns, will be "immediately accretive."

294.    Defendants' statements were false and misleading because they failed to disclose the existence of the acquisitions scheme described herein at § V and § VI, including § V.A. detailing the acquisitions scheme. Defendants' statements failed to disclose the fact that the acquisition would be accretive because of Defendants' erroneous and misleading accounting and manipulation of the acquired company's financial statements and recording of excess goodwill. Moreover, previous acquisitions had only demonstrated "strong top line growth" because of Defendants' manipulations.

C.    2001 Materially False And Misleading Statements And Omissions

1.    1/17/01 Press Release

295.    On January 17, 2001, Tyco announced its earnings for the quarter ended December 31, 2000:

Tyco International Ltd. (NYSE-TYC, BSX-TYC, LSE-TYI), a diversified manufacturing and service company, reported today that diluted earnings per share for its first quarter ended December 31, 2000 were 57 cents, a 24 percent increase over earnings of 46 cents per share in its first quarter of fiscal 2000. Net income before extraordinary items and cumulative effect of accounting change rose to $1.01 billion, an increase of 28 percent compared to $784.3 million last year. Sales for the quarter rose 21 percent to $8.02 billion compared with last year's $6.64 billion. These results are before non-recurring items. After giving effect to such items, diluted earnings per share before extraordinary items and

-119-

cumulative effect of accounting change for the first quarter of fiscal 2001 were 57 cents, or $1.01 billion, compared to 44 cents, or $757.2 million, in the first quarter of fiscal 2000.

"Each of Tyco's segments reported solid gains in revenue, operating profits and cash flow, even in the face of a turning economic environment.  The strongest growth was recorded by Tyco Electronics, where double-digit organic growth was enhanced by the successful integration of the Thomas & Betts OEM division," said L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer.

"Although we face an uncertain economic environment, we remain comfortable with Tyco's outlook for the remainder of 2001.  We have in place a very deliberate strategy to focus each of the businesses on recurring and other sources of revenue and earnings that are less sensitive to economic cycles.  Based on current business trends, we believe that although some parts of our business will see slower growth, overall Tyco's results will be in line with our expectations.  We will benefit from the integration of the acquisitions we have recently completed, particularly from the resulting synergies," he added.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

2.      1/17/01 Conference Call

296.     On January 17, 2001, Tyco held a conference call with analysts.  During the call, Defendants continued to falsely emphasize "organic growth" as the cause of the Company's publicly reported (but false) financial success:

KOZLOWSKI:              Tyco International today reported a 24% increase in first quarter earnings per share.  Our earnings per share increased to 57 cents a share from 46 cents last year.  Our revenue was up 21% to $8 billion for the quarter and we are pleased to report that organic growth for Tyco which excluding TyCom which has a different business model now where they building out their own system.  Organic growth was up from 16%.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set

forth above in § V and § VI.  Tyco's purported organic growth was the result of Defendants' fraudulent manipulations of Tyco's financial statements.

3.     2001 Proxy Statement Filed 1/29/01

297.   On January 29, 2001, Defendants filed with the SEC Tyco's Proxy Statement for the 2001 annual meeting (the "2001 Proxy Statement").  The 2001 Proxy Statement contains materially false and misleading statements on a variety of topics, including management remuneration, the Key Employee Loan Program, and allegations of accounting impropriety by the Company.

a.     Management Remuneration

298.   Concerning Tyco's executive compensation program generally, the 2001 Proxy Statement states:

> Tyco's executive compensation program [offers] significant financial rewards when Tyco and the individual achieve excellent results; however, significantly lower compensation is tied to lower levels of performance.  Specifically, if the compensation targets are not achieved, Tyco executives are ineligible for either cash bonuses or equity-based compensation.  In order for Mr. Kozlowski and Mr. Swartz to earn a cash bonus in fiscal 2000, a minimum of 22.5% growth in pre-tax income and operating cash flow growth over fiscal 1999 performance was required.  In addition, in order to meet the performance criteria to vest the minimum number of restricted shares, growth in earnings per share of at least 22.5% over fiscal 1999 was required.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E. detailing Defendants' looting of the Company.

299.   The 2001 Proxy Statement also contains materially false and misleading information regarding the administration of compensation to executive officers and key managers:

> The Compensation Committee of the Board of Directors is composed solely of independent directors, none of whom has any interlocking relationships with Tyco

-121-

that are subject to disclosure under rules of the SEC relating to proxy statements. The Compensation Committee approves all of the policies under which compensation is paid or awarded to Tyco's Chief Executive Officer, reviews and, as required, approves such policies for executive officers and key managers, and oversees the administration of executive compensation programs.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E. detailing Defendants' looting of the Company.

300.    The 2001 Proxy Statement contains the following specific information concerning the compensation of Defendants Kozlowski and Swartz:

| | | | | | | LONG TERM COMPENSATION | | |
| | | ANNUAL COMPENSATION(1) | | | | TYCOM | | |
| | | | | | | TYCO SHARES | TYCOM SHARES | |
| | | | CASH | STOCK | RESTRICTED | UNDERLYING | UNDERLYING | ALL OTHER |
| NAME & PRINCIPAL POSITION | YEAR | SALARY | BONUS(3) | BONUS(4) | STOCK AWARD(S)(5) | STOCK OPTIONS | STOCK OPTIONS | COMPENSATION(6) |
|---|---|---|---|---|---|---|---|---|
| L. DENNIS KOZLOWSKI...... | 2000 | $1,350,000 | $2,800,000 | | $21,207,540 | 5,107,158 | 800,000 | $527,152 |
| CHAIRMAN & CEO, TYCO | 1999 | 1,350,000 | 3,200,000 | | 25,707,178 | 6,621,834 | | 387,001 |
| INTERNATIONAL LTD. | 1998 | 1,250,000 | 2,500,000 | | 20,140,000 | 3,832,800 | | 901,002 |
| | | | | * * * | | | | |
| MARK H. SWARTZ.......... | 2000 | 768,750 | 1,400,000 | | 10,603,770 | 2,535,999 | 500,000 | 292,487 |
| EVP & CFO, TYCO | 1999 | 750,000 | 1,600,000 | | 12,029,641 | 2,976,480 | | 150,014 |
| INTERNATIONAL LTD. | 1998 | 559,500 | 1,250,000 | | 10,070,000 | 2,764,666 | | 256,878 |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E. detailing Defendants' looting of the Company.

301.    The 2001 Proxy Statement failed to disclose and misrepresented the actual compensation of Defendant Kozlowski:

For fiscal 2000, Mr. Kozlowski received a base salary of $1.35 million and a cash bonus in the amount of $2.8 million, as shown in the SUMMARY COMPENSATION TABLE on page 14. Mr. Kozlowski was granted 600,000 shares of restricted stock on January 5, 2000. These shares will vest over a period of up to three years if the specified performance criteria referred to above are met.

Mr. Kozlowski also received an aggressive performance-based option award, which includes significant growth in earnings per share and stock price appreciation measures (described in footnote 3 on page 16). Mr. Kozlowski also received restoration options in accordance with the restoration option provision. The restoration provision enables executive officers to use certain earned equity

awards and certain proceeds from the sale of shares acquired upon the exercise of options to pay option exercise costs, repay indebtedness owed to Tyco International (US) Inc., or for tax planning purposes while maintaining their equity position in Tyco.  At the time of the TyCom initial public offering, Mr. Kozlowski received an award of options to purchase 800,000 TyCom common shares at the initial public offering price of $32.00 with pro-rata vesting over four years.  The Committee believes Tyco is best served by the continued leadership of Mr. Kozlowski.   The Committee conferred with a nationally recognized consulting firm that analyzed Tyco's performance, as well as the marketplace for executive talent. The firm reviewed the performance option award, designed to focus on Mr. Kozlowski's retention as well as growth in shareholder value, and made its recommendations.   Another consulting firm reviewed and concurred with the recommendations.

The Committee considers Mr. Kozlowski's level of compensation appropriate in view of his performance and continued leadership of Tyco during fiscal 2000.  As noted above, Tyco experienced outstanding growth in earnings per share of 42.5%, operating cash flow of 48.6%, and net sales of 29%.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E. detailing Defendants' looting of the Company.

> b.  Key Employee Loan Program

302.    The 2001 Proxy Statement provides materially false and misleading statements concerning Tyco's KEL Program.  It states, for example:

> **The Compensation Committee administers the loan program**.  **The Compensation Committee authorizes loans**, which may not exceed the amount allowable as provided by any regulation of the United States Treasury or other state or federal statute.  Loans may be required to be secured by Tyco common shares owned by the employee or may be unsecured.  Loans under the loan program generally bear interest at Tyco's incremental short-term borrowing rate (6.67% for 2000) and are generally repayable in ten years or when the participant reaches age 69, whichever occurs first, except that earlier payments must be made in the event that the participant's employment with Tyco or its subsidiaries terminates.  The participant is also required to make loan payments upon the sale or other disposition of Tyco common shares (other than gifts to certain family members) with respect to which loans have been granted.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI, including § V.E.3. detailing Defendants' abuse of the KEL Program.

303.    The 2001 Proxy Statement also falsely and misleadingly states:

At September 30, 2000, the amount of loans outstanding under the [Key Employee Loan] program totaled $11,421,655, of which nothing was outstanding for any of the Named Officers.  The largest amount of indebtedness since October 1, 1999 for each of these individuals was $12,711,768 for Mr. Kozlowski, $304,363 for Mr. Garvey, and $1,000,000 for Mr. Swartz.  Neither Dr. Gromer nor Mr. Meelia had loans under the program during fiscal 2000.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E.3. detailing Defendants' abuse of the KEL Program.

4.    1/30/01 2000 Annual Report To Shareholders

304.    On or about January 30, 2001, Tyco released its 2000 Annual Report to Shareholders (the "2000 Annual Report"). On its very first page, the 2000 Annual Report falsely and misleadingly states that its "exceptional financial results" are the product of its "growth-on-growth" strategy:

Tyco has demonstrated the ability to grow each of its businesses organically, as well as by the acquisition of complementary businesses or product lines. This "growth-on-growth" strategy has yielded exceptional financial results for several years, and puts us in a position to achieve excellent growth in the future.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

305.    The 2000 Annual Report touts Tyco's ability to achieve "Organic Growth," even in the absence of any additional acquisitions:

Based on its performance to date, Tyco would continue growing revenues and achieving double-digit earnings gains annually for the foreseeable future even without additional acquisitions.  This is because we have leadership positions in many of the world's best growth industries.  Thus, we have the ability to increase

sales each year through a combination of geographic expansion, the introduction of innovative new products and market share gains fueled by our status as the low-cost producer in most of our markets.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.5. detailing the importance of Defendants' acquisitions scheme to the Company's perceived growth.

306.     The 2000 Annual Report included a full-page, misleading description of the Company's "free cash flow":

> At Tyco, cash is king.  We judge ourselves by the amount of free cash flow that we generate each year after we have paid all necessary expenses, including capital expenditures, which exceeded $1.8 billion last year.   In fiscal 2000, Tyco generated over $3.3 billion in free cash flow.  Cash generation is crucial because it is the very best indicator of how a company is really performing and it provides the resources for us to continue to grow our businesses by acquisition or other types of investment, such as through Tyco Ventures, our new venture capital arm.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.C. detailing Defendants' manipulation of the Company's publicly reported free cash flow figures.

307.     The 2000 Annual Report also provided investors with a false and misleading explanation of Tyco's acquisition strategy, including its purported ability to acquire companies that "immediately" add to earnings:

> Acquisitions are a definite growth driver at Tyco.  The second part of the growth-on-growth strategy involves acquisitions that add new products and businesses to complement our core groups.   We seek to acquire companies with superior products that have long-term growth potential but are performing below peak level, or companies that fill a gap in our existing product lines.  ***All acquisitions must immediately add to earnings***, but they must also make strategic sense by helping us become a stronger competitor in one of our existing business segments. Buying at a good price is important; finding a company whose people and products fit well in our organization is essential.

-125-

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. detailing Defendants' acquisitions scheme.

308.   The 2000 Annual Report also included a letter to Tyco shareholders from Defendant Kozlowski:

> Fiscal 2000 was another very strong year for Tyco.  I am pleased to report that all our operating units beat their performance targets, and they are in a position to achieve excellent growth in 2001 and beyond.
>
> Tyco's internal revenue growth in fiscal 2000 was 14 percent, a remarkable feat for a company of our size.  Put another way, our business units delivered $3.7 *billion* in incremental sales last year alone - not counting acquisitions. That is what I call a growth company.
>
> For the seventh consecutive year, we increased revenues and earnings substantially.  Revenues rose 29 percent to $28.9 billion and earnings grew $1.2 billion to $3.7 billion, a 46 percent increase over the prior year.  Our diluted earnings per share increased 42 percent to $2.18.  These are outstanding numbers, the result of our focus on lean, efficient management, continuous production improvement and aggressive expansion into new markets . . . .
>
> I have never been more confident about Tyco's core businesses and our growth opportunities.  We generated more than $3.3 billion in free cash flow in 2000, an amount that we hope to increase to over $4 billion − before capital spending on the TyCom Global Network − in 2001 . . . .
>
> *              *              *
>
> **Growth on Growth**
>
> At Tyco, we have a two-pronged growth strategy.  First, we seek to achieve double-digit organic growth every year.  This is growth without ever doing another acquisition . . . Strategic acquisitions also play a key role in our growth. A good acquisition should not only be profitable on its own terms, it should also help existing businesses and product lines . . . .
>
> *              *              *
>
> **Looking Forward**
>
> Tyco's future looks outstanding and I am confident that our "growth-on-growth" strategy will continue to deliver enviable results.  We are poised for growth

because we have the best brand names in our industries, names that represent "reliability" and "innovation" to purchasers.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

309.    In addition, the 2000 Annual Report provided investors with a false overview of the Company's operations:

> Sales increased 28.6% during Fiscal 2000 to $28,931.9 million from $22,496.5 million in Fiscal 1999.  Sales in Fiscal 1999 increased 18.0% compared to Fiscal 1998. Income before extraordinary items was $4,520.1 million in Fiscal 2000, as compared to $1,067.7 million in Fiscal 1999 and $1,168.6 million in Fiscal 1998. Income before extraordinary items for Fiscal 2000 included an after-tax net credit of $793.7 million ($1,484.7 million pre-tax) consisting of restructuring, non-recurring and impairment charges of $327.3 million ($424.2 million pre-tax) primarily for non-recurring claims related to a merged company and the exiting of USSC's interventional cardiology business, offset by a credit of $113.6 million ($148.9 million pre-tax) representing a revision of estimates of merger, restructuring and other non-recurring accruals and a gain of $1,007.4 million ($1,760.0 million pre-tax) on the issuance of common shares in connection with TyCom's initial public offering. Income before extraordinary items for Fiscal 1999 included an after-tax net charge of $1,304.8 million ($1,542.7 million pre-tax) primarily related to the mergers with USSC and AMP and costs associated with AMP's profit improvement plan.  Income before extraordinary items for Fiscal 1998 included an after-tax charge of $192.0 million ($256.9 million pre-tax) primarily related to AMP's profit improvement plan and costs incurred by USSC to exit certain businesses.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

310.    The 2000 Annual Report also provides limited, misleading information concerning loans taken by senior management under Tyco's KEL Program, which was instituted to encourage ownership of the Company's common stock by executives and other key employees.  According to the 2000 Annual Report: "During Fiscal 2000, the maximum amount

outstanding under is program was $26.0 million.  Loans receivable under this program were $11.4 million and $18.6 million at September 30, 2000 and 1999, respectively."  As Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E.3. detailing Defendants' abuse of the KEL Program.

5.    2/13/01 Form 10-Q For Quarter Ended 12/31/00

311.    On February 13, 2001, Defendants filed Tyco's Form 10-Q for the quarter ended December 31, 2000 (the "2/13/01 10-Q"), signed by Defendant Swartz.  In it, Defendants set out numerous materially false and misleading statements.  These false and misleading statements addressed a variety of topics, including the following:

a.    Tyco's Operating Results

312.    The 2/13/01 10-Q gives favorable, purportedly accurate information concerning Tyco's operating results. For example, Defendants provide the following summary information:

```
                                                    (UNAUDITED)
                                                 FOR THE QUARTERS
                                                ENDED DECEMBER 31,
                                                -------------------
                                                  2000      1999
                                                --------  --------

Income before income taxes, minority interest, extraordinary
   item and cumulative effect of accounting change...........  1,551.2   1,024.3
Income taxes.........................................  (529.5)   (263.9)
Minority interest..........................................   (12.5)     (3.2)
                                                --------  --------
Income before extraordinary item and cumulative effect of
   accounting change........................................  1,009.2    757.2
Extraordinary item, net of tax..............................    --       (0.2)
Cumulative effect of accounting change, net of tax..........   (29.7)    --
                                                --------  --------
Net income.................................................  $ 979.5  $ 757.0
                                                ========  ========
```

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

-128-

b.     Tyco's Reserves

313.    The 2/13/01 10-Q gives materially false and misleading information concerning

Tyco's reserves. For example:

> During the quarter ended December 31, 2000, we recorded restructuring and other non-recurring charges of $ 18.1 million primarily related to an environmental remediation project and the closure of a manufacturing plant.  Additionally, we incurred a non-recurring charge of $25.0 million related to the write-up of inventory under purchase accounting.   The $25.0 million charge has been included in cost of sales.   At September 30, 2000, there existed merger, restructuring and other non-recurring reserves of $365.9 million.   During the quarter ended December 31, 2000, we paid out $11.3 million in cash and incurred $1.7 million in non-cash charges that were charged against these reserves.   At December 31, 2000, there remained $371.0 million of merger, restructuring and other non-recurring reserves in our Consolidated Balance Sheet, of which $341.3 million is included in current liabilities and $29.7 million is included in long-term liabilities.  [2/13/01 10-Q at p. 25]

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI, including § V.A. detailing the acquisitions scheme.

6.     2/20/01 Prospectus Supplement (And Related
        Offering Documents For The Offering Of Tyco
        Debt Securities Cusip #902118AY4 And #902118AX6)

314.    On August 18, 2000, Tyco filed a Form S-3 for the registration of $3,500,000,000

in debt securities of Tyco International Group S.A. (the "8/18/00 S-3").  The 8/18/00 S-3 was

signed by Defendants Swartz, Kozlowski and Walsh, and by other of Tyco's directors (Michael

A. Ashcroft, Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M.

Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 8/18/00 S-3

incorporates the following documents by reference, it contains the same materially false and

misleading statements set forth in those documents, as described above: (i) Tyco's Annual

Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 1999; (ii) Tyco's

Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March

31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9,

1999, December 10, 1999, January 20, 2000, and July 14, 2000.

315.     Like the 1999 10-K and many of Tyco's other filings with the SEC throughout

the Relevant Period, the 8/18/00 S-3 recites Tyco's purported strategy, quoted and discussed

above in ¶286.

316.     The 8/18/00 S-3 also sets out the following operating information about the

Company:

|  | NINE MONTHS ENDED JUNE 30, | YEAR ENDED SEPTEMBER 30, |
| --- | --- | --- |
|  | 2000 | 1999 |
| Earnings: |  |  |
| Income (loss) before extraordinary items and cumulative effect of accounting changes.......... | $2,610.0 | $1,067.7 |
| Income taxes................. | 878.9 | 637.5 |
|  | 3,488.9 | 1,705.2 |

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI.

317.     On September 15, 2000, Tyco filed with the SEC a Prospectus relating to the

registration of $3,500,000,000 in debt securities of Tyco International Group S.A. (the "9/15/00

Prospectus").   Because the 9/15/00 Prospectus incorporates by reference the same documents

that were incorporated by reference in the 8/11/00 S-3, it contains the same materially false and

misleading statements set forth in those documents, as described herein.

318.     Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the

Relevant Period, the 9/15/00 Prospectus recites Tyco's purported strategy, quoted and discussed

above in ¶286.

319.    On February 20, 2001, Defendants filed with the SEC a Prospectus Supplement (the "2/20/01 Prospectus Supplement") to the 9/15/00 Prospectus.   Because the 2/20/01 Prospectus Supplement incorporates by reference the following documents, it contains the same materially false and misleading statements set forth in those documents, as described above: (i) Tyco's Annual Report on Forms 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Reports on Forms 10-Q for the quarter ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, and February 9, 2001, it contains the same materially false and misleading statements set forth in those documents, as described herein.

320.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 2/20/01 Prospectus Supplement recites Tyco's purported strategy, quoted and discussed above in ¶286.

> 7.    2/23/01 Form S-4 (And Related Offering Documents For
> The Exchange Of Tyco Shares For Scott Technologies Shares)

321.    On February 23, 2001, Tyco filed with the SEC a Form S-4 relating to Tyco's proposed offer to issue 9,415,481 shares of Tyco stock upon consummation of the merger with Scott Technologies (the "2/23/01 S-4").   The 2/23/01 S-4 was signed by Defendants Kozlowski, Swartz and Walsh, and by other of Tyco's directors (Michael A. Ashcroft, Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).   Because the 2/23/01 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter

ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, and February 9, 2001.

322.    Like many of Tyco's other filings with the SEC throughout the Relevant Period, the 2/23/01 S-4 recites Tyco's purported strategy, quoted and discussed above in ¶286.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of Scott Technologies:

> At a meeting held on January 10, 2001, Tyco's Board of Directors determined that the acquisition of Scott was in keeping with its corporate strategy of complementing its internal growth with acquisitions that are likely to benefit from cost reductions and synergies when combined with Tyco's existing operations and that are expected to be accretive to Tyco's earnings per share.

As Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

323.    On March 30, 2001, Tyco filed with the SEC a Form S-4/A (the "3/30/01 S-4/A") and a Prospectus (the "3/30/01 Prospectus") relating to the proposed merger between Scott Technologies and Tyco.  Because the 3/30/01 S-4/A and the 3/30/01 Prospectus each incorporate the following documents by reference, they each contain the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, and March 29, 2001.

324.    Like many of Tyco's other filings with the SEC throughout the Relevant Period, the 3/30/01 S-4/A and the 3/30/01 Prospectus each recite Tyco's purported strategy, quoted and discussed above in ¶286.  They also reiterate its so-called strategy in their discussion of Tyco's acquisition of Scott Technologies, using precisely the same language quoted from the 2/23/01

S-4, above.  As Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

325.    The 3/30/01 S-4/A and the 3/30/01 Prospectus also give favorable, purportedly accurate information concerning Tyco's operating results, including the identical historical financial data of Tyco represented in the 2/23/01 S-4, quoted above.  As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

326.    Tyco stock closed at $54.90 on March 6, 2001.

8.    3/13/01 Conference Call

327.    On March 13, 2001, Tyco held a conference call to discuss, among other things, its proposed acquisition of CIT.  Defendant Kozlowski stated:

KOZLOWSKI:            On the plus side, **this transaction is accretive** to Tyco's shareholders **delivering $0.10 the first full year**.  If one were to take out the amortization on this, we'd be delivering some $0.075 cents the first full year the new accounting rules allow us to deliver $0.10.  And if we were to pool, to be an apples to apples basis, we would be delivering that $0.10.  This $0.10 cents now is based upon putting the two companies together at current rent rates and a little bit of some cost reductions at CIT . . . .  This acquisition meets all of our criteria. CIT is a market leader. **The transaction is immediately accretive to earnings before any revenue enhancements.**

*       *       *

. . . We're very, very enthused by this acquisition.  It's certainly going to add to earnings.  We feel good about our earnings right now.  The transaction most likely will close in about July.  It should add a couple of cents this year, that we're in and next year for the full year, for the full fiscal year we're probably talking about some $0.10 to $0.12

> before we get into the revenue enhancements for the
> business.

As defendant Kozlowski either knew or was reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

9.      <u>3/28/01 Press Release</u>

328.      On March 28, 2001, Tyco issued a press release announcing that it had been

named the "number one performing company of 2000 by *BusinessWeek* magazine."  According

to the press release:

> Tyco is the top performer based on its revenue growth, earnings growth, return to
> shareholders, profit margins and return on equity, tallied for both one year and
> three years . . . .  L. Dennis Kozlowski, Chairman and CEO of Tyco, commented,
> "Tyco is delighted to receive this recognition from BusinessWeek.  ***Tyco's
> 'growth on growth' strategy has been designed to deliver ongoing solid,
> sustainable organic growth coupled with growth through acquisitions***.  Our
> strategy has positioned Tyco as the leader in our markets and as the high-quality,
> low-cost producer in the industries in which we operate." . . .  ***In addition, Tyco
> has made and integrated more than 118 acquisitions, <u>all of them</u>*** *accretive to*
> ***shareholders.***

329.      Defendants' March 28, 2001 statement was false and misleading because it failed

to disclose the existence of the acquisitions scheme described herein at § V.A., including but not

limited to the fact that the acquisition would be accretive because of Defendants' erroneous and

misleading accounting and manipulation of the acquired company's financial statements and

recording of excess goodwill.  Moreover, Tyco's previous acquisitions had been accretive

because of these manipulations.

10.      <u>3/29/01 S-4 (And Related Offering Documents</u>
            <u>For The Exchange Of Tyco Shares For CIT Shares)</u>

330.      On March 29, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed

merger between CIT and Tyco Acquisition Corp. XIX (NV), a direct wholly-owned subsidiary

-134-

of Tyco (the "3/29/01 S-4").  The 3/29/01 S-4 was signed by Defendants Kozlowski, Swartz and

Walsh, and by other of Tyco's directors (Michael A. Ashcroft, Joshua M. Berman, Richard S.

Bodman, John F. Fort, Stephen W. Foss, Philip M. Hampton, Wendy E. Lane, James S. Pasman,

Jr., and W. Peter Slusser).  Because the 3/29/01 S-4 incorporates the following documents by

reference, it contains the same materially false and misleading statements set forth in those

documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year

ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended

December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000,

November 15, 2000, and February 9, 2001.

331.    Like many of Tyco's other filings with the SEC throughout the Relevant Period,

the 3/29/01 S-4 recites Tyco's purported strategy, quoted and discussed above in ¶286.  It also

reiterates its so-called strategy in its discussion of Tyco's acquisition of CIT:

> The acquisition of CIT would also be consistent with Tyco's corporate strategy of
> complementing internal growth with synergistic acquisitions that are expected to
> be immediately accretive to earnings per share.

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

332.    The 3/29/01 S-4 also gives favorable, purportedly accurate information

concerning Tyco's operating results, including the following:

| | QUARTERS ENDED DECEMBER 31, | | YEAR ENDED SEPTEMBER 30, | |
| --- | --- | --- | --- | --- |
| | 2000(2) | 1999(2) | 2000(3) | 1999(4) |
| | (UNAUDITED) | | | |

(IN MILLIONS, EXCEPT PER SHARE DATA)

CONSOLIDATED STATEMENTS
  OF OPERATIONS DATA:

| | | | | |
| --- | --- | --- | --- | --- |
| Operating income....... | 1,308.9 | 1,189.0 | 5,474.4 | 2,190.8 |
| Income (loss) from continuing operations........... | 1,009.2 | 757.2 | 4,520.1 | 1,067.7 |
| Income (loss) from continuing operations per common share(10): | | | | |
| Basic............... | 0.58 | 0.45 | 2.68 | 0.65 |
| Diluted............. | 0.57 | 0.44 | 2.64 | 0.64 |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

333.    On April 13, 2001, Defendants filed with the SEC a Form S-4/A (the "4/13/01 S-4/A"), amending the 3/29/01 S-4.    Because the 4/13/01 S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, and April 3, 2001.

334.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 4/13/01 S-4/A recites Tyco's purported strategy, quoted and discussed above in ¶286.    It also reiterates its so-called strategy in its discussion of Tyco's acquisition of

CIT, using precisely the same language quoted from the 3/29/01 S-4, above.  As Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

335.    On April 24, 2001, Tyco filed with the SEC a prospectus relating to the proposed merger between CIT and Tyco Acquisition Corp. XIX (NV) (the "4/24/01 Prospectus"). Because the 4/24/01 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, and April 3, 2001.

336.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 4/24/01 Prospectus recites Tyco's purported strategy, quoted and discussed above in ¶286.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of CIT, using precisely the same language quoted from the 3/29/01 S-4, above.  As Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

337.    The 4/24/01 Prospectus also gives favorable, purportedly accurate information concerning Tyco's operating results, including the following:

| | QUARTER ENDED DECEMBER 31, | | YEAR ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2000(2) | 1999(2) | 2000(3) | 1999(4) |
| | (UNAUDITED) | | | |

(IN MILLIONS, EXCEPT PER SHARE DATA)

CONSOLIDATED STATEMENTS
  OF OPERATIONS DATA:

| | 2000(2) | 1999(2) | 2000(3) | 1999(4) |
|---|---|---|---|---|
| Operating income....... | 1,308.9 | 1,189.0 | 5,474.4 | 2,190.8 |
| Income (loss) from continuing operations........... | 1,009.2 | 757.2 | 4,520.1 | 1,067.7 |
| Income (loss) from continuing operations per common share(10): | | | | |
| Basic............... | 0.58 | 0.45 | 2.68 | 0.65 |
| Diluted............. | 0.57 | 0.44 | 2.64 | 0.64 |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

338.    On May 24, 2001, Defendants filed with the SEC a Post-Effective Amendment No. 1 to Form S-4 relating to the proposed merger between CIT and Tyco Acquisition Corp. XIX (NV) (the "5/24/01 Post-Effective Amendment").  The 5/24/01 Post-Effective Amendment was signed by Defendant Swartz for himself and for Defendants Kozlowski and Walsh, and for other of Tyco's directors (Michael A. Ashcroft, Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Wendy E. Lane, James S. Pasman, Jr., W. Peter Slusser and Joseph F. Welch). Because the 5/24/01 Post-Effective Amendment incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended December 31, 2000 and March 31, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001,

April 3, 2001, and May 24, 2001.

339.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 5/24/01 Post-Effective Amendment recites Tyco's purported strategy, quoted and discussed above in ¶286.  As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

340.    On June 5, 2001, Defendants filed with the SEC a prospectus relating to Tyco's proposed offer to exchange up to 7,141,083 common shares of Tyco stock for exchangeable shares of Tyco's direct subsidiary, CIT Exchangeco, Inc. (the "6/5/01 Prospectus").  Because the 6/5/01 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000 and March 31, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, and May 24, 2001.

341.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 6/5/01 Prospectus recites Tyco's purported strategy, quoted and discussed above in ¶286.  As Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

342.    On June 7, 2001, Tyco filed with the SEC a Form S-8 in connection with the issuance of securities to CIT Savings Incentive Plan, relating to the proposed merger between CIT and Tyco (the "6/7/01 S-8").  The 6/7/01 S-8 was signed by Defendants Kozlowski, Swartz

and Walsh, and by other of Tyco's directors (Michael A. Ashcroft, Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Joseph F. Welch, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).   Because the 6/7/01 S-8 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000 and March 31, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, and May 24, 2001.

      11.    4/18/01 Press Release

343.   On April 18, 2001, Tyco announced its financial results for the quarter ended March 31, 2001.  The Company stated:

> Tyco International Ltd. (NYSE: TYC, BSX: TYC, LSE: TYI), a diversified manufacturing and service company, reported today that diluted earnings per share for its second quarter ended March 31, 2001 were 65 cents, a 30 percent increase over earnings of 50 cents per share in its second quarter of fiscal 2000.  Net income before extraordinary items rose to $1.16 billion, an increase of 35 percent compared to $853.6 million last year.  Sales for the quarter rose 26 percent to $8.9 billion compared with last year's $7.07 billion.  These results are before non-recurring items.  After giving effect to such items, diluted earnings per share before extraordinary items for the second quarter of fiscal 2001 were 65 cents, or $1.15 billion, compared to 50 cents, or $855.5 million, in the second quarter of fiscal 2000.

> For the first half of fiscal 2001, income before non-recurring items, extraordinary items and cumulative effect of accounting change rose to $2.16 billion, or $1.22 per diluted share, a 27 percent increase over last year's diluted earnings per share of 96 cents.  After giving effect to non-recurring items, diluted earnings per share before extraordinary items and cumulative effect of accounting change were $1.22, or $2.16 billion, for the first half of fiscal 2001 compared to 94 cents, or $1.61 billion, in fiscal 2000.  Revenues for the first half of fiscal 2001 increased to $16.92 billion, 23 percent higher than last year's $13.71 billion.

> "The results achieved this quarter by each of our operating units are a tribute to the fundamental strength of our businesses," said L. Dennis Kozlowski,

Tyco's Chairman and Chief Executive Officer.  "We have demonstrated that even in the face of a slowing economy, our recurring revenue base, long-term contracts and geographic diversity can provide a steady and predictable revenue and earnings stream, and the cash flow required to fuel future growth."

As Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

12.    4/18/01 Conference Call

344.    On April 18, 2001, Defendants held a conference call with analysts to discuss the Company's purported earnings growth.  During the call, Defendant Kozlowski stated, among other things, that Tyco's earnings continued to increase despite the economic downturn:

DENNIS:                 Okay.  It is a recap here.  We are very pleased with our earnings increase of 30% from last year and our revenue growth of some 25%.  Overall Tyco organic growth is some 13% and free cash flow of $1.1 billion.  We felt that it was a strong quarter. We anticipate a strong earning to the second half of our year and our outlook for next year at this time continues to be good in spite of the various economic conditions that are going on around the world.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

13.    5/3/01 Press Release

345.    On May 3, 2001, Tyco announced the completion of the acquisition of Scott Technologies:

According to L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer, *"This acquisition will be immediately accretive to Tyco's earnings per share and will generate positive operating cash flows.*  Scott Technologies, which is a leader in its markets, will add significant recurring revenue to Tyco Fire & Security Services.

346.    Defendants' May 3, 2001 statement was false and misleading because it failed to

-141-

disclose the existence of the acquisitions scheme described herein at § V.A., including but not limited to the fact that the acquisition would be accretive because of Defendants' erroneous and misleading accounting and manipulation of the acquired company's financial statements and recording of excess goodwill.  Moreover, Tyco's previous acquisitions had been only accretive because of these manipulations.

14.    <u>5/11/01 Form 10-Q For Quarter Ended 3/31/01</u>

347.    On May 11, 2001, Defendants filed Tyco's Form 10-Q for the quarter ended March 31, 2001 (the "5/11/01 10-Q"), signed by Defendant Swartz.  In it, Defendants set out numerous materially false and misleading statements.  These false and misleading statements addressed a variety of topics, including the following:

a.    <u>Tyco's Operating Results</u>

348.    The 5/11/01 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, Defendants provide the following summary information:

|  | FOR THE QUARTERS ENDED MARCH 31, | | FOR THE SIX MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|
|  | 2001 | 2000 | 2001 | 2000 |
|  | (UNAUDITED) | | | |
| Income before income taxes, minority interest, extraordinary items and cumulative effect of accounting change | 1,544.9 | 1,141.6 | 3,096.1 | 2,166.0 |
| Income taxes | (385.9) | (285.0) | (915.4) | (549.0) |
| Minority interest | (11.7) | (1.1) | (24.2) | (4.3) |
| Income before extraordinary items and cumulative effect of accounting change | 1,147.3 | 855.5 | 2,156.5 | 1,612.7 |
| Extraordinary items, net of tax | (10.3) | -- | (10.3) | (0.2) |
| Cumulative effect of accounting change, net of tax | -- | -- | (29.7) | -- |
| Net income | $1,137.0 | $ 855.5 | $ 2,116.5 | $ 1,612.5 |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

-142-

349.   In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income, before certain credits (charges), improved in all segments in both the three months and six months ended March 31, 2001 as compared to the three months and six months ended March 31, 2000, with the exception of the Telecommunications segment for reasons that are discussed below.  The operating income improvements are the result of both increased revenues and, with the exception of Tyco Healthcare, enhanced margins.  Increased revenues result from organic growth and from acquisitions that are accounted for under the purchase method of accounting.  We enhance our margins through improved productivity and cost reductions in the ordinary course of business, unrelated to acquisition or divestiture activities.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

### b.   Tyco's Reserves

350.   The 5/11/01 10-Q also gives materially false and misleading information regarding the Company's reserves:

> During the six months ended March 31, 2001, we recorded restructuring and other non-recurring charges of $164.5 million, of which $32.4 million was included in cost of sales, primarily related to the closure of several manufacturing plants, sales offices, warehouses and administrative offices and an environmental remediation project.  In addition, we incurred a non-recurring charge of $39.0 million related to the write-up of inventory under purchase accounting, which has been included in cost of sales.  We also determined that $166.8 million of non-recurring charges established in the prior year were not needed due to the settlement of litigation.   At September 30, 2000, there existed merger, restructuring and other non-recurring reserves of $365.9 million.  During the six months ended March 31, 2001, we paid out $55.6 million in cash and incurred $35.7 million in non-cash charges that were charged against these reserves.  At March 31, 2001, there remained $272.3 million of merger, restructuring and other non-recurring reserves in our Consolidated Balance Sheet, of which $231.6 million is included in current liabilities and $40.7 million is included in long-term liabilities.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

       15.     5/17/01 Press Release

351.    On May 17, 2001, Tyco announced the acquisition of SecurityLink.  As stated in the Company press release:

> Tyco International Ltd. to Acquire SecurityLink and Other Businesses Of Cambridge Protection Industries L.L.C.; ***Acquisition Will Have Immediate Positive Impact on Tyco's Earnings . . . .***
>
>          *      *      *
>
> "Also, as with our existing ADT operations, we expect this business to generate healthy organic growth with attractive incremental margins.  Looking at the near-term, ***we expect the transaction will be immediately accretive to Tyco's earnings per share and free cash flow per share***.  The integration of the Cambridge businesses with ADT will provide product, service and operational synergies, which will result in ongoing positive benefits to Tyco shareholders."

352.    Defendants' May 17, 2001 statement was false and misleading because it failed to disclose the existence of the acquisitions scheme described herein at § V.A., including but not limited to the fact that the acquisition would be accretive because of Defendants' erroneous and misleading accounting and manipulation of the acquired company's financial statements and recording of excess goodwill.  Moreover, Tyco's previous acquisitions had been only accretive because of these manipulations.

       16.     5/30/01 Conference Call

353.    On May 30, 2001, Tyco held a conference call with analysts to discuss the Company's continued strategy of growing through acquisitions (including the CIT merger). Defendants stated:

KOZLOWSKI:            we announced the acquisition of C.R. Bard for roughly $3.2 billion.  We are, of course, excited about this deal.  Let me

-144-

tell you why.  It strengthens and broadens our healthcare franchise and is immediately accretive by about $0.05 per share for the first 12 months of ownership. ... our operations continue to perform well and we are on target to achieve our earnings and cash flow targets for the quarter and for the rest of our fiscal year.

*     *     *

We are on schedule to close CIT this coming Friday . . . .

CIT will be immediately accretive to us probably adding about $0.01 to our fiscal third quarter earnings for the one month that we own the company, and another $0.02 for our fiscal fourth quarter results.  This accretion is incremental to the earnings comments we have made in the past. In other words, we are comfortable with earning expectations of around $0.69 per share in the third quarter, consensus is now around $0.68, and around $2.77 or $2.78 for the year, versus a consensus of about $2.75 for the year.

I also want to take this opportunity to briefly outline the acquisition of Cambridge Security.... This deal is a classic Tyco bolt-on transaction. We will fold Cambridge into our existing ADT infrastructure, thereby standing about $220 million of cost efficiencies.

We look for the deal to add about $0.03 of earnings during the first year that we have it, with an initial cash on cash return in excess of 20% for the year. So from our organic growth plan for next year and the acquisitions of Cambridge, CIT, and Bard, we're starting to view our year fiscal year 2002 as a very good year for us.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

354.    On July 6, 2001, in an article entitled "Tyco Closes $1 Billion Purchase," *The Wall Street Journal* reported that:

Tyco International Ltd. said it closed its $1 billion acquisition of the electronic-security business of Cambridge Protection Industries LLC....

-145-

Tyco Chairman Dennis Kozlowski said the acquisition would be **"immediately accretive" to earnings and would generate "strong organic growth with attractive incremental margins."**

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

> 17.    5/30/01 Press Release

355.    On May 30, 2001, Tyco announced the acquisition of C. R. Bard:

Tyco International to Acquire C. R. Bard; Provides New Product Platforms for International Growth Of Tyco Healthcare's Medical Devices Business; **Acquisition Will Be Immediately Accretive to Tyco Earnings and Cash Flow.**

\*       \*       \*

Mr. Kozlowski added: "Bard also offers substantial cost synergies through leveraging administrative costs as well as gaining efficiencies in manufacturing, distribution and purchasing.  **The transaction will be immediately accretive to Tyco's earnings and free cash flow per share.**  The acquisition will provide ongoing benefit to our customers and shareholders."

356.    Defendants' May 30, 2001 statement was false and misleading because it failed to disclose the existence of the acquisitions scheme described herein at § V.A., including but not limited to the fact that the acquisition would be accretive because of Defendants' erroneous and misleading accounting and manipulation of the acquired company's financial statements and recording of excess goodwill.  Moreover, Tyco's previous acquisitions had been only accretive because of these manipulations.

> 18.    7/5/01 Press Release

357.    On July 5, 2001, Tyco announced the completion of the SecurityLink acquisition:

Tyco International Ltd. Completes Purchase Of SecurityLink and Other Businesses of Cambridge Protection Industries LLC; **Acquisition Expected To Be Immediately Accretive to Tyco's Earnings.**

\*       \*       \*

*According to Tyco's Chairman and Chief Executive Officer L. Dennis Kozlowski: "We expect this transaction will be immediately accretive to Tyco's earnings per share and free cash flow."*

358.   Defendants' July 5, 2001 statement was false and misleading because it failed to disclose the existence of the acquisitions scheme described herein at § V.A., including but not limited to the fact that the acquisition would be accretive because of Defendants' erroneous and misleading accounting and manipulation of the acquired company's financial statements and recording of excess goodwill.   Moreover, Tyco's previous acquisitions had been only accretive because of these manipulations.

      19.    <u>7/18/01 Earnings Announcement</u>

359.   On July 18, 2001, Tyco announced its results for the third quarter of fiscal 2001 (the three months ended June 30, 200l):

TYCO INTERNATIONAL REPORTS 24 PERCENT INCREASE IN THIRD QUARTER EARNINGS PER SHARE

PER SHARE EARNINGS RISE TO 72 CENTS FROM 58 CENTS

FREE CASH FLOW REACHES $1.5 BILLION

Pembroke, Bermuda, July 18, 2001 -- Tyco International Ltd. (NYSE-TYC, BSX-TYC, LSE-TYI), a diversified manufacturing and service company, reported today that diluted earnings per share for its third quarter ended June 30, 2001 were 72 cents, a 24 percent increase over earnings of 58 cents per share for the same quarter last year.   Net income before extraordinary items rose to $1.3 billion, an increase of 32 percent compared to $992.1 million last year.   Revenues for the quarter rose 25 percent to $9.3 billion compared with last year's $7.4 billion.

*    *    *

"Tyco's strong results in the quarter exemplify our longstanding strategy of building our base of recurring and service revenues and non-cyclical businesses. Expansion of our recurring revenue base in the Fire and Security segment and growth in our Healthcare business more than offset weakness in Electronics," said L. Dennis Kozlowski, Chairman and Chief Executive Officer of Tyco.

"The strength and diversity of our business mix makes us comfortable with the

outlook for Tyco during the remainder of fiscal 2001 as well as fiscal 2002," Kozlowski continued.  "Assuming current business trends, we expect to achieve our previously stated guidance of $2.77-2.78 earnings per share and, while it's early to make specific predictions, we believe that $3.45 per share is a reasonable estimate for fiscal 2002."

"On the acquisition front, we remain very much on plan.  The acquisition of CIT was completed on June 1, 2001, and its integration is proceeding smoothly.  Cost reductions have been implemented, less desirable assets are being divested, and the opportunities for financing the needs of Tyco's customer base are being actively pursued.  We are also on plan with integration and cost reductions at SecurityLink and we look forward to closing the C.R. Bard acquisition during the fourth calendar quarter," Kozlowski concluded.

*        *        *

TyCom's revenues decreased, reflecting its transition from solely a supplier of undersea telecommunication systems to an owner-supplier of the TyCom Global Network ("TGN") as well.  Sales of systems to third parties declined from a year ago as manufacturing capacity was allocated to the deployment of TGN.  The build-out of TGN is proceeding ahead of schedule and will be completed below the original budgeted cost. Revenues from the initial sale of capacity on TGN were recorded during the quarter.

The results above represent operations since June 1, 2001, the date of the acquisition of CIT.  The results of a single month are not indicative of results which would have been attained for an entire quarter. Revenues for the month of June were particularly strong on improved net finance margins and other finance revenues, including securitization gains.  Chargeoffs for credit losses trended down slightly, principally as a result of the disposition of lower quality assets, while credit loss reserves were increased.  The integration of CIT is proceeding ahead of schedule. Operating income will benefit from the effect of recent expense reduction initiatives.  Additionally, dispositions of previously identified under-performing assets are on track, with proceeds in line with expectations, and CIT expects to complete the remainder of the dispositions by the end of the calendar year. A number of financing transactions have been undertaken with customers of several Tyco businesses including ADT, Electronics and Healthcare.

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI.

20.  7/18/01 Conference Call

360.  On July 18, 2001, Tyco held a conference call to discuss, among other things, its

earnings during the third quarter of fiscal 2001.  According to Defendant Kozlowski:

KOZLOWSKI:  Organic growth excluding TyCom, was 6% for the combined company, with a 17% increase at Fire & Security, an 8% increase in Healthcare more than offsetting a 5% decline at Electronics....

*     *     *

The outlook for continued growth at Tyco was excellent. Based on the business trends we see today, we remain comfortable with our previous guidance of 277 to 278 for fiscal year 2001, that is primarily because of the recurring revenue, healthcare, and service businesses that I emphasized earlier on.  Looking out to 2002, while it may be too early to be precise, we believe that 345 estimates is quite reasonable. When we go to free cash flow, our previous guidance of $4 billion for 2001 now appears to be too conservative and I would point toward a higher $4.3 or 4.4 billion number.  We are confident we can grow our free cash flow by 20% to exceed $5 billion and some of that is coming from some reduction in working capital specifically on the electronics side of the business.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in § V and § VI.

21.  8/3/01 Announcement

361.  On August 3, 2001, Tyco announced another acquisition:

Tyco International to Acquire Sensormatic; Provides Comprehensive Range of New Products and Services Within Tyco Fire & Security; *Acquisition will be Immediately Accretive to Tyco Cash Flow and Earnings.*

*     *     *

According to Mr. Kozlowski: "This transaction will provide excellent, ongoing value to our customers and shareholders.  *It will be immediately accretive to Tyco's earnings and free cash flow per share*. *We see significant cost savings and synergistic opportunities in the areas of sales, administration,*

-149-

*manufacturing and distribution.***"**

362.    Defendants' August 3, 2001 statement was false and misleading because it failed to disclose the existence of the acquisitions scheme described herein at § V.A., including but not limited to the fact that the acquisition would be accretive because of Defendants' erroneous and misleading accounting and manipulation of the acquired company's financial statements and recording of excess goodwill.  Moreover, Tyco's previous acquisitions had been only accretive because of these manipulations.

22.    8/3/01 Conference Call

363.    On August 4, 2001, Tyco held a conference call to discuss, among other things, its acquisition of Sensormatic.  According to Defendant Kozlowski:  "This will be an excellent deal for us ... and it's immediately accretive by at least .3 cents per share during the first year of our ownership."

364.    About Tyco's earnings guidance, Kozlowski added:

KOZLOWSKI:              ... all in all, we remain very comfortable with our guidance of $2.77-2.78 per share for our fiscal '01, which closes on September 30th this year which would represent about a 27% increase versus last year.

For fiscal year 2002, we continue to believe that $3.45 per share is a reasonable estimate, but as we said on the conference call, we will allow for a range between $3.20 - $3.60.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § V.A.

365.    On August 6, 2001, Deutsche Bank Alex Brown, reporting materially false and misleading information received from Defendants, issued an analyst report entitled, "TYC Electronics' July Okay ... SRM's Strategic Impact Could Surpass EPS."  The report stated,

-150-

"Kozlowski said the acquisition pipeline was strong and was made up solely of tuck-in and bolt-on acquisitions for core companies, and contained 'absolutely no surprises.'"

23.   8/13/01 Form 10-Q For Quarter Ended 6/30/01

366.   On August 13, 2001, Defendants filed Tyco's Form 10-Q for the quarter ended June 30, 2001 (the "8/13/01 10-Q"), signed by Defendant Swartz.   In it, Defendants set out numerous materially false and misleading statements.   These false and misleading statements addressed a variety of topics, including the following:

a.   Tyco's Operating Results

367.   The 8/13/01 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results.   For example, Defendants provide the following summary information:

|  | TYCO INTERNATIONAL LTD. AND CONSOLIDATED SUBSIDIARIES | |
| --- | --- | --- |
|  | FOR THE QUARTERS ENDED JUNE 30, | |
|  | 2001 | 2000 |
| INCOME BEFORE INCOME TAXES, MINORITY INTEREST, AND EXTRAORDINARY ITEMS....... | 1,614.8 | 1,333.7 |
| Income taxes............................... | (378.8) | (333.7) |
| Minority interest.......................... | (15.8) | (2.7) |
| Income before extraordinary items......... | 1,220.2 | 997.3 |
| Extraordinary items, net of tax........... | (3.4) | -- |
| NET INCOME................................. | $ 1,216.8 | $   997.3 |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

368.   In addition, Defendants falsely and misleadingly attributed Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income, before certain (charges) credits, improved in all segments in both the quarter and nine months ended June 30, 2001 as compared to the quarter and nine months ended June 30, 2000, with the exception of the Telecommunications segment discussed below. The operating income improvements are the result of increased revenues resulting from organic growth and from acquisitions that are accounted for under the purchase method of accounting. We enhance our margins through improved productivity and cost reductions in the ordinary course of business, unrelated to acquisition or divestiture activities.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

b.   Tyco's Reserves

369.   The 8/13/01 10-Q also gives materially false and misleading information regarding the Company's reserves:

> During the nine months ended June 30, 2001, we recorded restructuring and other non-recurring charges of $214.7 million, of which $39.8 million was included in cost of sales, primarily related to the closure of several manufacturing plants, sales offices, warehouses and administrative offices and an environmental remediation project.  In addition, we incurred a non-recurring charge of $39.0 million related to the write-up of inventory under purchase accounting, which has been included in cost of sales.  We also determined that $166.8 million of non-recurring charges established in the prior year were not needed due to the settlement of litigation.   At September 30, 2000, there existed merger, restructuring and other non-recurring reserves of $365.9 million.  During the nine months ended June 30, 2001, we paid out $113.5 million in cash and incurred $86.2 million in non-cash charges that were charged against these reserves.  At June 30, 2001, there remained $214.1 million of merger, restructuring and other non-recurring reserves in Tyco Industrial's Consolidated Balance Sheet, of which $183.8 million is included in current liabilities and $30.3 million is included in long-term liabilities.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI.

        24.    8/24/01 S-4 (And Related Offering Documents For
                  The Exchange Of Tyco Shares For Sensormatic Shares)

    370.    On August 24, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed

merger between Sensormatic and a subsidiary of Tyco (the "8/24/01 S-4").  The 8/24/01 S-4 was

signed by Defendants Swartz, Kozlowski and Walsh and by other of Tyco's directors (Michael

A. Ashcroft, Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Joseph F.

Welch, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 8/24/01 S-4

incorporates the following documents by reference, it contains the same materially false and

misleading statements set forth in those documents, as described herein: (i) Tyco's Annual

Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly

Reports on Forms 10-Q for the quarters ended December 31, 2000, March 31, 2001 and June 30,

2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15,

2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, May 24, 2001, June 15,

2001, July 25, 2001, August 3, 2001, and August 16, 2001.

    371.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the

Relevant Period, the 8/24/01 S-4 recites Tyco's purported strategy, quoted and discussed above

in ¶286.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of

Sensormatic:

> At a meeting of the executive committee of Tyco's board of directors held on
> August 1, 2001, the executive committee determined that the acquisition of
> Sensormatic was in keeping with its corporate strategy of complementing its
> internal growth with acquisitions that are likely to benefit from cost reductions
> and synergies when combined with Tyco's existing operations and that are
> expected to be accretive to earnings per share.

As Defendants either knew or were reckless in not knowing, these statements of strategy when

made were materially false and misleading and omitted material information for the reasons set

forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

372.    On September 13, 2001, Defendants filed with the SEC a Form S-4/A (the "9/13/01 S-4/A"), amending the 8/24/01 S-4.  The 9/13/01 S-4/A was signed by Defendant Swartz for himself and for Defendants Kozlowski and Walsh, and for other of Tyco's directors (Michael A. Ashcroft, Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Joeseph F. Welch, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 9/13/01 S-4/A incorporates by reference the same documents that were incorporated by reference in the 8/21/01 S-4, it contains the same materially false and misleading statements set forth in those documents, as described herein.

373.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 9/13/01 S-4/A recites Tyco's purported strategy, quoted and discussed above in ¶286.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of Sensormatic, using precisely the same language quoted from the 8/24/01 S-4, above.  As Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

374.    On September 25, 2001, Defendants filed a prospectus with the SEC relating to the proposed merger between Sensormatic and a subsidiary of Tyco (the "9/25/01 Prospectus").  Because the 9/25/01 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000, March 31, 2001, and June 30, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1,

2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, May 24, 2001, June 15, 2002, July 25, 2001, August 3, 2001, and August 16, 2001.

375.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 9/25/01 Prospectus recites Tyco's purported strategy, quoted and discussed above in ¶286.  As Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

25.    8/28/01 S-3 (And Related Offering Documents
For The Offering Of Tyco Debt Cusip #902118BC1)

376.    On August 28, 2001, Tyco filed a Form S-3 for the registration of $6,000,000,000 in yet to be determined senior and subordinated debt securities (the "8/28/01 S-3").  The 8/28/01 S-3 was signed by Defendants Swartz, Kozlowski and Walsh, and by other of Tyco's directors (Michael A. Ashcroft, Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Joseph E. Welch, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 8/28/01 S-3 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Reports on Forms 10-Q for the quarters ended December 31, 2000, March 31, 2001, and June 30, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, May 24, 2001, June 15, 2001, July 25, 2001, August 3, 2001, and August 16, 2001.

377.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 8/28/01 S-3 recites Tyco's purported strategy, quoted and discussed above in ¶286.  As Defendants either knew or were reckless in not knowing, this statement of strategy

when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

378.    On August 31, 2001, Tyco filed with the SEC a Prospectus in connection with the registration of $6,000,000,000 in yet to be determined senior and subordinated debt securities (the "8/31/01 Prospectus").  Because the 8/31/01 Prospectus incorporates by reference the same documents that were incorporated by reference in the 8/28/01 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

379.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 12/8/00 Prospectus recites Tyco's purported strategy, quoted and discussed above in ¶286.  As Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

380.    On October 25, 2001, Tyco filed a Prospectus Supplement to the 8/31/01 Prospectus (the "10/25/01 Prospectus Supplement").    Because the 10/25/01 Prospectus Supplement incorporates by reference the same documents that were incorporated by reference in the 8/28/01 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

381.    The 10/25/01 Prospectus Supplement contains false and misleading statements about Tyco's operating results under the heading "Recent Developments of Tyco."  For example:

> Revenues before non-recurring items ... for the quarter rose 29% to $10.08 billion compared with last year's $7.80 billion.  Diluted earnings per share before non-recurring items, extraordinary items and the adoption of SAB 101 for the fourth quarter fiscal 2001 were $0.86, a 34% increase over earnings of $0.64 per diluted share in the fourth quarter fiscal 2000.  After giving effect to such items, revenues for the fourth quarter fiscal 2001 were $10.01 billion compared to $9.57 billion in the fourth quarter fiscal 2000 and diluted earnings per share for the fourth quarter of fiscal 2001 were $0.70 per share, compared to $1.12 diluted earnings per share

-156-

in the fourth quarter of fiscal 2000.

*     *     *

Revenues before non-recurring items and the adoption of SAB 101 for the year ended September 30, 2001 increased to $36.29 billion, 25% higher than last year's $28.93 billion. Diluted earnings per share before non-recurring charges and credits and extraordinary items, and the adoption of SAB 101, for the year rose to $2.81 per diluted share, or $5.15 billion, a 29% increase over last year's diluted per share earnings of $2.18, or $3.73 billion.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

26.   <u>9/11/01 Conference Call</u>

382.   On September 11, 2001, Tyco held a conference call/investor meeting with analysts.  During the call, Defendants provided investors with significant assurance that the Company was performing well and that it would remain profitable. For example, Defendants stated as follows:

KOZLOWSKI:   *... **we remain very much on track to achieve our earnings and cash flow targets for the year.*** Specifically, we're confident that Tyco will earn $2.77-2.78 a share in fiscal year '01 which would represent a 27% increase vs. last year.  Our free cash flow will exceed $4 billion, compared to $3.4 billion last year.  For fiscal year '02, we are looking for around $3.45 per share, with a range of 320 to 365, depending upon the end-markets for the electronics industry.  This is the same thing we have been saying for months.  The $3.45 would represent around a 25% increase above this year's record total and even the low end of our range would show better than a 15% growth.  We expect free cash flows to exceed $5 billion next year.  Our ability to deliver this growth in a pretty tough economic environment is a function of our very large exposure to recurring and service businesses such as security and businesses with no economic volatility like health care.

*     *     *

So we thought about titling my section of this agenda

-157-

because there's been a lot of negative sentiment, a lot of questions, *so we thought I'd call this part "Don't worry, be happy." Everything at Tyco is going to be okay*.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

383.    On October 3, 2001, Deutsche Bank Alex Brown, reporting materially false and misleading information received from Defendants, issued an analyst report entitled, "TYC: F4Q01 EPS Preview." The report stated:

> We rate TYC management strongest among our coverage universe.  This is key, since we think the risk to watch for is companies with structures that can't respond quickly enough to the new, more downbeat, reality....
>
> *         *         *
>
> We believe that Tyco offers the 'complete package' for multi-industry company investors: strong internal top line growth, excellent margins, an earnings stream with low cyclicality, strong cash flow and excellent acquisition skills.

27.    <u>10/18/01 Press Release</u>

384.    On October 18, 2001, Tyco announced its false and misleading financial results for the quarter ending September 30, 2001:

> Tyco International Ltd. (NYSE: TYC) (BSX-TYC, LSE-TYI), a diversified manufacturing and service company, reported today that diluted earnings per share for its fourth quarter ended September 30, 2001 were 86 cents, a 34 percent increase over earnings of 64 cents per share for the same quarter last year. Revenues for the quarter rose 29 percent to $10.1 billion compared with last year's $7.8 billion.  These results are before non-recurring charges and credits, extraordinary items, and the adoption of Staff Accounting Bulletin No. 101 (SAB 101).  After giving effect to such items, diluted earnings per share for the fourth quarter of fiscal 2001 were 70 cents, compared to $1.12 in the fourth quarter of fiscal 2000. Included in the prior year's $1.12 is 59 cents resulting from a gain on the issuance of shares by subsidiary.
>
> For fiscal 2001, income before non-recurring charges and credits, extraordinary items, and the adoption of SAB 101, rose to $2.81 per diluted share, a 29 percent increase over last year's diluted per share earnings of $2.18.  After

giving effect to such items, diluted earnings per share were $2.17 for fiscal 2001 compared to $2.64 in fiscal 2000. Included in the prior year's $2.64 is 59 cents resulting from a gain on the issuance of shares by subsidiary. Revenues for the twelve months increased to $36.3 billion, 25 percent higher than last year's $28.9 billion.

"Tyco's diversified mix of businesses once again showed that we can indeed continue to grow through both good and bad economic environments," said L. Dennis Kozlowski, Chairman and Chief Executive Officer of Tyco.

"In this tough environment, I am pleased to report that our mix of businesses continues to perform very well. Included in our business mix are businesses such as Healthcare, Fire and Security, and Tyco Capital, which are less affected by economic conditions and can provide consistent results and outperform in difficult times. Additionally, strong cash flow generation throughout all of our businesses funds further investment in these businesses and provides the means to opportunistically expand them as circumstances allow. We have taken immediate cost reduction actions in our Electronics business, which will allow us to continue to deliver strong earnings results despite weak end markets and will position us ahead of the curve in taking advantage of eventual economic recovery."

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

28.    10/18/01 Conference Call

385.    On October 18, 2001, Defendants conducted another conference call with analysts to convey their positive earnings estimates:

KOZLOWSKI:         Putting this together, we are reiterating our previous guidance of $3.70 per share for the current fiscal year we are in that began on October 1st which represents around 23% growth.

*         *         *

We remain very comfortable with our projection .3 cents per share of earnings accretion from the [Sensormatic] deal.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

386.     The next day, on October 19, 2001, *The Wall Street Journal* reported Defendant Kozlowski's false assurance that Tyco was well-positioned to grow during the economic downturn:

> L. Dennis Kozlowski, Tyco's chairman and chief executive officer, also gave a bullish forecast for fiscal 2002, slightly raising the range of the company's earnings targets and saying Tyco "has never been better positioned to grow during an economic downturn."

As Defendant Kozlowski either knew or was reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

### 29.    10/23/01 S-4 (And Related Offering Documents For The Exchange Of Tyco Shares For TyCom Shares)

387.     On October 23, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed amalgamation agreement between TyCom and a subsidiary of Tyco wherein TyCom would become a wholly-owned subsidiary of Tyco (the "10/23/01 S-4"). The 10/23/01 S-4 was signed by Defendants Swartz, Kozlowski and Walsh, and by other of Tyco's directors (Michael A. Ashcroft, Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Joseph F. Welch, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser). Because the 10/23/01 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarterly periods ended December 31, 2000, March 31, 2001 and June 30, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, May 24, 2001, June 15, 2001, July 25, 2001, August 3, 2001, and August 16, 2001.

388.   Under the heading "Recent Developments of Tyco and TyCom," Defendants stated the following with regard to its fourth quarter of fiscal 2001 financial results:

> Revenues before non-recurring items . . . for the quarter rose 29% to $10.08 billion compared with last year's $7.80 billion.  Diluted earnings per share before non-recurring items, extraordinary items and the adoption of SAB 101 for the fourth quarter fiscal 2001 were $0.86, a 34% increase over earnings of $0.64 per diluted share in the fourth quarter fiscal 2000.  After giving effect to such items, revenues for the fourth quarter fiscal 2001 were $10.01 billion compared to $9.57 billion in the fourth quarter fiscal 2000 and diluted earnings per share for the fourth quarter of fiscal 2001 were $0.70 per share, compared to $1.12 diluted earnings per share in the fourth quarter of fiscal 2000.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

389.   On November 9, 2001, Defendants filed with the SEC a Form S-4/A (the "11/9/01 S-4/A"), amending the 10/23/01 S-4.  The 11/9/01 S-4/A was signed by Defendant Swartz for himself and for Defendants Kozlowski and Walsh, and for other of Tyco's directors (Michael A. Ashcroft, Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Joseph F. Welch, Wendy E. Lane, James S. Pasman, Jr., and W. Peter Slusser).  Because the 11/9/01 S-4/A incorporates by reference the same documents that were incorporated by reference in the 10/23/01 S-4, it contains the same materially false and misleading statements set forth in those documents, as described herein.

390.   Like the 10/23/01 S-4, the 11/9/01 S-4/A contains false and misleading statements about Tyco's financial results under the heading "Recent Developments of Tyco and TyCom."

> Revenues before non-recurring items . . . for the quarter rose 29% to $10.08 billion compared with last year's $7.80 billion. Diluted earnings per share before non-recurring items, extraordinary items and the adoption of SAB 101 for the fourth quarter fiscal 2001 were $0.86, a 34% increase over earnings of $0.64 per diluted share in the fourth quarter fiscal 2000.  After giving effect to such items, revenues for the fourth quarter fiscal 2001 were $10.01 billion compared to $9.57

billion in the fourth quarter fiscal 2000 and diluted earnings per share for the fourth quarter of fiscal 2001 were $0.70 per share, compared to $1.12 diluted earnings per share in the fourth quarter of fiscal 2000.

*     *     *

Revenues before non-recurring items and the adoption of SAB 101 for the year ended September 30, 2001 increased to $36.29 billion, 25% higher than last year's $28.93 billion. Diluted earnings per share before non-recurring charges and credits and extraordinary items, and the adoption of SAB 101, for the year rose to $2.81 per diluted share, or $5.15 billion, a 29% increase over last year's diluted per share earnings of $2.18, or $3.73 billion.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

391.    On November 13, 2001, Defendants filed with the SEC a Prospectus relating to the amalgamation agreement between TyCom and a subsidiary of Tyco (the "11/13/01 Prospectus"). Because the 11/13/01 Prospectus incorporates by reference the same documents that were incorporated by reference in the 10/23/01 S-4, it contains the same materially false and misleading statements set forth in those documents, as described herein.

392.    Like the 10/23/01 S-4 and 11/9/01 S-4/A, the 11/13/01 Prospectus contains false and misleading statements about Tyco's financial results under the heading "Recent Developments of Tyco and TyCom." These statements are identical to those quoted above from the 11/9/01 S-4/A under the same heading, and are materially false and misleading for the same reasons.

30.    11/15/01 Conference Call

393.    Defendants hosted another conference call with investors on November 15, 2001. During the call, Defendant Kozlowski continued to provide investors with false assurances concerning the Company's projected earnings growth:

KOZLOWSKI:       Let me start here this morning with our guidance for fiscal year 2002.  We expect earnings per share to grow over 21% this year to $2.70 a share.

\*       \*       \*

Looking to the business cycle, we believe Tyco will grow revenues at a 10% rate and we expect our long track record of margin improvements to continue . . . .

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

394.    On December 7, 2001, J.P. Morgan, reporting materially false and misleading information received from Defendants, issued an analyst report entitled, "Tyco Int'l: Investor Meetings Reinforce Increasing ROIC Message."

The story at Tyco remains on track, characterized by accelerating ROIC and strong to improving fundamentals across the portfolio.  We recently had the opportunity to spend a few days with Dennis Kozlowski, during which the Tyco CEO reinforced some of the themes discussed at the investor day . . . .  The story seems very much on track as management presentations touched on most of the major current issues, including expectations for increasing ROIC, strong operating trends in key businesses and the acquisition strategy going forward . . . .  We continue to rate Tyco our top pick and look for further multiple expansion . . . .

395.    The price of Tyco stock closed at $58.84 on December 7, 2001.

31.    12/3/01 Announcement

396.    On December 3, 2001, Tyco announced the acquisition of Paragon Trade Brands. In the Company press release headline Tyco stated, **"*Acquisition Will Be Immediately Accretive to Tyco Earnings and Cash Flow.*"**

397.    Defendants' December 3, 2001 statement was false and misleading because it failed to disclose the existence of the acquisitions scheme described herein at § V.A., including but not limited to the fact that the acquisition would be accretive because of Defendants'

erroneous and misleading accounting and manipulation of the acquired company's financial statements and recording of excess goodwill.  Moreover, Tyco's previous acquisitions had been only accretive because of these manipulations.

>  32.  12/20/01 Announcement

398.  On December 20, 2001, Tyco announced the acquisition of McGrath RentCorp:

> Tyco International to Acquire McGrath RentCorp; Acquisition Expands Tyco Capital's Product Portfolio and Recurring Revenue Base; ***Immediately Accretive to Tyco Earnings and Cash Flow.***

> *       *       *

> ***According to L. Dennis Kozlowski . . . "As is the case with all Tyco acquisitions, the transaction will be immediately accretive to both Tyco's earnings and cash flow."***

399.  Defendants' December 20, 2001 statement was false and misleading because it failed to disclose the existence of the acquisitions scheme described herein at § V.A., including but not limited to the fact that the acquisition would be accretive because of Defendants' erroneous and misleading accounting and manipulation of the acquired company's financial statements and recording of excess goodwill.  Moreover, Tyco's previous acquisitions had been only accretive because of these manipulations.

>  33.  12/28/01 Form 10-K For Fiscal Year Ended 9/30/01

400.  On December 28, 2001, Tyco filed its Form 10-K for the fiscal year ended September 30, 2001 (the "2001 10-K"), signed by Defendants Swartz, Kozlowski and Walsh, and by other of Tyco's directors (Michael A. Ashcroft, Joshua M. Berman, Richard S. Bodman, John F. Fort, Stephen W. Foss, Wendy E. Lane, James S. Pasman, Jr., W. Peter Slusser, and Joseph F. Welch).

401.  In the 2001 10-K, Defendants set out numerous materially false and misleading statements, as evidenced by (among other things) Defendants' restatement of the Company's

operating results in a December 31, 2002 Form 10-K/A for the 2001 fiscal year. These materially false and misleading statements addressed a variety of topics, including the following:

a.   Tyco's "Strategy"

402.   The 2001 10-K purports to set forth Tyco's "strategy," which Defendants repeated verbatim in other SEC filings during the Relevant Period:

> Tyco's strategy is to be the low-cost, high-quality producer and provider in each of our industrial markets and, through Tyco Capital, to provide innovative financing and leasing solutions to independent customers and in support of our industrial segments. We promote our leadership position by investing in existing businesses, developing new markets and acquiring complementary businesses and products. Combining the strengths of our existing operations and our business acquisitions, we seek to enhance shareholder value through increased earnings per share and strong cash flows.

As Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

b.   Tyco's Operating Results

403.   The 2001 10-K also gives favorable, purportedly accurate information concerning Tyco's operating results. For example, Defendants provide the following summary information ($ in millions):

|  | FISCAL 2001 | FISCAL 2000 | FISCAL 1999 |
|---|---|---|---|
| Income before income taxes, minority interest, extraordinary items and cumulative effect of accounting changes | 6,003.5 | 6,464.8 | 1,705.2 |
| Income taxes | (1,284.9) | (1,926.0) | (637.5) |
| Minority interest | (47.5) | (18.7) | -- |
| INCOME BEFORE EXTRAORDINARY ITEMS AND CUMULATIVE EFFECT OF ACCOUNTING CHANGES | 4,671.1 | 4,520.1 | 1,067.7 |
| Extraordinary items, net of tax | (17.1) | (0.2) | (45.7) |
| Cumulative effect of accounting changes, net of tax | (683.4) | -- | -- |
| TYCO INDUSTRIAL NET INCOME | $ 3,970.6 | $ 4,519.9 | $ 1,022.0 |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI.

404.   In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions.  According to the 2001 10-K:

> Operating income, before certain (charges) credits and accounting change, improved in all segments in each of Fiscal 2001 and Fiscal 2000, with the exception of the Telecommunications segment as discussed below.  The operating improvements are the result of both increased revenues in all but our Telecommunications segment and enhanced margins in all but our Healthcare and Specialty Products segment.  Increased revenues resulted from acquisitions that are accounted for under the purchase method of accounting and from organic growth.  We enhanced our margins through improved productivity and cost reductions in the ordinary course of business, unrelated to acquisition or divestiture activities.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

405.   And concerning profits in Tyco's electrical business, Defendants stated:

> The 14.3% increase in revenue, before accounting change, in Fiscal 2001 over Fiscal 2000 resulted primarily from acquisitions. These acquisitions included: Siemens Electromechanical Components GmbH & Co. KG ("Siemens") and AFC Cable Systems, Inc. ("AFC Cable") in November 1999; Praegitzer Industries, Inc. ("Praegitzer") in December 1999; Critchley Group PLC ("Critchley") in March 2000; the electronic OEM business of Thomas & Betts in July 2000; CIGI Investment Group, Inc. ("CIGI") in October 2000; and Lucent Technologies' Power Systems business unit in December 2000.  Excluding the impact of these acquisitions, revenue increased an estimated 0.3%, which reflects an economic slowdown in the computer and consumer electronics and communications industries and, to a lesser extent, the effect of foreign exchange rates.

> The 62.1% increase in revenue in Fiscal 2000 over Fiscal 1999 was predominantly due to acquisitions and, to a lesser extent, organic growth. These acquisitions included: Glynwed International, pic in March 1999; Raychem Corporation ("Raychem") in August 1999; Siemens and AFC Cable in November 1999; Praegitzer in December 1999; Critchley in March 2000; and the electronic OEM business of Thomas & Betts in July 2000. Excluding the impact of these

acquisitions, revenue increased an estimated 13.1%.

The 20.0% increase in operating income and the increase in margins, before certain (charges) credits and accounting change, in Fiscal 2001 compared with Fiscal 2000 was primarily due to acquisitions and improved margins at both Tyco Printed Circuit Group and AMP. These increases were somewhat offset by decreased operating income and margins at Allied Tube and Conduit resulting from higher raw material prices.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

c. <u>Management Remuneration</u>

406. The 2001 10-K addresses management remuneration only by reference, stating:

Information concerning executive compensation is hereby incorporated by reference to the Registrant's definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year.

Because the 2001 10-K incorporates Tyco's Proxy Statement, filed on January 8, 2002, the 2001 10-K contains the same materially false and misleading statements set forth therein, as described below.

407. The 2001 10-K also gives limited information concerning loans taken by senior management under Tyco's Key Employee Loan Program (the "KEL Program"), which was instituted to encourage ownership of the Company's common stock by executives and other key employees. According to the 10-K: "During Fiscal 2001, the maximum amount outstanding under [the KEL] program was $29.5 million. Loans receivable under this program were $ 11.2 million and $11.4 million at September 30, 2001 and 2000, respectively." As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E.3. describing Defendants' manipulations of the KEL Program.

-167-

      D.      <u>2002 Materially False And Misleading Statements And Omissions</u>

          1.      <u>1/11/02 2001 Annual Report To Shareholders</u>

408.    On or about January 11, 2002, Tyco released its 2001 Annual Report to Shareholders (the "2001 Annual Report"). The 2001 Annual Report again reminded investors of Tyco's strategy to achieve growth by acquisitions:

> **DISCIPLINED ACQUIRER** Good acquirers don't build empires. They make money. ***Tyco approaches acquisitions with a strict set of rules. We begin with the strategic logic: the transaction must improve our potential for long-term internal growth. It must be immediately accretive to earnings and cash flow per share and produce high returns on invested capital.*** To consistently achieve these targets, we require that each acquisition be championed by a business unit that will oversee the integration into one of our existing segments.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

409.    The 2001 Annual Report also set forth information concerning Tyco's KEL Program:

> During Fiscal 2001, the maximum amount outstanding under [the Key Employee Loan] program was $29.5 million. Loans receivable under this program were $11.2 million and $11.4 million at September 30, 2001 and 2000, respectively.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E.3. describing Defendants' abuses of the KEL Program.

410.    The 2001 Annual Report also included a letter to Tyco shareholders from Defendant Kozlowski, which states:

> Fiscal 2001 was a year of outstanding performance for Tyco International. And, although I have made similar statements before, the consistency of our ability to deliver strong results is important, especially in a year marked by global economic turbulence. Many outstanding companies found it impossible to meet their financial targets last year; and some couldn't make any money at all.

Yet in the worst economic environment we have seen in a decade, Tyco managed to exceed its profit goals.  All of us at Tyco are very proud of that achievement.

How were we able to perform so well?  The answers go to the heart of what makes Tyco tick. And they explain why, despite the current economic slowdown, we remain optimistic about fiscal 2002.

We grew diluted earnings per share 29 percent in fiscal 2001 in large part because of the strategy we formed during the 1990-1991 recession to reinvent Tyco as a company that could thrive in any economy.  Since then, we have built business with low cyclicaliry and the ability to generate strong recurring revenues.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

411.    Defendant Kozlowski's letter goes on to say:

This strength was reflected in our earnings. For the ninth consecutive year, we increased revenues and earnings substantially.  Revenues rose 25 percent to $36.3 billion and earnings grew $1.4 billion to $5.1 billion, a 38 percent increase over the prior year.  Our diluted earnings per share increased 29 percent to $2.81.  Free cash flow exceeded $4.7 billion in fiscal 2001 and should surpass $5 billion next year.

Much of the increase came from organic growth. If Tyco never made another acquisition, we should be able to increase our earnings at a solid double-digit rate. We are fortunate to be in the types of businesses that grow even during economic slowdowns. For fiscal 2002, we are looking forward to earnings growth of 20 percent or better

I remain optimistic about Tyco's future.  It's a cliché today for a CEO to proclaim that his company is "well-positioned" but, in truth, we are.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.  Among other things, the Company was manipulating its free cash flows (*see* § V.C.), its growth rate was dependent upon its abusive accounting for acquisitions (*see* § V.A.) and the Company was hardly well-positioned as it had billions of dollars in debt coming due that it could not repay without selling off the Company's assets (*see* § V.F.).

412.    The letter continues:

Fiscal 2001 was a year of many achievements. Among the highlights:

*       *       *

*   *We acquired The CIT Group, Inc., a leading commercial consumer finance company with over $50 billion in assets. In the four months we have owned CIT (now known as Tyco Capital Corporation), it has performed exceptionally well.*

*Tyco Capital is a broadly diversified lender - both geographically and by industry - with powerful franchises and the ability to grow its earnings in all types of environments.  It has a large base of recurring revenue.*  (Italics in original.)

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.  Notably, the Company's CIT Group was not performing exceptionally well but, rather, had been manipulated via Defendants' acquisitions scheme.  *See* § V.A.

413.    The letter also states:

In 2001, Tyco demonstrated that, despite difficult business conditions, it could indeed grow its business in virtually any environment.  We believe we can continue to do so, and that we can deliver consistent growth for investors in the fiiture.

We are in excellent businesses, and everywhere we look we see opportunities to expand by creating new products, by moving into new markets and sometimes by acquisitions.  We are poised to deliver many years of exciting returns.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

414.    The 2001 Annual Report also sets forth all the identical operating results quoted above from the 2001 10-K. Those results are materially false and misleading, and omit material information, for the same reasons given above.

2.       1/15/02 Press Release

415.    On January 15, 2002, Tyco release its financial results for the quarter ended

December 31, 2001:

> Tyco International Ltd. (NYSE: TYC; BSE: TYC; LSE-TYI), a diversified manufacturing and service company, reported today that diluted earnings per share for its first quarter ended December 31, 2001 were 74 cents, a 17 percent increase over pro forma earnings of 63 cents per share for the same quarter last year.  As required, results for the first quarter of fiscal 2001 have been restated to reflect the adoption of Staff Accounting Bulletin No. 101 (SAB 101) and are presented on a pro forma basis to exclude goodwill amortization as a result of the Company's adoption of Statement of Financial Accounting Standards No. (SFAS) 142, "Goodwill and Other Intangible Assets."  Revenues for the quarter rose 25 percent to $10.1 billion compared with last year's $8.0 billion. Results presented above are before non-recurring charges and credits, extraordinary items, and, for fiscal 2001, the cumulative effect of accounting changes. As discussed further below and in the accompanying tables, non-recurring charges and credits for the first quarter totaled a charge of approximately $26 million, before tax, in fiscal 2002 and a credit of approximately $176 million, before tax, in fiscal 2001.  After giving effect to such non-recurring items, diluted earnings per share before cumulative effect of accounting changes and extraordinary items were 73 cents for the first quarter of fiscal 2002, compared to 57 cents in the first quarter of fiscal 2001.   The guidelines of SFAS 142 do not allow for restatement of prior year results.

> "Tyco once again produced strong results despite a very difficult economic environment. Strong demand worldwide for our fire and security products and services offerings, coupled with the stability of our healthcare and Tyco Capital businesses, contributed greatly to the results for the quarter," said L. Dennis Kozlowski, Chairman and Chief Executive Officer of Tyco.  "These results reflect the success of a strategy Tyco has pursued since 1992 to have leadership positions within each of our businesses, a strong base of recurring and service revenues, a low-cost structure and high quality products and services. With this quarter's results, Tyco has proven that it can outperform in a recessionary environment and has set the stage for additional growth when the economy recovers."

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI.

3.      1/15/02 Conference Call

416.    On January 15, 2002, Tyco held a conference call to discuss, among other things,

its earnings during the first quarter of fiscal 2002.  Although Defendants were to announce the

breakup of Tyco into four separate parts the following week, they continued to give false

reassurance of favorable results:

KOZLOWSKI:              Putting all this together, we remain committed to our full
                        year earnings guidance of $3.70 per share, up 21% from
                        last year.  We have not previously offered any guidance at
                        all on the second quarter.  Given the likelihood of another
                        tough quarter in electronics, we think second quarter
                        earnings will be in the range of 80-82¢ per share up
                        roughly 17% for the quarter.

417.    Kozlowski also falsely reassured investors and analysts about "rumors" that were

resurfacing about Tyco's accounting, and about the openness of its disclosures:

KOZLOWSKI:              *We're a very open company*, we're very willing to talk
                        about anything that our investors, shareholders, interested
                        parties have to talk to us about, we have Jack Blackstock,
                        Maryanne Kane, Mark Swartz, myself, available, we
                        present our accounting in the best disclosures that we can
                        possibly put together here.  Are we complex?  Yes, but
                        because we are complex *we have absolutely no qualms*
                        *whatsoever in presenting a good disclosure, there's*
                        *nothing hidden behind the scenes*, our cash flows are
                        going to be strong, we will back up our earnings with our
                        cash flows and from time to time there are, of course, some
                        motivated parties who can thrive or make money on rumors
                        and that's an unfortunate part of this business, *but here at*
                        *Tyco we're very willing to discuss anything at all that*
                        *anybody might have* . . . .

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in § V and § VI.  Notably, Defendants' reassurances that there was "nothing hidden"

could not be further from the truth.

418.    A January 16, 2002 article in *The Wall Street Journal* entitled, "Tyco

International Says Soft Demand Will Depress Fiscal Second-Quarter Results," reported:

> Mr. Kozlowski said the company remains **"*frustrated by continuing negative rumors*"** regarding the company's accounting.  **"*There is nothing negative going on at any place at Tyco,*"** he said, inviting anyone with questions about the company's accounting practices to "give us a call."  He also said the company stands by its earnings estimate of $3.70 a share for the fiscal year.  Tyco is based in Bermuda but managed from Exeter, N.H.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.  Notably, Defendants' reassurances that there was nothing negative going on at Tyco was simply false and misleading in light of Defendants' fraudulent conduct.

419.    Similarly, a January 16, 2002 article in *The New York Times* entitled, "Tyco Shares Fall as Investors Show Concern on Accounting," reported:

> Dennis Kozlowski, Tyco's chairman, expressed frustration in a conference call with analysts yesterday morning that Tyco's accounting continues to be questioned.  **"*Our accounting has been reviewed and found to be sound,*"** Mr. Kozlowski said.  **"*Our disclosure is exceptionally detailed.*"**
>
> \*       \*       \*
>
> Mr. Swartz, Tyco's chief financial officer, said Tyco follows standard accounting in its acquisitions and does not manipulate balance sheets.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in  § V and § VI, including  § V.A.5. describing Defendants' concealment from the SEC of the acquisitions scheme.

### 4.    1/22/02 Conference Call

420.    In or around mid-January 2002, Tyco announced the Company would be split into four parts.  Defendants held a conference call with analysts on January 22, 2002, in which they downplayed investor concerns about Tyco's accounting and asserted that the planned breakup

was not at all related to rumors about accounting improprieties.  In truth, the plan to break up the Company was going forward because Defendants could no longer continue the charade that had been perpetrating on the public and they knew that breaking up the Company would enable them another opportunity to falsify Tyco's books.  Defendants Kozlowski and Swartz stated as follows:

KOZLOWSKI:     [T]he plan [to break up the company] will release value . . . the separation will enhance our ability to continue to create shareholder value in the future . . . .  We are strictly playing offense here.  I want to stress that this is not a defensive response to the **baseless ridiculous rumors** last week nor the recent weakness in the stock price.

                                  *        *        *

SWARTZ:        **Related to the accounting rumors and accusations that Dennis talked about earlier, the split offs are going to create more transparency and financial disclosure on the pure play individual businesses that you will be seeing.**

                                  *        *        *

SWARTZ:        During the balance of this year, and as we look forward to fiscal 2003, the earnings of Tyco will continue strong. Guidance for the second quarter is a strong 14% to 17% growth over the prior year.  The full year earnings of $3.70 are in excess of 20% growth over the prior year, and every one of these businesses will enter fiscal 2003 with extremely strong organic fundamentals to continue to have these strong earnings.

                                  *        *        *

SWARTZ:        **I do take issue with better disclosure and we have many times asked people to show us better disclosure on acquisitions and we'll do it and have yet to see any that would be improved from what we currently have.**

                                  *        *        *

SWARTZ:        So the amount of disclosure that will end up being seen will be **the same good state of art disclosure that we have had** better than anyone else we can find out there but it will be done on a more reduced level and **even with all these**

-174-

> ***accounting insinuations, allegations, rumors, etc. we have
> had over the past few weeks, this has not changed our
> plan ANY nor any level of comfort as far as being able to
> go forward, have these individual financial statements
> and send each of these businesses off with extremely
> strong earnings and cash flows.***

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI, including § V.A. detailing the acquisitions scheme

421.    Defendant Kozlowski also went out of his way to assure investors that there were

no accounting improprieties or cash flow issues at Tyco.  For example, Defendant Kozlowski

stated:

KOZLOWSKI:                ***[W]e have no liquidity crisis . . .***

                                    *        *        *

                          ***[T]here's absolutely no new accounting questions . . .***

                                    *        *        *

                          ***The quality of our earnings has been excellent.***  This is
                          shown in the ratio of pre-cash flow to earnings or the cash
                          conversion ratio.  ***Our free cash flow has represented over
                          90% of earnings during the last couple of years***.

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in § V and § VI, including § V.C. detailing Defendants' manipulation of Tyco's free cash flows

and § V.F. detailing Defendants' scheme to conceal Tyco's creditworthiness and impending

liquidity crisis.

422.    Defendant Kozlowski was then quoted in *The New York Times* on January 24,

2002, as saying that investors should not react negatively to the Company's new breakup

strategy:

"Crooks are going to be crooks at any company," Mr. Kozlowski said. **"But we have executives of very high integrity."**

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

        5.     1/28/02 Proxy Statement

423.    On January 28, 2002, Defendants filed with the SEC Tyco's Proxy Statement for the 2002 annual meeting.   The Proxy Statement contains materially false and misleading statements on a variety of topics, including management remuneration, the KEL Program, and allegations of accounting impropriety by the Company.

        a.     Management Remuneration

424.    Concerning Tyco's executive compensation program generally, the 2002 Proxy Statement states:

> [Tyco's executive compensation program] offers the executive significant financial rewards when Tyco and the executive achieve excellent results.  At lower levels of performance, where expected compensation targets are not achieved, executive compensation is sharply reduced. Executives are ineligible for cash bonuses and do not benefit from equity-based compensation.  Thus, in order for Mr. Kozlowski and Mr. Swartz to have earned a cash bonus in fiscal 2001, the Company had to achieve a minimum of 15% growth in net income and at least a 10% growth in operating cash flow over fiscal 2000.  The performance criterion required to vest the minimum number of restricted shares granted to these executives was a growth rate in earnings per share before non-recurring items of at least 15% over fiscal 2000.  The Committee reports that the Company achieved each of these benchmarks, reflecting superior performance notwithstanding a very difficult business and economic environment.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in  § V and § VI, including § V.E. which details Defendants' looting of the Company and unauthorized remuneration.

425.   The 2002 Proxy Statement also contains materially false and misleading information regarding the administration of compensation to executive officers and key managers:

> The Compensation Committee of the Board of Directors is composed solely of independent directors, none of whom has any interlocking relationships with Tyco that are subject to disclosure under rules of the SEC relating to proxy statements. The Compensation Committee approves all of the policies under which compensation is paid or awarded to Tyco's Chief Executive Officer, reviews and, as required, approves such policies for executive officers and key managers, and has oversight of the administration of executive compensation programs.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E. which details Defendants' looting of the Company.

426.   The 2002 Proxy Statement contains the following specific information concerning the compensation of Defendants Kozlowski and Swartz:

| NAME & PRINCIPAL POSITION | YEAR | ANNUAL COMPENSATION(1) | | | | LONG TERM COMPENSATION | | |
|---|---|---|---|---|---|---|---|---|
| | | SALARY | CASH BONUS(3) | STOCK BONUS(4) | OTHER ANNUAL COMPENSATION(5) | RESTRICTED STOCK AWARD(S)(6) | SHARES UNDERLYING STOCK OPTIONS | ALL OTHER COMPENSATION(7) |
| L. Dennis Kozlowski...... | 2001 | $1,650,000 | $4,000,000 | | $219,543 | $30,398,880 | 1,439,135 | $4,313,553 |
| CHAIRMAN & CEO, | 2000 | 1,350,000 | 2,800,000 | | 143,652 | 21,207,540 | 5,357,798(8) | 383,500 |
| TYCO INTERNATIONAL LTD. | 1999 | 1,350,000 | 3,200,000 | | 81,960 | 25,707,178 | 6,621,834 | 305,041 |
| Mark H. Swartz.......... | 2001 | 968,750 | 2,000,000 | 500,014 | 277,856 | 15,199,440 | 788,425 | 2,112,968 |
| EVP & CFO, TYCO | 2000 | 768,750 | 1,400,000 | | 171,039 | 10,603,770 | 2,692,649(8) | 121,448 |
| INTERNATIONAL LTD. | 1999 | 750,000 | 1,600,000 | | 63,066 | 12,029,641 | 2,976,480 | 86,948 |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E. which details Defendants' looting of the Company.

427.   The 2002 Proxy Statement failed to disclose and misrepresented the actual compensation of Defendant Kozlowski:

> For fiscal 2001, Mr. Kozlowski received a base salary of $1.65 million and, based on a 38.9% increase in Net Income before non-recurring items and a 31.3% increase in Operating Cash Flow, a cash bonus in the amount of $4 million, as shown in the SUMMARY COMPENSATION TABLE on page 14. Mr.

-177-

Kozlowski was granted 600,000 shares of performance-based restricted stock on October 1, 2001.  If the pre-determined specified performance criteria are met, these shares will vest over a period of up to three years.  After three years, any remaining unearned shares will be forfeited and returned to the Company.

Mr. Kozlowski also received restoration options in accordance with the restoration option provision of the Company's option program.  The restoration provision enables executive officers to use certain earned equity awards and certain proceeds from the sale of shares acquired upon the exercise of options to pay option exercise costs, repay indebtedness owed to Tyco International (US) Inc., or for tax planning purposes while maintaining their equity position in Tyco.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E. which details Defendants' looting of the Company.

### b.   Key Employee Loan Program

428.    The 2002 Proxy Statement provides materially false and misleading statements concerning Tyco's KEL Program. It states, for example:

The Compensation Committee administers the loan program. ***The Committee authorizes loans, which may not exceed the amount allowable under any regulation of the United States Treasury or other state or federal statute.***  Loans may be required to be secured by Tyco common shares owned by the borrower or may be unsecured. Loans under the loan program generally bear interest at Tyco's incremental short-term borrowing rate (which was 3.7% for 2001).  The loans are generally repayable in ten years or when the borrower reaches age 69, whichever occurs first, except that earlier payments must be made in the event that the borrower's employment with Tyco or its subsidiaries terminates.  The borrower is also required to make loan payments upon the sale or other disposition of Tyco common shares with respect to which loans have been granted, other than gifts to certain family members.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E.3. which details Defendants' abuses of the KEL Program.

429.    The 2002 Proxy Statement also falsely and misleadingly states:

At September 30, 2001, the amount of loans outstanding under the [Key Employee Loan] program ***totaled $11,230,192, of which $0 was outstanding for***

> ***Mr. Kozlowski***, $231,718 was outstanding for Mr. Boggess, $20,702 was outstanding for Mr. Meelia and ***$0 was outstanding for Mr. Swartz***. The largest amount of indebtedness under the program during fiscal 2001 for each of the named officers was $23,009,703 for Mr. Kozlowski, $6,500,000 for Mr. Swartz, $20,702 for Mr. Meelia and $231,718 for Mr. Boggess ....

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.E.3. which details Defendants' abuses of the KEL Program.

430.     The Company's 2002 Proxy also disclosed:

> Mr. Walsh, a director, was instrumental in bringing about the acquisition by a subsidiary of the Company of The CIT Group, Inc. (now Tyco Capital Corporation) of Livingston, New Jersey.  For his services, Tyco paid Mr. Walsh a fee of $10 million.  In addition, at Mr. Walsh's request, Tyco contributed $10 million to a charitable fund established under The Community Foundation of New Jersey.  Mr. Walsh, as trustee of this fund, recommends the public charities to which contributions are made.  At the time of the acquisition, Mr. Walsh owned 50,000 shares of common stock of The CIT Group, Inc., which were converted to 34,535 Tyco common shares at the exchange ratio applicable to all stockholders of CIT.

431.     Reporting on the Company's 2002 Proxy, on January 29, 2002, *The Wall Street Journal* highlighted Tyco's payment to Defendant Walsh for his role in the CIT merger deal, as set forth above in § V.E.1. Tyco's stock fell 20% in reaction to Tyco's disclosure concerning the $20 million payment.  The stock would have declined more, but *The Wall Street Journal* also quoted Defendants' false affirmations that the payment was legitimate:

> ***Tyco spokeswoman Maryanne Kane said Tyco's board decided, without any outside help, that the $20 million payment was "appropriate based on the amount of work" Mr. Walsh did, which she said included providing guidance, advice and facilitating meetings.***

As set forth above in § V.E.1., the Board had not approved the payment to Mr. Walsh.

432.     In addition, Tyco issued a false and misleading press release on January 29, 2002, attempting to assuage investor concerns about the illicit payment by falsely stating the Company was performing strongly and that the drop in stock price was an overreaction because the

payment had been approved by Tyco's Board of Directors.  The press releases stated:

> Mr. Kozlowski said: "The Board felt that fee was appropriate in light of Mr. Walsh's efforts."

> Mr. Kozlowski continued:  "Clearly we are in an environment where people are intensely skeptical of corporate America, and for that matter, of Tyco.  As we have said before, we are prepared to openly discuss whatever legitimate questions or concerns our shareholders, the analyst community or the media may have.  We are extremely proud of the value we have built at Tyco and remain absolutely confident that, in time, this value will be recognized."

> "Our businesses are healthy and continue to perform strongly.  We are on track for the quarter and the year for earnings and cash flow.  Our separation plan is moving forward in high gear.  And we continue to believe, now more than ever, that it will create significant shareholder value.  Obviously, we believe the reaction in our stock price is unjustified."

As Defendants knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V.E.1.  The Company's Board of Directors had not approved the payment to Mr. Walsh.

### 6.    2/4/02 Press Release

433.    On February 4, 2002, Tyco issued a press release announcing the Company would be tapping its credit lines to shore up liquidity, but Defendants misleadingly assured investors that Tyco would have over $4 billion in cash flow for the year.  The press release quoted Kozlowski as saying "***the company has projected remaining fiscal year 2002 free cash flow to be in excess of $4 billion, of which a majority will be used to reduce existing indebtedness.***"

434.    As Defendant Kozlowski either knew or was reckless in not knowing, the Company's cash flow was falsely manipulated as is detailed in § V.C.

435.    The Company's February 4, 2002 press release was also interpreted by the marketplace to mean that, contrary to Defendants' statements, Tyco had liquidity problems that would affect its credit rating and could cause the Company to have trouble meetings its debt obligations.

7.      2/6/02 Conference Call

436.    In a conference call on February 6, 2002, Defendants announced that it was drawing down its bank lines, and falsely attempted to squelch rumors about manipulative acquisition accounting.  According to Defendant Kozlowski:

KOZLOWSKI:          Tyco has been over the last few weeks subjected to various *rumors and we believe misleading press coverage.*  We have several examples of this in recent days, ranging from outlandish headlines in a particular newspaper that is not even close to supported in the related article, to charges in things like TheStreet.com that we failed to disclose acquisitions that was later retracted by TheStreet.com.  Reports and rumors such as this do harm to our company and our shareholders.  They spook investors during these times, and they require lots of our management time to refute and they distract our employees.

                    *          *          *

                    *[T]here's no liquidity problems . . . .*

                    *          *          *

SWARTZ:             On one other issue, the accounting questions that have been asked.  Unfortunately, buried in a *New York Times* article today, they do come out and say that no evidence of accounting irregularities have been found at Tyco.  That is true, that is exactly what happened two years ago when these same allegations were given, same exact arguments, and *we were able to demonstrate two years ago that our accounting was sound*, the results we were showing were appropriate, and that was confirmed by independent reviews both from the government and also from independent auditors.  We are in the same position today as far as our approach to accounting.  *It's on a conservative basis, it is full disclosure, second to none . . . . [T]he accounting is sound and appropriate and we will put that on a public filing in an 8-K with SEC to be able to once again demonstrate to you that the accounting continues to be as sound as it was two years ago, a year ago and as included in our 10-K and our 10-Q that will be coming, one of full disclosure.*  So we do believe that the discussion we are having today, this morning, on our liquidity and accounting, will be able to prove that our business fundamentals and our approach to day-to-day business continues unchanged.

                    *          *          *

-181-

KOZLOWSKI:         ***So to state the obvious, there is a crisis of confidence at Tyco, but there's no crisis of reality.***

                                                   *        *        *

SWARTZ:            [S]ince you brought up the issue on other acquisitions, the articles that came out Friday and Monday related to the headlines of an inflammatory nature that these had never been included in financial statements or our cash flows. If anyone had been interested in seeing what the total amounts of cash acquisitions were for the 3-year period, they could go to the statement of cash flows on a line that says, "cash paid for acquisitions", and be able to see that total. Additionally, footnote 2, which I talked about earlier, which is extremely comprehensive, and includes all the detailed information, is related to 100% of those acquisitions that are included on the cash flow statement. And if there had been a story that could have come out, it would have been that there were acquisitions that we did not put out individual press releases on; however, as far as the financial statements are concerned, 100% of the acquisitions are included in there; we did have to pay the cash; it came out of our accounts. And additionally, the organic growth that we talk about on a quarterly basis, continues to exclude all acquisitions, effective foreign currency, and raw materials.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.F. describing Defendants' concealment of the Company's creditworthiness and liquidity problems. Moreover, the Company's accounting was not "conservative" as the Company has admitted its accounting was in fact "aggressive." *See, e.g.,* ¶151.

      437.    That same day, Tyco took an unusual step and issued a press release to reassert some points that were made during the February 6, 2002 conference call, including that "Tyco's business fundamentals are strong."[6]  As Defendants either knew or were reckless in not knowing,

---

[6]  The February 6, 2002 press release was filed with the SEC on Form 8-K on February 8, 2002, which was signed by Defendant Swartz.

this statement when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

438.    On February 11, 2002, Tyco again falsely reassured investors the Company did not have any liquidity issues in an article printed in *The Wall Street Journal*:

> J. Brad McGee, a Tyco executive vice president, said the big industrial and financial-services concern took the unusual step to make a strong case it wasn't in financial distress. **"*We wanted to make sure questions about liquidity were off the table,*"** he said.

As Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.F. describing Defendants' concealment of the Company's creditworthiness and liquidity problems.

8.    2/13/02 Conference Call

439.    On February 13, 2002, Tyco held a conference call in which Defendants Kozlowski and Scwartz misled investors by stating, among other things, the Company's accounting was not only appropriate but conservative:

KOZLOWSKI:     ***We already provide substantially more disclosure than our peers. We believe this is a good thing. The more you know about our accounting, I believe the more comfortable you will be.***

                                        *      *      *

SWARTZ:         We believed that as with all of our accounting that ***the best approach for us is to follow the most conservative that we can*** as far as showing the financial strength of the company.

                                        *      *      *

KOZLOWSKI:     We're confident once we sit with these people and walk with them through what's going on they see there is a stable company that's a going concern, that'll continue to be a going concern and ***does not have a liquidity crisis***.

-183-

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.F. describing Defendants' concealment of the Company's creditworthiness and liquidity problems.   Moreover, the Company's accounting was not "conservative" as the Company has admitted its accounting was in fact "aggressive."   *See, e.g.,* ¶151.

440.   On February 13, 2002, *The New York Times* reported that in 30 months, Defendants Kozlowski and Swartz made hundreds of millions of dollars selling their shares of Tyco stock:

> Since July 1999, Tyco International's two top executives have made more than $500 million in profits by selling Tyco shares, while saying publicly that they rarely, if ever, reduce their holdings.

### 9.   2/14/02 Form 10-Q

441.   On February 14, 2002, Defendants filed Tyco's Form 10-Q for the quarter ended December 31, 2001 (the "2/14/02 10-Q"), signed by Defendant Swartz. In it, Defendants set out numerous materially false and misleading statements. These false and misleading statements addressed a variety of topics, including the following:

### a.   Tyco's Operating Results

442.   The 2/14/02 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, Defendants provide the following summary information:

| | TYCO INTERNATIONAL LTD. AND CONSOLIDATED SUBSIDIARIES | |
| --- | --- | --- |
| | FOR THE QUARTERS ENDED DECEMBER 31, | |
| | 2001 | 2000 |
| INCOME BEFORE INCOME TAXES, MINORITY INTEREST, EXTRAORDINARY ITEMS AND CUMULATIVE EFFECT OF ACCOUNTING CHANGES............................... | 1,845.1 | 1,538.3 |
| Income taxes....................................... | (390.5) | (525.0) |
| Minority interest.................................. | (0.8) | (12.5) |
| Income before extraordinary items and cumulative effect of accounting changes...................... | 1,453.8 | 1,000.8 |
| Extraordinary items, net of tax.................... | (2.8) | -- |
| Cumulative effect of accounting changes, net of tax............................................... | -- | (683.4) |
| NET INCOME......................................... | $ 1,451.0 | $ 317.4 |

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

443.    As is set forth at § VI.B. and § VI.D., Tyco has since admitted that its accounting for the quarter ended December 31, 2001 was false.   The Company's pre-tax income was overstated.   As set forth in the December Report and Tyco's 10-Q/A for the quarter ended December 31, 2001 (filed on December 31, 2002), Tyco recorded charges of $290.6 million for the quarter ended December 31, 2002, $185.9 million of which is attributable to ADT dealer reimbursements.

b.    Tyco's Reserves

444.    The 2/14/02 10-Q also gives materially false and misleading information concerning Tyco's reserves.   It states, among other things:   "At the beginning of fiscal 2002, purchase accounting reserves were $732.1 million as a result of purchase accounting transactions in prior years."   However, Defendants failed to disclose they were manipulating Tyco's purchase accounting reserves in connection with acquisitions, as detailed herein in § V.A.

10.     2/22/02 *Boston Globe* Article

445.    Shortly after the release of the Form 10-Q, the *Boston Globe* ran an article on February 22, 2002 entitled "CEO DEFENDS TYCO PLAN, ACCOUNTING TYCO CHIEF DEFENDS BREAKUP PLAN, ACCOUNTING."   The *Boston Globe* quoted Kozlowski reaffirming that Tyco's accounting was both proper and conservative:

> HAMILTON, Bermuda - Tyco International Ltd. chief executive Dennis Kozlowski yesterday defended the conglomerate's accounting methods and breakup plan, declaring, **"We have nothing to hide,"** even as a large investor questioned the impartiality of Tyco's auditors.
>
> Kozlowski sought to reassure investors at Tyco's annual shareholder meeting here that, despite a wave of uncertainty that has battered the company's stock in recent weeks, **"Our accounting is conservative and it is proper."** He said Tyco had been unfairly sucked into the cyclone of concern around the collapse of Enron Corp.
>
> **"Let me assure you, Tyco is a very healthy and viable company,"** Kozlowski said.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.F. describing Defendants' concealment of the Company's creditworthiness and liquidity problems.  Moreover, the Company's accounting was not "conservative" as the Company has admitted its accounting was in fact "aggressive."  *See, e.g.*, ¶151.

11.     2/26/02 Conference Call

446.    During a weekly conference call on February 26, 2002, Defendant Swartz sought to falsely reassure analysts and investors about the propriety of Tyco's acquisition accounting practices:

SWARTZ:                This is the same corporate management team we have in place today that was in place 2 years ago which is the last time we had accounting allegations against the company. Allegations that are exactly the same today as they were 2

years ago, however the names of the acquisition and the dollar amount have changed.  Two years ago when we had these false allegations, as the management group, we told you that our accounting was appropriate and conservative, that the auditor opinions continued unchanged, the SEC ended up their enforcement action with no action being taken, and that the shareholder suits were baseless. With the court coming out yesterday and affirming the last point, the integrity of what we communicated to you 2 years ago was completely true, and 2 years ago we saw the same stock market volatility and credit market uncertainty that is in place today.  So now roll forward 2 years where we do have the same accounting allegations once again and as a management group we tell you once again that the accounting is appropriate and conservative, PWC, our outside auditors continue with their opinions unchanged and the new round of shareholder suits that copy the ones 2 years ago are also baseless.  And our integrity is extremely important to us, that is why we believe in being completely open, disclosing to a level far beyond others and we will continue to do that until we are able to in the future provide you the same closure that we have been able to provide to the accusations that we had 2 years ago.

*          *          *

**[T]o conclude, our accounting continues to be done appropriately and conservatively.**

As Defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. describing Defendants' acquisition scheme and concealment of that scheme from the SEC.  Moreover, the Company's accounting was not "conservative" as the Company has admitted its accounting was in fact "aggressive."  *See, e.g.,* ¶151.

      12.    <u>3/5/02 Conference Call</u>

    447.    On March 5, 2002, Defendant Swartz again attempted to allay concerns about

-187-

Tyco's acquisition "strategy," and its accounting practices.  He falsely stated as follows:

SWARTZ:                      [A]nyone who has been following Tyco over the past few
                             years knows, we are extremely disciplined when it comes
                             to acquisition. Every acquisition needs to be immediately
                             additive to earnings and cash flow during the first quarter
                             of ownership, needs to add to the competitive strength of
                             our businesses, has to provide minimum returns in the mid
                             teens during the first year of ownership.   That is our
                             acquisition strategy, it is true for every acquisition and we
                             continue to expect as we make acquisitions going forward,
                             that we will continue to have income statement benefits and
                             cash flow benefits as it reflects the strength of these
                             acquisitions and the benefit it ends up bringing to our
                             business.

                                            *       *       *

                             [T]he accounting here at Tyco which, as you hear,
                             continues to be in conformance with GAAP, prepared on a
                             conservative basis with proper disclosure for our investors
                             to see the performance of our business.

As Defendant Swartz either knew or was reckless in not knowing, these statements when made

were materially false and misleading and omitted material information for the reasons set forth

above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme.

             13.     3/10/02 *Sun-Sentinel* Article

      448.    On March 10, 2002, the *Sun-Sentinel* (Ft. Lauderdale) quoted Defendant

Kozlowski again reassuring investors the Company's accounting was conservative and proper:

      ***"Tyco has always been an open company and we have nothing to hide,"***

      Kozlowski told the shareholders, according to a Reuters report. ***"Our accounting
      is conservative and proper, living up to the letter and the spirit of the law.***"

As Defendant Kozlowski either knew or was reckless in not knowing, Tyco's accounting was not

conservative but was rather aggressive and improper.  These statements were materially false

and misleading and omitted material information for the reasons set forth above in § V and § VI,

including the fact the Company's accounting was not "conservative" as the Company has

                                         -188-

admitted its accounting was in fact "aggressive."  *See, e.g.,* ¶151.

### 14.    3/12/02 Conference Call

449.    Swartz's campaign to falsely reassure investors and analysts about Tyco's acquisition accounting and liquidity continued during the next weekly conference call, on March 12, 2002:

SWARTZ:    *. . . as we have said, our accounting, as far as acquisition accounting, in addition to the other areas that we have talked about, is in accordance with GAAP in an appropriate and consistent basis.*

*            *            *

*There is not a cash crisis looming at Tyco,* nor has there been one in the past.

*            *            *

*We have ample amounts of cash and liquidity available* and given the ongoing uncertainty in that CP market, we don't think it makes sense for us to jump in until that all balances itself out on issues unrelated to Tyco.

As Defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. detailing Defendants' acquisitions scheme, § V.C. describing Defendants' manipulation of the Company's free cash flow, and § V.F. describing Defendants' concealment of the Company's creditworthiness and impending cash crisis. Moreover, the Company's accounting was not in compliance with GAAP, as the Company has admitted.  *See* § VI.B and § VI.D.

### 15.    3/19/02 Conference Call And *The Wall Street Journal* Article

450.    During the weekly investor call on March 19, 2002, Swartz again tried to characterize the allegations of improper acquisition accounting at Tyco as a "rehash":

SWARTZ:    They [recent stories in *The Wall Street Journal*, *The New*

*York Times* and *Fortune.com*] continue to be a rehash of a rehash of items that we have thoroughly gone through and found to be totally appropriate not only by ourselves, but also our auditors and others. We are at a total loss to explain how recycled and disproved allegations like these warrant placement as the second most important news story in the global business in finance areas today.

451.   As Defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including the fact the Company's accounting was not in compliance with GAAP.  *See* § VI.B and § VI.D.

452.   On March 19, 2002, an article in *The Wall Street Journal* entitled "Tyco Inflated Cash Flow Of Acquisition" reported that the Company engaged in certain accounting manipulations as part of its Raychem acquisition and quoted false and misleading statements made by Tyco's representative J. Brad McGee:

> **A Tyco executive vice president, J. Brad McGee, denied there was any attempt to boost Tyco's results, and defended its accounting as proper.**  Mr. McGee said the specific payments discussed in the e-mails were investigated by the Securities and Exchange Commission in 1999 and 2000 as part of a broader informal probe of Tyco's accounting.  The SEC ended its probe in mid-2000, taking no action.
>
> *       *       *
>
> **Mr. McGee said Tyco has never "manipulated the cash flow or earnings of companies we acquire for the purpose of spring-loading, or getting better results after the acquisition."**

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. detailing the acquisitions scheme.  Moreover, Mr. McGee failed to disclose that Defendants had concealed documents from the SEC when the SEC had previously investigated Tyco.  *See* § V.A.5.

453.   Defendant Swartz's false statements were repeated to the market.  On March 20,

2002, Deutsche Bank Alex Brown, reporting materially false and misleading information received from Defendants, issued an analyst report entitled, "TYC: S&P Comments." The report stated:

> Tyco's CFO Mark Swartz addressed recent articles in *The Wall Street Journal*, *Fortune.com* and *The New York Times* regarding Tyco's acquisition accounting practices. **Tyco believes that these articles are based on information that has been inaccurately "hashed and rehashed" during the past two months. . . . Tyco still believes that its accounting policies are appropriate . . . and that allegations in the press are the results of reporting with out knowledge of Tyco's accounting practices.**

      16.    <u>4/2/02 Conference Call</u>

     454.    On April 2, 2002, the Company held yet another conference call in its ongoing efforts to provide false assurances concerning Tyco's accounting practices. Defendant Swartz stated as follows:

SWARTZ:              We also are real pleased and proud of our accounting policies and the standard we have set for open and forthright disclosure.

                                             \*       \*       \*

              We are unaware of any other management team of any company, of any size or complexity that has been willing to subject itself to as open a discussion of its accounting and disclosure practices as Tyco has. We think that says something about our confidence in Tyco and more importantly the integrity of our numbers.

As Defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including the fact the Company's accounting was not in compliance with GAAP. *See* § VI.B and § VI.D.

      17.    <u>4/25/02 Press Releases</u>

     455.    On April 25, 2002, Tyco released financial results for its quarter ended March 31,

2002 which were false and misleading.  The press release stated:

> Tyco International Ltd. (NYSE-TYC, BSX-TYC, LSE-TYI), a diversified manufacturing and service company, reported today a 96 cent loss per share, before extraordinary items, for the quarter ended March 31, 2002. These results include $1.61 per share of impairment, restructuring and other unusual charges which are discussed below.

456.   As Tyco would admit when it eventually restated these financial results after the Relevant Period, Tyco's results were even worse.

457.   On April 25, 2002, Tyco also issued a press release announcing the Company would not be split up.  Attached to the press release was a letter from Defendant Kozlowski to all shareholders stating:

> [I]t's been upsetting to see inaccurate reporting and unsubstantiated rumors about Tyco given such a public platform.  As stewards of a public company we know we are subject to scrutiny every day and the current climate is one in which all companies are under a microscope.  ***We have always tried to be as transparent in our accounting as possible.  Indeed, I consider our disclosure to be second to none among our peer companies.  That some in the media would compare us to companies that may have intentionally misled investors through the use of financial chicanery is insulting and inaccurate.  To be thrown into stories about "accounting scandals" damages our reputation and casts aspersions on our employees.***

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including the fact the Company's accounting was not in compliance with GAAP.  *See* § VI.B and § VI.D.

### 18.   4/25/02 Conference Call

458.   Defendants elaborated on their announcement during a conference call with analysts on April 25, 2002:

KOZLOWSKI:                    Finally, Tyco was the subject of a wave of some incorrect rumors and some misleading press reports.  These shook investors' confidence and also scared our employees, suppliers and customers.  In a melee we lost some

customers and we confused employees. In doing so the rumors became partially self-fulfilling. To prevent any risk of a liquidity squeeze we drew our backup bank lines and then triggered a debt rating downgrade from Standard & Poors and had higher costs of funds. We were comfortable being placed under a microscope but I have to admit to being very frustrated with some of the outlandish stories and headlines. They damaged our reputation, hurt and confused our employees, and certainly cost our shareholders money. We responded to these series of rumors with a series of weekly conference calls to answer questions from any and all. We are proud of our company and we believe that our openness will allow rationality ultimately to return.

*        *        *

SWARTZ:              *I'd like to stress that there are no liquidity issues,* next February is a reasonable roll forward with the reasonable amounts of debt that we would be in a position to go ahead and refinance, the only significance put that we have after that time period is not until our first fiscal quarter of 2004.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.F. describing Defendants' scheme to conceal the Company's creditworthiness and liquidity issues.

459.    As a result of Defendants' disclosures on April 25, 2002, revealing the truly abysmal state of Tyco's businesses that Defendants had been concealing from investors, Tyco shares closed at $20.75 on April 25 after closing at $25.90 on April 24.

19.    4/30/02 Conference Call

460.    During a conference call on April 30, 2002, Defendant Swartz once again specifically addressed the question of Tyco's liquidity and earnings power, falsely attempting to reassure investors and analysts:

SWARTZ:                    . . . *we continue to feel extremely comfortable as to the*

-193-

*earnings power,* the cash flow generation from every one of our businesses in which we participate.

\*        \*        \*

Two other points related to liquidity, just some misconceptions in the marketplace, we did not head the monetization route because we weren't in a position to spin CIT. From a debt perspective, we very well could have gone ahead and spun it . . . *we feel good about the liquidity,* we have a plan in place to do it with minimal execution risk, there are plenty of assets with strong cash flows that we have that we can rely on,

\*        \*        \*

*We are continuing to run these businesses without a liquidity issue* in that we do not believe there is one right now and its not that our heads are in the sand but on the contrary it's an issue next February, we've got a plan in place to go ahead and raise the cash proceeds that are necessary to overcome that . . . .

\*        \*        \*

*I do want to make clear though, you know, I am not changing any guidance as far as the balance of the year, we do think where we are currently, that that is the right level that people should factor in.*

\*        \*        \*

SWARTZ:                    . . . *there is no liquidity issue,* for those of you looking at next February.

As Defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.F. describing Defendants' scheme to conceal the Company's creditworthiness and liquidity issues.

20.    5/15/02 10-Q For The Quarter Ended 3/31/02

461.    On May 15, 2002, Defendants filed Tyco's Form 10-Q for the quarter ended March 31, 2002 (the "5/15/02 10-Q"), signed by Defendant Swartz. In it, Defendants set out

-194-

numerous materially false and misleading statements, as evidenced by (among other things) Defendants' restatement of its operating results in a June 12, 2002 10-Q/A for the same period. These false and misleading statements addressed a variety of topics, including the following:

a.   Tyco's Operating Results

462.   The 5/15/02 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results. For example, Defendants provide the following summary information ($ in millions):

```
                                              TYCO INTERNATIONAL LTD.
                                                 AND CONSOLIDATED
                                                   SUBSIDIARIES
                                              ------------------------
                                              FOR THE QUARTERS ENDED
                                                    MARCH 31,
                                              ------------------------
                                                 2002         2001
                                              -----------  -----------

(LOSS) INCOME BEFORE INCOME TAXES, MINORITY
  INTEREST AND EXTRAORDINARY ITEMS..............  (1,803.0)    1,488.1
Income taxes....................................    (97.4)     (366.0)
Minority interest...............................     (4.3)      (11.7)
                                                 ---------    --------
(Loss) income before extraordinary items.........  (1,904.7)   1,110.4
Extraordinary items, net of tax..................     (0.7)     (10.3)
                                                 ---------    --------
NET (LOSS) INCOME................................  $(1,905.4)  $1,100.1
                                                 =========    ========
```

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI.

463.   In addition, these statements are false and misleading and omit material information because Tyco has admitted that during the quarter ended March 31, 2002, it understated its reported loss by more than 71%.  As both the December Report and Tyco's 10-Q/A for the quarter ended March 31, 2002 (filed on December 31, 2002) reflect, during the second quarter of fiscal 2002 Tyco failed to timely record a loss due to an impairment in the value of its CIT subsidiary, *despite its contemporaneous analysis that an impairment charge*

*was necessary.*[7] When Tyco ultimately restated its March 31, 2002 financial statements, it reported a *$4.5 billion impairment* in the value of CIT's goodwill. The effect of this charge eliminated almost 40% of the earnings Tyco accumulated over its corporate life.

464.    Thus, the following additional statements in Tyco's 5/15/02 10-Q were materially false and misleading and omitted material information (as the Company has effectively admitted):

> The Company periodically reviews and evaluates its goodwill and other intangible assets for potential impairment. Effective October 1, 2001, the beginning of Tyco's fiscal year 2002, the Company adopted SFAS No. 142, "Goodwill and Other Intangible Assets," under which goodwill is no longer amortized but instead is assessed for impairment at least annually. Under the transition provisions of SFAS No. 142, there was no goodwill impairment at October 1, 2001. *Updated valuations were completed as of March 31, 2002 for our Tyco Telecommunications (formerly TyCom) reporting unit and Tyco Capital, which resulted in no impairment of goodwill at that date.*
>
> *    *    *
>
> However, during the quarter ended March 31, 2002, circumstances developed that could potentially impair the value of goodwill with respect to our Tyco Telecommunications reporting unit and Tyco Capital. Updated valuations were completed as of March 31, 2002, *which resulted in no impairment of goodwill at that date.*

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A.3. describing Defendants' refusal to writedown the excessive goodwill it carried on its books resulting from Defendants' manipulation of goodwill via the acquisitions scheme.

b.    <u>Tyco's Reserves</u>

465.    The 5/15/02 10-Q also gives materially false and misleading information

---

[7]  Tyco's 10-K for the year ended September 30, 2002 states that "the Company performed a SFAS 142 first step impairment analysis as of March 31, 2002 and concluded that an impairment charge was warranted at that time."  Nonetheless, the Company failed to record the charge.

-196-

regarding Tyco's reserves.  For example:

> At the beginning of fiscal 2002, purchase accounting reserves were $732.1 million as a result of purchase accounting transactions in prior years.  In connection with fiscal 2002 acquisitions, we established purchase accounting reserves of $182.2 million for transaction and integration costs.  In addition, purchase accounting liabilities of $355.7 million and a corresponding increase to goodwill and deferred tax assets were recorded during the six months ended March 31, 2002 relating to fiscal 2001 acquisitions. These reserves related primarily to revisions associated with finalizing the exit plans of LPS, Tyco Capital and SecurityLink, all acquired during fiscal 2001.  During the six months ended March 31, 2002, we paid out $318.4 million in cash for purchase accounting liabilities, plus $58.0 million relating to earn-out liabilities, and incurred $26.3 million in non-cash charges and reclassifications (including $2.3 million relating to earn-out liabilities) against the reserves established during and prior to this six-month period.  In addition, during the six months ended March 31, 2002, we assumed pre-existing put option rights of $105.9 million, of which $22.2 million has been paid in cash.  Certain acquisitions have provisions which require Tyco to make additional "earn-out" payments to the sellers if the acquired company achieves certain milestones subsequent to its acquisition by Tyco.  Also, in the six months ended March 31, 2002, we determined that $47.3 million of purchase accounting reserves related to acquisitions prior to fiscal 2002 were not needed and reversed that amount against goodwill.  At March 31, 2002, there remained $880.3 million in purchase accounting reserves on Tyco Industrial's Consolidated Balance Sheet, of which $600.3 million is included in accrued expenses and other current liabilities and $280.0 million is included in other long-term liabilities.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.A. describing Defendants' acquisitions scheme and manipulation of reserves in connection with the Company's acquisitions.

466.     A May 15, 2002 Associated Press Newswire story profiled Defendant Kozlowski. The story quoted Kozlowski from an interview given to Dow Jones after the April 25, 2002, announcement regarding the potential CIT IPO as follows: ***"I'm very well qualified to lead the Company out of its present state,"*** and have "absolutely no intention at all" of resigning.  As Defendant Kozlowski either knew or was reckless in not knowing, the bolded statement when made was materially false and misleading and omitted material information concerning

Kozlowski's looting of the Company and other fraudulent practices thereby making him the least qualified person to lead the Company out of its then-pending crisis that Kozlowski had created.

21.   5/16/02 Conference Call

467.   During a conference call on May 16, 2002, Defendant Swartz continued to reassure investors and analysts that Tyco was "comfortable with the guidance that we gave for the quarter and for the year," and that "there is no real liquidity issue going on here at Tyco."  As Defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.F. describing Defendants' concealment of the Company's true creditworthiness and liquidity crisis.  Tyco's 10-Q/A (filed on December 31, 2002) later revealed that *during the quarter ended June 30, 2002, Tyco's reported pre-tax income of $150.6 million was restated to a loss of $236.1 million* because of an improper failure to timely record an impairment in the value of goodwill at Tyco Telecommunications and Tyco Infrastructure Services.  As a result, *Tyco's reported pre-tax earnings during that quarter were overstated by approximately $387 million.*

468.   On May 16, 2002, AP, Dow Jones, and Reuters reported that Swartz reiterated that the Company planned to pay off about $10 billion of its $27 billion in debt after spinning-off CIT, and that the Company was on course to do so by the end of June.  According to Swartz, the Company was "not worried" about a potential debt downgrade to junk status given the Company's cash and cash-flow levels as well as the benefit from the expected sale or initial public offering of CIT.  Swartz further stated that the Company's "financial position as we sit right now is stronger than it was a year ago today."  As a result of the positive statements, the Company's stock rose $1.14, or 5.87%, to close at $20.56.  As Defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading

and omitted material information for the reasons set forth above in § V and § VI, including § V.F. describing Defendants' concealment of the Company's true creditworthiness and liquidity crisis.

469.    On May 17, 2002, numerous media outlets reported on the Company's positive statements from May 16, particularly focusing on the expected sale or IPO of CIT by the end of June 2002.  For example, *The Wall Street Journal* reported:

> [Tyco's] chief financial officer said the company is confident it can complete a sale or initial public offering of its CIT Group finance unit by the end of June.
>
> ***Mark Swartz also told an investor conference call that the company plans to pay off at least $10 billion of the $27 billion in debt being shouldered by its industrial arm, using the proceeds from the CIT deal, along with cash on hand from operations.***
>
> An IPO or sale of CIT is considered critical to investor confidence in Tyco, which has lost credibility this year amid abrupt changes in strategic direction and questions about its liquidity and heavy debt load.  To raise cash, the company has been trying to unload CIT, which it bought last June for $9.5 billion, but which is probably worth much less now.  Mr. Swartz said the company continues to pursue both an IPO of the unit and an outright sale.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in § V and § VI, including § V.F. describing Defendants' concealment of the Company's true creditworthiness and liquidity crisis.  Further, Tyco could not reasonably expect to obtain $10 billion from the CIT deal as the Company had been carrying the CIT division on its balance sheet at an excessive valuation as detailed herein at § V.A.3.

470.    On May 31, 2002, UBS Warburg, reporting materially false and misleading information received from Defendants, issued an analyst report entitled, "Tyco Int'l: SIA Reports Semiconductor Shipments Down 8% in April."  The report stated:

> Over the last few months, earnings estimates for Tyco have dropped from just under $3.70 per share (the center of management's range) to $2.58 per share.

\*     \*     \*

We maintain our fiscal 2002 earnings estimate of $2.60 per share and our fiscal 2003 earnings estimate of $2.95 per share.

\*     \*     \*

We believe Tyco's accounting policies are consistent with industry standards: Our analytical conclusion remains that Tyco's accounting and disclosures are in accordance with GAAP and in accordance with industry practice. Our investment conclusion remains that Tyco's stock should appreciate over time as investors regain comfort with its accounting policies.

471.    Defendants announced on June 1, 2002, that Defendant Kozlowski was the target of a criminal investigation being undertaken by the District Attorney of the County of New York into possible violations of state sales tax laws.

472.    According to the Company's December Report, the Board was then informed on June 1 and June 2, 2002: (1) that Defendant Kozlowski and Tyco's former general counsel Mark Belnick had been aware of the investigation since on or about May 3, 2002; (2) that the Company itself had received a subpoena in connection with the investigation; (3) that Tyco's former general counsel Mark Belnick had retained counsel to represent the Company in the investigation; (4) that the Company's counsel had met with prosecutors and had furnished prosecutors with data and documents; and (5) that it was now expected that Defendant Kozlowski would be indicted.

473.    According to the December Report, on June 2, 2002, Tyco requested that the Boies Firm represent it in connection with negotiating the terms of Defendant Kozlowski's resignation. Those negotiations led to Defendant Kozlowski resigning from the Tyco Board and from his position as the Company's Chief Executive Officer on June 3, 2002.

474.    In light of this the market also immediately began to question all aspects of the Company's performance. For example:

    a.     *Reuters Business Report* (June 3, 2002):

"This is one more piece of uncertainty and the share price is telling you what shareholders think," said John Maack, director of equities at money manager Crabbe Huson Group. "What we needed here were signs of stability and that things were going to be OK, not this";

    b.     *TheStreet.com* (June 3, 2002):

"The market is taking this as an indication that if [Kozlowski] were somewhat devious as a person, then they're extending that to the company," said Brett Gallagher, head of U.S. equities at Julius Baer Investment Management;

    c.     *Wall Street Journal Online News Roundup* (June 4, 2002):

Mr. Kozlowski resigned Monday amid an investigation into possible sales-tax evasion involving millions of dollars in artwork. Although the investigation appeared to focus on how he managed his vast personal fortune, much of it from sales of company stock, analysts said it raised serious concerns about his oversight of Tyco and its finances.

Investors already worried about the company's future sold Tyco stock with a vengeance, sending its shares down nearly 27% Monday in extremely heavy trading. Tyco stock has fallen 73% since Jan. 1; and

    d.     *Forbes.com* (June 4, 2002):

Tyco's diminishing credibility took another big hit on the news as did its stock-which fell 27% to $16.05 on Monday. Why? Similarities between Kozlowski's personal dealings and Tyco's corporate strategy keep coming to light.

    475.    On June 4, 2002, Kozlowski was indicted by the District Attorney of the County of New York for conspiring with executives and employees of art galleries and art consultants in New York and London to avoid paying more than $1 million in New York State and City sales taxes on millions of dollars in artwork purchased by Kozlowski and his wife ("Kozlowski Indictment"). The Kozlowski Indictment alleges that from August 11, 2001 through June 3, 2002, Kozlowski and his co-conspirators avoided having either the customer pay or the vendor collect the sales taxes due on the sale of at least six expensive paintings valued at $13,175,000. According to an article in the *New York Post*, dated July 12, 2002, the paintings were paid for

with Tyco funds and then repaid without interest. Kozlowski and his co-conspirators generated false documents, such as invoices and shipping documents, to make it appear that the art work was to be shipped out of New York and therefore not covered by New York State sales tax provisions.

476.    An article in the June 4, 2002 edition of *The New York Times*, entitled "Tyco Chief Out As Tax Inquiry Picks Up Speed," reported:

> Two weeks ago, with the investigation of his art purchases accelerating, Mr. Kozlowski offered a more modest speech to the graduates of St. Anselm's College in Manchester, N.H.
>
> "As you go forward in life, you will become leaders of families, communities, and even companies," Mr. Kozlowski said in the text of his May 18 commencement address. "You will be confronted with questions every day that test your morals. The questions will get tougher and the consequences will become more severe. Think carefully, and for your sake, do the right thing, not the easy thing."

477.    Upon the news of Kozlowski's indictment and forced resignation, the price of Tyco shares dropped $5.90, or 27%, to $16.05 from the previous closing price of $21.95 on May 31, 2002.

478.    As reported by Reuters Business Report on June 6, 2002:

> "The Company has a duty to disclose to its shareholders these types of loan arrangements, and if there was some misrepresentation regarding the nature of the loan, that could rise to a criminal violation of the securities laws," said Robert Mintz, a former federal prosecutor who is a partner with McCarter & English.

479.    On June 7, 2002, Tyco announced that it may delay the public offering of CIT and that two major agencies, Moody's Investors Services ("Moody's") and Standard & Poor's ("S&P"), had cut their ratings on Tyco's debt to one notch above junk status.  Thus, Moody's cut Tyco's long-term credit rating to Baa3 from Baa2 and lowered its short-term rating to Prime 3 from Prime 2.  Moody's warned that "Absent significant near-term debt reduction with proceeds from a successful sale of CIT, Tyco's ratings would likely fall into speculative grade."  Moody's

further warned that it may cut the Company's debt to junk status if a sale is not completed "in the very near future, as early as the end of June."  Moody's also stated that it "believes that potential proceeds from the (IPO) will fall short of expectations and Tyco will face a significant debt burden with sizable maturities over the next 18 months."

480.    On the same day, S&P cut Tyco's long-term rating to BBB - and left its short term rating unchanged at A2.  S&P said Tyco faced an erosion in management credibility and investor confidence, and was "concerned about the Company's ability to access capital markets or bank financing."  S&P changed its CreditWatch implication to "negative."  S&P stated that its ratings could be lowered further in the coming days or weeks if there were further developments in the criminal investigation or if the CIT IPO was not launched within the next two weeks; did not close within a month of the launch; or if proceeds from the offering were insufficient to improve Tyco's liquidity.

481.    Tyco also confirmed on June 7, 2002 that it was launching its own "comprehensive internal investigation," with the assistance of the Boies Firm, into Kozlowski's and other executives' use of Company funds.

482.    That same day, there were also numerous reports that the Manhattan District Attorney's Office and the SEC had broadened their investigations beyond Kozlowski to determine if executives used the Company's cash to buy any art and homes.

483.    Tyco's shares plunged $4.50 per share on June 7, 2002 to close at $10.10 (a six-year low) on volume of 199.8 million shares. According to Reuters Business Report, on that date, "[t]he downgrades . . . which are likely to make borrowing more expensive, could reduce [Tyco's] cash flow by $635 million in its third and fourth quarter, [Tyco] Chief Financial Officer Mark Swartz said.  Reuters further reported:

"If the CEO would take those kinds of risks in his personal life, then you could make the assumption that he was acting that way at the company," Plaza said.

"Kozlowski was so hands-on and so aggressive throughout all parts of the company that it has to touch other management.  You could assume that type of behavior was either allowed or encouraged."

484.   On June 7, 2002, J.P. Morgan Securities cut its rating on Tyco to "market perform" from "buy," citing corporate governance issues and the Company's potential legal problems.

485.   During a conference call held that same day, the last day of the Relevant Period, Defendant Swartz tried to downplay the crisis at Tyco as "a credibility and a perception issue." Similarly, John Fort, who was chosen by the Board to assume control of the Company, tried to reassure analysts and investors, falsely, that all was fundamentally well at Tyco.  According to Fort:

> FORT:   ***We are . . . we expect nothing related to Dennis to be material to our financials, and I think that's worth repeating.  They're just not material.  They're not going to affect either our historic or expected financials.***
>
> *                *                *
>
> ***. . . we do not have a liquidity issue at this point even in spite of recent developments.***
>
> *                *                *
>
> ***Now just look at this company and just take a look at it.  I mean our accounting is sound,*** even though we have tough economic times, ***our earnings and cash flows are strong and real.***  We're built on real hard assets factories and products and customers.  ***We're committed to solid organic growth going forward.***   We have competent excellent employees and ***we have our liquidity issues under control*** and with all that, ***I think it's very difficult to forecast that we're not going to be successful going forward.***

VIII.   PLAINTIFFS RELIED UPON DEFENDANTS' FALSE AND MISLEADING STATEMENTS

486.   Throughout the Relevant Period, Plaintiffs justifiably expected Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in the Company's offering documents for the sale of the Company's securities.  Plaintiffs would not have purchased the Company's securities at artificially inflated prices if Defendants had disclosed all material information then known to them, as detailed herein.  Thus, reliance by Plaintiffs should be presumed with respect to Defendants' omissions of material information as established under the *Affiliated Ute* presumption of reliance.

487.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine.  The market for Tyco securities was at all times an efficient market for the following reasons, among others:

(a)   Tyco's stock met the requirements for listing and was listed on the New York Stock Exchange;

(b)   As a regulated issuer, Tyco filed periodic public reports with the SEC;

(c)   Tyco's securities volume was substantial during the Relevant Period;

(d)   Tyco was followed by various analysts employed by major brokerage firms, including J.P. Morgan, Deutsche Bank Alex Brown, and UBS Warburg and others, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms and which were available to various automated data retrieval services; and

(e)   The market price of Tyco securities reacted efficiently to new information entering the market.

488.    The foregoing facts clearly indicate the existence of an efficient market for trading of Tyco securities and support application of the fraud-on-the-market theory.  Plaintiffs relied on the integrity of the market price for the Company's securities and are entitled to a presumption of reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

IX.    DEFENDANTS' CONDUCT CAUSED PLAINTIFFS' LOSS

489.    Throughout the Relevant Period, as detailed above, the prices of the Company's securities were artificially inflated as a direct result of Defendants' misrepresentations and omissions regarding the Company.  When the truth about the Company was partially revealed to the market beginning in January 2002 and continuing throughout the Relevant Period, the inflation that had been caused by Defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant damages to Plaintiffs.

490.    The Company's financial condition and results, including the existence of the acquisitions scheme, the ADT scheme and Defendants' scheme to loot Tyco – among other schemes and contrivances used by Defendants to paint a false picture of Tyco's financial well-being, were material information to Plaintiffs.  Had the truth been disclosed to the market at or before the Relevant Period, Plaintiffs would have been unwilling to purchase the Company's securities at the prices then being offered in the market.

491.    Beginning January 2002, Tyco shares traded at $58 before beginning a steep decline to as low as $8.25.  Tyco shares began to drop in early January 2002 because of investor concerns related to Tyco's accounting.  As reported in *The Wall Street Journal* on January 7, 2002, Tyco stock dropped on January 2, 2002 and January 3, 2002 on rumors that the Company was being investigated by the SEC.  The article highlighted concerns over the Company's accounting for the CIT acquisition and the Company's accounting for "installations of security

alarms, mostly through its ADT unit."   Commenting on the accounting for the ADT alarm installations, Lynn Turner, a former chief accountant at the SEC, is quoted in the article as stating:  "In my experience, when you're not forthcoming about something like this, people get nervous about financial reporting and your credibility."

492.    Defendants' manipulation of the Company's financial results could not hide the Company's true financial condition indefinitely.  On January 15, 2002, Tyco partially revealed its true financial condition, which Defendants had previously concealed, when the Company announced financial results for the quarter ended December 31, 2001 that were below analysts' expectations.  In addition, Defendant Kozlowski attempted to address market concerns about Tyco's accounting in a conference call on January 15, 2002, but only fed investor speculation of impropriety when he could not adequately address investors' questions.  As a result, Tyco's stock price dropped from a close on January 14 at $52.40 to a close on January 15 at $47.95 – a drop of 8.5%.

493.    Then, on January 22, 2002, Tyco announced plans to split the Company into four separate pieces.  Investors were surprised by the Company's sudden reversal of strategy, fueling investors' concerns that Tyco was hiding something and causing Tyco's shares to drop 5%, or $2.86, on January 23.  On January 24 the *Financial Times* reported:

> Yesterday's share price drop reflects skepticism in the wake of the Enron collapse and growing fears about companies keeping bad news out of accounts.
>
> Tyco has suffered for the past two years from suspicions about its accounting policies, but repeatedly denied that it has been less than transparent. Its decision to split fuelled some investors' belief that the company was attempting to pre-empt poor results.

494.    Similarly, on January 24, 2002, Dow Jones published an article also attributing the stock's decline to investor concerns the Company was splitting in an effort to conceal accounting improprieties:

[T]he stock closed Wednesday below its level before the breakup announcement. That's highly unusual, say academic researchers who have studied corporate breakups, which tend to add as much as 5% to a company's stock value in the days following the announcement.

"It's surprising the reaction isn't more favorable," said Stuart Gilson, a finance professor at Harvard Business School, whose research has shown that breakups of diversified companies such as Tyco (TYC) tend to increase shareholder value. ***The stock decline is a bearish sign, he said, suggesting that investors fear the company is trying to hide something, or hasn't put its controversial accounting issues behind it***.

495.    On January 28, 2002, Tyco filed its 2002 Proxy with the SEC.  The 2002 Proxy disclosed that Defendant Walsh, the Company's lead independent director, had been paid $10 million (with an additional $10 million being donated to a charity he headed) for his role in the Company's acquisition of CIT.  The trading day before the 2002 Proxy was filed, January 25, Tyco closed at $45.  On January 28, Tyco closed at $42.

496.    On January 29, 2002, *The Wall Street Journal* published an article harshly criticizing the payment, quoting corporate governance experts calling the payment "highly inappropriate" and a "conflict of interest."   This disclosure of improper self-dealing – in conjunction with the swirling rumors of accounting improprieties – sent shockwaves through the market galvanizing investors' fears that Tyco's management was not credible and the Company was run by officers and directors who did not comply with even the most basic of rules and regulations safeguarding investors.  Tyco stock dropped by over 20% in one day, as Tyco shares fell from a close of $42 on January 28 to a close of $33.65 on January 29.  This one disclosure wiped out $16.7 billion in the Company's market capitalization in one day.  However, Tyco shares would have dropped even more on January 29 had Tyco and Defendant Kozlowski not lied to the marketplace concerning Board of Director approval of the payment.  *See supra* § V.E.1.

-208-

497.    Quick on the heels of the news about the $20 million Walsh payment, *The New York Times* reported on January 30, 2002 that Defendants Kozlowski and Swartz had engaged in massive, hidden insider selling – surreptitiously disposing of over $100 million in Tyco shares during the prior fiscal year by selling their personal Tyco holdings back to the Company.  *The New York Times* article also discussed market rumors concerning Defendants' acquisitions scheme, as detailed herein.   In response, on January 30, 186 million shares of Tyco traded. Tyco's stock price dropped from a January 29 close of $33.65 to as low as $27.48 before rebounding to close at $34.85 because of Defendants' false reassurances responding to *The New York Times* article.  Tyco issued a press release during the trading day on January 30 stating:

> Tyco International Chairman and Chief Executive Officer, L. Dennis Kozlowski, announced today that he intends to purchase, in the open market, with his own funds, 500,000 shares of Tyco common stock, and Tyco Chief Financial Officer, Mark Swartz, intends to purchase, also with his own funds, 500,000 Tyco shares. Mr. Kozlowski further announced that the window is open for other Tyco officers and directors to purchase shares as well.   In making this announcement, Mr. Kozlowski reaffirmed his belief that the company is substantially undervalued by the marketplace, and his complete confidence in the long-term investment value of Tyco shares.

498.    Tyco shares started 2002 trading at $58 before being driven down to $27.48 on January 30, 2002 – erasing half Tyco's market capitalization in one month.  Plaintiffs' losses in the month of January 2002 can be directly linked to and were caused by the partial disclosure of Defendants' fraud, and therefore are compensable.

499.    Investors continued to be shocked by numerous additional partial disclosures of the fraud throughout the first half of 2002.  On Monday February 4, 2002, *The Wall Street Journal* reported on a surprising admission in a Tyco SEC filing concerning Tyco's acquisitions scheme:  "Tyco International Ltd. said it spent about $8 billion in its past three fiscal years on more than 700 acquisitions that were never announced to the public."  On the same day, Tyco

disclosed it would be drawing down on its emergency bank facilities, a move interpreted by investors as disclosing Tyco was not being honest with the marketplace regarding the Company's liquidity constraints.  In response, the Company's stock price dropped significantly. On February 4, Tyco closed at $29.90 after closing at $35.63 the prior trading day, a decline of 16%.

500.    And, on February 5, 2002, the Company's share price continued to fall as investors' concerns were heightened by the Company's inability to obtain financing and growing awareness that Tyco faced a liquidity crisis that Defendants had previously concealed from investors.  Tyco shares reached a low of $22 on February 5 before closing at $23.1, significantly lower than the close on February 4 at $29.90.  Reuters reported (as printed in the *San Diego Union Tribune* on February 6):

> Tyco International Ltd.'s stock market value plunged $13.6 billion yesterday as concerns mounted about the conglomerate's ability to raise cash amid increasing signs it can no longer easily access debt markets.

> Investor confidence in Tyco, already badly damaged by concerns about its complex accounting for acquisitions, was hurt further by downgrades in its credit ratings when the company decided to use lines of credit from banks to pay off short-term debt.

> Yesterday, its financing unit, Tyco Capital, said it will draw from $8.5 billion in bank credits to pay off short-term commercial paper, after a similar move by the Bermuda-based parent company on Monday.

> Tyco Capital, which is set to be spun off or sold as part of a radical restructuring plan announced by Tyco last month, has said it is gravely concerned by severe restrictions on its access to credit markets.

> *            *            *

> Tyco, whose product line ranges from diapers to security systems, has become the biggest corporate casualty from investors' increasing concerns about opaque accounting practices and questionable corporate ethics in the fallout from the collapse of energy trader Enron Corp.

Tyco stock closed down $6.80, or about 23 percent, at $23.10 yesterday on the New York Stock Exchange.  It has now declined more than 60 percent this year for a loss of more than $70 billion in market value. The company's bonds also suffered, with notes due in 2011 falling to 74.75 cents, a loss of 16 cents in the past week.

"There are no buyers for the debt," said Jim McDonald, vice president at T. Rowe Price Associates Inc. in Baltimore, who helps invest $15 billion in money-market assets.  He said liquidity for Tyco has dried up.

Investors and some analysts said there was no sign of a rebound anytime soon as the questions about Tyco's strategy and disclosure policies continue to mount.

*     *     *

"There's no reason to believe this name has bottomed out," said Carol Levenson, a bond analyst at Gimme Credit, who raised questions in a research note yesterday about how Tyco would refinance an estimated $11 billion in maturities coming due over the next 18 months.

Though Tyco's bonds remain investment-grade, bond investors are treating them like junk, quoting the bonds by price rather than by their yield margin over U.S. Treasuries.

501.   On February 6, 2002, *The New York Post* ran an article titled "TYCO IS ENRON

II; STOCK PLUNGES; BREAK-UP PLAN IN TROUBLE" commenting on Tyco's stock drop:

One of America's highest paid CEOs watched helplessly yesterday as his company - Tyco International - crumbled amid the taint of skullduggery.

Dennis Kozlowski, 55, is embroiled in what Wall Street is calling "Enron II" - the sad saga of a powerhouse collapsing due to *insider conflicts, overinflated stock and concerns about its accounting practices*.

Shares of Tyco, a maker of products ranging from medical supplies to fire extinguishers, plunged again yesterday to a new low in a downward spiral that's already wiped out more than half its market value in the past month, or $61 billion.

Credit-rating agencies also continued to trash Tyco's credit worthiness, saying it may not be able to borrow any more money to carry out its rescue break-up plan.

Analysts and investors say they're concerned particularly about the company's accounting.

"There's a fear that this is Enron II," said Bruce Bartlett of Oppenheimer.

**What's spooking investors is that Tyco's chief wants to split up the company into four units as a way to prove that it wasn't covering up slow growth by making huge acquisitions.**

Kozlowski has overseen $64 billion in acquisitions during his seven-year watch, but at least $8 billion of them weren't publicly disclosed.

Among several red flags that have been raised over Tyco in recent weeks is the disclosure that the company paid one of its board members $20 million to help engineer a key acquisition.

Kozlowski hasn't made headway in calming angry investors who've unloaded Tyco stock en masse. Tyco fell 23 percent yesterday, the largest drop in two decades, closing at $23.10 in huge volume of 175 million shares.

"The first thing they have to do is try to regain some credibility with the investor community, which they can do by making their financial statements less complex," said Rob Plaza, an analyst at Morningstar.

Kozlowski had hoped his break-up plan would allay concerns, but it raised more questions than it answered. Analysts called that an unexplained U-turn from Tyco's pattern of growth through acquisitions.

The downgrades raised concerns that Tyco won't be able to repay $11 billion in debt of piled onto the units it wants to spin off.

\*      \*      \*

But nagging suspicions in recent months about its accounting have come to a head. Two days ago, Tyco said it would replace $4.5 billion of its short-term debt with $5.9 billion in bank loans to give it more flexibility and shore up its balance sheet. The move came as ratings agencies Standard & Poor's and Fitch downgraded the debt of Tyco and its wholly-owned financial subsidiary, Tyco Capital.

**Tyco Capital officials acknowledged they have been shut out of the corporate bond market in recent days because of accounting worries.**

\*      \*      \*

Coming Apart

The plan at Tyco was to break up, not break. But the stock hit a new low yesterday at the company analysts are calling Enron II. What's going on:

\* A string of red flags are popping up.  They include conflicts of interest on Tyco's board, questionable accounting methods and $8 billion in unreported acquisitions.

\* Shares plunged 23 percent yesterday, the biggest fall in at least two decades. Tyco's market value is down $61 billion in just the last month.

\* Tyco's credit rating has been trashed repeatedly and was hit again yesterday when Fitch Ratings and Standard & Poor's said the company won't be able to borrow enough money to stay afloat.

502.    After the February 2002 disclosures, Tyco shares fluctuated without significant movement until April 25, 2002, when the Company announced (among other things) financial results for its fiscal second quarter.  The Company's financial results were below analysts' expectations and partially revealed the true financial condition of the Company, which Defendants had previously concealed.  For the period ending March 31, 2002, Tyco reported a net income loss of over $6 billion, which was in stark contrast to its March 31, 2001 reported net income of over $1 billion.  The Company attributed the loss to a number of factors, all related to Defendants' fraudulent activities.  For instance, the Company was forced to take a $2.41 billion writedown on the value of its TyCom Global Network, about which Defendants had previously made false and misleading statements.  *See* § V.D.  Tyco also took a charge of $180.6 million in connection with its investment in Flag Telecom, which had been falsely inflated as part of Defendants' scheme to loot the Company.  *See supra* ¶¶108-11.  Tyco's poor performance in the quarter was the result of Defendants' prior fraudulent conduct catching up with the Company and Defendants' inability to continue to hide Tyco's business units' poor performance via accounting tricks and other misleading measures.

503.    On April 25, 2002, the Company also disclosed it would sell CIT via an initial public offering for ***up to*** $7.15 billion.  The Company had paid almost $10 billion for CIT only eleven months prior.  Indeed, many were skeptical that Tyco could even get $7 billion for CIT.

The Company's inability to sell CIT for a price close to what Tyco paid for it was a strong indication to investors that (i) Tyco's accounting for acquisitions, such as CIT, was in fact false and misleading, and (ii) Tyco was suffering a severe liquidity crisis and was trying to raise capital via a fire sale.

504.    Tyco shares closed at $20.75 on April 25, 2002 after closing at $25.90 on April 24.  Tyco shares continued to fall over the next several trading days (there was no trading on April 27 and 28), reaching as low as $15.25 by April 30 on extremely heavy volume the entire week.  Much of the decline was the result of investor concerns that Tyco was facing a liquidity crisis, which Defendants had previously assured investors was not the case.  On April 30, *The New York Times* reported on Tyco's decline the previous day:  "Tyco International tumbled nearly 15 percent, sinking to 1997 levels, as investors worried about a cash shortage after Fitch Ratings cut its ratings on Tyco's debt, making it more expensive for Tyco to raise money.  The shares slumped $2.90, to $17, and [Tyco] was among the most active issues on the Big Board."  Also on April 29, *Barron's* issued an article stating:  "Liquidity fears continued to batter Tyco International . . . .  'If they don't refinance or sell assets, they'll run out of cash in the second quarter of next year,' predicts Glenn Reynolds, a fixed-income analyst at CreditSights."  Shares of Tyco only rebounded after Tyco assured investors on April 30 there was not a liquidity issue. *See supra* ¶468.

505.    Throughout Spring 2002 Tyco shares fluctuated on investors' concerns of, among other things, accounting improprieties and liquidity problems.  On May 28, 2002, Tyco stock dropped from its prior day close of $23.7 to $22.2 on revelations of Tyco's liquidity crisis and overvaluation of CIT, when Tyco media reported the Company's contemplated sale of its CIT

subsidiary to Lehman Brothers had fallen through and that no other entity was likely to step forward and buy the unit.

506.    Then, on June 1, 2002 – while the market was closed for the weekend – Tyco disclosed Kozlowski was the target of a criminal investigation.  Investors had all the evidence they needed to conclude that they could no longer rely upon the integrity of Tyco's senior officers and directors, nor could they trust the financial statements created by those officers and directors.  Investors sold Tyco stock in droves.  Tyco dropped from a closing price of $21.95 on May 31 to $15.60 on June 3 on trading of over 127 million shares.  Throughout early June, as investors digested news of Defendant Kozlowski's criminal conduct and its implications with regard to the Company's financial condition, Tyco's shares continued to fall on very heavy volume.

507.    On June 6, 2002, Tyco stock fell $3.30 from a close of $17.30 on June 5 to $14.60.  And, on June 7, 2002, Tyco stock plunged over 30% to close down $4.50 at $10.10. The drops on June 6 and June 7 were the result of a number of disclosures concerning management's looting of Tyco, improper accounting for CIT as part of the acquisition scheme and the Company's mounting liquidity crisis.  On June 6, Tyco was forced to disclose the sale of CIT was being delayed by the SEC's disapproval of Tyco's accounting for goodwill when it acquired CIT.  The sale of CIT was critical to the Company's ability to meet its debt burdens. Tyco would have to take a huge writedown of goodwill recorded as part of the acquisition of CIT.  Also on June 6, *The Wall Street Journal* published an article reporting the criminal investigation of Kozlowski targeted improper use of Tyco assets.  As a result of this news, on June 7, both Moody's and S&P downgraded Tyco on fears of a substantial liquidity crisis.  As reported by *The Boston Globe* on June 8:

In the most damaging loss of investor confidence since the company's troubles began six months ago, shares of Tyco International Ltd. yesterday plunged 30 percent after two credit-rating agencies downgraded its bonds and company officials said the crucial sale of its CIT Group finance unit would be delayed.

Tyco shares dropped $4.50 to close at $10.10 on sales of nearly 200 million shares, making them the most active on the New York Stock Exchange. Tyco's market capitalization has dropped by nearly $100 billion this year.

Tyco also faced reports that the investigation into the misuse of company funds by former CEO L. Dennis Kozlowski had expanded beyond the indictment, released Tuesday by Manhattan District Attorney Robert Morgenthau, charging Kozlowski with evading sales taxes on $13.1 million of artwork.

Tyco's interim CEO, John Fort, sought to quell investor fears with a midday conference call to explain the downgrades by Moody's Investor Service and Standard & Poor's. But Fort's strongest message seemed to be when he told investors and analysts that Kozlowski was no longer associated with the Bermuda-based conglomerate.

"I would just really want to emphasize that Dennis is gone," said Fort. "Dennis is gone. Now, just look at this company. Just take a look at it. I think it's very difficult to forecast that we're not going to be successful going forward."

Still, that message was undercut by the two downgrades, which left Tyco's long-term debt rating just one grade above junk level.

In a report, S&P analyst Cynthia Werneth said management credibility and investor confidence continued to erode. Moreover, she said, Tyco is being scrutinized for yet another downgrade if it can't quickly sell CIT or spin it off in a public offering. "If Tyco does not sell CIT, it would have to seek alternative financing arrangements to meet financial obligations beginning early in calendar-year 2003," she wrote.

Moody's said it had doubts about Tyco's ability to repay debt. "Moody's believes that greater uncertainty exists regarding Tyco's ability to achieve planned debt reduction from internally-generated funds," the firm said. "In such a scenario, Moody's notes that the need for refinancing could come much sooner than planned." That could hurt the firm's new managers as they seek to rebuild credibility and prove they can grow Tyco without the continual acquisitions that Kozlowski depended on, Moody's said.

The downgrades triggered loan covenants requiring Tyco to repay about $530 million in debt. An additional $125 million in debt may become due as a result, said chief financial officer Mark Swartz. Swartz said Tyco could easily repay the additional money. "We are looking at $1.5 billion of debt repayment

[this quarter] and still have $2.9 billion on hand," he said, adding the company still planned to repay $10 billion of its $27 million in debt within a year.

But the recovery plan hinges on liquidating CIT, and that has been delayed.  Swartz said the Securities and Exchange Commission hasn't yet approved a sale of shares in CIT because of concerns about the amount of goodwill Tyco recorded when it purchased CIT for $9.5 billion last year. Goodwill is the amount paid for a firm above its value as an operating business. That premium often reflects a good brand name or other intangibles.  The SEC approval on the sale is not expected until next week, Bloomberg News reported.

"We believe this issue is manageable," said Fort.

Still, some analysts were skeptical.

"They were discounting the writing off of goodwill, and that's way too cavalier an approach to a bunch of risk," said Rob Plaza, an analyst with Morningstar Inc. "***There's a writeoff of goodwill coming, and it's not going to be pretty.***"

508.    Defendants' penchant for making slapdash and expensive acquisitions as part of their acquisition scheme left the Company facing a huge liquidity crisis, with $11.3 billion in debt coming due in 2003 that Tyco had limited ability to pay.  As a result of Defendants' fraud, Tyco was a devastated Company.  Tyco's operating income in 2002 was a negative $1.452 billion – a major turnaround from the Company's previously reported operating income in 2001 of $6.186 billion.

509.    The declines in the Company's securities prices following the revelations detailed herein and the resulting losses suffered by Plaintiffs are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by Defendants, and to the market's adjustment of the Company's securities prices to reflect the newly emerging truth about the Company's financial condition.

510.    Throughout the Relevant Period, Defendants also concealed the true financial condition of the Company and material risks to the Company's liquidity.  As a result, investors in Tyco securities were misled as to, among other things, the creditworthiness of the Company and

its future prospects and ability to fund its operations.   These material risks, including those relevant to evaluation of the Company's potential to suffer a liquidity crisis and possible bankruptcy, materialized and resulted in the Company's securities being devalued with resulting damages to Plaintiffs.

511.    Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiffs.

X.    INAPPLICABILITY OF THE PSLRA SAFE HARBOR

512.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.   First, the safe harbor provided by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") does not apply to false or misleading statements that are made in connection with the Company's offerings of securities and/or are contained in financial statements which purport to have been prepared in accordance with GAAP.   Second, the statements complained of were not forward-looking statements nor were they identified as forward-looking statements when made.   Rather, the false or misleading statements complained of in this Complaint concerned historical and/or current facts and conditions existing at the time the statements were made.

513.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because at the time each of those statements was made, the speaker(s) knew the statement was false or

misleading, or the statement was authorized and/or approved by an executive officer of Tyco or of a Defendant who knew that the statement was materially false or misleading when made.

## XI.   ADDITIONAL ALLEGATIONS CONCERNING DEFENDANTS' SCIENTER

514.   In addition to the facts previously set forth herein, Plaintiffs plead in this section further facts demonstrating that Defendants acted knowingly and/or in reckless disregard for the truth that their statements were false and misleading.

515.   In violation of the antifraud provisions of the federal securities laws, which obligated them to refrain from trading Tyco stock while privy to material inside information concerning Tyco, the Individual Defendants sold millions of shares of Tyco stock for hundreds of millions of dollars in proceeds at prices that were artificially inflated by Defendants' materially false representations and omissions and other fraudulent conduct.

516.   The Individual Defendants' insider sales during the Relevant Period are summarized below:

| Name | Date | Shares | Price | $ Value |
|------|------|--------|-------|---------|
| KOZLOWSKI | 01/05/00 | 744,000.00 | 35.35 | 26,300,400.00 |
| KOZLOWSKI | 09/07/00 | 934,417.00 | 58.28 | 54,457,822.76 |
| KOZLOWSKI | 09/07/00 | 934,417.00 | 58.28 | 54,457,822.76 |
| KOZLOWSKI | 09/07/00 | 451,191.00 | 58.28 | 26,295,411.48 |
| KOZLOWSKI | 09/07/00 | 451,191.00 | 58.28 | 26,295,411.48 |
| KOZLOWSKI | 09/07/00 | 30,626.00 | 58.28 | 1,784,883.28 |
| KOZLOWSKI | 09/07/00 | 30,626.00 | 58.28 | 1,784,883.28 |
| KOZLOWSKI | 09/11/00 | 1,007,401.00 | 56.83 | 57,250,598.83 |
| KOZLOWSKI | 09/11/00 | 1,007,401.00 | 56.83 | 57,250,598.83 |
| KOZLOWSKI | 09/11/00 | 240,501.00 | 56.83 | 13,667,671.83 |

| KOZLOWSKI | 09/11/00 | 240,501.00 | 56.83 | 13,667,671.83 |
| KOZLOWSKI | 09/11/00 | 7,700.00 | 56.83 | 437,591.00 |
| KOZLOWSKI | 09/11/00 | 7,700.00 | 56.83 | 437,591.00 |
| KOZLOWSKI | 09/12/00 | 219,107.00 | 55.25 | 12,105,661.75 |
| KOZLOWSKI | 09/12/00 | 219,107.00 | 55.25 | 12,105,661.75 |
| KOZLOWSKI | 09/12/00 | 52,308.00 | 55.25 | 2,890,017.00 |
| KOZLOWSKI | 09/12/00 | 52,308.00 | 55.25 | 2,890,017.00 |
| KOZLOWSKI | 09/12/00 | 1,674.00 | 55.25 | 92,488.50 |
| KOZLOWSKI | 09/12/00 | 1,674.00 | 55.25 | 92,488.50 |
| KOZLOWSKI | 09/14/00 | 86,233.00 | 58.3 | 5,027,383.90 |
| KOZLOWSKI | 09/14/00 | 86,233.00 | 58.3 | 5,027,383.90 |
| KOZLOWSKI | 10/24/00 | 600,000.00 | 54.31 | 32,587,500.00 |
| KOZLOWSKI | 10/31/00 | 148,000.00 | 56.69 | 8,389,750.00 |
| KOZLOWSKI | 01/30/01 | 350,000.00 | 62.8 | 21,980,000.00 |
| KOZLOWSKI | 06/20/01 | 107,935.00 | 52.96 | 5,716,237.60 |
| KOZLOWSKI | 07/03/01 | 155,000.00 | 54.98 | 8,521,900.00 |
| KOZLOWSKI | 08/01/01 | 117,696.00 | 53.15 | 6,255,542.40 |
| **TOTAL** | | **8,284,947.00** | | **$457,770,390.66** |
| | | | | |
| SWARTZ | 01/05/00 | 372,000.00 | 35.35 | 13,150,200.00 |
| SWARTZ | 09/07/00 | 368,197.00 | 58.28 | 21,458,521.16 |
| SWARTZ | 09/07/00 | 368,197.00 | 58.28 | 21,458,521.16 |
| SWARTZ | 09/11/00 | 944,398.00 | 56.83 | 53,670,138.34 |
| SWARTZ | 09/11/00 | 944,398.00 | 56.83 | 53,670,138.34 |

| | | | | |
|---|---|---|---|---|
| SWARTZ | 09/12/00 | 205,404.00 | 55.25 | 11,348,571.00 |
| SWARTZ | 09/12/00 | 205,404.00 | 55.25 | 11,348,571.00 |
| SWARTZ | 10/24/00 | 300,000.00 | 54.31 | 16,293,750.00 |
| SWARTZ | 10/31/00 | 74,000.00 | 56.69 | 4,194,875.00 |
| SWARTZ | 01/30/01 | 175,000.00 | 62.8 | 10,990,000.00 |
| SWARTZ | 02/01/01 | 107,958.00 | 60.96 | 6,581,119.68 |
| SWARTZ | 06/20/01 | 53,967.00 | 53.03 | 2,861,870.01 |
| SWARTZ | 07/03/01 | 77,500.00 | 54.98 | 4,260,950.00 |
| **TOTAL** | | **4,196,423.00** | | **$231,287,225.69** |
| | | | | |
| WALSH | 11/30/00 | 15,147.00 | 52.89 | 801,124.83 |
| WALSH | 11/30/00 | 15,147.00 | 52.96 | 802,185.12 |
| WALSH | 12/18/01 | 9,032.00 | 56.09 | 506,604.88 |
| WALSH | 12/18/01 | 6,691.00 | 56.09 | 375,298.19 |
| WALSH | 12/18/01 | 4,073.00 | 56.09 | 228,454.57 |
| **TOTAL** | | **50,090.00** | | **$2,713,667.59** |
| | | | | |
| **Total Insider Selling By Individual Defendants** | | **15,081,509** | | **$691,771,283.94** |

517.   The Individual Defendants' trading in Tyco shares is suspicious and unusual because, among other reasons, they each sold massive amounts of Tyco stock while at the same time falsifying the Company's financial results and telling investors the Company was undervalued by the market.

518. Moreover, Kozlowski and Swartz's trading is suspicious because these Defendants took elaborate steps to conceal their insider trades and lied about the fact they were selling Tyco shares.

519. On January 30, 2002, *The New York Times* reported:

Two senior executives of Tyco International Ltd. quietly disposed of more than $100 million in Tyco stock during the company's last fiscal year, despite public comments that they rarely if ever sold Tyco shares.

L. Dennis Kozlowski, Tyco's chairman, and Mark Swartz, its chief financial officer, returned the stock to the company in late 2000 and 2001, according to forms filed with the Securities and Exchange Commission in November.

Like Kenneth L. Lay, the former chairman of the Enron Corporation, Mr. Kozlowski and Mr. Swartz used an uncommon tactic to reduce their Tyco positions, returning their shares directly to the company instead of selling them on the open market. As a result, they did not have to disclose the sales within 10 days after the month of the sale, as they would have had to do with ordinary sales of stock.

Mr. Kozlowski returned stock then worth about $70 million to the company, while Mr. Swartz returned stock worth $35 million. The men returned their shares during periods when Tyco's stock was trading at levels much higher than it was today.

\*     \*     \*

Mr. Kozlowski has repeatedly told analysts and the media that his large holdings in Tyco stock demonstrate his commitment to the company.

"I'm paid in Tyco stock," Mr. Kozlowski said in an interview last month. "We, the board, everybody, feel the best way to keep management's interest aligned with shareholders is to keep 100 percent of our net worth in Tyco's stock."

520. Defendants Kozlowski and Swartz were also motivated to engage in their fraudulent conduct to obtain large bonuses, which would not have been possible if Tyco did not falsely report ever growing earnings and cash flow. The compensation paid to Kozlowski and Swartz was directly tied to the Company's reported earnings growth and free cash flow.

521. The Company's 2002 Proxy Statement stated:

[I]n order for Mr. Kozlowski and Mr. Swartz to have earned a cash bonus in fiscal 2001, the Company had to achieve a minimum of 15% growth in net income and at least a 10% growth in operating cash flow over fiscal 2000. The performance criterion required to vest the minimum number of restricted shares granted to these executives was a growth rate in earnings per share before non-recurring items of at least 15% over fiscal 2000.

522.    Kozlowski and Swartz's incentive compensation was substantial.  In fiscal 2001 alone, Kozlowski and Swartz received shares of Tyco restricted stock worth $51,606,420 and $25,803,210, respectively, and were also paid cash bonuses of $6.8 million and $3.4 million, respectively, pursuant to the terms of the Company's incentive plan.

523.    Tyco knew its financial statements were false and misleading because, among other things, the Company was told so by outside legal counsel, William McLucas, hired to represent Tyco in connection with an SEC probe in 2000.  On December 27, 2002, *The Wall Street Journal* reported:

In May 2000, two months before the SEC closed its accounting inquiry, Mr. McLucas told Mr. Belnick in an e-mail:  "We have found issues that will likely interest the SEC."  Mr. McLucas described differences between the preliminary, or "flash" numbers reported monthly by Tyco's operating units, and the final reported numbers.

In his e-mail, Mr. McLucas said Tyco executives manipulated the figures by dipping into reserves to meet earning targets.  Mr. McLucas described "creativeness <...> employed in hitting the forecasts" at one divisional level, "reliance on reserves" at the next level, and then further "immaterial adjustments of the reserves to hit the forecasts" at Tyco's corporate headquarters.  The discrepancy between the preliminary reports and the final numbers, he wrote, "suggest something funny which is likely apparent if any decent accountant looks at this."

*            *            *

One document that apparently wasn't produced to the SEC in 2000 was an e-mail by Mr. McLucas to Mr. Belnick in which he referred to a "bad letter" from the chief financial officer of Sigma Circuits Inc., a company Tyco bought in 1998 for $57.8 million.  Mr. McLucas said the Sigma executive wrote the June 19 letter "confirming they were asked to hold product shipment just before the closing."

Such a move, accounting specialists say, would suppress sales and earnings for the old Sigma, but would allow Tyco to recognize more revenue and profit after the deal closed. Philip S. Bushnell, the former Sigma chief financial officer identified in another e-mail as the letter's author, says "it is consistent with what I might have done at the time" in response to a Tyco request.

524.    On June 14, 2004, the *Daily Deal* reported on the e-mails sent to Belnick from Tyco's outside counsel William McLucas:

McLucas' e-mails revealed that he was aware that Tyco executives were courting disaster, ***particularly by using cash reserves supposedly dedicated to covering costs stemming from Tyco's M&A activities to meet quarterly earnings targets***. A McLucas e-mail noted that "this kind of thing, along with the attitude that it's OK, can really get these guys in serious trouble." McLucas noted that with "some luck" the SEC would never learn of the full scope of the company's accounting practices.

525.    And, *The New York Times* reported on another e-mail exchange between McLucas and Belnick, which e-mail communications occurred in May 2000:

"The cost of this kind of fooling around can destroy a corporate franchise, and it's all so these guys can squeeze a couple of more pennies" out of earnings, Mr. McLucas said in his e-mail message. "If we escape this process without a crippling broadside, the toughest challenge here seems to me to involve how one changes the culture."

XII.    APPROPRIATENESS OF GROUP PLEADING
         AS TO THE INDIVIDUAL DEFENDANTS

526.    The Individual Defendants participated in the drafting, preparation and/or approval of the various public and shareholder and investor reports and other communications concerning Tyco that are complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and the omissions therefrom, and were aware of their materially false and misleading nature. Because of their positions with Tyco, each of the Individual Defendants had access to adverse undisclosed information about Tyco's business prospects and financial condition and performance as particularized herein, and knew (or recklessly

disregarded) that these adverse facts rendered the statements complained of herein materially false and misleading.

527.    The Individual Defendants, because of their positions of control and authority as officers and controlling persons of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period.   Each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.   Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports, releases and statements detailed herein and is therefore primarily liable for the representations contained therein.

XIII.   THE INDIVIDUAL DEFENDANTS' CONTROL OVER TYCO

528.    In addition to the allegations set forth herein, the following allegations demonstrate the control that certain Defendants exercised over Tyco.

529.    By virtue of their roles as members of the Board and/or as the Company's highest-ranking executives, Defendants Kozlowski, Swartz and Walsh were "control persons" of Tyco as that term is utilized in § 20(a) of the Exchange Act and § 15 of the Securities Act.

530.    Defendant Kozlowski was able to exercise control over Tyco's operations because he was the Company's highest-ranking executive.   As a result, Kozlowski served as the Company's primary voice in all press releases and interviews and actively participated in the day-to-day management of Tyco's affairs.   He was also principally responsible for making decisions regarding the compensation received by the Officer Defendants.

531.    Defendant Swartz was able to exercise control over Tyco's operations because he was the Company's highest-ranking financial officer during the time Plaintiffs' purchases of

Tyco securities were made.  As a result, he was intimately involved in all aspects of the day-to-day management of Tyco's operations and the misrepresentations and omissions concerning the Company's operations, financial results and compensation plans that are the subject of Plaintiffs' claims.  Swartz also prepared the Company's false and misleading financial statements, participated in the drafting of the Company's financial disclosures, supervised and drafted material portions of the Company's SEC filings and signed certain of the SEC filings described herein.

532.    As Tyco's "lead director," Walsh served as the primary liaison between Tyco's management and the Company's independent directors.  Walsh also served as a member of the Board's Corporate Governance, Nominating and Compensation Committees.  Through these various positions, Walsh was actively involved in the management of Tyco and had the ability to exercise control over Tyco's operations.

XIV.  THE INDIVIDUAL DEFENDANTS' USE OF ANALYSTS AS A CONDUIT TO DISSEMINATE FALSE AND MISLEADING INFORMATION ABOUT TYCO

533.    The Individual Defendants provided guidance to securities analysts and used misleading information to the securities markets.  Tyco was followed by securities analysts employed by brokerage firms that throughout the Relevant Period reported information provided to them by the Individual Defendants and made recommendations concerning the Company's securities based on the information provided by the Individual Defendants.

534.    Prior to and during the Relevant Period, it was the Company's frequent practice to have its top officers and key members of its management team, including the Individual Defendants, communicate regularly with securities analysts at the firms identified above (among others) on a regular basis to discuss, among other things, the Company's financial results, and to provide detailed guidance to these analysts with respect to the Company's business.  These

communications included, but were not limited to, conference calls, meetings, analyst briefings and investor conferences where the Individual Defendants discussed relevant aspects of the Company's operations and financial prospects on, among others, the following dates: January 18, 2000, April 18, 2000, June 28, 2000, July 19, 2000, October 24, 2000, November 14, 2000, January 17, 2001, March 13, 2001, April 18, 2001, May 30, 2001, July 18, 2001, August 3, 2001, September 11, 2001, October 18, 2001, November 15, 2001, January 15, 2002, January 22, 2002, February 6, 2002, February 13, 2002, February 26, 2002, March 5, 2002, March 12, 2002, March 19, 2002, April 2, 2002, April 25, 2002, April 30, 2002, May 16, 2002, and June 7, 2002. The Individual Defendants knew that by participating in these regular and direct communications with analysts, the Company disseminated information to the investing community, and that investors relied and acted on such information by purchasing and selling the Company's securities.

535. Many of the analyst reports issued during the Relevant Period were remarkably similar or reported substantially the same facts after meetings with the Company. This confirms that the information contained in analyst reports came from Tyco and the Individual Defendants.

536. The Individual Defendants engaged in the above-referenced communications with analysts to cause or encourage them to issue favorable reports concerning Tyco, and used these communications to present the operations and prospects of Tyco to the marketplace in a falsely favorable light to artificially inflate the market price of Tyco securities. Tyco also endorsed the reports of analysts, adopted them as its own, and placed its *imprimatur* on them as well as on the projections, forecasts, and statements contained therein, as set forth in more detail below. Despite their duty to do so, the Individual Defendants failed to correct these statements during the Relevant Period.

537.    The investment community, and in turn investors, relied and acted on the information communicated in these written reports that recommended that investors purchase Tyco securities.  The Individual Defendants manipulated and inflated the market price of Tyco securities by falsely presenting to analysts, through regular meetings, and during both telephonic and written communications, the prospects of the Company, as well as by failing to disclose the true adverse information about the Company that was known only to them.

XV.    PLAINTIFFS' NEW JERSEY RICO ALLEGATIONS

538.    Plaintiffs bring claims against all Defendants (Kozlwlowski, Swartz, Walsh and Tyco) pursuant to the New Jersey RICO Statute, N.J.S.A. 2C:41-1, *et seq*.  Through the misconduct described in detail above, Defendants engaged in a pattern of racketeering activity, as that term is defined in N.J.S.A. 2C:41-1.  Plaintiffs were damaged as a result of Defendants' schemes, and Defendants are liable therefore, under the New Jersey RICO Act, as is set forth in detail below.

A.    Defendants' Pattern Of Racketeering Conduct

539.    The predicate acts constituting Defendants' pattern of racketeering activity shared common purposes, results, participants, victims and methods.  In addition, as set forth above, they were carried out during an extended period of time and were interrelated by distinguishing characteristics and were not disconnected or isolated acts.  They were oriented toward common goals, objectives and schemes, including (i) the artificial and fraudulent inflation of Tyco's reported earnings; (ii) the artificial and fraudulent inflation of Tyco's stock price; (iii) Tyco's acquisition of other companies, in part, through the exchange of its artificially and fraudulently priced stock for the ownership of said companies; (iv) enabling Tyco to compensate its employees with the artificially and fraudulently inflated stock; and (v) the enrichment of Kozlowski, Swartz, and Walsh through unauthorized compensation and financial benefits.

-228-

540.    Each Defendant committed at least two predicate acts of racketeering conduct during the Relevant Period, which lasted from at least 1997 to at least 2002.

    1.    Theft And Violations Of Chapter 20
          Of Title 2C Of The New Jersey Statutes

541.    The Individual Defendants engaged in theft and theft by deception, in violation of N.J.S.A. 2C:20-3 and -4, by wrongfully and intentionally obtaining millions of dollars of income and property from Tyco to which they knew they were not lawfully entitled.  As is set forth at length above, in violation of N.J.S.A. 2C:20-4, Defendants conceal their wrongful activities through, among other things, their misleading accounting practices, and created and reinforced numerous false impressions regarding illicit income and financial benefits that they received. The Individual Defendants also prevented others from acquiring information that would affect their judgment of the particular transactions involved, failed to correct false impressions that they had created or reinforced with regard to those transactions and failed to correct false impressions held by Tyco's shareholders, even though they knew that such impressions influenced Tyco's shareholders, and even though, as employees, officers and/or directors of Tyco, they stood in a fiduciary relationship to the company and its shareholders, including Plaintiffs.  Such actions constitute racketeering activity under N.J.S.A. 2C:41-la.(l)(n).

542.    The Individual Defendants engaged in theft and theft by deception by, among other means, engaging in schemes (i) to abuse the Company's "relocation loans" program and KEL Programs, (ii) to pay themselves secret, unapproved bonuses, (iii) the payment of the secret Walsh finder's fee, (iv) selling stock to the Company at artificially inflated prices, and (v) other fraudulent schemes detailed herein in § V and § VI, including § V.E. detailing Defendants' looting of the Company.

543.    The Individual Defendants substantially assisted, cooperated and participated with one another in the perpetration of these thefts by orchestrating them and by aiding and abetting in their concealment through improper and misleading accounting practices and misrepresentations and omissions contained in Tyco's disclosures to shareholders and SEC filings.

2.      Fraudulent Practices And Violations Of
        Chapter 21 Of Title 2C Of The New Jersey Statutes

544.    As is set forth more fully above, the Individual Defendants also engaged in various fraudulent practices for both self-enrichment and to artificially inflate the market price of Tyco stock and assisted one another in the perpetration of their fraud.  Such actions are alleged more fully above, and in the RICO causes of action alleged herein, and include the fraudulent concealment of "relocation" loans, the unauthorized Walsh bonus, the TyCom Bonus (which was improperly concealed by being accounted for, in part, as an offering expense and booked against two reserve accounts), the ADT acquisition bonuses (also improperly offset against the unrelated gain accrued by Tyco on the disposition of the ADT Automotive business), the improper undervaluation of Flag Telecom stock in order to accelerate vesting of shares of restricted Tyco stock owned by Kozlowski and Swartz, the concealment of Kozlowski's abuse of the KEL Program loans in Tyco's SEC filings, the concealment of Belnick's side agreement guaranteeing an annual cash bonus at least equal to one-third of Kozlowski's, the concealment of Belnick's year 2000 compensation in Tyco's 2001 Proxy Statement and other SEC filings, the concealment of the true terms of Belnick's Retention Agreement, the concealment of income received by Kozlowski and Swartz through improper transactions with Tyco and Tyco's payment of various personal expenses incurred by them.  Such actions constitute "fraudulent practices" under N.J.S.A. 2C:41-la.(l)(o).

545.    In addition, as is set forth more fully in the RICO causes of action alleged herein, such actions were intended to constitute false statements of material fact or omissions of material fact, to be relied upon by Tyco's shareholders, including Plaintiffs, were reasonably relied upon by Tyco's shareholders, including Plaintiffs insofar as, had they known the truth, they would have sold or not purchased their Tyco stock in light of, at the very least, the rampant and manifest corruption of the Individual Defendants and the Company's inadequate oversight of those Defendants.  Such acts of fraudulent concealment constitute racketeering activity under N.J.S.A. 2C:41-la.(l)(o).

546.    As set forth more fully above, Tyco also engaged in fraudulent disclosures and accounting practices in order to artificially inflate its earnings and the market price of its stock. Such actions constitute "fraudulent practices" and racketeering activity under N.J.S.A. 2C:41-la.(l)(o).

547.    In addition, as is set forth more fully above and in the RICO causes of action, such actions constituted racketeering activity under N.J.S.A. 2C:41-la.(l)(o).  Both the Individual Defendants and Tyco made numerous false and misleading written statements, in the form of press releases, Proxy Statements, Annual Reports and security filings, for the purpose of promoting the sale of securities and omitted information required by law to be disclosed in written documents relating to said securities, in violation of N.J.S.A. 2C:21-7(i).  Such actions constitute racketeering activity under N.J.S.A. 2C:41-la.(l)(o).

3.    Use Of Tyco To Further And Promote Criminal Objects

548.    The Individual Defendants purposely and knowingly used, controlled and operated Tyco for the furtherance and promotion of numerous criminal objects, in violation of N.J.S.A. 2C:21-9(c).  Such actions included the thefts and fraudulent practices set forth in more detail above.  Such actions constitute racketeering activity under N.J.S.A. 2C:41-la.(l)(o).

### 4.   Securities Violations

549.   As set forth at length herein, Defendants committed fraud in the offering, sale and purchase of securities.   Such actions constitute racketeering activity under N.J.S.A. 2C:41-la.(l)(p).   In particular, as is alleged in detail herein, Defendants violated § 10(b) of the Exchange Act; the Individual Defendants violated § 20(a) of the Exchange Act and § 15 of the Securities Act; Defendants violated § 12(a)(2) of the Securities Act; and Defendants violated § 18 of the Exchange Act.

550.   In addition, Defendants offered, purchased or sold securities in violation of N.J.S.A. 49:3-71, as is alleged more fully above and in the RICO Counts alleged herein, by offering and selling those shares (i) by employing devices, schemes and artifices to defraud, and (ii) by engaging in acts, practices and courses of business that operated as a fraud and deceit, and, with respect to the Individual Defendants, by virtue of their status as control persons and as officers or directors of Tyco.   Such actions constitute racketeering activity under N.J.S.A. 2C:41-la.(l)(p).

### 5.   Mail And Wire Fraud

551.   Defendants committed mail fraud and wire fraud in violation of 18 U.S.C. § 1341 and § 1343, respectively.   Among other things, Defendants committed wire fraud by causing numerous documents to be filed with the SEC, knowing that they contained materially false and misleading statements using the SEC's EDGAR system.   Defendants also committed mail fraud by causing the numerous materially false and misleading disclosures contained in Press Releases, Proxy Statements and Annual Reports, as set forth above, to be mailed to Tyco's shareholders. In addition, Tyco's policy was to mail SEC filings to any shareholder or potential investor who requested them.   As set forth above, those filings contained materially false and misleading statements.   Such actions constitute racketeering activity under N.J.S.A. 2C:41-la.(2).

552.     These acts of wire fraud and mail fraud were made with the knowledge, approval or acquiescence of each Defendant.

553.     In addition, in connection with the insider sales of the Tyco stock owned by the Individual Defendants set forth above, those Defendants made telephonic or wire instructions to initiate the sales on or about the dates of such sales.  At the time of giving those instructions, those Defendants failed to disclose adverse material information about Tyco that was in their possession.  With respect to each of these transactions, the Individual Defendants caused the proceeds of the sales to be transferred to them by wire or other electronic means.  Though they knew that these proceeds were generated through fraudulent means, the Individual Defendants failed to disclose said adverse material information.

554.     The Individual Defendants engaged in such conduct in order to enrich themselves at the expense of Tyco investors, including Plaintiffs.  Each of the instructions to sell shares in Tyco and transfers of the proceeds of those sales to the Individual Defendants constitutes a separate act of wire fraud and of fraud in the offering, sale or purchase of securities.   Such actions constitute racketeering activity under N.J.S.A. 2C:41-la.(2) and under N.J.S.A. 2C:41-la.(l)(p).

      B.     <u>Defendants' Violations Of The New Jersey RICO Act</u>

555.     Defendants violated the New Jersey RICO Act in a number of ways, which are set forth more fully below.

556.     By way of summary, Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of two distinct enterprises as defined herein, which were engaged in or whose activities affected commerce or trade in New Jersey, through a pattern of racketeering activity, as set forth in the previous sections.  In connection therewith, among other things, (i) the Individual Defendants' embezzlement was effectuated and concealed, (ii) Tyco's reported

earnings were fraudulently increased, and (iii) the market price of Tyco's stock was artificially and fraudulently inflated.  Such activities violated N.J.S.A. 2C:41-2(c).

557.    In addition, using income derived from racketeering activity and/or through a pattern of racketeering activity, Tyco and/or an association in fact of Tyco and the Individual Defendants acquired and/or acquired control over numerous other business entities, including but not limited to ADT Automotive, Flag Telecom, Carlisle Plastics, U.S. Surgical Corp., Keystone International, Inc., Raychem Corp., Mallinckrodt and CIT (collectively "the Acquired Companies Enterprises"), each of which constituted enterprises under N.J.S.A. 2C:41-lc, and which engaged in commerce or trade in New Jersey.  Such actions violated N.J.S.A. 2C:41-2(a) and (b).

558.    Tyco's acquisitions of said entities contributed to and perpetuated the artificial and fraudulent inflation of the price of Tyco's stock via the acquisitions scheme set forth in § V.A.  The acquisitions were part of Tyco's false method of increasing earnings, as is described more fully above, through accounting machinations to artificially inflate Tyco's earnings in the post-acquisition periods.

559.    Not only was the fraudulent increase in the market price of its stock a benefit *per se* to Tyco, but Tyco also benefited from the fraudulent increase in the market price of its stock because the stock was used by the Company to fund various activities that served Tyco's interests, including, among other things, (i) using the stock to acquire other companies, and (ii) compensating officers and employees with stock and stock options the value of which were artificially and fraudulently inflated.

560.    The Individual Defendants benefited from these activities because (i) their embezzlement was concealed, (ii) their ability to continue pillaging Tyco was preserved,

(iii) they were enriched by the fraudulent and artificial inflation in the price of Tyco stock due to their ownership of shares of Tyco stock, and (iv) the fraudulent inflation of Tyco's ostensible earnings entitled the Individual Defendants to enhanced compensation based on Tyco's compensation incentives program.

C.     Plaintiffs' Injuries Arising From Defendants'
       Violations Of The New Jersey RICO Act

561.    Plaintiffs were injured by Defendants' violations of the New Jersey RICO Act because such violations resulted in, preserved and perpetuated the artificial and fraudulent inflation of the market price of Tyco stock that Plaintiffs purchased, acquired or held during the Relevant Period.

562.    Plaintiffs were injured by Tyco's investments in various other enterprises because they contributed to and perpetuated the artificial inflation of the price of Tyco stock owned or purchased by Plaintiffs and contributed to the false impression that Tyco's strategy of pursuing earnings growth through acquisitions was more successful than it actually was.  Defendants' violations of the New Jersey RICO Act directly caused injury to Plaintiffs because, among other things, they caused Plaintiffs to tender shares of stock owned by Plaintiffs in Mallinckrodt, CIT Group, Scott Technologies, Sensormatic, and TyCom in exchange for shares of falsely inflated Tyco stock in connection with Tyco's acquisitions of these entities.   Plaintiffs suffered significant losses as a result of these violations.

563.    Plaintiffs would not have purchased their shares of Tyco stock at the prices at which they were purchased, would have sold their Tyco stock without suffering the massive losses that they eventually suffered or would otherwise have avoided those losses if Defendants had not engaged in the conduct alleged herein.

XVI.   PLAINTIFFS' CAUSES OF ACTION

## COUNT I

(Against All Defendants For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5)

564.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

565.   This Count is brought by Plaintiffs against all Defendants (Kozlwlowski, Swartz, Walsh and Tyco) for violations of Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

566.   Defendants named in this Count, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices, and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and, during the Relevant Period, did: (i) deceive Plaintiffs regarding, among other things, Tyco's earnings, assets, revenue expenses, executive compensation and the accuracy of the Company's financial reporting of performance; (ii) artificially inflate and maintain the market price of Tyco securities; and (iii) cause Plaintiffs to purchase Tyco securities at artificially inflated prices.

567.   Defendants had actual knowledge that the statements specifically alleged above were materially false and misleading and that additional disclosures were necessary to correct the misleading effect of their statements.  In the alternative, Defendants acted with reckless disregard

for the truth in that they failed or refused to ascertain that their statements were materially false and misleading and/or lacking in reasonable basis at all relevant times.

568.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Tyco common stock was artificially inflated throughout the Relevant Period in which Plaintiffs purchased those securities.  In ignorance of the materially false and misleading nature of the representations and statements described above, Plaintiffs relied to their detriment on the statements described above and/or on the integrity and efficiency of the market for Tyco common stock.

569.    At the time of said misrepresentations and omission, Plaintiffs were ignorant of their falsity, and believed them to be true and complete.  Plaintiffs could not, in the exercise of reasonable diligence, have known the actual facts.  Plaintiffs would not have purchased Tyco securities at the market prices that prevailed during the Relevant Period, if Plaintiffs had known the true facts concerning the Company's financial results, the compensation paid to the Company's executive officers and directors, the Company's related-party transactions and Defendants' other unlawful conduct.

570.    The market price of Tyco's common stock declined materially upon the various partial public disclosures of the true facts about the fraudulent and improper practices which had inflated their prices and which material facts had been misrepresented and/or concealed as alleged herein.  Plaintiffs have therefore suffered substantial damages as a direct and proximate result of Defendants' misconduct as alleged herein.

571.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

572.    Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

## COUNT II

(Against All Defendants For Violations Of Section 18 Of The Exchange Act)

573.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  In particular, Plaintiffs repeat and reallege herein the allegations set forth in §§ III, IV, VI.B., VI.D., VII.A.1., VII.A.2., VII.B.3., VII.B.5., VII.B.6., VII.B.10-13., VII.B.21., VII.B.28., VII.C.3-5., VII.C.14., VII.C.23., VII.C.33., VII.D.1., VII.D.5., VII.D.9., and VII.D.20.  For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

574.     This claim is asserted against all Defendants (Kozlwlowski, Swartz, Walsh and Tyco) for violation of Section 18 of the Exchange Act.

575.     As set forth above, Defendants made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Tyco, including the Company's filings on Form 10-K and 10-Q during the Relevant Period.

576.     In connection with the purchase of the Company's shares, Plaintiffs and/or their agents specifically read and relied upon the Company's SEC filings, including the Company's filings on Form 10-K and 10-Q during the Relevant Period.

577.     Specifically, each plaintiff read and relied on the Company's financial statements in those filings and other statements regarding Tyco's business operation and financial results, including its earnings and cash flow.  Plaintiffs further relied on the Company's statements in those filings as being materially complete and as not omitting material information, including

information about the Company's financial condition.  Plaintiffs and/or their agents relied on these SEC filings not knowing that they were false and misleading.

578.    The reliance by Plaintiffs and/or their agents was reasonable.

579.    When the truth began to emerge about the false and misleading statements and omissions in the Company's documents and reports filed with the SEC, Plaintiffs were significantly damaged by the resulting drop in the value of the Company's stock.

580.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damage in connection with its purchases of the Company's stock.

581.    By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act.

## COUNT III

(Against The Individual Defendants For Violations Of Section 20(a) Of The Exchange Act)

582.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

583.    Plaintiffs assert this Count for violations of Section 20(a) of the Exchange Act against the Individual Defendants (Kozlwlowski, Swartz and Walsh).

584.    Through their positions of control and authority as officers and directors of the Company, the Individual Defendants were able to and did control, directly and indirectly, the content of the public statements disseminated by the Company.  With knowledge of the falsity of the statements contained therein or in severely reckless disregard of the truth about the Company's financial condition and prospects, the Individual Defendants caused the false and misleading statements and omissions of material facts as alleged herein.

585.    The Individual Defendants had direct involvement in the day-to-day operations of the Company, were senior officers of the Company, corporate officers with direct involvement in

Tyco's financial reporting and accounting functions, and/or were members of the Board of Directors, and therefore had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same.

586.    By reason of their management positions and/or control of the Board of Directors, the Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein.  Because of their executive, officer and director positions within Tyco and control of the Board of Directors of Tyco, the Individual Defendants had access to adverse non-public financial information about the Company and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

587.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

588.    Plaintiffs have been damaged by the violations of the Individual Defendants as described in this Count and seek recovery of damages caused thereby.

## COUNT IV

(Against All Defendants For Violations Of Section 11 Of The Securities Act)

589.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  Plaintiffs repeat and reallege the remaining allegations set forth above as if fully set forth herein

590.    This claim is asserted against all Defendants (Kozlwlowski, Swartz, Walsh and Tyco) for violation of Section 11 of the Exchange Act.

591.   Plaintiffs TRS and Atticus Capital purchased Tyco securities pursuant to the following false and misleading registration statements and prospectuses (the "Registration Statements/Prospectuses"), which were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above:

Form S-4 relating to a proposed merger between Mallinckrodt Inc. and a subsidiary of Tyco, dated July 12, 2000;

Form S-4/A, dated August 9, 2000;

Prospectus relating to the proposed merger between Mallinckrodt Inc. and a subsidiary of Tyco, dated August 11, 2000;

Form S-3 for the registration of $3,500,000,000 in debt securities of Tyco International Group S.A, dated August 18, 2000;

Prospectus relating to the registration of $3,500,000,000 in debt securities of Tyco International Group S.A., dated September 15, 2000;

Prospectus Supplement to the 9/15/00 Prospectus, dated February 20, 2001;

Form S-4 relating to Tyco's proposed offer to issue 9,415,481 shares of Tyco stock upon consummation of the merger with Scott Technologies, Inc., dated February 23, 2001;

Form S-4/A and a Prospectus relating to the proposed merger between Scott Technologies, Inc. and Tyco, dated March 30, 2001;

Form S-4 relating to a proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), a direct wholly-owned subsidiary of Tyco, dated March 29, 2001;

Amendment No. 1 to Form S-4, dated April 13, 2001;

Prospectus relating to the proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), dated April 24, 2001;

Post-Effective Amendment No. 1 to Form S-4 relating to the proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), dated May 24, 2001;

Prospectus relating to Tyco's proposed offer to exchange up to 7,141,083 common shares of Tyco stock for exchangeable shares of Tyco's direct subsidiary, CIT Exchangeco, Inc., dated June 5, 2001;

Form S-8 in connection with the issuance of securities to The CIT Group, Inc. Savings Incentive Plan, relating to the proposed merger between The CIT Group, Inc. and Tyco, dated June 7, 2001;

Form S-4 relating to a proposed merger between Sensormatic Electronics Corporation and a subsidiary of Tyco, dated August 24, 2001;

Form S-4/A, amending the 8/24/01 S-4, dated September 13, 2001

Prospectus with the SEC relating to the offer of Tyco Acquisition Corp. XXIV (NV), a wholly-owned subsidiary of Tyco, to exchange common shares of Tyco for each outstanding share of common stock of Sensormatic Electronics Corporation, dated September 25, 2001;

Form S-3 for the registration of $6,000,000,000 in yet to be determined senior and subordinated debt securities, dated August 28, 2001;

Prospectus in connection with the registration of $6,000,000,000 in yet to be determined senior and subordinated debt securities, dated August 31, 2001;

Prospectus Supplement to the 8/31/01 Prospectus, dated October 25, 2001;

Form S-4 relating to a proposed amalgamation agreement between TyCom and a subsidiary of Tyco wherein TyCom would become a wholly-owned subsidiary of Tyco, dated October 23, 2001;

Form S-4/A, amending the 10/23/01 S-4, dated November 9, 2001; and

Prospectus relating to the amalgamation agreement between TyCom and a subsidiary of Tyco, dated November 13, 2001.

592.    The Company is the registrant for these offerings.  Defendants named herein signed and/or were otherwise responsible for the contents and dissemination of the Registration Statements/Prospectuses.

593.    As issuer of the shares, Tyco is strictly liable to Plaintiffs for the misstatements and omissions.

594.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration

Statements/Prospectuses were true and without omissions of any material facts and were not misleading.

595.    Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the Plaintiffs that were contained in the Registration Statements/Prospectuses, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

596.    Plaintiffs acquired Tyco securities issued pursuant to, or traceable to, and in reliance on, the Registration Statements/Prospectuses.

597.    Plaintiffs sustained damages. The value of Tyco shares has declined substantially subsequent to and due to Defendants' violations.

598.    At the time Plaintiffs acquired the Tyco securities, Plaintiffs were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered such facts or wrongful conduct.

599.    Any applicable statute of limitations has been tolled since the filing of the first complaint in the consolidated federal securities class action against Defendants styled *In re Tyco International Ltd., Securities Litigation,* MDL Docket No. 02-1335-PB, Civil Action No. 02-266-PB (D.N.H.), until the Plaintiffs opted out of that litigation.

## COUNT V

(Against All Defendants For Violations Of Section 12(a)(2) Of The Securities Act)

600.    Plaintiffs TRS and Atticus Capital bring claims against all Defendants (Kozlwlowski, Swartz, Walsh and Tyco) pursuant to Section 12(a)(2) of the Securities Act.

601.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

602.    Defendants were sellers, offerors, and/or solicitors of sales of the shares offered pursuant to the Registration Statements/Prospectuses.

603.    The Registration Statements/Prospectuses contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  Defendants' actions of solicitation included participating in the preparation of the materially false and misleading Registration Statements/Prospectuses.

604.    Defendants owed to Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements/Prospectuses to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Registration Statements/Prospectuses as set forth above.

605.    Plaintiffs purchased or otherwise acquired Tyco shares pursuant to or traceable to the defective Registration Statements/Prospectuses.  Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statements/Prospectuses.

606.    Plaintiffs offer to tender to Defendants those Tyco securities that Plaintiffs continue to own in return for the consideration paid for those securities together with interest thereon.

607.    By reason of the conduct alleged herein, Defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs who hold Tyco shares purchased or acquired pursuant or traceable to Registration Statements/Prospectuses

have the right to rescind and recover the consideration paid for their Tyco shares and, hereby elect to rescind and tender its Tyco shares to Defendants sued herein.  To the extent Plaintiffs have sold their Tyco shares, they are entitled to rescissory damages.

608.    Any applicable statute of limitations has been tolled since the filing of the first complaint in the consolidated federal securities class action against Defendants styled *In re Tyco International Ltd., Securities Litigation,* MDL Docket No. 02-1335-PB, Civil Action No. 02-266-PB (D.N.H.), until the Plaintiffs opted out of that litigation.

## COUNT VI

(Against The Individual Defendants For Violations Of Section 15 Of The Securities Act)

609.    This Count is brought by Plaintiffs TRS and Atticus Capital pursuant to Section 15 of the Securities Act against the Individual Defendants (Kozlwlowski, Swartz and Walsh).

610.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

611.    Each of the Individual Defendants was a control person of Tyco by virtue of their positions as directors and/or as senior officers of Tyco.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of Tyco.

612.    Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the 1933 Act alleged in Counts IV and V above, based on their having signed or participated in the preparation and/or dissemination of the Registration Statements/Prospectuses or having otherwise participated in the process that allowed the offerings to be successfully completed.

## COUNT VII

(Against Tyco For Violations Of N.J.S.A. 2C:41-2(a))

613.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

614.    Tyco is a liable person under N.J.S.A. 2C:41-2(a) because Tyco received income derived from a pattern of racketeering activity and used and invested that income in the acquisition of numerous enterprises engaged in or whose activities affected commerce or trade.

615.    As is set forth above, Tyco purchased the Acquired Companies Enterprises, each of which constitutes an enterprise under N.J.S.A. 2C:41-lc, using, in part, Tyco stock whose market price was artificially and fraudulently inflated as a result of a pattern of racketeering activity, including the fraudulent accounting practices, misrepresentations, material omissions and securities violations effectuated by Defendants, including Tyco itself.   The enterprises acquired by Tyco engaged in and/or their activities affected interstate commerce.

616.    Tyco's acquisitions of said entities contributed to and perpetuated the artificial inflation of the price of Tyco's stock because said acquisitions were part of Tyco's purported but false method of increasing earnings as set forth in § V.A.

617.    Not only was the fraudulent increase in the market price of its stock a benefit *per se* to Tyco, but Tyco also benefited from the fraudulent increase in the market price of its stock because the stock was used by the Company to fund various activities that served Tyco's interests, including, among other things, (i) continuing to use the stock to acquire other companies and (ii) compensating officers and employees with stock and stock options the value of which was artificially and fraudulently inflated.

618.    Plaintiffs were injured by Tyco's investments in these enterprises because they contributed to and perpetuated the artificial inflation of the market price of Tyco stock owned or purchased by Plaintiffs and contributed to the false impression that Tyco's strategy of pursuing earnings growth through acquisitions was more successful than it actually was. In addition,

Plaintiffs tendered shares of stock owned by Plaintiffs in Mallinckrodt, Scott Technologies, CIT, Sensormatic and TyCom in exchange for shares of falsely inflated Tyco stock in connection with Tyco's acquisitions of these entities.

619.    Plaintiffs would not have purchased all or some of their shares of Tyco stock at the prices at which they were purchased, would have sold their Tyco stock without suffering the massive losses that they eventually suffered or would otherwise have avoided those losses if Tyco had not engaged in the conduct described above.

620.    Plaintiffs were injured by the afore-stated conduct and said conduct proximately caused Plaintiffs' injuries for the reasons previously stated.

## COUNT VIII

(Against Tyco For Vicarious Liability In Violation Of N.J.S.A. 2C:41-2(a))

621.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

622.    The Individual Defendants are liable persons under N.J.S.A. 2C:41-2(a).   The Individual Defendants invested or used income derived, directly or indirectly, from a pattern of racketeering activity (i) in other companies, (ii) Tyco, and/or (iii) an association in fact of Tyco and the Individual Defendants whose purpose was to artificially and fraudulently inflate the market price of Tyco's stock. Each of said entities constituted enterprises engaged in or whose activities affected commerce or trade.

623.    Tyco benefited from said investment and/or use of income derived, directly or indirectly, from a pattern of racketeering activity.

624.    The Individual Defendants' racketeering activities and use of the income derived therefrom were carried out in the scope of the Individual Defendants' employment activities, arose from the types of activities that they were employed to perform, were substantially within the limits of their authority and were carried out in part to serve Tyco's interests.

625.    Tyco intended that the racketeering activities take place, that the income derived from said activities be used or invested as aforesaid; was reckless or failed to exercise reasonable care with respect to the Individual Defendants' racketeering activities; and/or Tyco knew or should have known of the Individual Defendants' unfitness or dangerous attributes, as manifested by their acts of malfeasance, misrepresentation and defalcation, and could reasonably have foreseen the risk of harm created by the Individual Defendants, from which qualities of the Individual Defendants Plaintiffs' losses arose.

626.    Tyco failed to take measures to prevent or remedy the fraud.  For instance, Tyco's Board of Directors failed to correct Defendant Kozlowski's false statements to investors stating that the Board of Directors had approved the Company's payment of $20 million to Walsh as part of the CIT acquisition as set forth in § V.E.1.  Given the size of the Company's stock price drop on that date, and Kozlowski's clear response in a Company press release, the Board of Directors either knew or was reckless in not knowing that Kozlowski's statements were false and misleading and an attempt to conceal the criminal nature of the payment to Walsh.

627.    Similarly, an article in the December 27, 2002 edition of *The Wall Street Journal* shows that Tyco's outside counsel and certain of the Company's Board of Directors knew in early 2000 that the Company had serious accounting problems and that corporate funds were being misused by the Company's senior executives, including Kozlowski and Walsh.  Because the Audit Committee is charged under its charter with supervising Tyco's litigation, including the SEC's investigation of Tyco's financial statements, the Company's Audit Committee either knew or should have known about those adverse facts as well.  *The Wall Street Journal* article states:

> Newly discovered e-mails written by attorneys at Tyco International Ltd.'s former outside law firm reveal that they knew about personal use of corporate funds by

former Tyco Chairman L. Dennis Kozlowski and a host of accounting problems at the company in early 2000.

The e-mails - written by Wilmer, Cutler & Pickering partners Lewis Liman and William McLucas - have been obtained by the Manhattan district attorney's office and the Securities and Exchange Commission in their continuing investigation into Tyco and some of its former top executives, according to people familiar with the matter. Part of the SEC's probe involves whether the conglomerate and Wilmer Cutler withheld relevant information that would have helped the SEC in an informal inquiry it launched in 1999 into Tyco's accounting practices ....

628.    One e-mail mentioned in *The Wall Street Journal* article, a March 23, 2000 communication from a Wilmer Cutler partner to Belnick, states:  "There are payments to a woman whom the folks in finance describe to be Dennis's girlfriend [now wife, Karen Mayo].  I do not know Dennis's situation, but this is an embarrassing fact."

629.    In addition, a May 25, 2000 e-mail from another Wilmer Cutler partner to Belnick states, "We have found issues that will likely interest the SEC . . . creativeness is employed in hitting the forecasts. . . ."

630.    The same document acknowledges that "[t]here is also a bad letter from the Sigma people just before the acquisition confirming that they were asked to hold product shipment just before the closing…."   In addition, Wilmer partner McLucas stated that the company's financial reports suggest "something funny which is likely apparent if any decent accountant looks at this."

631.    The facts set forth in *The Wall Street Journal* articles were verified by McLucas in his testimony in Belnick's criminal trial.   McLucas acknowledged the use of cookie jar reserves by Tyco in his testimony.   In addition, he authenticated a May 2000 e-mail sent to Belnick during the course of McLucas's work on the SEC's investigation in which McLucas told Belnick that Tyco needed to change certain accounting practices that McLucas considered worrisome, particularly the use of accounting reserves to meet projected financial results.

632.    With reference to that practice, the e-mail stated, "The cost of this kind of fooling around can destroy a corporate franchise, and it's all so these guys can squeeze a couple of more pennies" out of earnings.   The e-mail further stated: "If we escape this process without a crippling broadside, the toughest challenge here seems to me to involve how one changes the culture."

633.    Tyco's Audit Committee and Board of Directors also either knew or were reckless in not knowing of the foregoing facts.  Once Tyco's counsel began an inquiry concerning the compensation paid to the Company's officers (including Walsh and Kozlowski), counsel determined in short order that these officers had engaged in the fraudulent schemes to inflate their compensation that are alleged herein.   It should have been equally easy for the Audit Committee Defendants, particularly with the assistance of the PwC Defendants, to learn the same information.  This is particularly true in light of facts then known to the members of the Audit Committee and Board of Directors.

634.    According to a September 24, 2002 Associated Press article, the Tyco Board's Compensation Committee was also apprized of several of the improper relocation loans taken by the Company's officers, including Kozlowski and Walsh.  And, minutes from the February 21, 2002 Tyco Compensation Committee meeting specifically mention improper loans to Belnick ($14.9 million), Kozlowski ($18.8 million) and Swartz ($7 million).

635.    PwC has also claimed in public statements that it raised questions with Tyco's management concerning the propriety of the compensation paid Tyco's officers.  For example, PwC LLP spokesman David Nestor was quoted in a January 3, 2003 article in *The New York Times* article as stating: "We did not know that the disclosure was wrong.  We raised questions about it, went to the company and were told that the disclosure was appropriate."

636.    Tyco, and its counsel and its Board of Directors, either knew or were grossly reckless in ignoring facts that demonstrated the existence of fraudulent conduct long before Tyco disclosed the Individual Defendants' misconduct.

637.    Despite red flags known to them, the members of the Audit Committee, the Compensation Committee and others at Tyco failed to investigate: (a) the propriety of the loans made to the Company's officers, including the Individual Defendants; (b) the adequacy of Tyco's disclosures concerning the Individual Defendants' compensation; and (c) the Individual Defendants' self-dealing transactions.

638.    Further, Tyco was motivated to conceal the depth of the Company's accounting fraud by the cash crunch that affected Tyco following the revelation of the criminal conduct undertaken by Kozlowski, Swartz, Walsh and others.  By claiming that the Company had not engaged in systemic accounting improprieties, Tyco was able to complete a $6 billion refinancing in January of 2003.  Without that refinancing, the persistent market rumors that Tyco would be forced to file for bankruptcy could well have become a reality.

639.    Plaintiffs were injured by the conduct of the Individual Defendants and of Tyco and said conduct proximately caused Plaintiffs' injuries for the reasons previously stated.

## COUNT IX

(Against Tyco For Liability Under N.J.S.A. 2C:41-2(b))

640.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

641.    Tyco is a liable person under N.J.S.A. 2C:41-2(b). Tyco acquired and/or maintained control over numerous other enterprises through a pattern of racketeering activity. As set forth above, Tyco purchased the Acquired Companies Enterprises that constitute enterprises under N.J.S.A. 2C:41-1c, which were engaged in or whose activities affected commerce or trade,

using, in part, Tyco stock whose market value was artificially and fraudulently inflated as a result of Defendants' pattern of racketeering activity.

642.   Tyco's acquisitions of said entities contributed to and perpetuated the artificial inflation of the market price of Tyco's stock because said acquisitions were part of Tyco's purported but false method of increasing earnings.  As is described more fully above, said acquisitions were "spring-loaded" through accounting machinations to artificially inflate Tyco's earnings in the post-acquisition periods.

643.   Plaintiffs were injured by Tyco's investments in these enterprises because they contributed to and perpetuated the artificial inflation of the market price of Tyco stock owned or purchased by Plaintiffs and because they contributed to the false impression that Tyco's strategy of pursuing earnings' growth through acquisitions was more successful than it actually was.

644.   In addition, Plaintiffs tendered shares of stock owned by Plaintiffs in Keystone, Raychem, Mallinckrodt and CIT in exchange for shares of falsely inflated Tyco stock in connection with Tyco's acquisitions of these entities.

645.   Plaintiffs would not have purchased all or some their shares of Tyco stock at the prices at which they were purchased, would have sold their Tyco stock without suffering the massive losses that they eventually suffered or would otherwise have avoided those losses if Tyco did not engage in the conduct described above.

646.   Plaintiffs were injured by the afore-stated conduct and said conduct proximately caused Plaintiffs' injuries for the reasons previously stated.

**COUNT X**

(Against Tyco And The Individual Defendants As An Association In
Fact For Violations Of N.J.S.A. 2C:41-2(b))

647.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

648.    Tyco and the Individual Defendants, as an association in fact, are liable persons under N.J.S.A. 2C:41-2(b).   Tyco and the Individual Defendants as an association in fact acquired and/or maintained control over numerous other enterprises through a pattern of racketeering activity as set forth more fully in the preceding Count.

649.    The acquisitions of and maintenance of control over said entities contributed to and perpetuated the artificial inflation of the market price of Tyco's stock as is described more fully above.

650.    Plaintiffs were injured by the afore-stated conduct and said conduct proximately caused Plaintiffs' injuries for the reasons previously stated.

**COUNT XI**

(Against The Individual Defendants For Liability Under N.J.S.A. 2C:41-2(b))

651.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

652.    The Individual Defendants are liable persons under N.J.S.A. 2C:41-2(b). The Individual Defendants caused Tyco to acquire and/or maintain control over numerous other enterprises through a pattern of racketeering activity. As set forth above, Tyco purchased the Acquired Companies Enterprises that constitute enterprises under N.J.S.A. 2C:41-1c, which were engaged in or whose activities affected commerce or trade, using, in part, Tyco stock whose market value was artificially and fraudulently inflated as a result of the pattern of racketeering activity carried out by Defendants.

-253-

653.    Said conduct contributed to and perpetuated the artificial inflation of the market price of Tyco's stock because said acquisitions were part of the purported but false method of increasing Tyco's earnings. In addition, as described more fully above, said acquisitions were "spring-loaded" through accounting machinations to artificially inflate Tyco's earnings in the post-acquisition periods.

654.    Plaintiffs were injured by the aforestated conduct and said conduct proximately caused Plaintiffs' injuries for the reasons previously stated.

## COUNT XII

(Against Tyco For Vicarious Liability Under N.J.S.A. 2C:41-2(b))

655.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

656.    The Individual Defendants are liable persons under N.J.S.A. 2C:41-2(b). As is set forth above, the Individual Defendants caused to be acquired and/or maintained the Acquired Companies Enterprises through a pattern of racketeering activity using, in part, Tyco stock whose market value was artificially and fraudulently inflated as a result of the pattern of racketeering activity carried out by Defendants.  The Acquired Companies Enterprises constitute enterprises under N.J.S.A. 2C:41-1c, which were engaged in or whose activities affected commerce or trade.

657.    The Individual Defendants' racketeering activities and use thereof to cause the acquisition of and maintain control over said enterprises were carried out in the scope of the Individual Defendants' employment activities, arose from the types of activities that they were employed to perform, were substantially within the limits of their authority and were carried out in part to serve Tyco's interests.

658.    Tyco intended that the racketeering activities take place and that, through them, said enterprises be acquired; Tyco was reckless or failed to exercise reasonable care with respect

-254-

to the Individual Defendants' racketeering activities and the acquisition of said enterprises through those activities; and/or Tyco knew or should have known of the Individual Defendants' unfitness or dangerous attributes, as manifested by their acts of malfeasance, misrepresentation and defalcation, and could reasonably have foreseen the risk of harm created by the Individual Defendants in causing said entities to be acquired and in maintaining control over said entities, and Plaintiffs' losses arose from those qualities of the Individual Defendants.

## COUNT XIII

(Against The Individual Defendants For Liability Under N.J.S.A. 2C:41-2(c))

659.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

660.    The Individual Defendants are liable persons under N.J.S.A. 2C:41-2(c).  These Defendants conducted and participated in Tyco's affairs through a pattern of racketeering activity.  Tyco constitutes an enterprise under N.J.S.A. 2C:41-1c. and, during the Relevant Period, was engaged in and its activities affected trade or commerce.  The Individual Defendants were employed by or associated with Tyco.

661.    As is set forth above, the Individual Defendants conducted or participated, directly or indirectly, in the conduct of Tyco's affairs through a pattern of racketeering activity. Among other things, the Individual Defendants engaged in fraudulent accounting practices, fraudulent misrepresentations and omissions in connection with the offering, purchase and sale of Tyco stock and securities law violations that constituted a pattern of racketeering activity under N.J.S.A. 2C:41-1.  In connection therewith, the market price of Tyco's stock was artificially and fraudulently inflated.

662.    As is set forth more fully above, the Individual Defendants benefited from the conduct of Tyco's affairs through a pattern of racketeering activity.  Further, in concealing their

own defalcations and in effectuating fraudulent accounting manipulations, the Individual Defendants were not simply engaged in carrying out their normal corporate functions.

663.    Plaintiffs were injured by the aforesaid pattern of racketeering activity as a result of Plaintiffs' ownership and acquisition of Tyco stock.

## COUNT XIV

(Against All Defendants For Liability Under N.J.S.A. 2C:41-2(c))

664.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

665.    Defendants are liable persons under N.J.S.A. 2C:41-2(c).  Defendants conducted and participated, through a pattern of racketeering activity, in the affairs of an enterprise comprised of an association in fact of Tyco and the other Defendants.  During the Relevant Period, said enterprise was engaged in and its activities affected trade or commerce. All of the Defendants were associated with said association in fact.

666.    As is set forth above, Defendants conducted or participated, directly or indirectly, in the conduct of the association in fact's affairs through a pattern of racketeering activity. In connection therewith, the market price of Tyco's stock was artificially and fraudulently inflated.

667.    For the reasons set forth more fully above, this pattern of racketeering activity benefited all of the Defendants.

668.    Plaintiffs were injured by the aforesaid pattern of racketeering activity as a result of Plaintiffs' ownership and acquisition of Tyco stock.

## COUNT XVIII

(Against All Defendants As An Association In Fact For Liability Under N.J.S.A. 2C:41-2(c))

669.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

670.    Defendants constituted an association in fact that is a liable person under N.J.S.A. 2C:41-2(c).  This association in fact conducted and participated in Tyco's affairs through a

pattern of racketeering activity. Tyco constitutes an enterprise under N.J.S.A. 2C:41-1c. and, during the Relevant Period, was engaged in and its activities affected trade or commerce. The association in fact was associated with Tyco.

671.    As is set forth above, the association in fact conducted or participated, directly or indirectly, in the conduct of Tyco's affairs through a pattern of racketeering activity.   In connection therewith, the market price of Tyco's stock was artificially and fraudulently inflated.

672.    As is set forth more fully above, all of the Defendants, operating as an association in fact, benefited from the conduct of Tyco's affairs through a pattern of racketeering activity.

673.    Further, in concealing their own defalcations and in effectuating fraudulent accounting manipulations, the Individual Defendants were not simply engaged in carrying out their normal corporate functions.

674.    Plaintiffs were injured by the aforesaid pattern of racketeering activity as a result of Plaintiffs' ownership and acquisition of Tyco stock.

## COUNT XV

(Against Tyco For Vicarious Liability Under N.J.S.A. 2C:41-2(c))

675.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

676.    The Individual Defendants are liable persons under N.J.S.A. 2C:41-2(c). These Defendants conducted and participated in Tyco's affairs through a pattern of racketeering activity.   In connection therewith, the market price of Tyco's stock was artificially and fraudulently inflated.

677.    Tyco constitutes an enterprise under N.J.S.A. 2C:41-1c. and, during the Relevant Period, was engaged in and its activities affected trade or commerce.  The Individual Defendants were employed by and/or associated with Tyco during the Relevant Period.

678.    Plaintiffs were injured by the aforesaid pattern of racketeering activity as a result of Plaintiffs' ownership and acquisition of Tyco stock.

679.    The Individual Defendants' racketeering activities, and their conducting or participating, directly or indirectly, in the conduct of Tyco's affairs, were carried out in the scope of the Individual Defendants' employment activities, arose from the types of activities that they were employed to perform, were substantially within the limits of their authority and were carried out in part to serve Tyco's interests.

680.    Tyco intended that the Individual Defendants' racketeering activities, and their conducting or participating, directly or indirectly, in the conduct of Tyco's affairs, take place; Tyco was reckless or failed to exercise reasonable care with respect to the Individual Defendants' racketeering activities and their conducting or participating, directly or indirectly, in the conduct of Tyco's affairs; and/or Tyco knew or should have known of the Individual Defendants' unfitness or dangerous attributes, as manifested by their acts of malfeasance, misrepresentation and defalcation, and could reasonably have foreseen the risk of harm created by the Individual Defendants, and Plaintiffs' losses arose from those qualities of the Individual Defendants.

## **COUNT XVI**

(Against All Defendants For Violations Of N.J.S.A. 2C:41-2(d))

681.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

682.    Defendants agreed with one another, as well as others including Belnick and PwC, that they would engage in the violations of the New Jersey RICO Act as set forth in the previous Counts of this Complaint.  Defendants, along with the other co-conspirators, agreed to assist one another in the planning and/or commission of said violations.  Defendants agreed to the commission of numerous predicate acts of racketeering in connection therewith.

683.    PwC agreed to assist and did assist the Individual Defendants in perpetrating thefts by providing clean audit opinions with respect to accounting statements that fraudulently concealed the thefts.  According the SEC, as found in its August 13, 2003 filing instituting public cease-and-desist proceedings against PwC partner Richard P. Scalzo, PwC was aware of but failed to require Tyco to properly account for and/or disclose: (i) the improper bonus payments in connection with the TyCom IPO, the ADT Automotive divestiture and the Flag Telecom transaction (as set forth in § V.E.4.); (ii) the $20 million CIT payment to Walsh (as set forth in § V.E.1.); (iii) the improper relocation loans (as set forth in § V.E.2.); (iv) the improper KEL Program loans (as set forth in § V.E.3.); and (v) Tyco's use of post-period adjustments to off-set charges so that Tyco could make its earnings forecasts (as set forth in § V.A.).

684.    As a direct and proximate result of Defendants' assistance of one another and conspiracy with PwC in connection with the violations of the New Jersey RICO Act alleged above, Plaintiffs were injured.

XVII.   PRAYER FOR RELIEF

685.    WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiffs against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

B.    Awarding rescission and/or rescissory damages in favor of Plaintiffs;

C.    Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiffs;

D.    Awarding Plaintiffs treble damages;

E.    Awarding Plaintiffs the fees and expenses incurred in this action, including attorneys' fees and expert fees; and

F.      Granting such other and further relief as the Court may deem just and proper.

XVIII.      <u>JURY DEMAND</u>

686.   Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  November 29, 2007                    BERNSTEIN LITOWITZ BERGER
                                                             & GROSSMANN LLP

                                                        _____/s/ John P. Coffey_____
                                                             JOHN P. COFFEY

                                                        JOHN P. COFFEY
                                                        220 St. Paul Street
                                                        Westfield, NJ  07909
                                                        Tel:    (908) 928-1700
                                                        Fax:    (908) 301-9008

                                                        BERNSTEIN LITOWITZ BERGER
                                                             & GROSSMANN LLP
                                                        BLAIR A NICHOLAS
                                                        MATTHEW P. SIBEN
                                                        DAVID A THORPE
                                                        JON F. WORM
                                                        12481 High Bluff Drive, Suite 300
                                                        San Diego, CA 92130
                                                        Tel:    (858) 793-0070
                                                        Fax:    (858) 793-0323

                                                        *Attorneys for Plaintiffs*

## <u>VERIFICATION AND CERTIFICATION IN ACCORDANCE WITH LOCAL CIVIL RULE 11.2</u>

I am authorized to file this verification on behalf of Plaintiffs.  I verify that I have reviewed the Complaint and the facts set forth in it are true and correct to the best of my knowledge, information and belief.  I am providing this verification on behalf of Plaintiffs as the facts set forth herein have been established through an investigation conducted by Bernstein Litowitz Berger & Grossmann LLP.

I certify that the matter in controversy is not the subject of any other action, arbitration or administrative proceeding, pending or contemplated, except as follows:  the allegations in this matter are related to the matters at issue in 1) In re Tyco International Ltd. Securities Litigation, MDL Docket No. 02-1335-B pending in the United States District Court for the District of New Hampshire; and 2) Franklin Mutual Advisors, LLC, et al. v. Tyco International Ltd. Case No. 07-CV-04575-WJM-MF pending in the United States District Court for the District of New Jersey.

Dated:  November 29, 2007

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP


_____/s/ John P. Coffey_____
JOHN P. COFFEY

JOHN P. COFFEY
220 St. Paul Street
Westfield, NJ  07909
Tel:    (908) 928-1700
Fax:    (908) 301-9008

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
BLAIR A NICHOLAS
MATTHEW P. SIBEN
DAVID A THORPE
JON F. WORM
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323

*Attorneys for Plaintiffs*